FILED
2012 Jun-22  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL LINDSEY,

                Plaintiff(s),

v.

NCO FINANCIAL SYSTEMS, INC.,      11-CV-03183

            Defendant(s).

## MEMORANDUM IN SUPPORT OF NCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, NCO Financial Systems, Inc. (NCO), submits this memorandum in support of its Motion for Partial Summary Judgment, seeking summary of judgment on Counts 2 through 5 of Plaintiff's Amended Complaint.  NCO does not seek summary judgment on the Fair Debt Collection Practices Act claim contained in Count 1 of Plaintiff's Amended Complaint.

## INTRODUCTION

Michael Lindsey alleges that NCO violated the Fair Debt Collection Practices Act (FDCPA) and Alabama common law by placing two phone calls that allegedly disclosed details of his debt to his stepmother and brother.  *See* Docket No. 1.  Under Alabama law, absent a viable independent Alabama tort claim, a claim for negligent and/or wanton/reckless supervision and training fails as a matter of law.  *See Leahey v. Franklin Collection Service, Inc.*, 756 F.Supp.2d 1322, 1329 (N.D. Ala. 2010).  Plaintiff originally brought no additional Alabama tort claims.

Assumedly recognizing the deficiency in his pleading, plaintiff amended the complaint to include generic tort claims for "negligence" and "wantonness," to bolster the negligent/wanton supervision and training claims. *See* Docket No. 24. Notwithstanding his attempts to remedy the problem, plaintiff's state law claims still fail for the following reasons:

1.      Plaintiff's negligence and wantonness claims fail because he does not allege actionable damages. Plaintiff's sole damages include emotional distress damages. Mental anguish damages are not available under Alabama law unless accompanied by physical injury or placement in immediate risk of physical harm. *See Hardesty v. CPRM Corp.*, 391 F.Supp.2d 1067, 1073 (2005). Further, plaintiff's testimony, without any tangible evidence indicating that he suffered a legally cognizable present injury, is insufficient to show mental anguish damages.

2.      Plaintiff's negligence claims also fail because NCO did not owe him a legal duty. Plaintiff relies upon the FDCPA to form the "duty" owed; however, the FDCPA does not establish a standard of care or provide a basis for tort liability grounded in negligence. *See Winberry v. United Collection Bureau, Inc.*, 697 F.Supp.2d 1279, 1293-94 (M.D. Ala. 2010).

3.      Plaintiff's wantonness claims also fail because NCO was not wanton in its collection efforts. As evidenced by the testimony of NCO's collection representative, Latisha Williams, she made a mistake when telephoning plaintiff's stepmother and brother and asking them to leave a message for the plaintiff. Ms. Williams did not notify the plaintiff's relatives that she was seeking to collect a debt. Nor did plaintiff's relatives

know that he was being contacted by a debt collector until after he filed this lawsuit. Such a "mistake" does not satisfy the standard to show wantonness.

4.      As plaintiff is unable to show NCO committed an independent Alabama tort, plaintiff's negligent and wanton supervision and training claims fail. *See Leahey*, 756 F.Supp.2d at 1329.

5.      Finally, even if the Court allows plaintiff to proceed on his training and supervision claims, NCO was not negligent or wanton/reckless in its training and supervision of its employees.   As evidenced by the testimony of Pat Deprospo, General Manager of NCO's Mendota Heights office, and Latisha Williams, NCO maintains robust training and monitoring procedures.   While Ms. Williams made a mistake in collecting plaintiff's account, of which NCO had no actual knowledge at the time, when it learned of Ms. Williams' conduct it appropriately disciplined her.

Accordingly, NCO is entitled to summary judgment on Counts 2 through 5.

## BACKGROUND

### A.      *NCO's Training and Supervision*

NCO is an international debt collection agency.   Debt collection agencies are regulated by various federal and state statutes, including the FDCPA.   As any conscientious company should, NCO takes its legal compliance very seriously. *See* Exhibit A, Deposition of Pat Deprospo at pg. 13, lines 13-18.   In fact, according to Mr. Deprospo, who has worked 23 years in the collection industry and 6 years with NCO, NCO's training and monitoring programs are the most comprehensive and "far greater . . . than what [he's] seen at other agencies." *Id.* at pg. 23, lines 21-24 and pg. 50, lines 5-7.

