FILED
2012 Jun-22  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF ALABAMA

3   SOUTHERN DIVISION

4   COURT FILE NO:  2:11-CV-03183-WMA
    -----------------------------------
5   MICHAEL LINDSEY,

6   Plaintiff,

7   vs.

8   NCO FINANCIAL SYSTEMS, INC.,

9   Defendant.
    -----------------------------------
10

11

12

13

14

15

16  -------------------------------------------------------------

17                      DEPOSITION OF

18                    PATRICK N. DEPROSPO

19  -------------------------------------------------------------

20

21

22

23

24

25  TAKEN ON:  06/13/2012            BY:  PAMELA J. FRANZ

**Exhibit "A"**

```
 1    APPEARANCES:

 2

 3

 4    PATE & COCHRUN, L.L.P.
      400 Title Building
 5    300 North 21st Street
      Birmingham, AL  35203
 6    Phone:  205.323.3900
      Fax:  205.3233906
 7
      By:  Mr. W. Whitney Seals
 8         For Plaintiff

 9

10

11    SESSIONS, FISHMAN, NATHAN & ISRAEL LLP
      55 West Monroe Street
12    Suite 1120
      Chicago, IL  60603-5130
13    Phone:  312.578.0990
      Fax:  312.578.0991
14    Email: jschultz@sessions-law.biz

15    By:  Mr. James K. Schultz
           For Defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1   INDEX

 2   Examination by Mr. Seals, page 4

 3   NO OBJECTIONS

 4   INDEX OF EXHIBITS

 5   NUMBER    DESCRIPTION

 6   1    Transcript of telephone call, page 36

 7   2    Transcript of telephone call, page 37

 8   3    Page 6 of Collector Training Manual, Bates Number NCO -
          00299, page 44
 9
     4    Six-page Fact Sheet, page 52
10
     5    Confidential Personnel file for Latisha Williams, Bates
11        Numbers NCO - 00248 through NCO - 00273, page 60

12   6    Second Notice to Take Deposition Upon Oral Examination
          of Pat DesProspo, page 73
13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   THE DEPOSITION OF PATRICK N. DEPROSPO is taken on the 13th of

 2   June, 2012, at Erstad & Riemer, 8009 34th Avenue South, Suite

 3   200, Minneapolis, Minnesota, commencing at the hour of 10:54

 4   a.m.

 5                                    * * *

 6                        PATRICK N. DEPROSPO,

 7            called as a witness, being first duly sworn,

 8                was examined and testified as follows:

 9                                    * * *

10            MR. SEALS:  Usually, we had some stipulations

11        in the past depositions.  For example, on the

12        objections, it would be to form, etc.  Are those

13        agreeable with you?

14            MR. SCHULTZ:  Yeah.

15            MR. SEALS:  Okay.  Is there any stipulation

16        maybe that we've had in the past that you'd like to not

17        use today?

18            MR. SCHULTZ:  No.  I think we're good.

19            MR. SEALS:  Okay.  Just making sure.

20            MR. SCHULTZ:  Yeah.  No.  I understand.

21                        EXAMINATION

22   BY MR. SEALS:

23   Q   Mr. DeProspo, you and I met a few moments ago.  My

24       name's Whitney Seals.  I represent a gentleman named

25       Mike Lindsey in a lawsuit he's filed against NCO

1           Financial Systems that's currently pending in the

2           Northern District of Alabama, and the purpose of the

3           deposition today is just to figure out sort of what you

4           know about the situation and basically to get your

5           experience with NCO, in as much as it goes to

6           supervising Latisha Williams.

7                Is that your understanding as to why you're here?

8     A     Yes.

9     Q     Okay.  If you would, tell us your full name.

10    A     Patrick Nicholas DeProspo.

11    Q     All right, sir.  And tell us your current employer and

12          your job title?

13    A     NCO Financial Systems, and my job title is general

14          manager.

15    Q     Okay.  And what does a general manager at NCO Financial

16          Systems do?

17    A     I'm responsible for the site, for the employees, for the

18          hiring, for the firing, disciplinary action, client

19          performance, P & Ls.  I mean, pretty much anything at

20          the site level that has to do with the office, I'm

21          responsible for.

22    Q     All right.  Does any part of your job duties include

23          training employees?

24    A     No.

25    Q     Okay.

**Patrick DeProspo** 6

```
 1   A   Well, I take that back.  After the initial training, I

 2       would say my managers are responsible for training.  I,

 3       myself, am not.

 4   Q   All right.  Is there anyone above you at the site where

 5       you work?

 6   A   No.

 7   Q   All right.  And what's the name of the site you work at?

 8   A   It's Mendota Heights.

 9   Q   Mendota Heights.  Have you had any other job titles

10       while you've been at NCO?

11   A   I was a general manager 2.  At one point, I actually had

12       more than one office reporting to me.

13   Q   All right.  Is a general manager 2 a higher level of

14       responsibility, pay grade, what have you, than general

15       manager?

16   A   I don't believe the pay grade was, but the --

17   Q   Fair enough.

18   A   -- responsibilities -- as I understand it, I was the

19       only general manager 2 within the company.  I was the

20       only general manager with multiple site

21       responsibilities.

22   Q   Other than general manager and general manager 2, have

23       you had any other job titles or job functions with NCO?

24   A   No.

25   Q   Okay.  How long have you been employed by NCO?
```

1  A    Approximately six years.

2  Q    So when you came on, you came on as a general manager?

3  A    I did.

4  Q    All right.  Have you -- you mentioned another site.  How

5       long have you been at the Mendota Heights location?

6  A    I want to say four years.

7  Q    So the majority of your time at NCO?

8  A    Correct.

9  Q    Okay.  And what other locations have you worked at?

10 A    We had an office in North Aurora, Illinois, which is

11      right outside of Chicago.  And then we had an office in

12      Jacksonville, Florida.

13 Q    When you were the general manager 2, which two offices

14      were under your province?

15 A    North Aurora and Mendota Heights.

16 Q    Okay.  How long has it been since you have just been

17      solely responsible for the Mendota Heights location?

18 A    Three years or so.

19 Q    Okay.  So you were -- you were the general manager there

20      in June of 2011.  Is that fair?

21 A    Yes.

22 Q    Okay.  Have you ever given a deposition before?

23 A    I have participated in one.  I've never actually given

24      one.

25 Q    Okay.  What do you mean by participated in one?

 1   A   We deposed a -- somebody.  I was there as a

 2       representative of the company.

 3   Q   Do you remember what kind of case it was?

 4   A   It was an employee matter on something that didn't have

 5       anything to do with FDCPA violations or anything of that

 6       nature.

 7   Q   Okay.  Have you ever had any other involvement in any

 8       litigation with NCO other than that employment case and

 9       the deposition today?

10   A   No.

11   Q   Just so I'm clear, have you ever been a party in a

12       lawsuit where NCO also was party?

13   A   I'm not sure I understand the question.

14   Q   Sure.  When a claim is filed, for example, in this case,

15       it's Michael Lindsey versus NCO Financial Systems, have

16       you ever been involved in a case where it was somebody

17       versus NCO Financial Systems and Patrick DeProspo?

18   A   No.

19   Q   Okay.  All right.  What, if anything, did you do to

20       prepare for your deposition today?

21           And before you answer, I want to make this clear.

22       I don't want to know anything at all at any point today

23       that you discussed with Mr. Schultz, because he's your

24       attorney and it's privileged, but anything -- with that

25       in mind, anything else I want to talk about.

```
 1   A     All right.

 2   Q     So what did you do to prepare for the deposition today?

 3   A     Today, nothing.

 4   Q     Okay.  What have you done before today to prepare?

 5   A     Just basically a call to say we're going to have a

 6         deposition and, you know, kind of 30,000-foot level

 7         here's what it is.

 8   Q     Okay.  And do you remember when you received the call?

 9   A     No.

10   Q     Okay.  That's fine.  Has it been this month?

11   A     (Witness nods.)

12   Q     Okay.

13               THE REPORTER:  Yes?

14               THE WITNESS:  Yes.  I'm sorry.

15               (Discussion off the record.)

16   Q     (By Mr. Seals)  Okay.  So you found out you'd have to

17         come down here and talk to me this month?

18   A     Yes.

19   Q     All right.  And again, I don't want to know anything you

20         talked to your lawyer about, but as you sit here, what

21         do you know about the facts of the lawsuit my client

22         filed?

23   A     Basically, I guess the suit has to do with an allegation

24         that our employee divulged information to a third party.

25   Q     Okay.  Anything beyond that?
```

**Patrick DeProspo**                                                      **10**

```
 1   A    I don't believe so.

 2   Q    Okay.  This may sound like a stupid question but bear

 3        with me.

 4   A    Sure.

 5   Q    Have you ever heard of the Fair Debt Collection

 6        Practices Act?

 7   A    Of course.

 8   Q    I think, in business, most folks call it the FDCPA for

 9        short.  Is that fair?

10   A    Absolutely.

11   Q    So if I refer to the FDCPA in my questions, do you know

12        what I'm talking about?

13   A    I do.

14   Q    Okay.  As a manager and employee of NCO, are you

15        required to be familiar with the FDCPA?

16   A    Absolutely.

17   Q    All right.  Do you agree that every collector at NCO is

18        required to follow the rules and regulations described

19        in the FDCPA?

20   A    I do.

21   Q    Is every collector at you Mendota Heights location

22        required to be familiar with the do's and don'ts of the

23        FDCPA?

24   A    Yes.

25   Q    All right.  And to your knowledge, what does NCO do to
```

```
1          make sure the collectors at your location in Mendota

2          Heights are familiar with the FDCPA?

3    A     We go through initial training that covers the FDCPA, as

4          well as NCO rules and regulations.

5              I will say that many of NCO's rules probably go

6          above and beyond the FDCPA.  They have initial testing

7          on that.  They have retesting, I believe every six

8          months, that they have to pass to stay employed with

9          NCO.  Managers obviously talk about it all the time in

10         huddles and when they're doing one-on-one training with

11         employees.

12             And then we'll have some -- you know, we'll have

13         some retraining classes as we move forward, if we feel

14         there's an area that we want to make sure we keep in

15         front of folks.

16             And I would say, just for clarification, not just

17         the FDCPA, many states have laws as well.  So it's not

18         just the FDCPA.  It's state laws, as well as client

19         expectations that we have, as well as NCO expectations

20         that we have.

21   Q     So is it a fair statement that your -- that NCO's

22         employees -- and I'm going to focus on the Mendota

23         Heights location because that's --

24   A     Sure.

25   Q     -- the one that's at issue here.
```

1   A   Right.

2   Q   I'm not sure what they do in Jacksonville, and I really

3       don't care.  I only care about what goes on in your

4       office.

5   A   Okay.

6   Q   Is it important that they are familiar with not only the

7       FDCPA, but any relevant state law and any client

8       expectation?  Is that what you're telling me?

9   A   Yes.

10  Q   Okay.  Does any part of your job include making sure

11      that the collectors you supervise are following the

12      requirements of the FDCPA?

13  A   Generally speaking, I would say yes.  I mean,

14      ultimately, the general managers of our sites are

15      responsible for what staff do.

16  Q   Okay.  What -- can you tell me what you do to make sure

17      that they're complying?

18  A   Personally, I mean, I'm not -- I'm not reviewing files

19      and things of that nature.  There's a supervisor that

20      every collector reports to.  Those supervisors have

21      division managers.  Those supervisors and division

22      managers are responsible for call monitoring, file

23      reviews, daily huddles.  And maybe not every day, but,

24      you know, throughout the course of the week, huddles,

25      retraining the staff, one on ones.

```
 1              And through those, that's where the collectors

 2         adhere to the FDCPA, any updates to the FDCPA or state

 3         laws or client or NCO policies are brought.  We take a

 4         look at, you know, what they do on a daily basis in

 5         addition to their, you know, individual roles, and make

 6         sure that they're, you know, basically following all the

 7         compliance expectations that we have out there.

 8    Q    Okay.  I understand and I appreciate that answer.  While

 9         I have you here and while I've got you testifying, I'm

10         curious, why is it that it's important for NCO's

11         collectors to follow the FDCPA or any relevant state

12         laws that you discussed?

13    A    Well, I don't think they're any different than, you

14         know, not speeding or you can't rob a bank or you can't

15         go up and hit somebody.  I mean, you know, we take a lot

16         of pride in telling our folks, you know, this is a law.

17         Just like any other law out there, you have to -- you

18         have to follow that.

19    Q    Okay.  All right.  Do you know Latesha Williams?

20    A    I do.

21    Q    Okay.  And do you know her only professionally?  Do you

22         know her socially?

23    A    No.  I just -- just through the office.

24    Q    All right.  And are you in a supervisory position over

25         her?
```

 1  A   Not directly.  Again, there's collectors, there are,

 2      actually, team leads, there are supervisors, there are

 3      division managers.  At one point, we had a director that

 4      was layered in between the division managers and me, and

 5      then myself.

 6  Q   Okay.  Now, Ms. Williams started working with NCO, it

 7      looks like, based on the records I have, in February of

 8      2010.  Were you the general manager for the Mendota

 9      Heights location at that time?

10  A   I was.

11  Q   Okay.  So between February 8, 2010, and today's date,

12      you've had the same position at NCO.  Is that fair?

13  A   I have.

14  Q   Okay.  Do you know as you sit here how she is paid?

15      Hourly?  Salary?

16  A   Hourly.

17  Q   Okay.  Do you know if she receives any commissions or

18      bonuses based on how much she collects?

19  A   There is a bonus opportunity that's out there.

20  Q   Can you describe that to me?

21  A   Sure.  There's a multiplier.  The collectors have to

22      collect a certain amount of money based off that

23      multiplier.

24          So, for example, just to use raw numbers, if

25      somebody is getting paid ten bucks an hour, there's

```
 1        173 hours in an average month, so their base is 17.33.

 2        Then they have to collect two, three, four times that.

 3        After they collect that, any percentage above that

 4        they're paid a percentage of.

 5   Q    Okay.  And does the percentage vary on client, or is it

 6        across the board?

 7   A    There can be some variations by client.  That whole

 8        plan, there can be some variations by client.

 9   Q    Can you give me roughly like a third, 10 percent,

10        5 percent, 15 percent?

11   A    It's usually between 20 and 25 percent.

12   Q    Okay.  As you sit here, and you may know or you may not

13        know, do you know has she ever received a performance

14        bonus while she's worked at NCO?

15   A    I couldn't tell you what months, but I'm sure she

16        probably has.

17   Q    Okay.  I'll ask her.  How many employees does the

18        Mendota Heights location have?

19   A    Today?

20   Q    Yes, sir.

21   A    Oh, probably about 60.

22   Q    All right.  About how many would they have had in June

23        of 2011?

24   A    We've run anywhere from high 50s to mid 70s probably for

25        the last couple years.
```

**Patrick DeProspo**                                                          **16**

| | | |
|---|---|---|
| 1 | Q | So somewhere between 50 and 70.  Is that fair? |
| 2 | A | Yeah. |
| 3 | Q | All right.  And back in 2011, do you know how many |
| 4 | | accounts Latisha Williams would have been working on? |
| 5 | A | They were -- as I recall, they were working more in a |
| 6 | | dialer environment.  So there would have been accounts |
| 7 | | in a dialer pool that she was part of a team that they |
| 8 | | collected on. |
| 9 | Q | Explain that to me.  What do you mean by a dialer pool? |
| 10 | A | Just accounts that are loaded into a pool. |
| 11 | | On clients where we get a lot of business, you're |
| 12 | | not going to have collectors working 5,000 accounts |
| 13 | | each.  It just doesn't make sense from a business |
| 14 | | perspective. |
| 15 | | So they're -- we put accounts in a pool, and the |
| 16 | | pools will dial out on those.  And, you know, there's |
| 17 | | certain variances, I mean, depending upon account |
| 18 | | balances and whether an account has a number or doesn't |
| 19 | | have a number that may be worked mainly more -- but |
| 20 | | generally speaking, Latisha was working on a campaign, |
| 21 | | if I remember correctly. |
| 22 | Q | Okay.  And so that I'm clear, if I'm understanding you |
| 23 | | right, and please tell me if I'm not understanding you, |
| 24 | | there would be a number of accounts in a pool, a dialer |
| 25 | | would go out, and then it would randomly be assigned to |

```
 1        a certain person?

 2   A    Well, that may not be real accurate.

 3        Basically, there's lines that the dialer will kick

 4        out, and there may be, you know, two lines for each

 5        collector.  And if it grabs somebody over here, then it

 6        will take it and get it to the first available

 7        collector.

 8        So there may -- you know, it's not necessarily

 9        assigned to a collector as much as it is it goes to an

10        available collector that's not already on the phone

11        talking to somebody.

12   Q    All right.  So she would be part of a team.  So it

13        wouldn't be a -- a -- it wouldn't be like, Latisha, here

14        are your accounts for the day, it would just simply be

15        if she was the next available collector, she would work

16        the account?

17   A    Generally speaking, yes.

18   Q    Do you know roughly how many people would be on her

19        team?

20   A    Typically, our teams are anywhere from eight to ten on

21        the low end to twelve to fifteen on the high end.

22   Q    And how many accounts would be in the pool, roughly?

23   A    Oh, I couldn't tell you, to be honest with you.

24   Q    Okay.  I would assume that eight to ten or twelve to

25        fifteen people would be a large number of accounts?
```

 1   A   Well, it wouldn't be a hundred accounts per collector.

 2       It would be a little bit more than that, but I couldn't

 3       tell you the exact number.

 4   Q   I understand.  Okay.  Does Latisha Williams work full

 5       time for NCO?

 6   A   She does.

 7   Q   Okay.  And what are her working hours, generally?

 8   A   I can't tell you the days.  I know collectors work three

 9       early days, which is usually 8:00 to 5:00 --

10   Q   Okay.

11   A   -- and then two late nights, which are generally 12:00

12       to 9:00.  We also usually have them come in a couple

13       Saturdays a month, which typically runs 7 a.m. to

14       11 a.m.

15   Q   Okay.  You don't work on Sundays?

16   A   No.

17   Q   Okay.  All right.  You told me the employees.  If you

18       could break it down, how many of those employees are

19       managers and how many are collectors?

20   A   Are you talking about today's numbers?

21   Q   Let's talk about today.  And then, if we could, if you

22       know, back in June of 2011.

23   A   All right.  I won't know back to June of 2011.

24           I can tell you that typically we run, like I said,

25       ten to twelve collectors per supervisor.  Well, ten to

**Patrick DeProspo**                                                    **19**

| | | |
|---|---|---|
| 1 | | fifteen is probably a little better gauge. |
| 2 | | Right now, we have about, oh, probably 40 |
| 3 | | collectors and four managers. |
| 4 | Q | All right.  And yourself? |
| 5 | A | And myself, right. |
| 6 | Q | Is there anyone that works there that isn't a collector |
| 7 | | or a manager? |
| 8 | A | Yes. |
| 9 | Q | Okay.  Who would those be? |
| 10 | A | We have a front desk receptionist, we have a recruiter, |
| 11 | | we have a facilities/desktop guy. |
| 12 | Q | Okay.  Understood. |
| 13 | A | And we have an HR guy. |
| 14 | Q | Understood.  Okay.  Do you have any idea how many calls |
| 15 | | per day -- per shift, rather, that Latisha Williams |
| 16 | | would have been working back June of 2011? |
| 17 | A | No.  I can't -- I can't tell you. |
| 18 | Q | Can you tell me today? |
| 19 | A | It depends.  I mean, if she's working manually, usually |
| 20 | | they'll make 150, 200 calls a day. |
| 21 | | If the -- I think probably more relevant is the |
| 22 | | number of contacts they get, and the number of contacts |
| 23 | | they get can run anywhere from three to four in some of |
| 24 | | our files up to, you know, probably fifteen on some of |
| 25 | | the other files that are out there. |

**Patrick DeProspo**                                                      **20**

1   Q   And so I know, what's a -- what's a contact?

2   A   Just when you get a right party on the phone.  So if

3       you're calling me, you're calling Pat DeProspo, and I'm

4       saying, yeah, this is Pat DeProspo when the call was

5       on --

6   Q   Okay.  So it's a live person as opposed to an answering

7       machine or just ring, ring, ring, that kind of thing?

8   A   Right.

9   Q   Okay.  Okay.  All right.  Tell me, what is -- what is

10      skip tracing?

11  A   Skip tracing is generally when you are work -- an

12      industry axiom would be -- skip tracing would be when

13      you're working to find a contactable number for

14      somebody.

15  Q   Okay.  And how is that typically done at NCO?

16  A   It's online through various databases that are out

17      there.  I don't think it's any different for NCO than it

18      is any other agency out there.  There's various

19      databases that they go through.

20         I mean, some of it's a waterfall where it's

21      systematically done, and then some of it is where, you

22      know, you may have this much information and they pair

23      it down to this.  (Indicating.)  And then the staff will

24      from there figure out had where they need to go.

25  Q   Is contacting third parties part of skip tracing?

```
 1   A   Yes.

 2   Q   Okay.  In what way?

 3   A   Well, I'm not sure I understand the question.

 4   Q   All right.  Part of skip tracing would be contacting

 5       third parties?

 6   A   It would be.

 7   Q   Could we agree that skip tracing is trying to find

 8       accurate telephone number, address, some sort of

 9       identifying information for --

10   A   Yeah.

11   Q   -- someone who owes money to NCO?

12   A   Yes.

13   Q   Is that a fair statement?

14   A   Yes.

15   Q   Okay.  Would skip tracing involve contacting third

16       parties in order to confirm or correct any information

17       you may have on the consumer?

18   A   It could be.

19   Q   All right.  I mean, it is sometimes, isn't it?

20   A   Yes.

21   Q   Okay.  And I didn't ask you this before, have you ever

22       had any other jobs in the debt collection field?

23   A   Prior to coming to NCO, I was vice president of

24       operations for a company.