Prior to actively collecting debt, all collectors are trained in the classroom for a couple of weeks on NCO policies, the FDCPA, state policies, and client-specific policies. *Id.* at pg. 23, lines 13-20.  The collector-in-training must pass multiple tests before they "graduate out to the floor."  *Id.* at pg. 25-26, lines 17-2.  If a collector does not pass one of the tests on the first try, he or she has to retest.  *Id.* at pg. 25, line 21.  If the collector is unable to pass the re-test, the candidate will be terminated.  *Id.* at pg. 25, lines 23-24.  In addition to the classroom work, the collectors perform system training, where "they have to get on the phone and work with the trainer."  *Id.* at pg. 26, lines 22-25.  During the initial training, the collectors are trained to skip trace and learn how and when to contact third parties.  *Id.* at pg. 26, lines 14-25.

Training continues through the course of the collector's employment.  The collectors are required to retest every six months in order to maintain employment with the company.  *Id.* at pg. 11, lines 7-9.  The retesting is designed to ensure collectors retain the information presented in training and that they are up to date on the law and NCO policy.  *Id.* at pg. 27, lines 9-13.  When the law or policies change, employees are required to sign an acknowledgment form that they were updated on the change.  *Id.* at pg. 27-28, lines 21-5.

Additionally, managers conduct daily team huddles to discuss issues that have come up in collection calls, and also meet one-on-one with employees.  *Id.* at pg. 11, lines 9-11.  During these "side-by-sides," the managers "sit with collectors and make sure they're working their files correctly" and identify any compliance issues that may arise on their calls.  *Id.* at pg. 28, lines 16-22.  Finally, to the extent the collector comes across

an issue while working an account, there are multiple levels of supervisors for the collector to go to for advice – senior collectors, direct supervisors, division managers and the general manager. *Id.* at pg. 14, lines 1-5.

Collectors are also anonymously monitored and work on the assumption that every call could be monitored. NCO has "two internal groups that are separate from each other that provide internal monitoring, and then the supervisors typically do their own monitoring within their teams as well." *Id.* at pg. 29, lines 8-12. In total then, there are 3 different and separate teams of monitors reviewing collection calls to ensure compliance with NCO's policies and the law.

Plaintiff generally alleges that Latisha Williams called his step-mother and brother and disclosed the existence of his debt to these third parties. Latisha Williams worked out of NCO's office in Mendota Heights, Minnesota. In that office, managers are required to "virtually get on every contact that a collector makes" to ensure compliance with company policy and the FDCPA. *Id.* at pg. 29, lines 18-20. Supervisors in Mendota Heights typically spend 2-3 hours each day monitoring the collectors' calls. *Id.* at pg. 48, line 8. The managers also randomly review account notes for compliance issues. *Id.* at pg. 51, lines 5-18.

If issues arise on the monitored calls, the collectors are then trained to correct any mistakes and appropriately disciplined through a progressive disciplinary process. *Id.* at pg. 30, lines 17-22. Finally, if a collector violates the law, which results in NCO having to pay a settlement in a lawsuit or claim, they are fined for 25% of NCO's defense costs, up to $500. *See id.* at pg. 52, lines 12-14.