25   Q   What was the name of the company?
```

 1   A    Superior.

 2   Q    Superior?

 3   A    Just Superior.

 4   Q    Just Superior?

 5   A    Yep.

 6   Q    Okay.  Any other jobs in debt collection?

 7   A    Oh, man.  I've been in this for 23 years.

 8   Q    Really?

 9   A    Yeah.

10   Q    Okay.

11   A    American Creditors Bureau is where I started at.  I

12        worked for Payco/FM Services.

13   Q    Anywhere else?

14   A    CRW.

15   Q    Okay.  And did you hold various jobs with those

16        companies?

17   A    For all but about two years of my employment, I've been

18        a general manager or vice president of operations.

19   Q    Okay.  Those two years, did you ever work as a

20        collector?

21   A    I did.

22   Q    Okay.  So roughly two years you worked as a collector.

23        The rest of the time you've been in management?

24   A    Yes.

25   Q    All right.  Are you familiar -- we may be able to bypass

**Patrick DeProspo**                                                           **23**

```
 1        some of this, but we may not be.  Are you familiar with

 2        Latisha Williams' training?

 3   A    You know, the training is done outside of the

 4        operations.  There's an entirely different training

 5        department within the company, so, I mean, I'm generally

 6        familiar with it.  I don't sit in on the training

 7        classes, obviously.  It's not my responsibility --

 8   Q    Sure.

 9   A    -- to be there for, you know, weeks at a time.

10   Q    Sure.  Sure.  What's your understanding as to what

11        happens training wise when a person is hired to be a

12        collector at NCO?

13   A    Sure.  They go through -- they go through training.

14        There's various tests that they have.  I mean,

15        obviously, we have trainers are out there that go over

16        the various, you know, NCO policies, FDCPA, state

17        policies.

18             Typically, there's some client-specific training

19        that's done either during that training process or as

20        they're released to the floor with a manager.

21             It's a very comprehensive process.  I'll tell you,

22        in the time I've been at NCO, I have not seen a more

23        comprehensive training process than I have with this

24        company.  I mean, it's just amazing what these guys have

25        done in terms of laying stuff out, testing, retesting,
```

```
 1        the material that they cover, and, you know, Latisha

 2        went through that.

 3   Q    Is it your opinion, based on your experience, that if a

 4        collector -- a new hire, someone off the street that has

 5        never done this before goes through NCO's program, they

 6        would be adequately trained to do the job of collecting

 7        debt?

 8   A    I believe they are adequately prepared, once they hit

 9        the floor, to be able to collect a debt.  They know what

10        the policies are.  We have them go through

11        acknowledgments, sign-offs.  If any questions need to be

12        asked, they are.

13             And then typically they sit with or around team

14        leads or supervisors, you know, who are there to assist

15        them as well, so I would answer absolutely, yes.

16   Q    How long is the training process from a new hire's first

17        day until they are collecting on the floor?

18   A    Today, as it stands, it is three weeks.  I can't tell

19        you back when Latisha was hired, but I do know beyond a

20        shadow of a doubt that today it's three weeks.  We

21        went -- it kind of varied from a week to two weeks when

22        I first got on with NCO, but it's a full three weeks

23        today.

24   Q    Okay.  And of those three weeks, how long is what I'll

25        call classroom time, not sitting on the floor with a
```

1          lead or whatever?

2     A    Right.  Oh, wow.  Out of 15 days, I mean, 15 business

3          days in those three weeks, if I had put an hour number

4          on it, it's probably 13 plus for those days.

5     Q    Okay.  So the vast majority is classroom as opposed to

6          sitting on the floor with a lead?

7     A    Yeah.  And actually, if you talk about just sitting on

8          the floor with a lead, kind of doing monitoring and

9          mirroring, it's probably closer to 14 days.  I mean,

10         there's not much of that that goes on.

11    Q    All right.  Okay.  And after those 15 days, if the

12         person has passed the test they're supposed to pass,

13         they're allowed to sit on the floor and start collecting

14         accounts like Latisha.  Is that fair?

15    A    Yes.

16    Q    Okay.

17    A    Well, if I mention this too, if it helps you, there are

18         multiple tests that they have to take too, quizzes and

19         tests that have to do with FDCPA, state laws, and things

20         of that nature.

21             And if they don't pass those, they have to retest.

22         And I believe it's on either the second or the third one

23         that they're actually -- if they don't pass it by the

24         second or third try, they're let go during training.

25             So they do have to be able to not only sit in the

**Patrick DeProspo**                                                    **26**

1          class, but they have to be able to test and pass tests

2          to be able to graduate out to the floor.

3    Q    Have you reviewed the tests yourself?

4    A    They're general FDCPA tests.  I believe they come from

5          the ACA.  We take a look at those, and I think we've

6          made a few adjustments on them.

7                Again, that's not my department.  I don't have

8          anything to do with the training department that's out

9          there, but it's pretty comprehensive.  I mean, they

10         touch on just about everything, including things that

11         pertain just to the FDCPA, and there is various like

12         state tests that they have to dig down to state laws

13         that they need to know as well.

14   Q    All right.  I understand.  Would -- how would skip trace

15         be part of that training, those 15 days?

16   A    They'll talk about it.  I mean, there's training

17         questions.  I can't tell you what you they are off the

18         top of my head, but they'll talk about that.  There's

19         practicality, you know, in if this happens, you know,

20         can you do this, or if this happens, what do you do

21         next.

22               I believe, in part of their system training that

23         kind of goes along with that classroom training, they

24         have to get on the phone and work with the trainer as

25         well.  I believe they actually do some skip tracing as

```
 1         well.

 2    Q    Okay.  So you would expect that to be a topic covered

 3         during training?

 4    A    Oh, absolutely.

 5    Q    All right.  And you mentioned they have to be retested,

 6         I think you said every six months?

 7    A    Yes.

 8    Q    Okay.  And what does that involve exactly?

 9    A    It's basically a retesting of the FDCPA, state laws,

10         policies and things like that to make sure that they've

11         retained that information and that they can, you know,

12         prove throughout the course of the year that they're

13         still up to date on all the policies they've got.

14              We have so -- I mean, as you know, we have so much

15         that comes out.  I mean, it seems like, you know, all

16         the time there are changes to --

17    Q    It changes every week, it seems like.

18    A    Yep.  So we want to make sure that the collectors retain

19         that information and that they're able to apply that as

20         they're working accounts.

21    Q    If there is a change in the law, does NCO take steps to

22         notify the collectors on the floor and the managers?

23    A    That comes from the training department, and typically,

24         what will happen is they'll go ahead and they'll get

25         memorandums out.  Those are to be covered with the
```

1        collectors.  Typically, there's sign-offs on those,

2        either -- you know, that are kept by the suits or

3        whatever, but we have to go ahead and sign off on that,

4        and then typically those will be included in future

5        tests, if they're, you know --

6    Q   Like FOTI?

7    A   Yes.

8    Q   I mean something like that would be in future tests?

9    A   Not so much the FOTI.  I mean, that stuff is covered and

10       we do that at the state level, but things like that

11       could be included in those future tests.

12   Q   Okay.  I got you.  Other than the retesting and the

13       updates we talked about, is there any other retraining

14       that you would expect Latisha or collectors like Latisha

15       to undergo during the course of a year?

16   A   Oh, sure.  I mean, the managers are required to, you

17       know, do side-by-sides and sit with collectors and make

18       sure they're working their files correctly, make sure,

19       if they see something happening that shouldn't be

20       happening, they point that out.  If it's something of a

21       compliance nature, you know, there may be some sort of

22       corrective action that's involved with that.

23            There's monitoring that goes on.  That's very, very

24       important because, during the course of a call,

25       obviously you can hear and then match that up with the

```
 1        account notes, if things are happening that shouldn't be

 2        occurring out there.

 3             So, in my mind, you know, the testing that goes on

 4        through our training department is a great foundation,

 5        but as important, if not more important, is that

 6        ongoing, one-on-one training, the ongoing telephone

 7        monitoring.

 8             And that -- the monitoring is quite extensive.  We

 9        have two internal groups that are separate from each

10        other that provide internal monitoring, and then the

11        supervisors typically do their own monitoring within

12        their teams as well.

13             So, again, when you talk about the completeness of

14        what NCO does, I've never seen a training or monitoring

15        program like this in 23 years of business.

16   Q    How many contacts would you expect your managers to

17        monitor a week per collector?

18   A    You know, our site's a little different.  I require my

19        managers to virtually get on every contact that a

20        collector makes, and part of that is performance driven,

21        but part of it's compliance driven as well, because we

22        want to make sure that we're not only performing for our

23        clients, we want to make sure -- a lot of times, you

24        know, if a consumer has a concern, they may point that

25        out as another person gets on the phone.
```

```
1              So managers -- and at one point in time, we even

2         tracked that, to make sure that the managers were, you

3         know, getting on virtually every call that was out

4         there.

5    Q    Was that policy, the getting on virtually every single

6         call, was that the policy back in June of 2011 at your

7         site?

8    A    I can't tell you if it was in place in June.  I know

9         that that's been something I've pushed since I walked

10        into this site.

11   Q    Okay.  And you've been at the site four years?

12   A    Approximately four years, yeah.  I want to say October

13        of -- October of '07, if I recall correctly.

14   Q    Okay.

15   A    So, I mean, we're coming up on four and a half or so,

16        five years.

17   Q    What do you expect your managers to do if, in the course

18        of monitoring a call, they hear something that violates

19        NCO's policy?

20   A    Sure.  They bring it to my attention and it's

21        immediately addressed.

22             We typically bring that to HR's attention.  There's

23        a corrective action or policy or process that NCO has.

24        Typically, if it warrants corrective action, the first

25        time someone will get a verbal.  The second time they'll
```

```
 1        get a written.  The third time they get a final.  After

 2        that, it -- it leads to a termination.

 3             That verbal stays out there, I want to say -- I'd

 4        have to go back and look at the policy.  I want to say,

 5        at the time that all this came up, I believe a verbal

 6        stayed out there for three months.  So if you were

 7        working a desk and we had a compliance issue, you'd get

 8        a verbal, and that would stay out there for three

 9        months.

10             If, during that three months, something else came

11        up, you'd automatically go to a written at that point.

12        That written would be out there for six months.  If

13        something came up at the point you got a written, you'd

14        go to a final, and that stays out there for a year.

15             That's to ensure us that we know that if an

16        employee made an error, that it wasn't like a week later

17        or a month later another error came up and they weren't

18        being held accountable not for like that error but for

19        the error before.

20   Q    Is it important, at least in your mind, that, and I'll

21        use the word "discipline" is swift or quickly -- if

22        someone makes a mistake -- for example, one of your

23        managers comes to you and says, Collector 5 did

24        something that violates the policy yesterday on a call I

25        heard, I mean, how quickly do you write them up?  How
```

1      quickly do you discipline them?

2   A  Well, we immediately go to HR.  I mean, HR has to sign

3      off on all disciplines.  And we're not -- I mean, even

4      as a site director, I'm not authorized to put you on a

5      final warning without HR signing off on it.

6   Q  Sure.

7   A  So, yes, I would say, when it comes to our attention --

8      keep in mind, I guess, that, you know, you're talking

9      about a million accounts on that site.  There are going

10     to be times where issues come up that we don't catch it,

11     right?  It may come up on a complaint or someone may

12     reach out to the client or, you know, your client may

13     file a lawsuit --

14  Q  Right.

15  A  -- feeling that, you know, there's an allegation out

16     there that something wrong happened.

17        I can tell you, when those are brought to my

18     attention, they immediately go to HR.  And throughout --

19     through that process on HR signing off on it, they are

20     addressed.

21  Q  And I understand that you -- HR is not your department?

22  A  Right.

23  Q  But how quick does HR take action?  I mean, do they sit

24     on it for months?  Is it a short amount of time?  What's

25     been your experience?

```
 1   A   Generally speaking?

 2   Q   Yes, sir.

 3   A   Relatively quickly.

 4           I mean, you know, I think, like in anything else,

 5       you have to take a look at the circumstances that are

 6       out there.  And, you know, if something happens, you

 7       gotta, you know, measure it versus what action you took

 8       before.

 9           And there's some data gathering.  We have to get

10       responses from the collectors.  I mean, we certainly

11       can't just say, hey, this is the allegation, boom.

12   Q   Right.

13   A   I mean, we have to find out, you know, what their --

14       what their side of the story is --

15   Q   Right.

16   A   -- but I would say NCO does a relatively good job in

17       responding to those in a reasonable period of time.

18   Q   Okay.  You said that a verbal is about three months, and

19       if there is another issue in the time the verbal is

20       going on, it automatically goes to written --

21   A   Well, it doesn't automatically.

22   Q   Okay.

23   A   I mean, there are times where something's egregious

24       enough that -- you know, someone blatantly and

25       deliberately violates policy, that we've actually
```

**Patrick DeProspo**                                                      **34**

| | | |
|---|---|---|
| 1 | | escalated those to a final.  So, I mean, it just depends |
| 2 | | on what it is. |
| 3 | Q | Okay.  Well, let me ask you about this, because I -- |
| 4 | | what about -- I know that part of the requirements of |
| 5 | | these collectors is that they meet certain goals in |
| 6 | | collecting money? |
| 7 | A | Mm-hm. |
| 8 | Q | Is that a fair statement? |
| 9 | A | Yes. |
| 10 | Q | Okay.  So let's say a collector does not meet their goal |
| 11 | | in January and receives a written warning -- or a verbal |
| 12 | | warning.  Excuse me. |
| 13 | A | Okay. |
| 14 | Q | Are you following me so far? |
| 15 | A | I do. |
| 16 | Q | The next month, if they do not meet that goal, do they |
| 17 | | receive another verbal, or does it go to a written at |
| 18 | | that point? |
| 19 | A | That would go to a written at that point. |
| 20 | Q | Is that automatic? |
| 21 | A | Typically speaking, yes. |
| 22 | Q | Okay. |
| 23 | A | I mean, there is -- if someone's out on a leave of |
| 24 | | absence or they have a death in the family, we're not |
| 25 | | going to, you know, say, hey, look, you missed a week |

```
 1          and you didn't hit your full month's goal -- it's

 2          prorated, but generally speaking, yes.

 3     Q    Okay.  So absent an extenuating circumstance, a death in

 4          the family, illness, something of that nature, it would

 5          be an automatic escalation from verbal to written?

 6     A    Generally speaking, yes.

 7     Q    Okay.  That is fair.  We are here because, as you know,

 8          my client filed a lawsuit against NCO based on, in part,

 9          two phone calls that Latisha Williams made to third

10          parties.

11     A    Right.

12     Q    Do you understand that?

13     A    I do.

14     Q    Have you read the transcripts or listened to the calls?

15     A    I have listened to the calls.

16     Q    Okay.  When did you listen to the calls?

17     A    When it was first brought to our attention.  I can't

18          give you the date, but --

19     Q    Sure.

20     A    -- when it came in, we got those and got the calls.  And

21          typically we'll listen to the calls and we'll read the

22          account notes and kind of figure out what went on.

23     Q    You can't tell me the date it was brought to your

24          attention.  Can you tell me was it this year?  Was it

25          last year?
```

**Patrick DeProspo**                                                        **36**

1    A    I can't tell you, but I can tell you when we would have

2         received the lawsuit.  Typically speaking, as the

3         general manager or the site director, I'm notified of

4         that almost immediately.  So whenever we would have got

5         that probably is, I don't know, a good range of time.

6    Q    Okay.  I want to show you the transcripts of those

7         calls, if I can.

8    A    Sure.

9    Q    And I'll tell you too, if you want to discuss it with

10        Jim, you're welcome to, but Jim's office provided these

11        to me.

12   A    Sure.

13   Q    I didn't type these up.  Okay?

14   A    Okay.

15   Q    I'm going to mark this call, this transcript as

16        Exhibit 1.

17             And to give you a little background, this is a

18        phone call to my client's stepmother.  He does not live

19        with her.  All right?  She's a third party, I believe.

20             I don't think there's been any allegation she owed

21        NCO any money or any of NCO's clients, and this call

22        took place on June 9th, 2011.  It's only the one page.

23   A    (Perusing.)  Okay.

24   Q    Have you had a chance to read that?

25   A    I have.

| | | |
|---|---|---|
| 1 | Q | Okay.  I want to show you the next transcript, and I'll |
| 2 | | tell you this is a call to my client's brother who lives |
| 3 | | in a different state than he does that happened on |
| 4 | | June 16th, 2011, and he's another third party. |
| 5 | A | Sure. |
| 6 | Q | And that's only two pages. |
| 7 | A | (Perusing.)  Okay. |
| 8 | Q | Based on your recollection, is there anything different |
| 9 | | in those transcripts than what you remember from the |
| 10 | | phone calls? |
| 11 | A | I don't believe so. |
| 12 | Q | Okay.  You mentioned that when the lawsuit was received, |
| 13 | | you would have received notice of that pretty quickly? |
| 14 | A | Relatively quickly. |
| 15 | Q | Okay.  What sort of investigation did you or NCO perform |
| 16 | | to investigate these claims? |
| 17 | A | They would have pulled the calls and listened to the |
| 18 | | calls.  They would have -- and when I say they, us.  We |
| 19 | | would have reviewed the collector notes, and we would |
| 20 | | have matched the two up together and determined if a |
| 21 | | violation or compliance issue had occurred. |
| 22 | Q | All right, sir.  In looking at those, they kind of -- |
| 23 | | they're kind of similar.  I mean, they're clearly -- |
| 24 | | she's calling a third party.  She says she has a bad |
| 25 | | number.  It's a reference. |

1   A   Sure.

2   Q   She's trying to correct -- whatever the call says.  In

3       fact, she says in both of them at the very beginning

4       that they're monitored and recorded, and I remember

5       seeing that in the training manual.

6           That's a requirement that NCO collectors say in

7       each call, is it not?

8   A   Yes.

9   Q   Okay.  Is this -- is this part of a script she was using

10      at the time?

11  A   I don't recall, to be honest with you.

12  Q   Okay.  Would she be the better person to answer it?

13  A   Probably.

14  Q   All right.  And I know that NCO uses scripts for certain

15      phone calls, do they not?

16  A   They do, yes.

17  Q   In fact, the manual has a couple of examples.  One is

18      answering machine messages, there's a script.  Is that

19      your understanding?

20  A   Yes.

21  Q   There's also another one in there involving a

22      third-party live contact at a person's -- consumer's

23      residence.  Are you familiar with that script?

24  A   I am, yes.

25  Q   And that one, I think -- it's roughly like that.  The

```
 1        person identifies themself.  They -- when they're asked,

 2        they say who they work for, and then they ask if the

 3        person -- whoever answers the phone can deliver a

 4        message for them.  Very similar as to what happened

 5        here?

 6    A   Correct.

 7    Q   Okay.

 8    A   And maybe I need to clarify.

 9    Q   Yes, sir.

10    A   There are scripts that are out there.  I don't know if

11        the scripts were in place when this call occurred.

12    Q   That's absolutely fair, and we'll get to that with

13        Ms. Williams.  I appreciate you telling me that.

14             In looking at these calls, is there anything that

15        sticks out to you that violates NCO policy?

16    A   Well, sure.  We -- I mean, generally speaking, we would

17        not be calling a third party when we had a number for

18        the consumer.

19    Q   How do you know that there was a number for the

20        consumer?

21    A   Well, I mean, knowing this -- knowing this account, I

22        know that we had a number for the consumer.  I can't see

23        it from this transcript, but, you know, knowing the

24        violation --

25    Q   Okay.
```

| 1 | A | -- that would be involved in it, I know that. |
| 2 | Q | Okay.  So you would not call a third party if you |
| 3 | | already had a number for the consumer? |
| 4 | A | Correct. |
| 5 | Q | All right.  Is there anything else? |
| 6 | A | Well, she's naming NCO's name in there.  That shouldn't |
| 7 | | have been done as well.  I mean, typically, we don't |
| 8 | | share NCO Financial with third parties unless asked, and |
| 9 | | I don't believe -- I don't know -- I'm looking on this, |
| 10 | | it doesn't look like we were asked. |
| 11 | Q | Is there anything else? |
| 12 | A | Not off the top of my -- I guess I can go back and |
| 13 | | reread it.  I mean, just right off the initial run... |
| 14 | Q | Well, because you're under oath and because this may be |
| 15 | | used in a trial, I certainly want to make sure I have |
| 16 | | all my bases covered. |
| 17 | A | Okay. |
| 18 | Q | It's only three pages.  Do you mind looking at it one |
| 19 | | more time? |
| 20 | A | Sure. |
| 21 | Q | And if you want, we can take them one at a time, if |
| 22 | | there's something that sticks out in one that maybe |
| 23 | | doesn't in the other. |
| 24 | A | (Perusing.)  She's got here that it's "a reference |
| 25 | | number for Michael Lindsey." |

1   Q    Okay.  "Reference number for Michael Lindsey."

2   A    (Perusing.)  I'm not sure that I'm seeing anything else,

3        but if you have an idea, if you have a specific

4        question --

5   Q    Sure.  Of course.

6   A    -- I can probably help you out.

7   Q    Okay.

8   A    Yeah.  She's got here the number that I have is -- I

9        don't think that's a good number.  And again, I don't

10       know at that point, just knowing the account history,

11       so ...

12  Q    Okay.  So based on what you told me, she shouldn't have

13       called because they had a good contact number?

14  A    Well, they had -- they had a number.

15  Q    Okay.

16  A    Just so that we're clear, I mean, at some point, you

17       know, you're going to take a look at that if you're

18       calling, calling, calling.  You know, you're trying to

19       get Pat DeProspo and you get -- you know, this is

20       Whitney Seals.  I mean, there's a point where there's

21       some question about that.  Typically, though, they'll

22       ask the supervisor, okay, here's what I'm thinking,

23       what's my next step.

24            But knowing what I know about the account,

25       obviously, you know, I don't know that we didn't have a

```
 1          good number at that point in time.

 2    Q     She identifies that she works for NCO without being

 3          asked.  You said --

 4    A     Right.

 5    Q     -- that was something that was against NCO policy.  Is

 6          that fair?