**B.**     *Collection Efforts on Michael Lindsey's Account*

In June 2011, Bank of America placed an account for collection with NCO that was owed by Michael Lindsey.  On June 9, 2011, after "being unable to get in contact with the debtor," NCO's collection representative, Latisha Williams, placed a call to plaintiff's step-mother, Kay Lindsey, in an effort to obtain a better number for the plaintiff or to confirm she had a correct number.  *See* Exhibit B, Deposition of Latisha Williams at pg. 29, lines 20-24.  During the call, Ms. Williams did not state that she was a debt collector or that she was collecting the plaintiff's debt.  *See* Exhibit C, Deposition of Kay Lindsey at pg. 39-40, lines 15-2.  In fact, Kay Lindsey admits that she did not know that NCO was a debt collector or that Mike Lindsey owed a debt until after this lawsuit was filed.  *Id*.  Ms. Williams finished the call by asking Kay Lindsey if she could confirm the phone number she had for the plaintiff was accurate or if she could leave a message for the plaintiff.  Kay Lindsey offered to take the message and passed the message along to the plaintiff.  *See id*, pg. 15, lines 17-18, page 20, lines 1-4.

After the call, the relationship between the plaintiff and his step-mother did not change.  Ms. Lindsey unequivocally testified that there could not have been any kind of negative impact on her relationship with her step-son as a result of the call.  *Id.* at pg. 35, lines 11-14.  Her frequency of contact with him was the same before and after the call.  *Id.* at pg. 33, lines 1-5.  Finally, she had no recollection that the plaintiff seemed embarrassed or avoided her after the call.  *Id.* at pg. 33, lines 18-22.

After attempting to reach the plaintiff to no avail, on June 16, 2011, Ms. Williams called the plaintiff's brother.  *See* Exhibit D, Deposition of Gregory Lindsey at pg. 16,

1518145_1                                                6

lines 5-9.  Again, Ms. Williams did not state that she was a debt collector or that she was collecting the plaintiff's debt.  *Id.* at pg. 21, lines 7-20.  Gregory Lindsey testified that he did not know NCO was a debt collector.  *Id.* at pg. 16, lines 22-23.  Ms. Williams left another message for the plaintiff, which Gregory Lindsey passed along to his brother.  *Id.* at pg. 19, line 19-21, page 22, lines 3-9.

Gregory Lindsey testified that his relationship with his brother has not changed since he received the call from NCO.  *Id.* at pg. 26-28.  They were in contact with each other the same amount before and after the call.  *Id.* at pg. 27, lines 7-9.  Gregory Lindsey did not notice a change in his brother's personality or his behavior after the call.  *Id.* at pg. 28, lines 16-21.  The brothers vacationed together twice after the call – once on an Alaskan cruise and once at the beach – and on neither trip did Gregory Lindsey notice any change in his brother's behavior or that his brother seemed embarrassed that NCO called Gregory Lindsey.  *Id.* at pg. 30, lines 13-17.

## C.   *Latisha Williams' Training*

Latisha Williams participated in NCO's training program prior to being permitted to collect debt.  *See* Exhibit B, Deposition Transcript of Latisha Williams at pg. 10.  This training consisted of classroom training, testing, retesting every 6 months, listening in on live calls with collectors, and side-by-side training with her supervisor.  *Id.* at pg. 10-11.  A topic covered during her training was skip tracing and when a collector can legally call a third party.  *Id.* at pg. 12, lines 18-20 and pg. 14, lines 2-8.  Ms. Williams was trained not to leave messages with third parties when she had a number on file for the debtor.  *Id.* at pg. 49-50, lines 25-2.  Ms. Williams was also trained that when calling a third party,

she was not to state that she was calling from NCO unless expressly asked.  *Id.* at pg. 50, lines 3-6.   When she called Kay Lindsey and Greg Lindsey, Ms. Williams made a "mistake" contrary to her training.  *Id.* at pg. 44, line 8.  In response to the mistake, NCO disciplined her pursuant to its disciplinary policy and provided her with additional training.  *Id.* at pg. 56 and pg. 58, lines 12-14.

**D.      *Plaintiff's Alleged Damages***

Plaintiff has testified that, as a result of the alleged disclosure of his debt to third parties, he felt "internally … sort of embarrassed,", though his mental state did not affect his enjoyment of a family cruise or interaction with his family.  *See* Exhibit E, Deposition of Michael Lindsey at pg. 92, lines 14-22.  Plaintiff's embarrassment stemmed from a "sense" that his brother and step-mother "understood that NCO was a debt collector," although he was not certain his step-mother "knew it was NCO" (testifying his step mother thought the "call was from a loan company" that was "inquiring about … an important personal business matter"). *Id*. at pg. 105, lines 12-15, 77-80.  Plaintiff does not believe, correctly, that NCO provided any information regarding the debt to either person.  *Id*. at pg. 77-81, 106, lines 19-22.