 7    A     Typically, yes.

 8    Q     Okay.  And also she says -- there's a -- they were --

 9          the person was a reference number for Michael Lindsey?

10    A     Right.

11    Q     Okay.  What's wrong with that?

12    A     Because it's not -- I guess they're not really a

13          reference number.  I mean, it's a third-party number

14          and, you know, certainly there's public information

15          that's out there, but it's not necessarily a reference

16          number.

17              You know, at the end of the day, I guess someone is

18          going to probably question, you know, what's the

19          reference number and stuff, and I don't know that

20          that's -- I'm not an attorney.

21    Q     Sure.

22    A     I don't know if that's 100 percent accurate.

23    Q     Okay.  As in the script for third parties in the

24          training manual -- and if you want, I've got the manual

25          here.  You're welcome to look at it, but I assume you
```

**Patrick DeProspo**                                                      **43**

1          probably are familiar with the training manual?

2    A     Yes.

3    Q     Okay.  In that third-party script with a live person at

4          a consumer's residence, part of the message or part of

5          the script is can you deliver a message to the consumer

6          for me?

7    A     Sure.

8    Q     And that's also done here?

9    A     Mm-hm.

10   Q     Is that part of her training?  Is that what she's

11         supposed to do when she speaks with these folks?

12   A     Well, I think what you're -- I think what you're

13         referencing in the training manual is when a call to a

14         third party may occur.

15   Q     Okay.  We'll --

16   A     So there's a -- if we've got a contactual number --

17         let's put it this way.  If we don't have a contactual

18         number for a person --

19   Q     Yes, sir.

20   A     -- and we're talking to a third party, then there's

21         certain things that are going to be said, and that

22         script is accurate, as I understand it, you know,

23         legally and lawfully and through NCO policy.

24             I believe the problem here is that we did not know

25         that there was not a -- that that wasn't a good number.

```
1          We called a third party is what the problem is.

2     Q    Okay.  So in your mind, in looking at this, the issue

3          that sticks out, at least at first blush, is that

4          Latisha called these two folks when she had a number for

5          Mr. Lindsey?

6     A    Yes, a possible good number for him, and certainly we

7          had not confirmed that it was not a good number.

8     Q    Okay.  Let's see here.  I won't mark the entire page--

9          or the entire manual in your deposition, but I will mark

10         what has been Bates labeled by your attorneys as NCO -

11         299 and show you this is the script I was referring to.

12         Is that also what you were referring to as well?

13    A    Well, the answer machine voicemail message is for the

14         consumer's residence.

15              MR. SCHULTZ:  I think he's talking about down

16         there.

17              THE WITNESS:  Oh, okay.

18    Q    (By Mr. Seals)  At the bottom, yes, sir.  Thank you.

19    A    That would be if you got -- well, let's say -- I don't

20         know if I can give you a good example.  Let's see.  If

21         we were trying to get in touch with you and your wife's

22         living at the residence, obviously, and maybe you have a

23         brother living at the residence, so that's going to be a

24         third-party script for a live person at the consumer's

25         residence.
```

1           So I'm calling your client, and someone other than

2       your client or his spouse or responsible party is there,

3       so it would be a third party at the consumer's

4       residence.  I believe these calls were made to third

5       parties not at the consumer's residence.

6    Q   That's correct.  That's correct.

7    A   So that would not be an accurate script.

8    Q   Okay.  Okay.  That's fair and I appreciate that.  My

9       question is this:  Do you -- as you sit here right now,

10      do you think that Ms. Williams asking both Kay Lindsey

11      and Greg Lindsey if they could relay a message to

12      Mr. Lindsey violated NCO policy?

13   A   Yes.

14   Q   Okay.  In what way?

15   A   Well, the call -- the call should have been made to the

16      third parties.  And knowing that we had a possible good

17      number, a message should not have been left.

18          And Latisha was trained on that, she knew that, and

19      I believe it was an error that she made on this account

20      in terms of the actions that she took.

21          But certainly our training, both the initial

22      training as well as huddles and ongoing training,

23      one-on-one training, telephone monitoring, if that would

24      have ever come up, but I don't know of anything in her

25      personnel file where it did, but all the training we

**Patrick DeProspo**                                                              **46**

1        have would have been directed towards that's not NCO's

2        policy.  We don't do that and it can't happen.  And if

3        it did, there would have been a JDS in there from a --

4                  THE REPORTER:  You need to keep your voice up

5        here just a little bit.

6                  THE WITNESS:  Oh, sure.  I'm sorry.

7    Q    (By Mr. Seals)  What's a GDS?

8                  MR. SCHULTZ:  A JDS?

9    Q    (By Mr. Seals)  A JDS.  I'm sorry.

10   A    A job discussion summary.  That's our corrective action,

11       or I think you referred to it as discipline.

12   Q    Okay.  Let me ask it this way then.  Assume for me, if

13       you would, that Latisha did not have a possible good

14       contact for Mr. Lindsey.  Okay?

15   A    So the account came over without a phone number?

16   Q    Without a phone number.  It just came over.

17            Would -- in that circumstance, would you still find

18       fault with her asking these people to deliver a message

19       to Mike?  Would it be against NCO policy?

20   A    If we don't have a contactual number for the consumer

21       and NCO has kind of gone through its waterfall process

22       to find a potential good number, so we had no leads

23       whatsoever, then, yes, through NCO policy we could call

24       a third party and probe and ask them to leave a message,

25       if they agree to do that.

| | | |
|---|---|---|
| 1 | Q | Leave a message or deliver a message?  Is that fair? |
| 2 | A | Yes. |
| 3 | Q | Okay.  Is any part of your job monitoring calls?  I |
| 4 | | think you said it wasn't, but I want to make sure I'm |
| 5 | | correct. |
| 6 | A | I will monitor calls with supervisors, and it's more |
| 7 | | for -- it's as much for the collectors as it is for the |
| 8 | | training of the managers to make sure they're doing that |
| 9 | | right. |
| 10 | | Yeah.  I'll sit back, and if I have some free time, |
| 11 | | and heaven knows we don't have a lot of free time, but |
| 12 | | if I do, I'll sit in on a line and do some monitoring |
| 13 | | myself. |
| 14 | Q | How often, we'll say hours in a day, do you expect your |
| 15 | | managers to walk the floor and listen to maybe what's |
| 16 | | going on -- eavesdrop, if you will, on what's going on |
| 17 | | in the collection calls? |
| 18 | A | I would say between -- and some of that is |
| 19 | | side-by-sides.  Mind you, when you're doing |
| 20 | | side-by-sides, it's not just sitting there looking at |
| 21 | | what a collector is putting on an account.  They put |
| 22 | | splitters in and they listen to the calls. |
| 23 | | There's a couple of different ways that they can |
| 24 | | monitor.  One is a splitter.  So I'll be sitting next to |
| 25 | | you, and your headphone will be in there and I'll have a |

**Patrick DeProspo**                                                                **48**

```
1        splitter and I'm listening to that call.  Some of it is

2        random.

3              And what I like to see the supervisors do -- it

4        will -- it will -- typically, between the both of them,

5        between talk-offs, splitters, and random monitoring, it

6        will probably be a good three or four hours a day.

7    Q   Okay.

8    A   Not the majority of their day.  Two hours, three hours.

9        I don't know.  A good part of their day.

10             But, personally, I like the random monitoring

11       because when, you know, you're sitting there with

12       collectors, I think, like anyone else, they --

13   Q   They're on their best behavior, right?

14   A   Well, I mean, I won't say your best behavior, but

15       they're -- you know, they're doing things differently.

16             I don't know that people, when you're sitting next

17       to them, sometimes they get a little tight and --

18   Q   Sure.

19   A   -- sometimes they get a little nervous and stuff.  When

20       you're doing it randomly, you kind of get the real deal.

21       I mean, here's Whitney, and I'm randomly monitoring him

22       and he doesn't know it and -- I'm just kind of seeing

23       what he's doing.  And that's probably where the majority

24       of their monitoring is coming from, is random-type

25       monitoring.
```

**Freedom Court Reporting, Inc**                               **877-373-3660**

1  Q   Okay.

2  A   Now, the two external groups within NCO, external to the

3      site, 100 percent of their monitoring is random.

4  Q   Is there any way to know, looking at the account notes,

5      whether or not a call has been monitored?

6  A   Huh-uh.

7  Q   No way?

8  A   No.

9  Q   Okay.  You said virtually -- your hope is or your goal

10     is that virtually every contact is monitored?

11 A   Well, not necessarily monitored, because there's no

12     way -- I'd have to have ten supervisors for every team

13     for ten collectors to reasonably be able to do that.  I

14     like to get the managers on the calls.

15 Q   Okay.

16 A   So they're wrapping the call up.  I'm talking to you,

17     and you're saying, hey, I can't pay the bill.  That's

18     great.  You know, let's take a look at a couple of

19     options.  Maybe the rep did or didn't kind of go over

20     those.

21         If it's a payment, I want to make sure you agreed

22     to this.  I want to verify the information to make sure

23     there's no reason she's out there --

24             THE REPORTER:  Just a little slower, please.

25             THE WITNESS:  I'm sorry.

```
1                    MR. SCHULTZ:   Louder and slower.

2                    THE WITNESS:   So, you know, just kind of going

3           over the calls themselves.  But they're not going to

4           have an opportunity to monitor all of that.  I will tell

5           you the monitoring, just from my 23 years of experience

6           here, is far greater at NCO than what I've seen at other

7           agencies.

8      Q    (By Mr. Seals)  Okay.  You used two terms that I want to

9           make sure I understand so if it has to be explained to a

10          jury, talk-offs and side-by-sides.

11     A    Sure.

12     Q    Would you explain to me what a talk-off is?

13     A    A talk-off is where the manager gets on the phone with

14          the consumer.  It's either, you know, trying to work out

15          a payment arrangement with them, confirming a payment

16          arrangement, or in the event they're, you know, refusing

17          to pay the bill, just to make sure we understand the

18          reasons why.  So that would be that.  That's a talk-off.

19                   Side-by-sides is if you're a rep and I'm sitting

20          next to you and I'm doing some work with you, I'm seeing

21          how you're managing your file, file flow, make sure the

22          documentation is accurate, just -- I may be tied into a

23          splitter and making sure we don't have any compliance

24          issues that are out there.  It's just trying to

25          proactively make sure the reps are doing their job right
```

1      and they're compliant at all times.

2   Q   You said that you like managers to monitor, you like

3       them to do side-by-sides, you like them to get involved

4       in the calls.

5           How often do you expect that they review account

6       notes, either for accuracy or just to make sure that

7       there's nothing obviously wrong in the account notes?

8   A   Right.  At one point, we actually had file review logs

9       where managers were keeping logs that were out there.

10      It's not -- I don't think it's reasonable in the course

11      of the day, obviously, for them to look at every

12      account.

13          I mean, this client, and I don't know what their

14      inventory was at the time, but let's say they had 10,000

15      accounts out there, there's no way a manager is going to

16      be able to look at every one of those in the course of a

17      month.

18          They're randomly looking at those.  They're making

19      sure -- I mean, in my experience, typically, if you see

20      someone doing something wrong, it doesn't just happen on

21      one account.  There's a trend that's there.  So if I'm

22      looking at your accounts and you're working for me and

23      I'm your supervisor, maybe I only look at five accounts

24      a day for you.  It may not seem like a lot if you've got

25      a thousand or 1500 accounts in your file, but a long

```
 1           time ago I learned, you know, if I see you doing

 2           something on one account, you're probably doing that

 3           same thing on another account.

 4   Q     It's interesting that you mention that.  That brings me

 5           back to the language Ms. Williams uses in both of these,

 6           in Exhibit 1 and 2, seems strikingly similar.

 7               Do you know if she was using that sort of language

 8           or that sort of -- taking that sort of action in her

 9           other accounts, as you sit here?

10   A     I don't.  I couldn't tell you from, you know, two years

11           ago or a year -- a year and a half ago.

12   Q     Okay.  Are you aware of NCO's consumer defense for

13           payment policy?

14   A     Yes.

15   Q     Has NCO made Latisha reimburse them any monies for

16           defense?

17   A     I couldn't say.

18   Q     Okay.  Would she be the better one to answer that?

19   A     Yes.

20   Q     Okay.  All right.  I'm going to show you what I've

21           marked as Exhibit 4.  This is another document produced

22           by your attorney's office.

23   A     Okay.

24   Q     Do you know what that is?

25   A     Yes.  That's the account notes of, it looks like your
```

**Patrick DeProspo**                                                    **53**

```
 1        client's account.

 2   Q    Have you ever looked at my client's account notes before

 3        today?

 4   A    Yes.

 5   Q    Okay.  When was the last time you looked at them?

 6   A    Oh, I couldn't say.  I mean, I know we looked at them

 7        when this first came in to, you know, measure what we

 8        did and what we should have done.

 9   Q    Have you looked at them since you were notified you

10        would be giving a deposition?

11   A    Yes.

12   Q    And we've agreed that was earlier in the month, I think?

13   A    Yes.

14   Q    Okay.  Do you know how to decipher these?  I mean, can

15        you read these and understand what they say?

16   A    I can help you along, if you have any questions.

17   Q    I have a couple.  We took Greg Stevens' deposition

18        previously.  Do you know Mr. Stevens?

19   A    I do.

20   Q    Okay.  And he helped me out quite a bit.  He told me

21        that Mr. Lindsey's phone number was called eighteen

22        times and five messages were left.  Okay?

23   A    Okay.

24   Q    And if you want, you can go through there to confirm or

25        deny it.  It looks accurate.
```

**Patrick DeProspo**                                                                          **54**

```
 1   A    Okay.  I'll take your word for it.

 2   Q    Okay.  Anyway, one question I have is -- is -- is there

 3        any way to tell if the number is auto dialed, manually

 4        dialed, anything like that?

 5   A    There is some opportunity to see that.  I mean, usually,

 6        when they run dialers, it's on a live vox.

 7   Q    Okay.

 8   A    And usually you'll see vox under the ID that's over

 9        there.  V-o-x.  It looks like on this one -- I can't --

10        you know, off the top of my head, I can't tell you who

11        the collector IDs are.  I believe -- I believe SRA is

12        Latisha, and she could probably answer that for you.  I

13        couldn't tell you who the other ones were.

14   Q    Okay.

15   A    It doesn't look like this one -- it looks like the calls

16        that were made on this one may have been manual calls.

17   Q    All right.  All right.  In a manual call, explain this

18        to me, because we received NCO's recordings, not only

19        the transcripts but any other calls they made on the

20        account, and my client's voicemail message is on there

21        five or six times.  It's about five times, I think.

22   A    Right.

23   Q    When calling, would the collector hear the voicemail

24        message?

25   A    Yes.
```

1   Q    So if -- for example, if someone today manually dialed

2        my home phone or my cell phone, they would hear the

3        message that's left?

4   A    Yes.

5   Q    Okay.  Or at least you would expect them to hear the

6        message that was left?

7   A    Yes, they would.

8   Q    Okay.  Let's see here.  One other question I had, if you

9        will turn, sir, to page 3.  At the bottom, they're

10       numbered.  Okay.  You're there.  About midway down, on

11       June 9th, 2011, at 6:14 in the evening, it says,

12       "TO/LM."  What does "TO/LM" mean?

13  A    Telephoned other, left message.

14  Q    Okay.  And I'll represent to you, based on everything

15       else we have, I think that's the call to Kay Lindsey.

16  A    All right.

17  Q    It says, "TTP MRD LM for CB."  My understanding is

18       talked to person, monitoring recording disclosure --

19  A    Right.

20  Q    -- left message for call back?

21  A    Right.

22  Q    All right.  There's two dots there.  Is there supposed

23       to be anything else there, or is that the end of the

24       note?

25  A    No.  I'm guessing that's just the collector -- I mean,

**Patrick DeProspo**                                                        **56**

```
 1        again, as much as we try and make coding uniform and
 2        stuff, you get collectors just doing dot, dot.  She may
 3        have done dot and accidentally hit another period,
 4        thinking it was the end of the sentence, because there
 5        was a little bit of typing that was going on there.
 6             I don't -- I -- you can't access the account
 7        online.  I mean, the only access I have is the same
 8        access you had here, but certainly there's nothing I've
 9        seen that has anything else there.
10   Q    Okay.  Looking at this, and I know it's kind of easy
11        with hindsight being 20/20, but would it be apparent to
12        you that a violation of NCO's policy has taken place if
13        you looked at this?
14   A    Absolutely.
15   Q    Okay.  And explain to me again just so I'm clear, what
16        would stick out to you?
17   A    Well, look, we had a number for the --
18   Q    Yes, sir.
19   A    -- consumer.
20   Q    Yes, sir.
21   A    And we didn't know that it wasn't a good number.  And
22        then we made a call to a third party.  So it was
23        certainly a call that should not have been made, you
24        know, and Latisha, again, was trained on that.  It was
25        an error.
```

1   Q   In looking at this as well, would you expect your

2       managers, if they randomly pulled this account like we

3       talked about, to notice immediately that there was a

4       violation of policy?

5   A   They should have.

6           I mean, in looking at it again, I'm not sure what

7       the manager's, you know, review policy would have been.

8       You know, again, if -- depending upon what they're

9       looking for, they may have been trying to, you know,

10      make sure calls were being made at different times to

11      try and get the person on the phone.

12          But this account, it looks like was placed on the

13      7th, and everything else kind of drops off.  There's one

14      on the 28th.  It looks like we received an attorney

15      demand letter on June, the 28th, so --

16          I mean, the managers do have a process out there to

17      review accounts.  I'm not going to tell you everyone's

18      going to get hit -- I mean, they're not going to get hit

19      the first day.  They're not necessarily going to get hit

20      the first week.  Eventually, if a manager would have

21      looked at this, the supervisor or division manager, you

22      know, it should have been caught.

23  Q   Is there any way to tell if a manager looked at it?

24  A   I don't see any manager log-ons on here.

25  Q   All right, sir.  There was something else too.  If you

```
 1        look, it says, "Account View Only, CC/CC."  What does

 2        that mean?

 3   A    That's just a coding.  Collectors, so that -- we have

 4        some processes in place at NCO that if a check's going

 5        to post or something, collectors will need to pull it

 6        up.  If they're looking for a call back, they'll have to

 7        pull it up.

 8             You know, in an effort to make sure we're more

 9        functional and the flows are going right, collectors can

10        only look into accounts so often.  We take away some

11        action codes.

12             I suspect on that -- and what page was that on that

13        you're looking at?

14   Q    I was looking on page 3.

15   A    Yeah.  So I don't know.  It looks like someone was just

16        pulling it up and took a quick look on it.  There's no

17        documentation that's there.  So it was it just a quick

18        pull-up.  It could have been someone pulling the account

19        up in error, so...

20   Q    All right, sir.

21   A    It doesn't look like there's anything that's sticking

22        out from those two log-ons that's out of the ordinary.

23   Q    All right.  And you said the account got there -- got to

24        NCO on June 7, 2011, and all activity ceased the 28th.

25        So about three weeks it was in your office?
```

1   A   It looks that way.

2   Q   All right.  Is there any way to tell when and if a

3       letter was sent to Mr. Lindsey?

4   A   Usually, those letters go out -- so you understand the

5       process, typically, those letters go out.  There's a

6       waterfall that runs for bankruptcy as well as letters

7       that go out on this.

8           I'd have to take a look.  I'm not -- to be honest

9       with you, I can't tell you what the letter series is for

10      this client, on what it is, so -- and Latisha wouldn't

11      be able to help out on that either.  It would have to go

12      back to our Bank of America internal team to figure out

13      what the letter is and to tell you where it went out and

14      when it went out.

15  Q   Okay.  So your testimony is, looking at this, it's not

16      clear when a letter would have gone out, and you don't

17      expect Latisha to know that either?

18  A   I don't believe -- no.  Latisha wouldn't know that, not

19      necessarily.

20          She's no longer working this client or anything,

21      but typically those letters go out.  So you understand,

22      we don't -- you probably already know, under the FDCPA,

23      there's certain requirements to get a letter out after a

24      contact's made.

25  Q   Right.

**Patrick DeProspo**                                                      **60**

1  A    And virtually every agency out there today doesn't do

2       that.  They get a letter out upon receipt of the

3       account.

4            So our accounts come in.  We run it through a

5       bankruptcy scrub, we run it through a deceased scrub, to

6       make sure the debtor has not filed bankruptcy and we're

7       not in violation of that, or they're not deceased.

8            And then at that point, we go ahead and get a

9       letter out.  That typically happens within the first 24

10      to 48 hours of the account.  And that's systematic.

11      It's standardized.  It's not up to anyone flipping a

12      switch.  It just happens.  As the accounts come in, they

13      get scrubbed.

14 Q    It's automatic.  It comes in, the letter goes out?

15 A    Yep.

16 Q    All right, sir.

17 A    It takes the guesswork out for everybody.

18 Q    Makes sense to me.

19 A    I'm trying to put you guys out of business.

20 Q    Keep trying.

21           MR. SCHULTZ:  Yeah.  Keep trying is right.

22 Q    (By Mr. Seals)  I'm going to show you what I'm marking

23      as Exhibit 5, and these are -- these are a portion of

24      Latisha's personnel file that was provided to me.

25 A    Okay.

```
 1                    THE WITNESS:  Are we able to -- and I hate to

 2         ask you guys this.  Can we break to use the restroom?

 3                    MR. SEALS:  Of course.

 4                    MR. SCHULTZ:  Yeah.

 5                    MR. SEALS:  And I should have told you.  Go

 6         ahead.

 7                    THE WITNESS:  Is that okay?

 8                    MR. SEALS:  Yes, of course.

 9                    THE WITNESS:  All right.  Thank you.

10                    (Recess taken.)

11    Q    (By Mr. Seals)  All right, sir.  We just took a break,

12         and I had marked Exhibit 5, which is a portion of the

13         personnel file for Latisha Williams.

14              Have you ever looked at her personnel file before?

15    A    I have.

16    Q    Okay.  Did you do so since you were notified about this

17         deposition?