Besides the internal "[e]mbarrassment, [and] humiliation both personally and professionally," plaintiff suffered no additional damages.  *Id.* at pg. 108, lines 17-19. Finally, plaintiff testified he did not visit a therapist or doctor, has no plans to do so in the future, and does not anticipate taking any medications for his feelings. *Id*. at pg. 114, lines 19-22, page 115, lines 3-5.

**E.      Plaintiff's Claims**

On September 1, 2011, plaintiff filed suit against NCO, and an amended complaint was filed on April 13, 2012.  Plaintiff alleges that NCO violated the FDCPA (Count 1) and Alabama state law for its negligent failure to train and supervise its employees (Count 2), reckless and wanton failure to train and supervise its employees (Count 3), negligence (Count 4), and wantonness (Count 5) when seeking to collect a debt owed to Bank of America.  *See* Docket No. 24, Amended Complaint pg. 6-9.  Plaintiff alleges that NCO's actions caused him to suffer "worry, embarrassment, humiliation, anxiety, and mental anguish." *Id.* at ¶¶ 38, 44, 48, and 53.  Plaintiff's state law claims are without merit, and judgment in favor of NCO should be entered.

## I.      LAW AND ARGUMENT

**A.      Legal Standard**

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), *quoting Fed. R. Civ. P.* 56(e) Advisory Committee's note on 1963 amendments.  Federal Rule of Civil Procedure section 56(c) provides that the Court should grant a motion for summary judgment if it finds "no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

**B.**     ***Plaintiff Has No Evidence of Any Actionable Damages to Support His Tort Claims of Negligence or Wantonness***

    **1.**    **Plaintiff Did Not Suffer Physical Injury and Was Not Within the Zone of Danger.**

Plaintiff's negligence and wantonness claims fail because he has failed to plead actionable damages.  Alabama law is clear – a plaintiff may not "maintain a suit for negligence or wantonness when the only damages are mental or emotional harm." *Hardesty v. CPRM Corp.*, 391 F.Supp.2d 1067, 1073 (2005).  Instead, "Alabama follows the 'zone-of-danger' test, which limits recovery of mental anguish damages to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."  *Ex parte Gran Manor, Inc.*, 778 So.2d 173, 179 (Ala. 2000); *quoting AALAR, Ltd., Inc. v. Francis,* 716 So.2d 1141, 1147 (Ala. 1998) (plaintiff that was not exposed to a risk of physical injury is not entitled to recover mental anguish damages); *see also White Consol. Indus., Inc. v. Wilkerson,* 737 So.2d 447, 449 (Ala.1999) (plaintiffs outside of the "zone of danger" could not recover for emotional distress); *Terrell v. R&A Manufacturing Partners, Ltd.*, 835 So.2d 216, 229 (Ala. Civ. App. 2002) (plaintiff that was not arrested or feared for his physical safety could not recover emotional distress damages).

Likewise, here plaintiff's negligence and wantonness claims fail because his damages, if any, arise solely from his emotional and mental distress.  Plaintiff claims in his amended complaint that his damages are "worry, embarrassment, humiliation, anxiety, and mental anguish."  *See* Docket No. 24 at ¶ 48, 53.  Further, plaintiff testified at his deposition that his damages are solely "embarrassment, humiliation both personally

and professionally." *See* Exh. E, M. Lindsey Dep. at pg. 108, line 17-19.  Accordingly, as plaintiff fails to offer any evidence that he was physically injured or placed in immediate risk of physical harm, plaintiff's negligence and wantonness claims warrant dismissal.