18    A    Yes.

19    Q    Okay.  So it would have been within the last few weeks?

20    A    Yes.

21    Q    All right.  I'm going to show that to you, sir.  I just

22         had a couple of questions about it.

23              The first one I had, because I wasn't familiar with

24         the term, is on -- they're Bates stamped at the bottom,

25         the page numbers.
```

```
1   A    Okay.

2   Q    On what's Bates stamped 255 --

3   A    Okay.

4   Q    -- it says, "Covered with her.  Good call overall.

5        Advised her some more 3p pumping tactics.  Thanks."

6   A    Third party.

7   Q    Third-party pumping tactics?

8   A    Yes.

9   Q    What's a third-party pumping tactic?

10  A    Just probing.  I mean, again, there's a lot of acronyms

11       that we use within this industry, and that would have

12       just been probing for more information and trying to get

13       information.

14  Q    All right, sir.  That was my first question.  And then

15       the next one I have is on page 259.  Just let me know

16       when you're there.

17  A    Okay.

18  Q    It says at the bottom there -- excuse me.  Under the --

19       do you see the part where it says, "Development Area"?

20  A    Okay.

21  Q    It's next to "Discipline" and the little pyramid there?

22  A    Yep.

23  Q    It says, "Needs Improvement, Lacking proper activation

24       on new business accounts.  Needs to be skipping accounts

25       to find better numbers."
```

1   A   Okay.

2   Q   What was the criticism there?

3   A   It looks like she was not calling her new business

4       accounts quickly enough, because we have some standards

5       out there that those numbers need to be called.  And it

6       looks like there needs to be some better skip tracing --

7       on some skip tracing for numbers.

8   Q   It says at the bottom, under "Action Plan, will do side

9       by sides to help make sure Latisha understands how to

10      set up talk offs and skip trace her accounts."

11  A   Right.

12  Q   Is that the same -- when we use that term

13      "side-by-sides" as it's used here, is that the same that

14      you described to me earlier?

15  A   It is.  So that would have been the supervisor saying,

16      unless you activate your accounts better, some better

17      skip tracing, and I'm going to do side-by-sides and sit

18      with you one on one to make sure that we're doing

19      that -- it looks like setting talk-offs.

20  Q   The critical dates on here are June 8th, 2011, with a

21      follow-up of June 15th, 2011.

22  A   Okay.

23  Q   Does that mean that during June 8th -- the week of

24      June 8th to June 15th, he would have been sitting next

25      to her?

**Patrick DeProspo** 64

```
1   A   Should have been.

2   Q   Okay.  How often, if they received one of these

3       development plans?

4   A   Well, it depends.  I mean, if I sat with you and I saw

5       that you were doing things the way you needed to do, I'd

6       probably circle back around for a little bit and make

7       sure that you were continuing doing it and not just

8       doing it because I'm there with you.

9           If you weren't doing it right, then the supervisor

10      may have been sitting with her every day during that

11      period, just to make sure she got it right and had a

12      good handle on it.

13  Q   One of the phone calls, the one referenced in Exhibit 1,

14      was on June 9th.

15  A   Okay.

16  Q   I think we talked about it.  There's no way to tell in

17      the account notes, is there, whether or not there was a

18      side-by-side going on, is there?

19  A   No, because they wouldn't have documented that.  There's

20      just too much going on for them to do that.

21  Q   All right.  Okay.  Switching gears just a little bit.

22      If you would turn with me, sir, to 265.

23  A   Okay.

24  Q   Are you there, sir?

25  A   I am.
```

**Patrick DeProspo**                                                                                    **65**

1    Q    It looks like, and please correct me if I'm wrong, but

2          it looks like it's a verbal warning for performance

3          based on not meeting a goal in collecting.

4                Is that what it looks like to you?

5    A    That's correct.

6    Q    Okay.  It's a verbal warning, and you said those last

7          about six months and they escalate to written warnings?

8    A    Verbal would have been approximately three months.

9    Q    Three months.  I'm sorry.

10   A    Yes.  And I'm taking a guess based on what the policy

11         was back then.

12   Q    I understand.  And then it looks like 266, about four

13         months later, it says she "acted in an unprofessional

14         manner by failing to properly document NCO account

15         records."  What does that mean to you?

16   A    It looks like there was not some documentation that

17         happened, and it came up either on a, you know,

18         monitoring or a side-by-side, or somehow it came up and

19         it was addressed with a verbal warning.

20   Q    All right.  And she received another verbal warning, if

21         you flip the page, on January 3rd, 2011, and this was

22         another performance-related verbal warning; is that

23         correct?

24   A    Yes.

25   Q    All right.  So I'm clear, the warning on 266 is

**Freedom Court Reporting, Inc**                                        **877-373-3660**

     1          collector misconduct, the warning on 267 is performance.

     2               If Latisha -- would it be your understanding that

     3          if a person gets a performance verbal warning, if they

     4          get a misconduct verbal warning, at what point does it

     5          escalate to a written warning?

     6     A    Well, those are -- those are different, and again --

     7     Q    Right.

     8     A    -- some of it has to do with HR --

     9     Q    Okay.

    10     A    -- so I'm not able --

    11     Q    I understand.

    12     A    -- without having notes and everything in front of me,

    13          but typically -- and maybe this will help clear it for

    14          you.

    15     Q    Yes, sir.

    16     A    So let's say you start missing work and we give you an

    17          attendance verbal warning.

    18     Q    Okay.

    19     A    And then you get a verbal, so that's out there typically

    20          for three months.  Say the next month after you got the

    21          verbal, so it was still within that three-month time, we

    22          come up with the performance warning.  It doesn't go

    23          from a verbal to a written, because that's a different

    24          area.

    25     Q    Okay.

**Patrick DeProspo**                                                          **67**

```
1   A    So they escalate within those areas, not necessarily

2        from attendance to performance to misconduct to

3        something else.

4   Q    Okay.

5   A    Does that help?

6   Q    That helps a lot.  I appreciate it.

7            I guess the next one -- there are a few more in

8        here.  Let's see.  She received another performance

9        warning, and this is the written warning like we talked

10       about, the escalation, and it looks like on

11       February 1st.  It's page 268.

12  A    Right.

13  Q    Then one that's kind of confusing.  I'll have to ask her

14       about it, probably.  On April 14th, 2011, she received a

15       verbal warning for collector misconduct, it says, "On

16       April 6th, 2011, you violated Company" --

17               THE REPORTER:  Just a little slower.

18  Q    -- "policy, and acted in an unprofessional manner by

19       failing to follow NCO procedure when speaking with the

20       consumer."

21           As you sit here, do you know what this was about?

22  A    I don't.

23  Q    Okay.

24  A    That's over -- you know, over a year ago.

25  Q    It was.  You have no independent recollection as to why
```

```
 1        she received this?

 2   A    No, sir.

 3   Q    Okay.  I had to ask.

 4             The next is on September the 8th, 2011, and it is a

 5        verbal warning for collector misconduct.  It says, On

 6        June 15th, June 16th, June 21st, and June 25th, 2011,

 7        "You violated company policy and acted in an

 8        unprofessional manner by failing to properly document

 9        NCO records"?

10   A    Correct.

11   Q    All right.  What was this one about?

12   A    I couldn't tell you, but it could have -- it could have

13        been -- it could have been something on the same account

14        where it was an error that got repeated.

15   Q    So that you know, the lawsuit in this case was filed on

16        September the 1st, 2011 --

17   A    Okay.

18   Q    -- and I believe I notified your counsel of it that day.

19        It wasn't served or anything, but I let him know that we

20        had filed suit.

21   A    Okay.

22   Q    Knowing that, does that make this more likely that it

23        was related to Mr. Lindsey's account, in your opinion?

24   A    I couldn't tell you, to be honest with you.

25   Q    Fair enough.  Fair enough.  The next one is on 271, and
```

```
 1          it's a written warning for collector misconduct.  It

 2          says, the pertinent part, on June 9th, June 10th,

 3          June 15th, June 16th, June 21st, June 24th and 25th,

 4          2011, "You violated Company policy and acted in an

 5          unprofessional manner by failing to fully follow NCO

 6          procedure regarding calls placed on an account, relating

 7          to third party contacts, and when documenting NCO's

 8          records."  The date at the top is September 8th, 2011.

 9              Do you know what this is about?

10     A    I don't.  Is that the one that's 271 down at the bottom?

11     Q    Yes, sir.

12     A    I couldn't tell you.

13     Q    Okay.  Is it unusual to you that the signatures are all

14          dated February 15th, 2012?

15     A    Well, I...

16     Q    If you know.  I don't want you to guess or anything.

17     A    Well, I'm guessing what happened is, is that this is

18          something that came to our attention in February of

19          2012, but the actual issues happened back in June of

20          2011.

21     Q    All right.  Other than these warnings in front of us,

22          and I understand that you don't know specifically why

23          she received them, okay, has Latisha Williams received

24          any sort of punishment based on any of the claims my

25          client has made in this lawsuit?
```

**Patrick DeProspo**

```
 1   A    I'm not sure I understand.

 2   Q    Okay.  We have these warnings in front of us?

 3   A    Right.

 4   Q    And correct me if I'm wrong, but my understanding is you

 5        cannot tell me whether or not these relate to

 6        Mr. Lindsey's account, can you?

 7   A    I believe she did get a written warning.  My

 8        recollection is I believe she did.  I couldn't tell you

 9        which one specifically, but I believe she did get a

10        warning for what happened.

11   Q    Do you know if she got more than one?

12   A    I don't.

13   Q    You don't know, okay.  Other than the warning you know

14        about, has there been any other discipline whatsoever

15        for Ms. Williams as a result of the allegations my

16        client has made?

17   A    I couldn't say without, you know, the personnel file and

18        notes in front of me.

19            I mean, you referenced before the repayment plan.

20        I can't tell you if that's --

21   Q    That's fair.

22   A    -- I can't tell you that without her personnel file in

23        front of me.

24   Q    That's fair.  Do you know if, because of the allegations

25        and the complaint against NCO specifically directed at
```

```
 1          Ms. Williams, she was required to undergo any more

 2          training or have any more monitoring?

 3    A     Typically, that would have been covered with her during

 4          the JDS process.  I mean, those JDS process, if you

 5          think about them, they're not just discipline.  They are

 6          the opportunity to show the employee where they did

 7          something wrong.

 8    Q     Okay.

 9    A     To use some retaining there.

10    Q     Yes, sir.

11    A     And then, again, I don't have her personnel file here in

12          front of me, but the supervisor should have gone ahead

13          and done some additional monitoring, like I said before,

14          to make sure that the issue that we covered with her,

15          you know, then did not have the same compliance issues

16          coming up over and over and over again.

17    Q     As you sit here today, do you know whether or not NCO's

18          policy regarding skip tracing and/or third-party

19          contacts has changed in any way between June 2011 and

20          today?

21    A     I couldn't tell you.  I mean, policies change as things

22          come up.  If there's a new state, you know, laws, or,

23          you know, if there's a lawsuit under the FDCPA by

24          another company that we have to adhere to, so stuff

25          changes all the time.
```

```
 1              I could not tell you for those two areas within

 2        that time frame, you know, specifically if anything has

 3        changed or not.

 4   Q    Has anything changed at your site because of the

 5        complaint my client filed?

 6   A    Well, in the sense that it shouldn't have happened and

 7        it was addressed, you know, we'll go out there and, you

 8        know, we'll make sure that that's not an issue happening

 9        on other teams as well.

10   Q    Okay.

11   A    But certainly, in terms of our training process, I'd say

12        no, because the employees are trained not to do that the

13        first time.

14   Q    You said something interesting.  Do you know one way or

15        another if -- if my client's claims were mentioned in

16        huddles or a big group meeting or anything like that?

17   A    We would not necessarily name, you know, this is the

18        consumer --

19   Q    Sure.  But the situation then.  How about that?

20   A    I don't recall.  I don't think we would.

21   Q    Okay.  That's fair.

22              MR. SEALS:  I think that's all I have for you.

23              THE WITNESS:  Okay.

24              MR. SCHULTZ:  Pat, you've got the opportunity,

25        if you want, to review the transcript to make sure our
```

1          court reporter here took down everything correctly.

2                    THE WITNESS:  Okay.

3                    MR. SCHULTZ:  If you want and if you believe

4          that she was able to do so, you can just waive that

5          right so that you don't have to deal with it.

6                    THE WITNESS:  Okay.

7                    MR. SCHULTZ:  You have a choice.  Generally

8          speaking, if you want my suggestion, we waive signature

9          so you don't have to deal with it, but you can do

10         whatever you want.

11                   THE WITNESS:  I'm fine with that.

12                   MR. SCHULTZ:  All right.  So we will waive.

13         You're all done.

14                   MR. SEALS:  Before we -- before we -- I want

15         to make sure I mark the deposition notice as Exhibit 6.

16                         (WITNESS EXCUSED)

17                   (Deposition concluded at 12:15 p.m.)

18                   (The ORIGINAL EXHIBITS are attached to the

19                   original transcript and copies supplied to all

20                   counsel.)

21                   (The ORIGINAL TRANSCRIPT was provided to

22                   MR. SEALS and copies to MR. SEALS and

23                   MR. SCHULTZ.)

24                      * * (END OF RECORD) * *

25

```
 1   STATE OF MINNESOTA
                                                        CERTIFICATE
 2   COUNTY OF COTTONWOOD

 3        I, PAMELA J. FRANZ, hereby certify that I reported the
     deposition of PATRICK N. DEPROSPO on the 13th day of June,
 4   2012, and that the witness was by me first duly sworn to tell
     the truth and nothing but the truth concerning the matter in
 5   controversy aforesaid;

 6        That I was then and there a Notary Public in and for the
     County of Cottonwood, State of Minnesota; that by virtue
 7   thereof I was duly authorized to administer an oath;

 8        That the foregoing transcript is a true and correct
     transcript of my stenographic notes in said matter,
 9   transcribed under my direction and control;

10        That the cost of the original has been charged to the
     party who noticed the deposition and that all parties who
11   ordered copies have been charged at the same rate for such
     copies;
12
          That the reading and signing of the deposition was
13   waived;

14        That I am not related to nor an employee of any of the
     attorneys or parties hereto, nor a relative or employee of
15   any attorney employed by the parties hereto, nor financially
     interested in the outcome of the action and have no contract
16   with parties, attorneys or persons with an interest in the
     action that affects or has a substantial tendency to affect
17   my impartiality;