> **2.     Plaintiff Has Not Suffered Mental Anguish or Emotional Distress as a Matter of Law.**

Even if this Court finds that plaintiff could recover only mental anguish damages without alleging physical harm or immediate risk of physical harm on his negligence and wantonness claims, plaintiff has failed to offer sufficient evidence of mental damages to support those claims as a matter of law.  *See Southern Bakeries, Inc. v. Knipp*, 852 So.2d 712 (Ala.2002).

"Alabama has long required a manifest, present injury before a plaintiff may recover in tort."  *Id.* at 716.  In *Southern Bakeries,* the Alabama Supreme Court dismissed plaintiff's mental anguish and emotional distress claims because he had not sought medical care for his alleged emotional distress and did not plan to have any future psychiatric, psychological treatment or counseling.  *Id.* at 718.  As a result, plaintiffs had "not suffered any legally cognizable present injury" for purposes of their fraud and wantonness claims.  *Id.*

Similarly, plaintiff has failed to show he suffered a legally cognizable present injury as a result of NCO's conduct.  Again, plaintiff has admitted that his actual damages are limited to "[e]mbarrassment, [and] humiliation both personally and professionally."  *See* Exh. E, M. Lindsey Dep. at pg. 108, lines 17-19.  Plaintiff felt

"internally … sort of embarrassed", although his mental state did not affect his enjoyment of a family cruise or interaction with his family. *Id*. at pg. 92, lines 14-22. Plaintiff did not visit a therapist or doctor, has no plans to do so in the future, and does not anticipate taking any medications for his feelings. *Id*. at pg. 114, lines 19-22 and pg. 115, lines 3-5.

Finally, plaintiff's step-mother and brother did not notice any change in plaintiff's behavior suggesting that he felt embarrassed or humiliated after they received the calls from NCO. *See* Exh. C, K. Lindsey Dep. at pg. 33, lines 18-22 and Exh. D, G. Lindsey Dep at pg. 30, lines 13-17. Both Gregory and Kay Lindsey testified that their frequency of contact with the plaintiff has not changed and their relationships with the plaintiff have not been negatively impacted as a result of the calls. Exh. C at pgs. 33, 35 and Exh. D at pgs. 26-28. Incredibly, it was plaintiff's filing of the present lawsuit, and not NCO's phone calls, that actually notified plaintiff's family members of the existence of this debt. *See* Exhibit C, Deposition of Kay Lindsey at pg. 13, lines 2-5.

As in *Southern Bakeries, Inc.*, plaintiff has not suffered from a legally cognizable present injury, and summary judgment in favor of NCO on the negligence and wantonness claims (Counts 4-5) is appropriate.

## C.    NCO Did Not Owe Plaintiff a Legal Duty

The negligence claim also fails as a matter of law because plaintiff has failed to prove that NCO owed him a legal duty. "To establish negligence, a plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold,* 643 So.2d 564, 567 (Ala.1994) (citation omitted). Whether a legal duty exists is a question of law. *Rose v. Miller & Co.,* 432

So.2d 1237, 1238 (Ala.1983).  Plaintiff alleges that NCO owed him a duty "to not violate the FDCPA and to not cause him harm in the course of collecting a debt."  *See* Amended Complaint at ¶ 47.

Recently, in *Winberry v. United Collection Bureau, Inc.*, 697 F.Supp.2d 1279, 1294 (M.D. Ala. 2010), the court found that an FDCPA violation, even if it occurred, did not provide a statutory duty to support a negligence claim, and dismissed plaintiff's negligence per se and negligence claims.  Similarly, in *Alleyne v. Midland Mortgage Co.,* 2006 WL 2860811 (D. Colo. 2006), the court dismissed the plaintiff's negligence per se claims based upon an FDCPA standard of care because the "FDCPA does not establish any 'standards of care' nor does it provide a basis for tort liability.  *Id.* at *12-13.