18        WITNESS MY HAND AND SEAL this 19th day of June, 2012.

19

20

21

22

23                                  _____

24                                        NOTARY PUBLIC

25
```

**WORD INDEX**

**< - >**
**-** 1:*4, 9, 16, 19*
 3:*8* 44:*10*

**< 0 >**
**00248** 3:*11*
**00273** 3:*11*
**00299** 3:*8*
**06** 1:*25*
**07** 30:*13*

**< 1 >**
**1** 3:*6* 52:*6*
**1,** 64:*13*
**1.** 36:*16*
**10** 15:*9*
**10,000** 51:*14*
**10:54** 4:*3*
**100** 42:*22* 49:*3*
**10th,** 69:*2*
**11** 18:*14*
**1120** 2:*12*
**12:00** 18:*11*
**12:15** 73:*17*
**13** 1:*25* 25:*4*
**13th** 4:*1* 74:*3*
**14** 25:*9*
**14th** 67:*14*
**15** 15:*10* 25:*2, 2,*
 *11* 26:*15*
**150** 19:*20*
**1500** 51:*25*
**15th** 63:*21, 24*
 68:*6* 69:*3, 14*
**16th** 37:*4* 68:*6*
 69:*3*
**17.33.** 15:*1*
**173** 15:*1*
**19th** 74:*18*
**1st** 67:*11* 68:*16*

**< 2 >**
**2** 3:*7* 6:*11, 13,*
 *19, 22* 7:*13* 52:*6*
**2:11-CV-03183-WM
A** 1:*4*
**20** 15:*11* 56:*11,*

**11**
**200** 4:*3* 19:*20*
**2010** 14:*8, 11*
**2011** 7:*20* 15:*23*
 16:*3* 19:*16* 30:*6*
 36:*22* 37:*4*
 55:*11* 58:*24*
 63:*20* 65:*21*
 67:*14, 16* 68:*4,*
 *16* 69:*4* 71:*19*
**2011,** 68:*6*
**2011.** 18:*22, 23*
 63:*21* 69:*8, 20*
**2012** 1:*25* 4:*2*
 69:*14, 19* 74:*4*
**2012.** 74:*18*
**205.323.3900** 2:*6*
**205.3233906** 2:*6*
**21st** 2:*5* 68:*6*
 69:*3*
**23** 22:*7* 29:*15*
 50:*5*
**24** 60:*9*
**24th** 69:*3*
**25** 15:*11*
**255** 62:*2*
**259** 62:*15*
**25th** 68:*6*
**25th,** 69:*3*
**265.** 64:*22*
**266** 65:*12, 25*
**267** 66:*1*
**268.** 67:*11*
**271** 68:*25* 69:*10*
**28th** 57:*14, 15*
**28th.** 58:*24*
**299** 44:*11*

**< 3 >**
**3** 3:*8* 55:*9*
**3.** 58:*14*
**30,000-foot** 9:*6*
**300** 2:*5*
**312.578.0990** 2:*13*
**312.578.0991** 2:*13*
**34th** 4:*2*
**35203** 2:*5*
**36** 3:*6*
**37** 3:*7*

**3p** 62:*5*
**3rd** 65:*21*

**< 4 >**
**4** 3:*2, 8* 52:*21*
**40** 19:*2*
**400** 2:*4*
**44** 3:*8*
**48** 60:*10*

**< 5 >**
**5** 3:*8* 15:*10*
 31:*23* 60:*23*
 61:*12*
**5,000** 16:*12*
**5:00** 18:*9*
**50** 16:*1*
**50s** 15:*24*
**52** 3:*8*
**55** 2:*11*

**< 6 >**
**6** 3:*8, 12*
**6.** 73:*15*
**6:14** 55:*11*
**60** 3:*11*
**60.** 15:*21*
**60603-5130** 2:*12*
**6th** 67:*16*

**< 7 >**
**7** 18:*13* 58:*24*
**70** 16:*1*
**70s** 15:*24*
**73** 3:*12*
**7th** 57:*13*

**< 8 >**
**8** 14:*11*
**8:00** 18:*9*
**8009** 4:*2*
**8th** 63:*20, 23, 24*
 68:*4* 69:*8*

**< 9 >**
**9:00** 18:*12*
**9th** 36:*22* 55:*11*
 69:*2*
**9th.** 64:*14*

**< A >**
**A** 5:*8, 10, 13, 17,*
 *24* 6:*1, 6, 8, 11,*
 *16, 18, 24* 7:*1, 3,*
 *6, 8, 10, 15, 18, 21,*
 *23* 8:*1, 1, 4, 10,*
 *11, 13, 18* 9:*1, 3,*
 *5, 5, 9, 11, 18, 23*
 10:*1, 4, 7, 10, 13,*
 *16, 20, 24* 11:*3,*
 *24* 12:*1, 5, 9, 13,*
 *18* 13:*3, 13, 20,*
 *23* 14:*1, 10, 13,*
 *16, 19, 21* 15:*7,*
 *11, 15, 19, 21, 24*
 16:*2, 5, 5, 10*
 17:*2, 17, 20, 23*
 18:*1, 6, 8, 11, 16,*
 *20, 23* 19:*5, 8, 10,*
 *13, 17, 19* 20:*2, 8,*
 *11, 16* 21:*1, 3, 6,*
 *10, 12, 14, 18, 20,*
 *23* 22:*1, 3, 5, 7, 9,*
 *11, 14, 17, 19, 21,*
 *24* 23:*3, 9, 11, 13*
 24:*3, 8, 18, 19, 25*
 25:*2, 7, 15, 17*
 26:*4, 16* 27:*4, 7,*
 *9, 18, 23* 28:*7, 9,*
 *16, 20* 29:*18, 19*
 30:*8, 12, 15, 20*
 32:*2, 4, 7, 15, 22*
 33:*1, 3, 13, 16, 21,*
 *23* 34:*7, 9, 13, 15,*
 *19, 21, 23* 35:*6,*
 *11, 13, 15, 17, 20*
 36:*1, 8, 12, 14, 17,*
 *23, 25* 37:*5, 7, 11,*
 *14, 17, 20* 38:*1, 8,*
 *11, 13, 16, 20, 21,*
 *24* 39:*3, 6, 8, 10,*
 *16, 21* 40:*1, 4, 6,*
 *12, 17, 20, 24*
 41:*2, 6, 8, 14, 16,*
 *25* 42:*4, 7, 10, 12,*
 *12, 22* 43:*2, 7, 9,*
 *12, 13, 16, 20*
 44:*6, 13, 19, 22,*
 *23* 45:*7, 13, 15*

46:*10, 15, 20*
47:*2, 6, 18, 25*
48:*8, 14, 19* 49:*2,*
*6, 8, 11, 16* 50:*9,*
*11, 13, 22* 51:*8,*
*16* 52:*10, 14, 17,*
*19, 23, 25* 53:*4, 6,*
*11, 13, 16, 19, 23*
54:*1, 5, 8, 15, 22,*
*25* 55:*4, 7, 13, 16,*
*19, 21, 25* 56:*14,*
*17, 19, 21* 57:*3, 5,*
*24* 58:*3, 15, 21*
59:*1, 2, 4, 5, 18,*
*23* 60:*1, 4, 8, 11,*
*15, 17, 19, 25*
61:*15, 18, 20*
62:*1, 3, 6, 8, 10,*
*17, 20, 22* 63:*1, 3,*
*11, 15, 20, 22*
64:*1, 4, 11, 15, 17,*
*19, 23, 25* 65:*5, 8,*
*10, 16, 24* 66:*6, 8,*
*10, 12, 16, 19*
67:*1, 5, 12, 14, 22,*
*24* 68:*2, 4, 10, 12,*
*17, 21, 24* 69:*10,*
*12, 15, 17* 70:*1, 3,*
*7, 9, 12, 17, 22*
71:*3, 9, 11, 21*
72:*6, 11, 17, 20*
**a.m** 18:*13*
**a.m.** 4:*4* 18:*14*
**able** 22:*25* 24:*9*
25:*25* 26:*1, 2*
27:*19* 49:*13*
51:*16* 59:*11*
61:*1* 66:*10* 73:*4*
**about.** 8:*25*
**absence** 34:*24*
**absent** 35:*3*
**absolutely** 24:*15*
39:*12*
**Absolutely.**
10:*10, 16* 27:*4*
56:*14*
**ACA** 26:*5*
**access** 56:*6, 7, 8*
**accidentally** 56:*3*

**account** 16:*17,*
*18* 17:*16* 29:*1*
35:*22* 39:*21*
41:*10* 45:*19*
46:*15* 47:*21*
49:*4* 51:*5, 7, 21*
52:*2, 25* 53:*2*
54:*20* 56:*6* 57:*2,*
*12* 58:*1, 18, 23*
60:*10* 64:*17*
65:*14* 68:*13, 23*
69:*6* 70:*6*
**account,** 41:*24*
**account.** 51:*12*
52:*3* 53:*1* 60:*3*
**accountable**
31:*18*
**accounts** 16:*4, 6,*
*10, 12, 15, 24*
17:*14, 22, 25*
18:*1* 25:*14* 32:*9*
51:*15, 22, 23, 25*
52:*9* 57:*17*
58:*10* 60:*4, 12*
62:*24, 24* 63:*4,*
*10, 16*
**accounts.** 27:*20*
**accuracy** 51:*6*
**accurate** 21:*8*
43:*22* 45:*7* 50:*22*
**accurate.** 17:*2*
42:*22* 53:*25*
**acknowledgments**
24:*11*
**acronyms** 62:*10*
**Act** 10:*6*
**acted** 65:*13*
67:*18* 68:*7* 69:*4*
**action** 5:*18*
28:*22* 30:*23, 24*
32:*23* 33:*7* 52:*8*
58:*11* 63:*8*
74:*15, 16*
**action,** 46:*10*
**actions** 45:*20*
**activate** 63:*16*
**activation** 62:*23*
**activity** 58:*24*
**actual** 69:*19*

**actually** 33:*25*
**addition** 13:*5*
**additional** 71:*13*
**address** 21:*8*
**addressed** 65:*19*
72:*7*
**addressed.** 30:*21*
32:*20*
**adequately** 24:*6,*
*8*
**adhere** 13:*2*
71:*24*
**adjustments** 26:*6*
**administer** 74:*7*
**Advised** 62:*5*
**affect** 74:*16*
**aforesaid** 74:*5*
**After** 31:*1*
**again.** 71:*16*
**agencies.** 50:*7*
**agency** 20:*18*
60:*1*
**ago** 4:*23* 52:*1,*
*11*
**ago.** 52:*11* 67:*24*
**agree** 10:*17*
21:*7* 46:*25*
**agreeable** 4:*13*
**agreed** 49:*21*
53:*12*
**ahead** 27:*24*
28:*3* 60:*8* 71:*12*
**ahead.** 61:*6*
**AL** 2:*5*
**ALABAMA** 1:*2*
5:*2*
**all** 27:*15* 69:*13*
73:*19*
**allegation** 9:*23*
32:*15* 33:*11*
36:*20*
**allegations** 70:*15,*
*24*
**allowed** 25:*13*
**am.** 64:*25*
**amazing** 23:*24*
**America** 59:*12*
**American** 22:*11*
**amount** 14:*22*
32:*24*

**an** 17:*9* 20:*11*
31:*15* 66:*16*
68:*7* 69:*4*
**and** 5:*11* 8:*8*
14:*4* 25:*8, 18*
28:*9* 33:*18, 24*
35:*20* 40:*8, 12*
45:*18* 51:*22*
56:*1, 21* 59:*13*
65:*18* 68:*25*
70:*17* 71:*19*
72:*6* 73:*22*
**answer** 8:*21*
13:*8* 24:*15*
38:*12* 44:*13*
52:*18* 54:*12*
**answering** 20:*6*
38:*18*
**answers** 39:*3*
**any** 8:*7* 74:*15*
**anything,** 59:*20*
**anything.** 69:*16*
**Anyway** 54:*2*
**apparent** 56:*11*
**APPEARANCES:**
2:*1*
**apply** 27:*19*
**appreciate** 13:*8*
39:*13* 45:*8* 67:*6*
**Approximately**
7:*1* 30:*12* 65:*8*
**April** 67:*14, 16*
**are** 12:*14* 14:*2*
18:*18* 25:*17*
32:*19* 33:*5* 71:*5*
**are,** 14:*1*
**are.** 24:*12*
**area** 11:*14* 62:*19*
**area.** 66:*24*
**areas** 67:*1* 72:*1*
**arrangement**
50:*15, 16*
**as** 11:*3* 23:*19*
26:*24, 25* 27:*19*
36:*15*
**ask.** 68:*3*
**asked** 24:*12*
40:*8* 42:*3*
**asked,** 39:*1*
**asked.** 40:*10*

**asking** 45:10
46:18
**assigned** 16:25
17:9
**assist** 24:14
**assume** 17:24
42:25 46:12
**at** 5:19 34:17
43:3 47:20 70:25
**attached** 73:18
**attendance** 66:17
67:2
**attention** 30:20,
22 32:7, 18
35:17, 24 69:18
**attorney** 8:24
57:14 74:15
**attorney.** 42:20
**attorneys** 44:10
74:14, 16
**attorney's** 52:22
**Aurora** 7:10, 15
**authorized** 32:4
74:7
**auto** 54:3
**automatic** 34:20
35:5 60:14
**automatically**
31:11 33:20
**automatically.**
33:21
**available** 17:6, 10,
15
**Avenue** 4:2
**average** 15:1
**aware** 52:12
**axiom** 20:12

< B >
**back** 6:1 16:3
18:22, 23 19:16
24:19 30:6 31:4
40:12 47:10
52:5 55:20 58:6
59:12 64:6
65:11 69:19
**background**
36:17
**bad** 37:24
**balances** 16:18

**bank** 13:14
59:12
**bankruptcy** 59:6
60:5, 6
**base** 15:1
**based** 14:7, 18,
22 24:3 35:8
37:8 41:12
55:14 65:3, 10
69:24
**bases** 40:16
**basically** 5:4 9:5,
23 13:6 17:3
27:9
**basis** 13:4
**Bates** 3:8, 8
44:10 61:24 62:2
**be** 17:14 24:11
28:19 29:1 40:14
**be.** 21:6, 18
**bear** 10:2
**been** 7:16 22:17
**been.** 57:7 64:1
**before** 53:2
**before,** 71:13
**before.** 31:19
33:8
**beginning** 38:3
**behavior** 48:13,
14
**being** 42:2
**believe** 6:16
10:1 11:7 24:8
25:22 26:4, 22,
25 31:5 37:11
40:9 43:24 45:4,
19 54:11, 11
59:18 68:18
70:7, 8, 9 73:3
**believe.** 36:19
**best** 48:13, 14
**better** 19:1
38:12 52:18
62:25 63:6, 16, 16
**beyond** 9:25
11:6 24:19
**big** 72:16
**bill** 49:17 50:17
**Birmingham** 2:5

**bit** 18:2 53:20
56:5 64:6
**bit.** 46:5 64:21
**blatantly** 33:24
**blush** 44:3
**board** 15:6
**bonus** 14:19
15:14
**bonuses** 14:18
**boom.** 33:11
**bottom** 44:18
55:9 62:18 63:8
69:10
**bottom,** 61:24
**break** 18:18 61:2
**break,** 61:11
**bring** 30:20, 22
**brings** 52:4
**brother** 37:2
44:23
**brought** 13:3
32:17 35:17, 23
**bucks** 14:25
**Building** 2:4
**Bureau** 22:11
**business** 10:8
16:11, 13 25:2
62:24 63:3
**business.** 29:15
60:19
**but** 16:19 47:11
48:14 65:1
**but,** 12:23
**By** 2:6, 15 4:22
67:18 71:23
**bypass** 22:25

< C >
**call** 3:6, 7 9:5, 8
10:8 12:22 20:4
24:25 30:3, 6, 18
31:24 36:15, 18,
21 37:2 38:2, 7
39:11 40:2
43:13 45:15, 15
46:23 48:1 49:5,
16 54:17 55:15,
20 56:22, 23
58:6 62:4
**call,** 28:24

**called** 4:7 41:13
44:1, 4 53:21
63:5
**calling** 20:3, 3
37:24 39:17
41:18, 18, 18
45:1 54:23 63:3
**calls** 19:14, 20
35:9, 14, 16, 20,
21 36:7 37:10,
17, 18 38:15
39:14 45:4 47:3,
6, 17 50:3 54:15,
19 57:10 64:13
69:6
**calls.** 35:15
47:22 49:14
51:4 54:16
**came** 31:10
**campaign,** 16:20
**can** 47:23 53:14
58:9
**can.** 36:7
**can't** 13:14 35:17
**care** 12:3, 3
**case** 8:3, 8, 16
68:15
**case,** 8:14
**catch** 32:10
**caught.** 57:22
**CB** 55:17
**CC** 58:1, 1
**ceased** 58:24
**cell** 55:2
**certain** 14:22
16:17 17:1 34:5
38:14 43:21
59:23
**certainly** 33:10
40:15 42:14
44:6 45:21 56:8,
23 72:11
**CERTIFICATE**
74:1
**certify** 74:3
**chance** 36:24
**change** 27:21
71:21
**changed** 71:19
72:3, 4

changes  27:16,
17  71:25
charged  74:10, 11
check's  58:4
Chicago  2:12
7:11
choice  73:7
circle  64:6
circumstance
35:3  46:17
circumstances
33:5
claim  8:14
claims  37:16
69:24  72:15
clarification  11:16
clarify.  39:8
class  26:1
classes  11:13
23:7
classroom  24:25
25:5  26:23
clear  8:11  16:22
41:16  56:15
59:16  65:25
66:13
clear.  8:21
clearly  37:23
client  5:18  9:21
11:18  12:7  13:3
15:5, 7  32:12, 12
35:8  45:1, 2
51:13  59:10, 20
69:25  70:16  72:5
client.  15:8
clients  16:11
29:23  36:21
client's  36:18
37:2  53:1, 2
54:20  72:15
client-specific
23:18
closer  25:9
COCHRUN  2:4
codes.  58:11
coding  56:1  58:3
collect  14:22
15:2, 3  24:9
collected  16:8

collecting  24:6,
17  25:13  34:6
collecting.  65:3
Collection  10:5
21:22  22:6  47:17
Collector  3:8
10:17, 21  12:20
17:5, 9, 10, 15
19:6  22:20
23:12  24:4
29:17, 20  31:23
34:10  37:19
47:21  54:11, 23
55:25  66:1
67:15  68:5  69:1
collector.  17:7
18:1  22:22
collectors  11:1
12:11  13:1, 11
14:1, 21  16:12
18:8, 19, 25  19:3
27:18, 22  28:1,
14, 17  33:10
34:5  38:6  47:7
48:12  49:13
56:2  58:3, 5, 9
collects  14:18
come  9:17
18:12  26:4
32:10, 11  45:24
60:4, 12  66:22
71:22
comes  27:15, 23
31:23  32:7  60:14
coming  21:23
30:15  48:24
71:16
commencing  4:3
commissions
14:17
companies  22:16
company  6:19
21:25  23:5, 24
67:16  68:7  69:4
71:24
company.  8:2
21:24
complaint  32:11
70:25  72:5

completeness
29:13
compliance  13:7
28:21  29:21
31:7  37:21
50:23  71:15
compliant  51:1
complying  12:17
comprehensive
23:21, 23  26:9
concern  29:24
concerning  74:4
concluded  73:17
Confidential  3:8
confirm  21:16
53:24
confirmed  44:7
confirming  50:15
confusing  67:13
consumer  21:17
29:24  39:20, 22
40:3  43:5  46:20
50:14  52:12
67:20  72:18
consumer.  39:18
56:19
consumer's
38:22  43:4
44:14, 24  45:3, 5
contact  20:1
29:19  38:22
41:13  46:14
49:10
contactable  20:13
contacting  20:25
21:4, 15
contacts  19:22,
22  29:16  69:7
71:19
contact's  59:24
contactual  43:16,
17  46:20
continuing  64:7
contract  74:15
control  74:9
controversy  74:5
copies  73:19, 22
74:11, 11

correct  21:16
38:2  45:6  65:1,
23  70:4  74:8
Correct.  7:8
39:6  40:4  45:6
47:5  65:5  68:10
corrective  28:22
30:23, 24  46:10
correctly  28:18
correctly.  16:21
30:13  73:1
cost  74:10
COTTONWOOD
74:2, 6
couldn't  18:2
counsel  68:18
counsel.  73:20
COUNTY  74:2, 6
couple  15:25
18:12  38:17
47:23  49:18
53:17  61:22
course  12:24
27:12  28:15, 24
30:17  51:10, 16
course.  10:7
41:5  61:3, 8
COURT  1:1, 4
73:1
cover  24:1
covered  27:2, 25
28:9  62:4  71:3,
14
covered.  40:16
covers  11:3
Creditors  22:11
critical  63:20
criticism  63:2
CRW.  22:14
curious  13:10
current  5:11
currently  5:1

< D >
daily  12:23  13:4
data  33:9
databases  20:16,
19
date  27:13

35:*18, 23*  69:*8*
**date,**  14:*11*
**dated**  69:*14*
**dates**  63:*20*
**day**  12:*23*  17:*14*
19:*15*  24:*17*
42:*17*  47:*14*
48:*8*  51:*11, 24*
57:*19*  64:*10*
74:*3, 18*
**day.**  19:*20*  48:*6,*
*9*  68:*18*
**days**  18:*8, 9*
25:*2, 3, 9, 11*
26:*15*
**days.**  25:*4*
**deal**  73:*5, 9*
**deal.**  48:*20*
**death**  34:*24*  35:*3*
**Debt**  10:*5*  21:*22*
22:*6*  24:*7, 9*
**debtor**  60:*6*
**deceased**  60:*5*
**deceased.**  60:*7*
**decipher**  53:*14*
**Defendant**  2:*15*
**Defendant.**  1:*9*
**defense**  52:*12, 16*
**deliberately**  33:*25*
**deliver**  39:*3*
43:*5*  46:*18*  47:*1*
**demand**  57:*15*
**deny**  53:*25*
**department**  23:*5*
26:*7, 8*  27:*23*
29:*4*  32:*21*
**depending**  16:*17*
57:*8*
**depends**  19:*19*
34:*1*  64:*4*
**deposed**  8:*1*
**DEPOSITION**
1:*17*  3:*12*  4:*1*
5:*3*  7:*22*  8:*9, 20*
9:*2, 6*  44:*9*
53:*10, 17*  61:*17*
73:*15, 17*  74:*3,*
*10, 11*
**depositions**  4:*11*

**DEPROSPO**  1:*18*
4:*1, 23*  8:*17*
20:*3, 4*  41:*19*
74:*3*
**DEPROSPO,**  4:*6*
**DeProspo.**  5:*10*
**describe**  14:*20*
**described**  10:*18*
63:*14*
**DESCRIPTION**
3:*5*
**desk**  19:*10*  31:*7*
**desktop**  19:*11*
**DesProspo**  3:*12*
**determined**  37:*20*
**Development**
62:*19*  64:*3*
**dial**  16:*16*
**dialed**  54:*3, 4*
55:*1*
**dialer**  16:*6, 7, 9,*
*24*  17:*3*
**dialers**  54:*6*
**did**  31:*23*  71:*6*
**did.**  7:*3*  22:*21*
**different**  13:*13*
20:*17*  23:*4*
29:*18*  37:*3, 8*
47:*23*  57:*10*
66:*6, 23*
**differently.**  48:*15*
**dig**  26:*12*
**directed**  46:*1*
70:*25*
**direction**  74:*9*
**directly**  14:*1*
**director**  14:*3*
32:*4*  36:*3*
**disciplinary**  5:*18*
**discipline**  31:*21*
32:*1*  62:*21*
70:*14*  71:*5*
**discipline.**  46:*11*
**disciplines**  32:*3*
**disclosure**  55:*18*
**discuss**  36:*9*
**discussed**  8:*23*
13:*12*
**Discussion**  9:*15*
46:*10*