> [S]imply because the FDCPA's statutory purpose is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses ..." 15 U.S.C. § 1692(e), an independent duty to a debtor is not created. Further, the FDCPA was not enacted for the public's safety, and cannot reasonably be implicated as a causation factor in plaintiff's claimed "injury" even if an FDCPA violation had occurred. The FDCPA also provides its own remedies for violations, which do not exist at common law and the FDCPA therefore cannot be relied upon to support a negligence *per se* claim. *Henry v. Kemp,* 829 P.2d 505, 506 (Colo.App.1992) (citations omitted) (where a statute provides a specific means of enforcing legal duties that are unknown at common law, that statutory remedy will be considered exclusive).

*Id.*

Here, plaintiff bases his negligence claims on a duty arising under the FDCPA. However, the FDCPA is not a "codification of negligence principles."  *Byes v. Credit Bureau Enterprises, Inc.,* 21996 WL 99360 at *3 (E.D. La. 1996).  Simply put, the

FDCPA does not create a duty or standard of care for the enforcement of state law tort claims, and plaintiff's negligence claims fail because he is unable to show that NCO owed him a duty independent of the FDCPA.

### D.    NCO Was Not Wanton in Its Collection Efforts

Plaintiff's wantonness claim also fails because NCO did not consciously or intentionally commit a wrongful act which produced injury to the plaintiff.  "Wantonness has been defined as the conscious doing of some act or the omission of some duty which under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result. . ." *Roberts v. Brown*, 384 So. 2d 1047, 1048 (Ala. 1980) (internal quotation omitted).  "Before a party could be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury." *Salter v. Westra*, 904 F.2d 1517, 1524 (11th Cir. 1990) (internal quotation omitted).  "The most crucial element of wantonness is knowledge." *Roberts* at 1048.

Here, plaintiff cannot meet this standard.  Plaintiff testified that NCO intentionally humiliated him by contacting third parties in an attempt to coerce, threaten, and embarrass him by "telling them about his personal affairs." *See* Exh. E, M. Lindsey Dep. at pg. 110.  However, NCO did not disclose the debt to plaintiff's relatives.  In fact, neither relative even knew that NCO was a debt collector or that NCO was collecting a debt owed by the plaintiff. *See* Exh. C, K. Lindsey Dep. at pg. 13, lines 2-5 and Exh. D, G. Lindsey Dep. at pg. 18-19.  Further, Michael Lindsey himself admits that he does not

believe NCO provided any information regarding his debt to either person.  *See* Exh. E, M. Lindsey Dep. at pg. 77-81, pg. 106, lines 19-22.

Further, as evidenced in the testimony of Latisha Williams, she placed phone calls to the plaintiff's step-mother and brother in hopes to obtain location information for the debtor and only after plaintiff failed to answer or return any of Latisha Williams' calls. *See* Exh. B, L. Williams Dep. at pg. 29, lines 17-24.  Ms. Williams was trained not to leave a message with a third party and not to state that she was calling from NCO when calling a third party unless specifically asked.  *Id.* at pgs. 49-50.  To the extent Ms. Williams did not comply with NCO policy or the technical provisions of the FDCPA, it was a "mistake," not intentional behavior to satisfy a wantonness claim.  *Id. at pg.* 44, lines 8-11.  Accordingly, Plaintiff's wantonness claims should be dismissed.

## E.    Absent a Viable Alabama Tort Claim, Plaintiff's Negligent or Reckless and Wanton Training and Supervision Claims Fail as a Matter of Law.

As shown above, there is no genuine issue of material fact precluding entry of summary judgment in favor of NCO on plaintiff's negligence and wantonness claims. And absent a viable Alabama tort claim, plaintiff's negligent or reckless and wanton training and supervision claims similarly fail as a matter of law.

"To sustain a claim for negligent or wanton hiring or supervision, [and/or] training … 'the plaintiff must [first] establish that the allegedly incompetent employee committed a common-law, Alabama tort'".  *Leahey v. Franklin Collection Service, Inc*. 756 F.Supp.2d 1322, 1329 (N.D.Ala.2010).