**DISTRICT**  1:*1, 2*
5:*2*
**DIVISION**  1:*3*
12:*21, 21*  14:*3, 4*
57:*21*
**divulged**  9:*24*
**do**  26:*20*  60:*1*
73:*9*
**do.**  10:*13, 20*
12:*15*  13:*20*
34:*15*  35:*13*
53:*19*
**document**  52:*21*
65:*14*  68:*8*
**documentation**
50:*22*  58:*17*
65:*16*
**documented**
64:*19*
**documenting**
69:*7*
**does**  58:*1*
**does.**  18:*6*
**doesn't**  16:*18*
**doing**  11:*10*
25:*8*  47:*8, 19*
48:*15, 20, 23*
50:*20, 25*  51:*20*
52:*1, 2*  56:*2*
63:*18*  64:*5, 7, 8, 9*
**done.**  53:*8*  73:*13*
**don't**  40:*7*  41:*9*
44:*19*  59:*16*
**don't.**  67:*22*
70:*12*
**don'ts**  10:*22*
**do's**  10:*22*
**dot**  56:*2, 2, 3*
**dots**  55:*22*
**doubt**  24:*20*
**down**  44:*15*
**driven**  29:*21*
**driven,**  29:*20*
**drops**  57:*13*
**duly**  4:*7*  74:*4, 7*
**during**  71:*3*
**duties**  5:*22*

**< E >**
**each**  17:*4*  29:*9*

**earlier**  53:*12*
63:*14*
**early**  18:*9*
**easy**  56:*10*
**eavesdrop**  47:*16*
**effort**  58:*8*
**egregious**  33:*23*
**eight**  17:*20, 24*
**eighteen**  53:*21*
**either**  23:*19*
25:*22*  28:*2*
50:*14*  51:*6*
59:*11, 17*  65:*17*
**else,**  33:*4*  41:*2*
**else.**  67:*3*
**Email**  2:*14*
**employed**  6:*25*
11:*8*  74:*15*
**employee**  8:*4*
9:*24*  10:*14*
31:*16*  71:*6*
74:*14, 14*
**employees**  5:*17,*
*23*  11:*22*  15:*17*
18:*17, 18*  72:*12*
**employees.**  11:*11*
**employer**  5:*11*
**employment**  8:*8*
22:*17*
**end.**  17:*21*
**enough.**  6:*17*
**ensure**  31:*15*
**entire**  44:*8, 9*
**entirely**  23:*4*
**environment**  16:*6*
**error**  31:*16, 17,*
*18, 19*  45:*19*
58:*19*  68:*14*
**error.**  56:*25*
**Erstad**  4:*2*
**escalate**  65:*7*
66:*5*  67:*1*
**escalated**  34:*1*
**escalation**  35:*5*
67:*10*
**even**  30:*1*  32:*3*
**evening**  55:*11*
**event**  50:*16*
**Eventually**  57:*20*

**Patrick DeProspo**                                                        80

ever 21:21
every 51:11
everybody. 60:17
everyone's 57:17
everything 55:14
exact 18:3
exactly 27:8
Examination 3:2,
12 4:21
examined 4:8
example 4:11
8:14 14:24
31:22 44:20 55:1
examples 38:17
Excuse 34:12
62:18
EXCUSED 73:16
Exhibit 36:16
52:6, 21 60:23
61:12 64:13
73:15
EXHIBITS 3:4
73:18
expect 27:2
28:14 29:16
30:17 47:14
51:5 55:5 57:1
59:17
expectation 12:8
expectations
11:19, 19 13:7
experience 5:5
24:3 32:25 50:5
51:19
Explain 16:9
50:12 54:17
56:15
explained 50:9
extensive 29:8
extenuating 35:3
external 49:2, 2

< F >
facilities 19:11
Fact 3:8 38:3, 17
facts 9:21
failing 65:14
67:19 68:8 69:5
Fair 6:17 7:20
10:5, 9 11:21

14:12 16:1
21:13 25:14
34:8 35:7 39:12
42:6 45:8 47:1
68:25, 25 70:24
fair. 70:21 72:21
familiar 10:15, 22
11:2 12:6 22:25
23:1, 6 38:23
43:1 61:23
family 34:24
35:4
far 34:14 50:6
fault 46:18
Fax 2:6, 13
FDCPA 8:5 10:8,
11, 15, 19, 23
11:2, 3, 6, 17, 18
12:7, 12 13:2, 2,
11 23:16 25:19
26:4, 11 27:9
71:23
FDCPA, 59:22
February 14:7,
11 67:11 69:14,
18
feel 11:13
feeling 32:15
field 21:22
fifteen 17:21, 25
19:1, 24
figure 5:3 20:24
35:22 59:12
FILE 1:4 3:8
12:22 32:13
45:25 50:21, 21
51:8, 25 60:24
61:13, 14 70:17,
22 71:11
filed 4:25 8:14
9:22 35:8 60:6
68:15, 20 72:5
files 12:18 19:24,
25 28:18
final 31:1, 14
32:5 34:1
FINANCIAL 1:8
5:1, 13, 15 8:15,
17 40:8
financially 74:15

find 20:13 21:7
33:13 46:17, 22
62:25
fine 9:10 73:11
firing 5:18
first 4:7 17:6
24:16, 22 30:24
35:17 44:3 53:7
57:19, 20 60:9
61:23 62:14
72:13 74:4
FISHMAN 2:11
five 30:16 51:23
53:22 54:21, 21
flip 65:21
flipping 60:11
floor 23:20 24:9,
17, 25 25:6, 8, 13
27:22 47:15
floor. 26:2
Florida. 7:12
flow 50:21
flows 58:9
FM 22:12
focus 11:22
folks 10:8 13:16
43:11 44:4
folks. 11:15
follow 10:18
13:11, 18 67:19
69:5
following 12:11
13:6 34:14
follows: 4:8
follow-up 63:21
for 10:8 15:24
20:13 31:18
39:17 44:4
52:12, 15 59:9
66:13
for. 5:21
foregoing 74:8
form 4:12
forward 11:13
FOTI 28:6, 9
found 9:16
foundation, 29:4
four 7:6 15:2
19:3, 23 30:11,

12, 15 48:6 65:12
frame 72:2
FRANZ 1:25 74:3
free 47:10, 11
from 26:4
front 11:15
19:10 66:12
69:21 70:2, 18,
23 71:12
full 5:9 18:4
24:22 35:1
fully 69:5
functional 58:9
functions 6:23
future 28:4, 8, 11

< G >
gathering 33:9
gauge. 19:1
GDS 46:7
gears 64:21
general 5:13, 15
6:11, 13, 14, 19,
20, 22, 22 7:2, 13,
19 12:14 14:8
22:18 26:4 36:3
Generally 12:13
16:20 17:17
18:7, 11 20:11
23:5 33:1 35:2,
6 39:16 73:7
gentleman 4:24
get 27:24 31:7
33:9 62:12
getting 14:25
30:3, 5
give 15:9 35:18
36:17 44:20
66:16
given 7:22, 23
giving 53:10
go 11:3, 5 13:15
16:25 20:19
23:13, 13, 15
24:10 25:24
27:24 28:3 31:4,
11, 14 32:2, 18
34:17, 19 40:12
49:19 53:24
59:4, 5, 7, 11, 21

60:*8*  61:*5*  66:*22*
72:*7*
**go.**  20:*24*
**goal**  34:*10, 16*
35:*1*  49:*9*  65:*3*
**goals**  34:*5*
**goes**  5:*5*  12:*3*
17:*9*  24:*5*  25:*10*
26:*23*  28:*23*
29:*3*  33:*20*  60:*14*
**going**  9:*5*  11:*22*
16:*12*  32:*9*
33:*20*  34:*25*
36:*15*  41:*17*
42:*18*  43:*21*
44:*23*  47:*16, 16*
50:*2, 3*  51:*15*
52:*20*  56:*5*
57:*17, 18, 18, 19*
58:*4, 9*  60:*22*
61:*21*  63:*17*
64:*18, 20*
**good**  33:*16*  36:*5*
41:*9, 13*  42:*1*
43:*25*  44:*6, 7, 20*
45:*16*  46:*13, 22*
48:*6, 9*  56:*21*
62:*4*  64:*12*
**good.**  4:*18*
**got**  36:*4*  51:*24*
**got.**  27:*13*
**gotta**  33:*7*
**grabs**  17:*5*
**grade**  6:*14, 16*
**graduate**  26:*2*
**great**  29:*4*  49:*18*
**greater**  50:*6*
**Greg**  45:*11*
53:*17*
**group**  72:*16*
**groups**  29:*9*  49:*2*
**guess**  9:*23*  32:*8*
40:*12*  42:*12, 17*
65:*10*  67:*7*  69:*16*
**guessing**  55:*25*
69:*17*
**guesswork**  60:*17*
**guy.**  19:*11, 13*
**guys**  23:*24*

60:*19*  61:*2*

**< H >**
**had**  6:*11*
**half**  30:*15*  52:*11*
**HAND**  74:*18*
**handle**  64:*12*
**happen**  27:*24*
46:*2*  51:*20*
**happened**  37:*3*
39:*4*  65:*17*
69:*17, 19*  72:*6*
**happened.**  32:*16*
70:*10*
**happening**  28:*19,*
*20*  29:*1*  72:*8*
**happens**  23:*11*
26:*19, 20*  33:*6*
60:*9, 12*
**has**  24:*4*  72:*2*
**has.**  15:*16*  30:*23*
**hate**  61:*1*
**have**  6:*22*  8:*4,*
*15*  11:*12*  12:*20*
23:*24*  26:*7*  36:*1*
40:*15*  41:*12*
57:*20*  58:*3*
62:*11*  68:*12*
**have.**  11:*20*
14:*13*  36:*25*
57:*5*  61:*15*
**head**  26:*18*
54:*10*
**headphone**  47:*25*
**hear**  28:*25*
30:*18*  54:*23*
55:*2, 5*
**heard**  10:*5*  31:*25*
**heaven**  47:*11*
**Heights**  6:*9*  7:*5,*
*17*  10:*21*  11:*2,*
*23*  14:*9*  15:*18*
**Heights.**  6:*8*  7:*15*
**held**  31:*18*
**help**  41:*6*  53:*16*
59:*11*  63:*9*
66:*13*  67:*5*
**helped**  53:*20*
**helps**  25:*17*  67:*6*

**her**  17:*18*  45:*24*
52:*8*  67:*13*
**her,**  71:*14*
**here**  17:*13*
**here.**  11:*25*
57:*24*
**hereto**  74:*14, 15*
**hey**  33:*11*  34:*25*
49:*17*
**high**  15:*24*  17:*21*
**higher**  6:*13*
**him**  48:*21*
**hindsight**  56:*11*
**hire**  24:*4*
**hired**  23:*11*
24:*19*
**hire's**  24:*16*
**hiring**  5:*18*
**history,**  41:*10*
**hit**  13:*15*  24:*8*
35:*1*  56:*3*  57:*18,*
*18, 19*
**hold**  22:*15*
**home**  55:*2*
**honest**  17:*23*
38:*11*  59:*8*  68:*24*
**hope**  49:*9*
**hour**  4:*3*  14:*25*
25:*3*
**Hourly**  14:*15*
**Hourly.**  14:*16*
**hours**  15:*1*  18:*7*
47:*14*  48:*6, 8*
60:*10*
**hours.**  48:*8*
**How**  7:*4*  31:*25*
**HR**  19:*13*  32:*2, 2,*
*5, 18, 19, 21, 23*
66:*8*
**HR's**  30:*22*
**huddles**  11:*10*
12:*23*  45:*22*
72:*16*
**huddles,**  12:*24*
**Huh-uh.**  49:*6*
**hundred**  18:*1*

**< I >**
**I**  6:*1*  22:*11*
31:*24*  39:*21*

41:*8*  47:*3*  49:*13*
54:*12*  69:*15*
**I,**  6:*2*
**ID**  54:*8*
**I'd**  31:*3*  64:*5*
**idea**  19:*14*  41:*3*
**identifies**  39:*1*
42:*2*
**identifying**  21:*9*
**IDs**  54:*11*
**if**  14:*24*  20:*2*
31:*12, 21*  39:*10*
40:*21*  44:*20*
46:*2, 12*  56:*12*
65:*20*
**IL**  2:*12*
**I'll**  24:*24*  31:*20*
37:*1*
**Illinois**  7:*10*
**illness**  35:*4*
**I'm**  5:*20*  13:*9*
20:*3*  47:*4*  51:*21*
**immediately**
30:*21*  32:*2, 18*
36:*4*  57:*3*
**impartiality**  74:*17*
**important**  12:*6*
13:*10*  28:*24*
29:*5, 5*  31:*20*
**Improvement**
62:*23*
**in**  7:*11*  11:*9, 14*
13:*4*  33:*16*  34:*5*
35:*3*  38:*2, 6*
64:*16*  67:*7*
70:*22*  71:*11*
72:*15*  74:*4*
**INC.,**  1:*8*
**include**  5:*22*
12:*10*
**included**  28:*4, 11*
**including**  26:*10*
**independent**
67:*25*
**INDEX**  3:*1, 4*
**Indicating.**  20:*23*
**individual**  13:*5*
**industry**  20:*12*
62:*11*

information 9:24 20:22 21:9, 16 27:11, 19 42:14 49:22 62:12
information. 62:13
initial 6:1 11:3, 6 40:13 45:21
interest 74:16
interested 74:15
interesting 52:4 72:14
internal 29:9, 10 59:12
inventory 51:14
investigate 37:16
investigation 37:15
involve 21:15 27:8
involved 8:16 28:22 40:1 51:3
involvement 8:7
involving 38:21
is 7:10 10:17 20:9 33:19 38:17 41:19 42:5, 17 47:18 48:1 54:11 55:17 65:25 69:17
is. 9:7 34:2 44:1
ISRAEL 2:11
issue 11:25 31:7 33:19 37:21 44:2 71:14 72:8
issues 32:10 50:24 69:19 71:15
it 14:6 15:5 17:5, 12 20:17 35:24 48:3, 5 58:5 63:5 66:4 68:22 69:1
it, 32:10
it. 32:5 54:1 61:22 64:12 67:6 73:5
its 46:21

it's 20:20 30:20 35:1
I've 52:20 56:8

< J >
Jacksonville 7:12 12:2
James 2:15
January 34:11 65:21
JDS 46:3, 8, 9 71:4, 4
Jim 36:10
Jim's 36:10
job 5:12, 13, 22 6:9, 23, 23 12:10 24:6 33:16 46:10 47:3 50:25
jobs 21:22 22:6, 15
jschultz@sessions -law.biz 2:14
June 4:2 7:20 15:22 18:22, 23 19:16 30:6, 8 36:22 37:4 55:11 57:15 58:24 63:20, 21, 23, 24, 24 64:14 68:6, 6, 6, 6 69:2, 2, 3, 3, 3, 3, 19 71:19 74:18
June, 74:3
jury 50:10
just 11:16 58:15 61:21 64:7

< K >
Kay 45:10 55:15
keep 11:14 32:8 46:4 60:20, 21
keeping 51:9
kept 28:2
kick 17:3
kind 8:3 9:6 20:7 24:21 25:8 26:23 35:22 37:22, 23 46:21 48:20, 22 49:19

50:2 56:10 57:13 67:13
knew 45:18
know 5:4 8:22 9:6, 19, 21 10:11 11:12 12:24 13:4, 5, 6, 14, 15, 16, 19, 21, 22 14:14, 17 15:12, 13, 13 16:3, 16 17:4, 8, 18 18:8, 22, 23 19:24 20:1, 22 23:3, 9, 16 24:1, 9, 14, 19 26:13, 19 27:14, 15 28:2, 5, 17, 21 29:3, 18, 24 30:3, 8 31:15 32:8, 12, 15 33:4, 6, 7, 13, 24 34:4, 25 36:5 38:14 39:10, 19, 22, 23 40:1, 9 41:10, 17, 18, 19, 24, 25, 25 42:14, 17, 18, 19, 22 43:24 44:20 45:24 48:9, 11, 15, 16, 22 49:4, 18 50:2, 14, 16 51:13 52:1, 7, 10, 24 53:6, 7, 14, 18 54:10 56:10, 21, 24 57:7, 8, 22 58:8, 15 59:17, 18, 22 62:15 67:21, 24 68:15, 19 69:9, 16, 22 70:11, 13, 13, 17, 24 71:15, 17, 22, 23 72:2, 7, 8, 14, 17
know, 26:19 27:11 35:7 43:22 57:9 65:17
knowing 39:21, 21, 23 41:10, 24 45:16 68:22
knowledge 10:25
knows 47:11

< L >
L.L.P. 2:4
labeled 44:10
Lacking 62:23
language 52:5, 7
large 17:25
last 65:6
late 18:11
later 31:16
Latesha 13:19
Latisha 3:8 5:6 16:4, 20 17:13 18:4 19:15 23:2 24:1, 19 25:14 28:14, 14 35:9 44:4 45:18 46:13 52:15 54:12 56:24 59:10, 17, 18 61:13 63:9 66:2 69:23
Latisha's 60:24
law 12:7 13:17 27:21
law. 13:16
lawfully 43:23
laws 11:17, 18 13:3, 12 25:19 26:12 71:22
laws, 27:9
lawsuit 4:25 8:12 9:21 32:13 35:8 36:2 37:12 68:15 69:25 71:23
lawyer 9:20
layered 14:4
laying 23:25
lead 25:1, 6, 8
leads 14:2 24:14 31:2 46:22
learned 52:1
leave 34:23 46:24 47:1
left 53:22 55:3, 6, 13, 20
left. 45:17
legally 43:23

**letter** 57:*15* 59:*3, 9, 13, 16, 23* 60:*2, 9, 14*
**letters** 59:*4, 5, 6, 21*
**level** 5:*20* 6:*13* 9:*6* 28:*10*
**like** 26:*11* 51:*2*
**like.** 27:*17*
**Lindsey** 4:*25* 8:*15* 40:*25* 41:*1* 42:*9* 44:*5* 45:*10, 11, 12* 46:*14* 59:*3*
**LINDSEY,** 1:*5*
**Lindsey.** 55:*15*
**Lindsey's** 53:*21* 68:*23* 70:*6*
**line** 47:*12*
**lines** 17:*3, 4*
**listen** 35:*16, 21* 47:*15, 22*
**listened** 35:*14, 15* 37:*17*
**listening** 48:*1*
**litigation** 8:*8*
**little** 18:*2* 19:*1* 29:*18* 36:*17* 46:*5* 48:*17, 19* 49:*24* 56:*5* 62:*21* 64:*6, 21* 67:*17*
**live** 20:*6* 36:*18* 38:*22* 43:*3* 44:*24* 54:*6*
**lives** 37:*2*
**living** 44:*22, 23*
**LLP** 2:*11*
**LM** 55:*12, 12, 17*
**loaded** 16:*10*
**location** 7:*5, 17* 10:*21* 11:*1, 23* 14:*9* 15:*18*
**locations** 7:*9*
**log-ons** 57:*24* 58:*22*
**logs** 51:*8, 9*
**long** 6:*25* 7:*5, 16* 24:*16, 24* 51:*25*
**longer** 59:*20*

**look** 13:*4* 26:*5* 31:*4* 33:*5* 34:*25* 40:*10* 41:*17* 42:*25* 49:*18* 51:*11, 16, 23* 54:*15* 56:*17* 58:*1, 10, 16, 21* 59:*8*
**looked** 53:*2, 5, 6, 9* 56:*13* 57:*21, 23* 61:*14*
**looking** 37:*22* 39:*14* 40:*9, 18* 44:*2* 47:*20* 49:*4* 51:*18, 22* 56:*10* 57:*1, 6, 9* 58:*6, 13, 14* 59:*15*
**looks** 14:*7* 52:*25* 53:*25* 54:*9, 15* 57:*12, 14* 58:*15* 59:*1* 63:*3, 6, 19* 65:*1, 2, 4, 12, 16* 67:*10*
**lot** 13:*15* 16:*11* 29:*23* 47:*11* 51:*24* 62:*10* 67:*6*
**Louder** 50:*1*
**low** 17:*21*
**Ls** 5:*19*

**< M >**
**machine** 20:*7* 38:*18* 44:*13*
**made.** 59:*24*
**majority** 7:*7* 25:*5* 48:*8, 23*
**make** 13:*5* 28:*17* 64:*6*
**making** 4:*19* 12:*10* 50:*23* 51:*18*
**man** 22:*7*
**management** 22:*23*
**manager** 5:*15* 6:*11, 13, 15, 19, 20, 22, 22* 7:*2, 13, 19* 10:*14* 14:*8* 19:*7* 22:*18* 36:*3*

50:*13* 51:*15* 57:*20, 21, 23, 24*
**manager.** 5:*14* 23:*20*
**managers** 6:*2* 11:*9* 12:*14, 21, 22* 14:*3, 4* 18:*19* 27:*22* 28:*16* 29:*16, 19* 30:*1, 2, 17* 31:*23* 47:*8, 15* 49:*14* 51:*2, 9* 57:*2, 16*
**manager's** 57:*7*
**managers.** 19:*3*
**managing** 50:*21*
**manner** 65:*14* 67:*18* 68:*8* 69:*5*
**Manual** 3:*8* 38:*17* 42:*24, 24* 43:*1, 13* 44:*9* 54:*16, 17*
**manual.** 38:*5*
**manually** 19:*19* 54:*3* 55:*1*
**many** 16:*3*
**mark** 36:*15* 44:*8, 9* 73:*15*
**marked** 52:*21* 61:*12*
**marking** 60:*22*
**match** 28:*25*
**matched** 37:*20*
**material** 24:*1*
**matter** 8:*4* 74:*4*
**matter,** 74:*8*
**may** 32:*11, 12* 56:*2*
**maybe** 40:*22*
**me** 52:*4* 53:*20*
**me,** 66:*12*
**me.** 6:*12* 10:*3* 34:*12* 36:*11* 60:*18, 24* 70:*18, 23*
**mean** 5:*19* 7:*25* 12:*18* 13:*15* 16:*9, 17* 19:*19* 20:*20* 21:*19* 23:*5, 24* 25:*2* 26:*9, 16* 27:*14,*

15 28:*8, 9, 16* 30:*15* 31:*25* 32:*2, 3, 23* 33:*4, 10, 13, 23* 34:*1, 23* 37:*23* 39:*16, 21* 40:*7, 13* 41:*16, 20* 42:*13* 48:*14, 21* 51:*13, 19* 53:*6, 14* 54:*5* 55:*12* 56:*7* 57:*6, 16, 18* 58:*2* 62:*10* 63:*23* 64:*4* 65:*15* 70:*19* 71:*4, 21*
**mean,** 12:*13* 23:*14* 25:*9* 55:*25*
**measure** 33:*7* 53:*7*
**meet** 34:*5, 10, 16*
**meeting** 65:*3* 72:*16*
**memorandums** 27:*25*
**Mendota** 6:*8, 9* 7:*5, 15, 17* 10:*21* 11:*1, 22* 14:*8* 15:*18*
**mention** 25:*17* 52:*4*
**mentioned** 7:*4* 27:*5* 37:*12* 72:*15*
**message** 39:*4* 43:*4, 5* 44:*13* 45:*11, 17* 46:*18* 47:*1, 1* 54:*20, 24* 55:*3, 6, 20*
**message,** 46:*24*
**message.** 55:*13*
**messages** 38:*18* 53:*22*
**met** 4:*23*
**MICHAEL** 1:*5* 8:*15* 40:*25* 41:*1* 42:*9*
**mid** 15:*24*
**midway** 55:*10*
**Mike** 4:*25* 46:*19*
**million** 32:*9*

**mind** 8:25 29:3
31:20 32:8
40:18 44:2 47:19
**Minneapolis** 4:3
**Minnesota** 4:3
74:1, 6
**mirroring** 25:9
**misconduct** 66:1,
4 67:2, 15 68:5
69:1
**missed** 34:25
**missing** 66:16
**mistake** 31:22
**Mm-hm.** 34:7
43:9
**moments** 4:23
**money** 14:22
21:11 34:6 36:21
**monies** 52:15
**monitor** 29:17
47:6, 24 50:4
51:2
**monitored** 38:4
49:5, 10, 11