In *Leahey*, plaintiff sued a debt collector alleging violations of the FDCPA and Alabama state law for invading plaintiff's privacy and negligently and wantonly hiring and supervising its debt collectors. *Id.* at 1325.  The court dismissed plaintiff's invasion of privacy claims, which also resulted in the dismissal of his hiring and supervision claims.  "Because Leahey's invasion of privacy claim fails as a matter of law, he cannot sustain a claim for negligent or wanton hiring or supervision." *See also Shuler v. Ingram & Associates*, 710 F.Supp.2d 1213, 1228 (N.D.Ala.2010) (granting debt collector's motion for summary judgment holding where plaintiffs "alleged no cognizable tort claim … their reckless and wanton training and supervision claim fails as a matter of law.)

Since plaintiff's negligence and wantonness claims fail as a matter of law (discussed above), he cannot sustain a claim for negligent or wanton hiring or supervision.  Judgment should be entered in favor of NCO on Counts 2 and 3.

## F.    NCO Properly Trained and Supervised Its Employees

Even if plaintiff is permitted to proceed on his negligent and wanton training and supervision claims without showing a violation of an independent Alabama tort, his claims still fail as NCO was not negligent or wanton in its training and supervision of its employees.

To recover on negligent supervision and training claims against an employer, "[a] plaintiff must establish 'by affirmative proof' that the employer actually knew of the incompetence [of the employee], or that the employer reasonably should have known of it." *Southland Bank v. A & A Drywall Supply Co.*, 21 So.3d 1196, 1216 (Ala.2008) (citation omitted) (explaining that claims for negligent supervision and training are

treated as one claim subject to the same standard); *see also Pritchett v. ICN Med. Alliance, Inc.,* 938 So.2d 933, 940 (Ala.2006) (same).  The plaintiff meets this burden by either showing "specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice." *Lane v. Cent. Bank of Ala., N.A.,* 425 So.2d 1098, 1100 (Ala.1983) (citation omitted).

Likewise, a claim for wanton supervision requires the plaintiff to establish by affirmative proof that the employer actually knew of the employee's incompetence or reasonably should have known of it.  *Speigner v. Shoal Creek Drummond Mine,* 402 F. App'x 428, 433 (11th Cir. 2010).  "Wanton supervision" requires that the employer wantonly disregard its agent's incompetence." *Armstrong Bus. Services, Inc. v. AmSouth Bank,* 817 So. 2d 665, 682 (Ala. 2001) (internal quotations omitted).

Here, plaintiff cannot show that NCO negligently or wantonly failed to train or supervise its employees.  NCO takes its legal compliance very seriously.  *See* Exh. A, P. Deprospo Dep. at pg. 13, lines 13-18.  In fact, according to Mr. Deprospo, who has worked 23 years in the collection industry and 6 years with NCO, NCO's training and monitoring programs are the most comprehensive and "far greater . . . than what [he's] seen at other agencies."  *Id.* at pg. 23, lines 21-24 and pg. 50, lines 5-7.  Plaintiff has offered no evidence to the contrary.

As detailed above, prior to actively collecting debt, NCO trains its collectors for weeks on NCO policies, the FDCPA, state laws, and client-specific policies.  *Id.* at pg. 23, lines 13-20.  Collectors are required to pass multiple tests before they "graduate out to

the floor." *Id.* at pg. 25-26, lines 17-2.  The trainee that is unable to pass one of the tests will be terminated.  *Id.* at pg. 25, lines 23-24.

Moreover, training does not end, but is on-going and continuous during the collector's employment.  For example, collectors are required to retest on company policies and the law every six months in order to maintain their employment.  *Id.* at pg. 11, lines 7-9.  The retesting is designed to ensure collectors retain the information presented in training and that they are up to date on the law and NCO policy.  *Id.* at pg. 27, lines 9-13.