**monitoring** 12:22
25:8 28:23 29:8,
10, 11, 14 30:18
45:23 47:3, 12
48:5, 10, 21, 24
49:3 50:5 55:18
65:18 71:2, 13
**monitoring.** 29:7
48:25
**Monroe** 2:11
**month** 9:10, 17
15:1 18:13
31:17 34:16
53:12 66:20
**month.** 51:17
**months** 11:8
15:15 27:6 31:6,
10, 12 32:24
33:18 65:7, 9, 13
66:20
**month's** 35:1
**months.** 31:9
65:8
**more** 23:22 47:6
58:8 71:1

**move** 11:13
**MRD** 55:17
**much** 27:14
**multiple** 6:20
25:18
**multiplier** 14:21
**multiplier.** 14:23
**My** 4:23 29:18
32:17 45:8
69:24 70:7, 15
74:17
**myself.** 14:5
47:13

**< N >**
**name** 6:7 21:25
40:6 72:17
**name.** 5:9
**named** 4:24
**name's** 4:24
**naming** 40:6
**NATHAN** 2:11
**nature** 12:19
28:21 35:4
**nature.** 8:6 25:20
**NCO** 1:8 3:8, 11,
11 4:25 5:5, 13,
15 6:10, 23, 25
7:7 8:8, 12, 15,
17 10:14, 17, 25
11:4, 9, 19 13:3
14:6, 12 15:14
18:5 20:15, 17
21:11, 23 23:12,
16, 22 24:22
27:21 29:14
30:23 33:16
35:8 36:21
37:15 38:6, 14
39:15 40:8 42:2,
5 43:23 44:10
45:12 46:19, 21,
23 49:2 50:6
52:15 58:4, 24
65:14 67:19
68:9 69:5 70:25
**NCO's** 11:5, 21
13:10 24:5
30:19 36:21
40:6 46:1 52:12

54:18 56:12
69:7 71:17
**necessarily** 17:8
42:15 49:11
57:19 67:1 72:17
**necessarily.**
59:19
**need** 20:24
24:11 26:13
39:8 46:4 58:5
63:5
**needed** 64:5
**Needs** 62:23, 24
63:6
**nervous** 48:19
**never** 7:23 24:5
29:14
**new** 24:4, 16
62:24 63:3 71:22
**next** 48:16 63:24
**next.** 26:21
**Nicholas** 5:10
**nights** 18:11
**NO** 3:3 49:11
58:16
**No.** 5:24 6:6, 24
8:10, 18 9:9
18:16 49:8
**nods.** 9:11
**North** 2:5 7:10,
15
**NORTHERN** 1:2
5:2
**not** 4:16 11:17
15:12 34:24
59:15, 18
**not.** 6:3 72:3
**Notary** 74:6, 24
**note** 55:24
**notes** 29:1
35:22 37:19
51:6, 7 52:25
53:2 64:17
66:12 70:18 74:8
**notes,** 49:4
**nothing.** 9:3
**Notice** 3:12
37:13 57:3 73:15
**noticed** 74:10

**notified** 36:3
53:9 61:16 68:18
**notify** 27:22
**now,** 45:9
**NUMBER** 3:5, 8
16:18, 19, 24
17:25 19:22, 22
20:13 21:8 25:3
37:25 39:17, 19,
22 40:3, 25 41:1,
8, 9, 13 42:1, 9,
13, 13, 19 43:16,
18 44:4, 6 45:17
46:15, 16, 20, 22
53:21 54:3
56:17, 21
**number.** 18:3
41:14 42:16
43:25 44:7
**numbered** 55:10
**Numbers** 3:11
14:24 18:20
62:25 63:5
**numbers.** 61:25
63:7

**< O >**
**oath** 40:14 74:7
**OBJECTIONS**
3:3 4:12
**obviously** 11:9
23:7, 15 28:25
41:25 44:22
51:7, 11
**occur.** 43:14
**occurred.** 37:21
39:11
**occurring** 29:2
**October** 30:12, 13
**OF** 1:17 4:1
6:13 14:7 19:23,
24 21:8, 23
28:21 29:13
34:4, 23 36:3
43:4 49:18
60:23 63:23
69:18, 19 74:14
**of.** 15:4

**office**  5:*20*  6:*12*
7:*10, 11*  36:*10*
58:*25*
**office.**  12:*4*
13:*23*  52:*22*
**offices**  7:*13*
**offs**  63:*10*
**Oh**  15:*21*  17:*23*
19:*2*  22:*7*  25:*2*
27:*4*  28:*16*
44:*17*  46:*6*  53:*6*
**Okay**  4:*15, 19*
5:*9, 15*  6:*25*  7:*9,*
*16, 19, 22, 25*  8:*7,*
*19*  9:*4, 8, 10, 16,*
*25*  10:*2, 14*
12:*10, 16*  13:*8,*
*19, 21*  14:*6, 11,*
*14, 17*  15:*5, 12,*
*17*  16:*22*  17:*24*
18:*4, 7, 15, 17*
19:*9, 12, 14*  20:*6,*
*9, 9, 15*  21:*2, 15,*
*21*  22:*6, 15, 19,*
*22*  24:*24*  25:*5,*
*11*  27:*2, 8*  28:*12*
30:*11*  33:*18*
34:*3, 10*  35:*3, 7,*
*16*  36:*6, 13*  37:*1,*
*12, 15*  38:*9, 12*
40:*2*  41:*1, 12, 22*
42:*8, 11, 23*  43:*3,*
*15*  44:*2, 8*  45:*8,*
*8, 14*  46:*12, 14*
47:*3*  49:*9*  50:*8*
52:*12, 18, 20*
53:*5, 14, 20, 22*
54:*1, 2*  55:*5, 8,*
*10, 14*  56:*10, 15*
59:*15*  61:*7, 16,*
*19*  64:*2, 21*  65:*6*
68:*3*  69:*13, 23*
70:*2, 13*  72:*21*
**Okay.**  5:*25*  9:*12*
12:*5*  18:*10*
22:*10*  25:*16*
30:*14*  33:*22*
34:*13, 22*  36:*14,*
*23*  37:*7*  39:*7, 25*
40:*17*  41:*7, 15*

44:*17*  48:*7*  49:*1,*
*15*  52:*23*  53:*23*
54:*7, 14*  60:*25*
62:*1, 3, 17, 20*
63:*1, 22*  64:*15,*
*23*  66:*9, 18, 25*
67:*4, 23*  68:*17,*
*21*  71:*8*  72:*10,*
*23*  73:*2, 6*
**on**  17:*20*  25:*7*
29:*3*  37:*3*  47:*16*
51:*20*  55:*10*
67:*10, 15*  68:*5, 15*
**on.**  16:*8*  25:*10*
35:*22*
**once**  24:*8*
**one**  25:*22*  40:*18*
57:*13*
**one.**  7:*24*
**one-on-one**
11:*10*  29:*6*  45:*23*
**ones**  54:*13*
**ones.**  12:*25*
**ongoing**  29:*6, 6*
45:*22*
**online**  20:*16*
56:*7*
**only**  54:*18*
**operations**  21:*24*
23:*4*
**operations.**  22:*18*
**opinion**  24:*3*
68:*23*
**opportunity**
14:*19*  50:*4*  54:*5*
71:*6*
**opportunity,**
72:*24*
**opposed**  20:*6*
25:*5*
**options**  49:*19*
**or**  14:*17*  28:*2*
53:*24*  72:*14*
**or,**  71:*22*
**Oral**  3:*12*
**order**  21:*16*
**ordered**  74:*11*
**ordinary.**  58:*22*
**ORIGINAL**  73:*18,*

*19, 21*  74:*10*
**other**  50:*6*
**other.**  40:*23*
**our**  29:*22*  72:*25*
**out**  20:*16*  26:*8*
30:*3*  32:*15*
50:*14*  59:*12*
**out.**  41:*6*  59:*14*
**outcome**  74:*15*
**outside**  7:*11*
23:*3*
**over**  13:*24*
23:*15*  49:*19*  54:*8*
**over.**  46:*16*
**overall.**  62:*4*
**owed**  36:*20*
**owes**  21:*11*


**< P >**
**p.m.**  73:*17*
**page**  3:*2, 6, 7, 8,*
*8, 8, 11, 12*  44:*8*
55:*9*  58:*12, 14*
61:*25*  62:*15*
65:*21*  67:*11*
**page.**  36:*22*
**pages**  40:*18*
**pages.**  37:*6*
**paid**  14:*14, 25*
15:*4*
**pair**  20:*22*
**PAMELA**  1:*25*
74:*3*
**part**  5:*22*  12:*10*
16:*7*  17:*12*
20:*25*  21:*4*
26:*15, 22*  29:*20,*
*21*  34:*4*  38:*9*
43:*4, 4, 10*  47:*3*
48:*9*  62:*19*  69:*2*
**part,**  35:*8*
**participated**  7:*23,*
*25*
**parties**  20:*25*
21:*5, 16*  40:*8*
42:*23*  45:*5, 16*
74:*10, 14, 15, 16*
**parties.**  35:*10*
**party**  8:*11, 12*
20:*2*  36:*19*

37:*24*  39:*17*
40:*2*  43:*14, 20*
44:*1*  45:*2, 3*
46:*24*  56:*22*
69:*7*  74:*10*
**party.**  9:*24*  37:*4*
62:*6*
**pass**  11:*8*  25:*21,*
*23*  26:*1*
**pass,**  25:*12*
**passed**  25:*12*
**Pat**  3:*12*  20:*3, 4*
41:*19*  72:*24*
**PATE**  2:*4*
**PATRICK**  1:*18*
4:*1, 6*  5:*10*  8:*17*
74:*3*
**pay**  6:*14, 16*
49:*17*  50:*17*
**Payco**  22:*12*
**payment**  49:*21*
50:*15, 15*  52:*13*
**pending**  5:*1*
**people**  17:*18, 25*
46:*18*  48:*16*
**percent**  15:*10, 10*
42:*22*  49:*3*
**percent,**  15:*9*
**percent.**  15:*11*
**percentage**  15:*3,*
*4, 5*
**perform**  37:*15*
**performance**
5:*19*  15:*13*
29:*20*  65:*2*  66:*3,*
*22*  67:*2, 8*
**performance.**
66:*1*
**performance-relat**
**ed**  65:*22*
**performing**  29:*22*
**period**  33:*17*
64:*11*
**period,**  56:*3*
**person**  17:*1*
20:*6*  23:*11*
25:*12*  29:*25*
38:*12*  39:*1, 3*
42:*9*  43:*3, 18*

44:*24*  55:*18*
57:*11*  66:*3*
**Personally**  12:*18*
48:*10*
**Personnel**  3:*8*
45:*25*  60:*24*
61:*13, 14*  70:*17,*
*22*  71:*11*
**persons**  74:*16*
**person's**  38:*22*
**perspective.**
16:*14*
**pertain**  26:*11*
**pertinent**  69:*2*
**Perusing.**  36:*23*
37:*7*  40:*24*  41:*2*
**Phone**  2:*6, 13*
17:*10*  20:*2*
26:*24*  35:*9*
36:*18*  37:*10*
38:*15*  39:*3*
46:*15, 16*  50:*13*
53:*21*  55:*2, 2*
64:*13*
**phone.**  29:*25*
57:*11*
**place**  30:*8*  36:*22*
39:*11*  56:*12*  58:*4*
**placed**  57:*12*
69:*6*
**Plaintiff**  2:*8*
**Plaintiff,**  1:*6*
**plan**  15:*8*  63:*8*
**plan.**  70:*19*
**plans**  64:*3*
**please**  16:*23*
65:*1*
**please.**  49:*24*
**plus**  25:*4*
**point**  6:*11*  8:*22*
14:*3*  28:*20*
29:*24*  30:*1*
31:*13*  34:*18*
41:*10, 16, 20*
42:*1*  51:*8*  60:*8*
66:*4*
**point.**  31:*11*
34:*19*

**policies**  13:*3*
23:*16*  24:*10*
27:*10, 13*  71:*21*
**policies.**  23:*17*
**policy**  30:*5, 6, 19,*
*23*  31:*4, 24*
33:*25*  39:*15*
42:*5*  45:*12*  46:*2,*
*19, 23*  52:*13*
56:*12*  57:*4, 7*
65:*10*  67:*18*
68:*7*  69:*4*  71:*18*
**policy.**  43:*23*
**pool**  16:*7, 9, 15,*
*24*  17:*22*
**pool.**  16:*10*
**pools**  16:*16*
**portion**  60:*23*
61:*12*
**position**  13:*24*
14:*12*
**possible**  44:*6*
45:*16*  46:*13*
**post**  58:*5*
**potential**  46:*22*
**practicality**  26:*19*
**Practices**  10:*6*
**prepare**  8:*20*  9:*2,*
*4*
**prepared**  24:*8*
**president**  21:*23*
22:*18*
**pretty**  5:*19*  26:*9*
37:*13*
**previously**  53:*18*
**pride**  13:*16*
**Prior**  21:*23*
**privileged**  8:*24*
**proactively**  50:*25*
**probably**  11:*5*
15:*16, 21, 24*
19:*1, 2, 21, 24*
25:*4, 9*  36:*5*
41:*6*  42:*18*  43:*1*
48:*6, 23*  52:*2*
54:*12*  59:*22*
64:*6*  67:*14*
**Probably.**  38:*13*
**probe**  46:*24*
**probing**  62:*10, 12*

**problem**  43:*24*
44:*1*
**procedure**  67:*19*
69:*6*
**process**  23:*19,*
*21, 23*  24:*16*
30:*23*  32:*19*
46:*21*  57:*16*
59:*5*  71:*4, 4*
72:*11*
**processes**  58:*4*
**produced**  52:*21*
**professionally**
13:*21*
**program**  24:*5*
29:*15*
**proper**  62:*23*
**properly**  65:*14*
68:*8*
**prorated**  35:*2*
**prove**  27:*12*
**provide**  29:*10*
**provided**  36:*10*
60:*24*  73:*21*
**province**  7:*14*
**public**  42:*14*
74:*6, 24*
**pull**  58:*5, 7*
**pulled**  37:*17*
57:*2*
**pulling**  58:*16, 18*
**pull-up**  58:*18*
**pumping**  62:*5, 7,*
*9*
**punishment**
69:*24*
**purpose**  5:*2*
**pushed**  30:*9*
**put**  16:*15*  25:*3*
32:*4*  43:*17*
47:*21*  60:*19*
**putting**  47:*21*
**pyramid**  62:*21*

**< Q >**
**Q**  4:*23*  5:*9, 11,*
*15, 22, 25*  6:*4, 7,*
*9, 13, 17, 22, 25*
7:*2, 4, 7, 9, 13, 16,*
*19, 22, 25*  8:*3, 7,*

*11, 14, 19*  9:*2, 4,*
*8, 10, 12, 16, 19,*
*25*  10:*2, 5, 8, 11,*
*14, 17, 21, 25*
11:*21, 25*  12:*2, 6,*
*10, 16*  13:*8, 19,*
*21, 24*  14:*6, 11,*
*14, 17, 20*  15:*5, 9,*
*12, 17, 20, 22*
16:*1, 3, 9, 22*
17:*12, 18, 22, 24*
18:*4, 7, 10, 15, 17,*
*21*  19:*4, 6, 9, 12,*
*14, 18*  20:*1, 6, 9,*
*15, 25*  21:*2, 4, 7,*
*11, 13, 15, 19, 21,*
*25*  22:*2, 4, 6, 8,*
*10, 13, 15, 19, 22,*
*25*  23:*8, 10*  24:*3,*
*16, 24*  25:*5, 11,*
*16*  26:*3, 14*  27:*2,*
*5, 8, 17, 21*  28:*6,*
*8, 12*  29:*16*  30:*5,*
*11, 14, 17*  31:*20*
32:*6, 14, 21, 23*
33:*2, 12, 15, 18,*
*22*  34:*3, 8, 10, 14,*
*16, 20, 22*  35:*3, 7,*
*12, 14, 16, 19, 23*
36:*6, 9, 13, 15, 24*
37:*1, 6, 8, 12, 15,*
*22*  38:*2, 9, 12, 14,*
*17, 21, 25*  39:*7, 9,*
*12, 19, 25*  40:*2, 5,*
*11, 14, 18, 21*
41:*1, 5, 7, 12, 15*
42:*2, 5, 8, 11, 21,*
*23*  43:*3, 8, 10, 15,*
*19*  44:*2, 8, 18*
45:*6, 8, 14*  46:*7,*
*9, 12, 16*  47:*1, 3,*
*14*  48:*7, 13, 18*
49:*1, 4, 7, 9, 15*
50:*8, 12*  51:*2*
52:*4, 12, 15, 18,*
*20, 24*  53:*2, 5, 9,*
*12, 14, 17, 20, 24*
54:*2, 7, 14, 17, 23*
55:*1, 5, 8, 14, 17,*
*20, 22*  56:*10, 15,*

*18, 20*  57:*1, 23,*
*25*  58:*14, 20, 23*
*59*:*2, 15, 25*
*60*:*14, 16, 18, 20,*
*22*  61:*11, 16, 19,*
*21*  62:*2, 4, 7, 9,*
*14, 18, 21, 23*
*63*:*2, 8, 12, 20, 23*
*64*:*2, 13, 16, 21,*
*24*  65:*1, 6, 9, 12,*
*20, 25*  66:*7, 9, 11,*
*15, 18, 25*  67:*4, 6,*
*13, 18, 23, 25*
*68*:*3, 11, 15, 18,*
*22, 25*  69:*11, 13,*
*16, 21*  70:*2, 4, 11,*
*13, 21, 24*  71:*8,*
*10, 17*  72:*4, 10,*
*14, 19, 21*
**question**  10:*2*
*41*:*4, 21*  42:*18*
*45*:*9*  54:*2*  55:*8*
*62*:*14*
**question.**  8:*13*
*21*:*3*
**questions**  10:*11*
*24*:*11*  26:*17*
*61*:*22*
**questions.**  53:*16*
**quick**  32:*23*
*58*:*16, 17*
**quickly**  31:*21, 25*
*32*:*1*  37:*13*  63:*4*
**quickly.**  33:*3*
*37*:*14*
**quite**  29:*8*  53:*20*
**quizzes**  25:*18*

**< R >**
**random**  48:*5, 10*
**random.**  48:*2*
*49*:*3*
**randomly**  16:*25*
*48*:*20, 21*  51:*18*
*57*:*2*
**random-type**
*48*:*24*
**range**  36:*5*
**rate**  74:*11*

**raw**  14:*24*
**reach**  32:*12*
**read**  35:*14, 21*
*36*:*24*  53:*15*
**reading**  74:*11*
**real**  17:*2*  48:*20*
**really**  12:*2*  22:*8*
*42*:*12*
**reason**  49:*23*
**reasonable**  33:*17*
*51*:*10*
**reasonably**  49:*13*
**reasons**  50:*18*
**recall**  16:*5*
*30*:*13*  38:*11*
*72*:*20*
**receipt**  60:*2*
**receive**  34:*17*
**received**  9:*8*
*15*:*13*  36:*2*
*37*:*13*  54:*18*
*57*:*14*  64:*2*
*65*:*20*  67:*8, 14*
*68*:*1*  69:*23, 23*
**received,**  37:*12*
**receives**  14:*17*
*34*:*11*
**receptionist**
*19*:*10*
**Recess**  61:*10*
**recollection**  37:*8*
*67*:*25*  70:*8*
**RECORD**  73:*24*
**record.**  9:*15*
**recorded**  38:*4*
**recording**  55:*18*
**recordings**  54:*18*
**records**  14:*7*
*65*:*15*  68:*9*  69:*8*
**recruiter,**  19:*10*
**refer**  10:*11*
**reference**  40:*24*
*41*:*1*  42:*9, 13, 15,*
*19*
**reference.**  37:*25*
**referenced**  64:*13*
*70*:*19*
**referencing**  43:*13*
**referred**  46:*11*

**referring**  44:*11,*
*12*
**refusing**  50:*16*
**regarding**  69:*6*
*71*:*18*
**regulations**  10:*18*
**regulations.**  11:*4*
**reimburse**  52:*15*
**relate**  70:*5*
**related**  68:*23*
*74*:*14*
**relating**  69:*6*
**relative**  74:*14*
**Relatively**  33:*3,*
*16*  37:*14*
**relay**  45:*11*
**released**  23:*20*
**relevant**  12:*7*
*13*:*11*  19:*21*
**remember**  8:*3*
*9*:*8*  16:*21*  37:*9*
*38*:*4*
**rep**  49:*19*  50:*19*
**repayment**  70:*19*
**repeated.**  68:*14*
**reported**  74:*3*
**REPORTER**  9:*13*
*46*:*4*  49:*24*
*67*:*17*  73:*1*
**reporting**  6:*12*
**reports**  12:*20*
**represent**  4:*24*
*55*:*14*
**representative**
*8*:*2*
**reps**  50:*25*
**require**  29:*18*
**required**  10:*15,*
*18, 22*  28:*16*  71:*1*
**requirement**  38:*6*
**requirements**
*12*:*12*  34:*4*  59:*23*
**reread**  40:*13*
**residence**  38:*23*
*43*:*4*  44:*22, 23*
*45*:*4*
**residence.**  44:*14,*
*25*  45:*5*
**responding**  33:*17*
**responses**  33:*10*

**responsibilities**
*6*:*18*
**responsibilities.**
*6*:*21*
**responsibility**
*6*:*14*  23:*7*
**responsible**  5:*17,*
*21*  6:*2*  7:*17*
*12*:*15, 22*  45:*2*
**rest**  22:*23*
**restroom**  61:*2*
**result**  70:*15*
**retain**  27:*18*
**retained**  27:*11*
**retaining**  71:*9*
**retest.**  25:*21*
**retested,**  27:*5*
**retesting**  11:*7*
*27*:*9*  28:*12*
**retesting,**  23:*25*
**retraining**  11:*13*
*12*:*25*  28:*13*
**review**  51:*5, 8*
*57*:*7, 17*  72:*25*
**reviewed**  26:*3*
*37*:*19*
**reviewing**  12:*18*
**reviews**  12:*23*
**Riemer**  4:*2*
**right**  5:*11, 22*
*6*:*4, 7, 13*  7:*4, 11*
*8*:*19*  9:*19*  10:*17,*
*25*  13:*19, 24*
*15*:*22*  16:*3, 23*
*17*:*12*  18:*17, 23*
*19*:*2, 4*  20:*2, 9*
*21*:*4, 19*  22:*25*
*25*:*2, 11*  26:*14*
*27*:*5*  32:*11*
*36*:*19*  37:*22*
*38*:*14*  40:*5, 13*
*45*:*9*  48:*13*
*50*:*25*  51:*8*
*52*:*20*  54:*17, 17*
*55*:*22*  57:*25*
*58*:*9, 20, 23*  59:*2*
*60*:*16*  61:*9, 11,*
*21*  62:*14*  64:*9,*
*11, 21*  65:*20, 25*

68:11  69:21
73:5, 12
**right.**  9:1  12:1
19:5  20:8  32:14,
22  33:12, 15
35:11  42:4, 10
47:9  54:22
55:16, 19, 21
59:25  60:21
63:11  66:7
67:12  70:3
**ring**  20:7, 7, 7
**rob**  13:14
**roles**  13:5
**roughly**  15:9
17:18, 22  22:22
38:25
**rules**  10:18  11:4,
5
**run**  15:24  18:24
19:23  40:13
54:6  60:4, 5
**runs**  18:13  59:6

**< S >**
**said,**  18:24
**Salary**  14:15
**same**  56:7
**sat**  64:4
**Saturdays**  18:13
**saw**  64:4
**say**  72:11
**say,**  31:4
**say.**  52:17
**saying**  20:4
49:17
**saying,**  63:15
**says**  31:23
37:24  38:2, 3
42:8  55:17  58:1
62:4, 18, 19, 23
63:8  65:13
67:15  68:5  69:2
**says,**  55:11
**Schultz**  2:15
4:14, 18, 20  8:23
44:15  46:8  50:1
60:21  61:4
72:24  73:3, 7, 12
**SCHULTZ.**  73:23

**script**  38:9, 18,
23  42:23  43:3, 5,