Less formal, but no less important training occurs daily.  For example, collection managers conduct daily "team huddles" to discuss issues that come up in collection calls, and also meet one-on-one with employees.  *Id.* at pg. 11, lines 9-11.  During these "side-by-sides," the managers "sit with collectors and make sure they're working their files correctly" and identify and correct any compliance issues that may arise on their calls. *Id.* at pg. 28, lines 16-22.  Finally, to the extent the collector comes across an issue while working an account, there are multiple levels of supervisors for the collector to go to for advice – senior collectors, direct supervisors, division managers and the general manager. *Id.* at pg. 14, lines 1-5.

To ensure that this training works, collectors are anonymously monitored by 3 separate groups, and work on the assumption that every call could be monitored.  *Id.* at pg. 29, lines 8-12.  At the Mendota Heights NCO office, the office where the collector at issue, Latisha Williams worked, the managers are required to "virtually get on every contact that a collector makes."  *Id.* at pg. 29, lines 18-20.  Supervisors in Mendota

Heights typically spend 2-3 hours each day monitoring the collectors' calls. *Id.* at pg. 48, line 8. Finally, the managers also randomly review account notes for compliance issues. *Id.* at pg. 51, lines 5-18. If issues arise on the monitored calls, the collectors are then trained on any mistakes and appropriately disciplined through a progressive disciplinary process. *Id.* at pg. 30, lines 17-22. Finally, if a collector violates the law, which results in NCO having to pay a settlement in a lawsuit or claim, they are fined for 25% of NCO's defense costs, up to $500. *See id.* at pg. 52, lines 12-14. For an employee that makes an hourly wage, that can be a stiff penalty.

Latisha Williams testified that she participated in this training program prior to being permitted to collect debt. *See* Exh. B, L. Williams Dep. at pg. 10. Ms. Williams' training consisted of classroom training, testing, retesting every 6 months, listening in on live calls with experienced collectors, and side-by-side training with her supervisor. *Id.* at pg. 10-11. A topic that was specifically covered during her training was how and when a collector can legally call a third party. *Id.* at pg. 12, lines 18-20 and pg. 14, lines 2-8. Ms. Williams was trained not to leave messages with third parties when she had a number on file for the debtor. *Id.* at pg. 49-50, lines 25-2. Ms. Williams was also trained that when calling a third party she was not to state that she was calling from NCO unless expressly asked. *Id.* at pg. 50, lines 3-6. However, she made a mistake during her calls with Kay and Gregory Lindsey. *Id.* at pg. 44, line 8.

In response to the mistakes, NCO disciplined her pursuant to its disciplinary policy and provided her with additional training. *Id.* at pg. 56 and pg. 58, lines 12-14. Once NCO had notice of the issue, it acted appropriately and by no means "disregarded

its agent's incompetence."  In sum, NCO makes every effort to ensure legal compliance in its training and supervision of employees.  Accordingly, there is no evidence to support plaintiff's negligent and wanton supervision claims, and summary judgment should be entered in favor of NCO.

## II.   CONCLUSION

Based on the foregoing, NCO is entitled to summary judgment on Counts 2 through 5 of plaintiff's complaint for negligence and/or wantonness and negligent and/or reckless and wanton training and supervision.

Respectfully submitted,

*/s/ Laura C. Nettles*
Laura C. Nettles, Esq. (ASB-5805-S63L)
Lloyd, Gray, Whitehead & Monroe, P.C.
2501 20th Place South, Suite 300
Birmingham, AL  35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380
E-mail: lnettles@lgwmlaw.com

and

Allison L. Cannizaro, Esq.
James K. Schultz
Sessions Fishman Nathan & Israel, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile:  (312) 578-0991
Email: jschultz@sessions-law.biz
acannizaro@sessions-law.biz

Attorneys for Defendant, NCO Financial
Systems, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on the 22nd day of June, 2012, served a copy of the foregoing document to all attorneys of record by electronically filing document upon the following parties:

John C. Hubbard
**JAUREGUI & LINDSEY, LLC**
2110 Devereux Circle, Ste 100
Birmingham, AL 35243

W. Whitney Seals
**PATE & COCHRUN, LLP**
P.O. Box 10448
Birmingham, AL 35202

*/s/ Laura C. Nettles*
OF COUNSEL