22  44:11, 24
**script.**  45:7
**scripts**  38:14
39:10, 11
**scrub**  60:5, 5
**scrubbed.**  60:13
**SEAL**  74:18
**Seals**  2:6  3:2
4:10, 15, 19, 24
9:16  41:20
44:18  46:7, 9
50:8  60:22  61:3,
5, 8, 11  72:22
73:14, 22, 22
**SEALS:**  4:22
**Second**  3:12
25:22, 24  30:25
**see**  28:19  39:22
44:8, 20  48:3
51:19  52:1  54:5,
8  55:8  57:24
62:19  67:8
**seeing**  38:5
41:2  48:22  50:20
**seen**  23:22
29:14  50:6  56:9
**sense**  16:13
60:18  72:6
**sent**  59:3
**sentence**  56:4
**separate**  29:9
**September**  68:4,
16  69:8
**series**  59:9
**served**  68:19
**Services.**  22:12
**SESSIONS**  2:11
**set**  63:10
**setting**  63:19
**shadow**  24:20
**share**  40:8
**she**  15:15
**Sheet**  3:8
**she's**  43:10
**shift**  19:15
**short**  10:9  32:24
**shouldn't**  40:6

**show**  36:6  37:1
44:11  52:20
60:22  61:21  71:6
**side**  33:14  63:8
**side-by-side**
64:18  65:18
**side-by-sides**
28:17  47:19, 20
50:19  51:3
63:13, 17
**side-by-sides.**
50:10
**sides**  63:9
**sign**  28:3  32:2
**signature**  73:8
**signatures**  69:13
**signing**  32:5, 19
74:11
**sign-offs**  24:11
28:1
**similar**  37:23
39:4
**similar.**  52:6
**simply**  17:14
**single**  30:5
**sir**  5:11  37:22
44:18  55:9
57:25  61:11, 21
62:14  64:22, 24
**sir.**  15:20  33:2
39:9  43:19
56:18, 20  58:20
60:16  66:15
68:2  69:11  71:10
**sit**  9:20  14:14
15:12  23:6
24:13  25:13, 25
28:17  32:23
45:9  47:10, 12
52:9  63:17
67:21  71:17
**site**  5:17, 20  6:4,
7, 20  7:4  30:7,
11  32:4, 9  36:3
49:3  72:4
**site.**  30:10
**sites**  12:14
**site's**  29:18
**sitting**  24:25
25:6, 7  47:20, 24

48:11, 16  50:19
63:24  64:10
**situation**  5:4
72:19
**six**  7:1  11:7
27:6  31:12
54:21  65:7
**Six-page**  3:8
**skip**  20:10, 11, 12,
25  21:4, 7, 15
26:14, 25  63:6, 7,
10, 17  71:18
**skipping**  62:24
**slower**  49:24
**slower.**  50:1
67:17
**so**  58:19
**so,**  30:15
**so.**  7:18  10:1
37:11
**socially**  13:22
**solely**  7:17
**some**  58:10
**somebody**  8:1,
16  13:15  14:25
17:5
**somebody.**  17:11
20:14
**someone's**  34:23
**something's**
33:23
**sorry.**  9:14  46:6,
9  49:25  65:9
**sort**  5:3  21:8
28:21  37:15
52:7, 8, 8  69:24
**sound**  10:2
**South**  4:2
**SOUTHERN**  1:3
**speaking**  12:13
16:20  17:17
33:1  34:21  35:2,
6  36:2  39:16
67:19  73:8
**speaks**  43:11
**specific**  41:3
**specifically**
69:22  70:9, 25
72:2
**speeding**  13:14

splitter 47:24
48:1 50:23
splitters 47:22
48:5
spouse 45:2
SRA 54:11
staff 12:15, 25
20:23
stamped 61:24
62:2
standardized
60:11
standards 63:4
stands 24:18
start 25:13 66:16
started 14:6
22:11
state 11:18 12:7
13:2, 11 23:16
25:19 26:12, 12
27:9 28:10 37:3
71:22 74:1, 6
statement 11:21
21:13 34:8
STATES 1:1
11:17
stay 11:8 31:8
stayed 31:6
stays 31:3, 14
stenographic
74:8
step. 41:23
stepmother 36:18
steps 27:21
Stevens 53:17, 18
stick 56:16
sticking 58:21
sticks 39:15
40:22 44:3
stipulation 4:15
stipulations 4:10
story 33:14
Street 2:5, 11
24:4
strikingly 52:6
stuff 23:25 28:9
42:19 48:19
56:2 71:24
stupid 10:2

substantial 74:16
such 74:11
suggestion 73:8
suit 9:23
suit. 68:20
Suite 2:12 4:2
suits 28:2
summary 46:10
Sundays 18:15
Superior 22:2, 4
Superior. 22:1, 3
supervise 12:11
supervising 5:6
supervisor 12:19
18:25 41:22
51:23 57:21
63:15 64:9 71:12
supervisors
12:20, 21 14:2
24:14 29:11
47:6 48:3 49:12
supervisory
13:24
supplied 73:19
supposed 25:12
43:11 55:22
sure 8:13, 14
11:1, 14 12:2, 10,
16 13:6 14:21
15:15 21:3
23:10, 10, 13
27:10, 18 28:16,
18 29:22, 23
30:2, 20 39:16
40:15 41:2, 5
46:6 47:4, 8
49:21, 22 50:9,
17, 21, 23, 25
51:6, 19 57:6, 10
58:8 60:6 63:9,
18 64:7, 11 70:1
71:14 72:8, 19,
25 73:15
sure, 28:18
sure. 4:19 10:4
11:24 23:8 32:6
35:19 36:8, 12
37:5 38:1 40:20
42:21 43:7

48:18 50:11
suspect 58:12
swift 31:21
switch 60:12
Switching 64:21
sworn 74:4
sworn, 4:7
system 26:22
systematic. 60:10
systematically
20:21
SYSTEMS 1:8
5:1, 13, 16 8:15,
17

< T >
tactic 62:9
tactics 62:5, 7
Take 3:12 6:1
13:3, 15 17:6
25:18 26:5
27:21 32:23
33:5 40:21
41:17 49:18
54:1 58:10 59:8
TAKEN 1:25 4:1
56:12
taken. 61:10
takes 60:17
talk 8:25 9:17
11:9 18:21 25:7
26:16, 18 29:13
63:10
talked 9:20
28:13 55:18
57:3 64:16 67:9
talking 10:12
17:11 18:20
32:8 43:20
44:15 49:16
talk-off 50:12, 13
talk-off. 50:18
talk-offs 48:5
50:10
talk-offs. 63:19
team 14:2 16:7
17:12, 19 24:13
49:12 59:12
teams 17:20
29:12 72:9

telephone 3:6, 7
21:8 29:6 45:23
Telephoned 55:13
tell 5:9, 11 12:16
15:15 16:23
17:23 18:3, 8, 24
19:17, 18 20:9
23:21 24:18
26:17 30:8
32:17 35:23, 24
36:1, 1, 9 37:2
50:4 52:10 54:3,
10, 13 57:17, 23
59:2, 9, 13 64:16
68:12, 24 69:12
70:5, 8, 20, 22
71:21 72:1 74:4
telling 12:8
13:16 39:13
ten 14:25 17:20,
24 18:25, 25
49:12, 13
tendency 74:16
term 61:24 63:12
termination. 31:2
terms 23:25
45:20 50:8 72:11
test 25:12 26:1
testified 4:8
testifying 13:9
testimony 59:15
testing 11:6
23:25 29:3
tests 23:14
25:18, 19 26:1, 3,
4, 12 28:5, 8
tests. 28:11
than 45:1
Thank 44:18
61:9
Thanks 62:5
that 8:5, 24
12:19 14:3, 22
15:3 26:10, 22
28:10 29:5, 24
38:18 39:14
42:19 43:21
44:3 47:8 51:6
52:2 58:12
63:13 64:10

| | | | |
|---|---|---|---|
| 65:*16*, *22*  66:*2*<br>73:*4*<br>**that,**  28:*3*<br>**that.**  13:*18*  15:*2*<br>24:*2*  28:*22*<br>39:*13*  40:*1*<br>46:*25*  64:*20*<br>73:*11*<br>**That's**  49:*17*<br>**THE**  4:*1, 11*  5:*1,*<br>*2, 17*  6:*18, 19*<br>10:*22*  12:*6, 11*<br>13:*6*  15:*17*<br>16:*15*  19:*21*<br>23:*3*  25:*11, 23,*<br>*25*  26:*17*  27:*25*<br>28:*12, 25*  29:*10*<br>35:*21*  36:*2*  37:*9,*<br>*17*  38:*25*  39:*2,*<br>*19, 23*  42:*18, 23*<br>44:*13*  45:*15*<br>47:*7*  49:*2*  50:*17,*<br>*21*  54:*19*  55:*2, 5,*<br>*23*  57:*12*  59:*4*<br>60:*2*  61:*12*<br>66:*20*  67:*19*<br>72:*4, 12, 17*<br>73:*18*  74:*3, 4, 6,*<br>*10, 14, 16*<br>**their**  51:*13*<br>**them**  53:*6*<br>**them,**  48:*4*<br>**them.**  26:*6*<br>**themself**  39:*1*<br>**then**  62:*14*<br>**then.**  65:*11*<br>**there**  7:*19*  54:*2,*<br>*20*  56:*4*<br>**there,**  45:*2*<br>**there.**  13:*7*<br>14:*19*  19:*25*<br>29:*2*  30:*4*  44:*16*<br>51:*9*  56:*5, 9*<br>62:*16*  71:*9*<br>**thereof**  74:*7*<br>**there's**  14:*25*<br>16:*16*  26:*18*<br>30:*22*  41:*20*<br>43:*20*  64:*19* | **these**  36:*10*  64:*2*<br>**these,**  52:*5*<br>**they**  16:*7*  24:*5*<br>26:*9, 23*  34:*16*<br>60:*12*  66:*3*<br>**they'll**  30:*25*<br>41:*21*<br>**they're**  27:*12*<br>55:*9*  57:*8*<br>**they've**  27:*10*<br>**thing**  20:*7*  52:*3*<br>**things**  12:*19*<br>25:*19*  26:*10*<br>27:*10*  28:*10*<br>29:*1*  43:*21*<br>48:*15*  64:*5*  71:*21*<br>**think**  4:*18*  10:*8*<br>13:*13*  19:*21*<br>20:*17*  26:*5*  27:*6*<br>33:*4*  36:*20*<br>38:*25*  41:*9*<br>43:*12, 12*  44:*15*<br>45:*10*  46:*11*<br>47:*4*  48:*12*<br>51:*10*  53:*12*<br>55:*15*  64:*16*<br>71:*5*  72:*20, 22*<br>**think.**  54:*21*<br>**thinking**  56:*4*<br>**thinking,**  41:*22*<br>**third**  9:*24*  15:*9*<br>20:*25*  21:*5, 15*<br>25:*22, 24*  31:*1*<br>35:*9*  36:*19*  37:*4,*<br>*24*  39:*17*  40:*2, 8*<br>42:*23*  43:*14, 20*<br>44:*1*  45:*3, 4, 16*<br>46:*24*  56:*22*<br>62:*6*  69:*7*<br>**third-party**  38:*22*<br>42:*13*  43:*3*<br>44:*24*  62:*7, 9*<br>71:*18*<br>**this**  23:*23*  54:*17*<br>61:*16*<br>**this,**  40:*9*<br>**this.**  59:*7*<br>**those**  4:*12*<br>22:*15*  36:*6* | **those,**  28:*1*<br>**those.**  49:*20*<br>**thousand**  51:*25*<br>**Three**  7:*18*  15:*2*<br>18:*8*  19:*23*<br>24:*18, 20, 22, 24*<br>25:*3*  31:*6, 8, 10*<br>33:*18*  40:*18*<br>48:*6, 8*  58:*25*<br>65:*8, 9*  66:*20*<br>**three-month**<br>66:*21*<br>**through**  24:*10*<br>**through.**  20:*19*<br>**tied**  50:*22*<br>**tight**  48:*17*<br>**time**  7:*7*  11:*9*<br>14:*9*  18:*5*  22:*23*<br>23:*22*  24:*25*<br>27:*16*  30:*1, 25,*<br>*25*  31:*1, 5*  32:*24*<br>33:*19*  38:*10*<br>40:*19, 21*  47:*11*<br>51:*14*  52:*1*  53:*5*<br>66:*21*  72:*2*<br>**time,**  47:*10*<br>**time.**  23:*9*  33:*17*<br>36:*5*  42:*1*  71:*25*<br>72:*13*<br>**times**  15:*2*<br>29:*23*  32:*10*<br>33:*23*  53:*22*<br>54:*21, 21*  57:*10*<br>**times.**  51:*1*<br>**Title**  2:*4*  5:*12, 13*<br>**titles**  6:*9, 23*<br>**to**  5:*5*  8:*19*<br>9:*16*  10:*25*<br>14:*21*  16:*25*<br>17:*24*  18:*13, 25*<br>25:*5*  27:*21*<br>29:*16*  41:*18*<br>45:*11*  47:*24*<br>50:*3, 8, 24*  51:*15*<br>56:*11*  57:*10, 16*<br>58:*6, 23*  60:*5*<br>61:*1*  63:*9*  67:*2*<br>70:*5*  73:*21*<br>**to.**  44:*11* | **today**  4:*17*  5:*3*<br>8:*9, 20, 22*  9:*2, 3,*<br>*4*  15:*19*  18:*21*<br>19:*18*  24:*18, 20*<br>53:*3*  55:*1*  60:*1*<br>71:*17, 20*<br>**today.**  24:*23*<br>**today's**  14:*11*<br>18:*20*<br>**told**  18:*17*  41:*12*<br>53:*20*  61:*5*<br>**took**  33:*7*<br>**took.**  45:*20*<br>**top**  26:*18*  40:*12*<br>54:*10*  69:*8*<br>**topic**  27:*2*<br>**touch**  26:*10*<br>44:*21*<br>**trace**  26:*14*<br>63:*10*<br>**tracing**  20:*10, 11,*<br>*12, 25*  21:*4, 7, 15*<br>26:*25*  63:*6, 7, 17*<br>71:*18*<br>**tracked**  30:*2*<br>**trained**  24:*6*<br>45:*18*  56:*24*<br>72:*12*<br>**trainer**  26:*24*<br>**trainers**  23:*15*<br>**Training**  3:*8*<br>5:*23*  6:*1, 2*  11:*3,*<br>*10*  23:*2, 3, 4, 6,*<br>*11, 18, 19, 23*<br>24:*16*  26:*8, 15,*<br>*16, 22, 23*  27:*3,*<br>*23*  29:*4, 6, 14*<br>38:*5*  42:*24*  43:*1,*<br>*10, 13*  45:*21, 22,*<br>*23, 25*  47:*8*  71:*2*<br>72:*11*<br>**training,**  45:*22*<br>**training.**  23:*13*<br>25:*24*<br>**transcribed**  74:*9*<br>**Transcript**  3:*6, 7*<br>36:*15*  37:*1*<br>39:*23*  72:*25*<br>73:*19, 21*  74:*8, 8* |

transcripts  35:14
36:6  37:9  54:19
trend  51:21
trial  40:15
true  74:8
truth  74:4, 4
try  25:24  56:1
57:11
trying  21:7  38:2
41:18  44:21
50:14, 24  57:9
60:19, 21  62:12
trying.  60:20
TTP  55:17
turn  55:9  64:22
twelve  17:21, 24
18:25
two  7:13  15:2
17:4  18:11
22:17, 19, 22
24:21  29:9  35:9
37:6, 20  44:4
48:8  49:2  50:8
52:10  55:22
58:22  72:1
type  36:13
Typically  17:20
18:13, 24  20:15
23:18  24:13
28:1, 4  29:11
30:22, 24  34:21
35:21  36:2  40:7
41:21  42:7  48:4
51:19  59:5, 21
60:9  66:13, 19
71:3
typically,  27:23
typing  56:5

< U >
ultimately  12:14
undergo  28:15
71:1
understand  6:18
8:13  13:8  18:4
21:3  26:14
32:21  35:12
43:22  50:9, 17
53:15  59:4
65:12  69:22

understand,
59:21
understand.  4:20
66:11  70:1
understanding
5:7  16:22, 23
23:10  38:19
55:17  66:2  70:4
understands  63:9
Understood  19:14
Understood.
19:12
uniform  56:1
UNITED  1:1
unprofessional
65:13  67:18
68:8  69:5
unusual  69:13
up  46:4
up.  58:7
updates  13:2
28:13
us,  69:21
use  4:17  14:24
31:21  61:2
62:11  63:12  71:9
uses  38:14  52:5
using  38:9
Usually  4:10
15:11  18:9, 12
19:19  54:8  59:4
usually,  54:5

< V >
variances  16:17
variations  15:7, 8
varied  24:21
various  20:16, 18
22:15  23:14, 16
26:11
vary  15:5
vast  25:5
verbal  30:25
31:3, 5, 8  33:18,
19  34:11, 17
35:5  65:2, 6, 8,
19, 20, 22  66:3, 4,
17, 19, 21, 23
67:15  68:5
verify  49:22

versus  8:15, 17
33:7
very  28:23
vice  21:23  22:18
View  58:1
violated  45:12
67:16  68:7  69:4
violates  30:18
31:24  33:25
39:15
violation  37:21
39:24  56:12
57:4  60:7
violations  8:5
virtually  29:19
30:3, 5  49:9, 10
60:1
virtue  74:6
voice  46:4
voicemail  44:13
54:20, 23
vox  54:8
V-o-x  54:9
vox.  54:6
vs.  1:7

< W >
waive  73:4, 8
waive.  73:12
waived  74:13
walk  47:15
walked  30:9
want  7:6  8:21,
22, 25  9:19
11:14  27:18
29:22, 23  30:12
31:3, 4  36:6, 9
37:1  40:15, 21
42:24  47:4
49:21, 22  50:8
53:24  69:16
72:25  73:3, 8, 14
want.  73:10
warning  32:5
34:11, 12  65:2, 6,
20, 22, 25  66:1, 3,
4, 5, 22  67:9, 9,
15  68:5  69:1
70:7, 10, 13

warning.  65:19
66:17
warnings  65:7
69:21  70:2
warrants  30:24
was  20:4  56:22,
24  65:21  74:11
was.  14:10
waterfall  20:20
46:21  59:6
way  21:2  43:17
45:14  46:12
49:4, 7, 12  51:15
54:3  57:23  59:2
64:5, 16  71:19
72:14
way.  59:1
ways  47:23
We  24:20  29:8,
21  37:18  44:6
45:25  53:7  57:2
66:21  68:19
week  12:24
24:21  27:17
29:17  31:16
34:25  57:20
63:23
weeks  23:9
24:18, 20, 21, 22,
24  25:3  58:25
61:19
welcome  36:10
42:25
Well  6:1  11:4,
17, 18, 19  13:13
17:2  18:1, 25
21:3  24:15
25:17  26:25
29:21  32:2
33:21  34:3
39:16, 21  40:6, 7,
14  41:14  43:12
44:12, 13, 19
45:15, 22  48:14
49:11  56:17
57:1  59:6  64:4
66:6  69:15, 17
72:6
well.  26:13  27:1
29:12  72:9

**went**  24:2, *21*
*35:22  59:13, 14*
**were**  31:*6*
**we're**  *4:18  9:5*
*29:22  30:15*
*32:3  34:24*
*41:16  43:20*
*58:8  60:6  63:18*
**were.**  54:*13*
**weren't**  31:*17*
**West**  2:*11*
**we've**  *4:16*
*15:24  26:5*
*33:25  43:16*
*53:12*
**what**  *9:20  23:10*
*24:9  56:15  57:6*
**What's**  32:*24*
*47:15*
**whatsoever**
*46:23  70:14*
**when**  20:*12*
*24:21  48:19*
**where**  6:*4*
**While**  13:*8*
**Whitney**  2:*6*
*4:24  41:20  48:21*
**who**  54:*10  74:10*
**whole**  15:*7*
**why**  67:*25  69:22*
**wife's**  44:*21*
**will**  20:*23*
**Williams**  3:*8*
*13:19  14:6  16:4*
*18:4  19:15  23:2*
*35:9  39:13*
*45:10  52:5*
*69:23  70:15  71:1*
**Williams.**  5:*6*
*61:13*
**wise**  23:*11*
**with**  11:*8, 10*
*23:1  36:9  39:12*
*48:11  50:13*
*61:23  74:16*
**within**  29:*11*
*72:1*
**witness**  *4:7  9:11,*
*14  44:17  46:6*
*49:25  50:2  61:1,*

*7, 9  72:23  73:2,*
*6, 11, 16  74:4, 18*
**word**  31:*21  54:1*
**work**  6:*5, 7*
*17:15  18:4, 8, 15*
*20:11  22:19*
*26:24  39:2*
*50:14, 20  66:16*
**worked**  7:*9*
*15:14  16:19*
*22:12, 22*
**working**  14:*6*
*16:4, 5, 12, 20*
*18:7  19:16, 19*
*20:13  27:20*
*28:18  31:7*
*51:22  59:20*
**works**  19:*6  42:2*
**would**  35:*4*
*37:19  39:16*
*45:23*
**would.**  55:*7*
*72:20*
**wouldn't**  59:*10*
**wow**  25:*2*
**wrapping**  49:*16*
**write**  31:*25*
**written**  31:*1, 11,*
*12, 13  33:20*
*34:11, 17, 19*
*35:5  65:7  66:5,*
*23  67:9  69:1*
*70:7*
**wrong**  32:*16*
*42:11  51:7, 20*
*65:1  70:4*
**wrong.**  71:*7*

**< Y >**
**Yeah**  *4:20  20:4*
*25:7  30:12  41:8*
*47:10  58:15*
*60:21*
**Yeah.**  *4:14  16:2*
*21:10  22:9  61:4*
**year**  27:*12*
*28:15  35:24, 25*
*52:11, 11  67:24*
**year.**  31:*14*

**years**  7:*18*
*22:17, 19, 22*
*29:15  30:11, 12*
*50:5  52:10*
**years.**  7:*1, 6*
*15:25  22:7  30:16*
**Yep**  27:*18*
**Yep.**  22:*5  60:15*
*62:22*
**Yes.**  5:*8  7:21*
*9:18  10:24  12:9*
*17:17  19:8  21:1,*
*12, 14, 20  22:24*
*24:15  25:15*
*27:7  28:7  34:9,*
*21  35:2, 6  38:8,*
*16, 20, 24  42:7*
*43:2  45:13  47:2*
*52:14, 19  53:4,*
*11, 13  54:25*
*55:4  61:18, 20*
*62:8  65:24*
**yesterday**  31:*24*
**you**  5:*3  9:19*
*10:14  13:13, 17,*
*21  16:22  18:17,*
*21  20:21  28:16*
*29:23  30:2  33:6*
*40:2  41:16*
*42:25  53:9  55:8*
*56:23  57:21, 25*
*70:4, 8  71:4  72:7*
**you,**  16:*23*
*23:21  49:16*
**you.**  17:*23*
*19:17  38:11*
*44:18  61:9  64:8*
*66:14  68:24*
*69:12  72:22*
**you'd**  31:*13*
**your**  5:*4  8:23*
*12:3  30:6  31:22*
*35:23  47:14*
*52:25  57:1*
**you're**  16:*11*
*41:17  43:12*