FILED
2012 Jun-22  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

```
1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF ALABAMA

3   SOUTHERN DIVISION

4   COURT FILE NO:  2:11-CV-03183-WMA
    -----------------------------------
5   MICHAEL LINDSEY,

6   Plaintiff,

7   vs.

8   NCO FINANCIAL SYSTEMS, INC.,

9   Defendant.
    -----------------------------------
10

11

12

13

14

15

16  ------------------------------------------------------------

17                      DEPOSITION OF

18                    LATISHA WILLIAMS

19  ------------------------------------------------------------

20

21

22

23

24

25  TAKEN ON:  06/13/2012              BY:  PAMELA J. FRANZ
```

**Latisha Williams**                                                                                 **2**

```
 1    APPEARANCES:

 2


 3


 4    PATE & COCHRUN, L.L.P.
      400 Title Building
 5    300 North 21st Street
      Birmingham, AL  35203
 6    Phone:  205.323.3900
      Fax:  205.3233906
 7
      By:  Mr. W. Whitney Seals
 8         For Plaintiff

 9


10


11    SESSIONS, FISHMAN, NATHAN & ISRAEL LLP
      55 West Monroe Street
12    Suite 1120
      Chicago, IL  60603-5130
13    Phone:  312.578.0990
      Fax:  312.578.0991
14    Email: jschultz@sessions-law.biz

15    By:  Mr. James K. Schultz
           For Defendant
16


17


18
      Also Present:  Mr. Patrick N. DeProspo
19


20


21


22


23


24


25
```

```
 1   INDEX

 2   Examination by Mr. Seals, page 4

 3   Examination by Mr. Schultz, page 48

 4   Further Examination by Mr. Seals, page 50

 5   Further Examination by Mr. Schultz, page 57

 6   Further Examination by Mr. Seals, page 59

 7   Objections by Mr. Schultz, pages 23,35,61

 8   INDEX OF EXHIBITS

 9   NUMBER    DESCRIPTION

10   1    Confidential NCO Collector Training Manual, Bates
          Numbers NCO --  00290 through NCO - 00354, page 9
11
     2    Transcript of telephone call, page 22
12
     3    Transcript of telephone call, page 22
13
     4    Six-page Fact Sheet, page 31
14
     5    Confidential Personnel file for Latisha Williams, Bates
15        Numbers NCO - 00248 through NCO - 00273, page 33

16   6    Confidential Interoffice Memorandum to Collection
          Personnel from NCO Training Department, "Subject:
17        Consumer Defense Repayment Policy," page 41

18

19

20

21

22

23

24

25
```

```
 1   THE DEPOSITION OF LATISHA WILLIAMS is taken on the 13th of

 2   June, 2012, at Erstad & Riemer, 8009 34th Avenue South, Suite

 3   200, Minneapolis, Minnesota, commencing at the hour of 12:20

 4   p.m.

 5                              * * *

 6                     LATISHA WILLIAMS,

 7          called as a witness, being first duly sworn,

 8             was examined and testified as follows:

 9                              * * *

10                            EXAMINATION

11   BY MR. SEALS:

12   Q   Ms. Williams, my name is Whitney Seals.  I'm a lawyer

13       from Birmingham, Alabama.  I represent a gentlemen by

14       the name of Michael Lindsey.  Mr. Lindsey has brought a

15       lawsuit against NCO Financial, based in part on some

16       things that happened during the collection of his

17       account.

18          Is it your understanding that that's why you're

19       here today?

20   A   Yes.

21   Q   Okay.  Have you ever given a deposition before?

22   A   No.

23   Q   Okay.  You're doing fine, but if you would let me finish

24       my question and then give me an answer, and I'll do my

25       very best to let you finish your answer before I ask
```

**Latisha Williams**                                                                 **5**

| | | |
|---|---|---|
| 1 | | another question.  Sometimes I can get a little ahead of |
| 2 | | myself, and I don't want to do that with you.  Okay? |
| 3 | A | (Witness nods.) |
| 4 | Q | Yes? |
| 5 | A | Yes. |
| 6 | Q | If I prompt you, I promise I'm not being rude.  I want |
| 7 | | to make sure that she gets yeses or noes or whatever |
| 8 | | your answer is on the record.  Okay? |
| 9 | A | Okay. |
| 10 | Q | All right.  Now, just to be safe, are you on any |
| 11 | | medication or anything that would affect your ability to |
| 12 | | testify today or tell the truth? |
| 13 | A | No. |
| 14 | Q | Okay.  What did you do to prepare for the deposition |
| 15 | | today? |
| 16 | A | I listened to the recordings, and I did review a little |
| 17 | | notes. |
| 18 | Q | Okay.  Other than listening to the recordings and |
| 19 | | reviewing the notes, did you do anything else? |
| 20 | A | I spoke with -- |
| 21 | Q | Well, hang on.  If you spoke with your attorney, I don't |
| 22 | | want to know anything about that. |
| 23 | A | Okay.  No. |
| 24 | Q | Okay.  Got it.  When did you find out that you'd have to |
| 25 | | come down here and do a deposition? |

**Latisha Williams**                                                                    **6**

```
 1   A    I found out about -- that was -- I would say about -- I

 2        think like -- I can't really say how long I knew about

 3        it, because there was never a set date.

 4   Q    Yes, ma'am.

 5   A    So I can't really say.

 6   Q    When did you find out you'd have to be here today?

 7   A    I would say I knew about it like a month and a half in

 8        advance.

 9   Q    Okay.  You currently work for NCO Financial, don't you?

10   A    Yes.

11   Q    Okay.  How long have you been employed with them?

12   A    Two and a half years.

13   Q    All right.  The records look like you started working

14        with them in February of 2010.  Does that sound right?

15   A    I think it's February of 2009.

16   Q    February of 2009.  Okay.  All right.  Fair enough.  If

17        the record said February of 2010, would you disagree

18        with them?

19   A    Yeah.  I -- yeah.

20   Q    You would?

21   A    Yes.

22   Q    Okay.  All right.  That's fine.  Have you ever had any

23        other job in debt collection or in the debt collection

24        field?

25   A    No.
```

**Latisha Williams** 7

```
 1    Q    Okay.  And what is your job title at NCO?

 2    A    My job title is to collect debts from people who have

 3         delinquent accounts with us.

 4    Q    Okay.  Do they call you a collector?  What's your title?

 5    A    I'm a collector.

 6    Q    All right.  And what are your duties as a collector, or

 7         did you just describe those duties?

 8    A    I just described them.

 9    Q    Okay.  Now, are you paid hourly or salary?

10    A    I'm paid hourly.

11    Q    Okay.  Do you get paid commissions or bonuses based on

12         how much you can collect?

13    A    If we go over our goal, there is commission.

14    Q    All right.  It looks like the account that you were

15         working was part of a Bank of America set of accounts.

16         Is that your understanding?

17    A    Yes.

18    Q    Okay.  Did Bank of America have any separate commissions

19         or bonuses set up?

20    A    The bank -- like each and every client is different, and

21         I can't exactly remember if Bank of America had like --

22         had other bonuses or not.

23    Q    Okay.  Did you ever receive any bonus while working the

24         Bank of America accounts?

25    A    Yeah.  At tax time, I received a bonus.
```

```
1    Q    All right.  Okay.  Have you ever received any other

2         bonus while working for NCO, other than what you just

3         told me?

4    A    Yes.  I received an employee referral in August.

5    Q    Okay.  Anything else?

6    A    No -- but -- no.  I have commissioned twice since I've

7         been at NCO, and then I had a referral bonus check, so

8         that's like a commission too.

9    Q    All right.  Are you familiar with the Fair Debt

10        Collection Practices Act?

11   A    Yes.

12   Q    Okay.  And I think we've been calling it the FDCPA.  If

13        I call it the FDCPA, do you know what I'm talking about?

14   A    Yes.

15   Q    Okay.  What's your understanding of the purpose of the

16        FDCPA?

17   A    It's the rules and regulations of what we can and we

18        cannot do.

19   Q    Okay.  In collecting debt?

20   A    Yes.

21   Q    Are you expected to be familiar with the FDCPA as an

22        employee of NCO?

23   A    Yes.

24   Q    Now, you told me that you believe you started working

25        with NCO in 2009.  That's fine.  I want to show you what
```

**Latisha Williams**                                                                    **9**

```
 1        I'm going to mark as Exhibit 1 to your deposition.  I'd

 2        ask you if you recognize that?

 3   A    Yes.

 4   Q    What is that?

 5   A    This is our training manual.

 6   Q    Is -- it's been represented to me by your lawyers that

 7        this is the manual that they would have used to train

 8        you.  Is it the manual that you would have had used?

 9   A    Yes.

10   Q    Okay.  Are you familiar with the manual?

11   A    Yeah, I am.

12   Q    Okay.  All right.  When you started, did they make you

13        read the whole thing?

14   A    They didn't like -- I'm not really -- like my training

15        was like a long time ago.  I know that -- that I read

16        something.  I read it -- like we took tests on it, and I

17        know that we talked about it.  I know there was certain

18        stuff that stood out more than others.

19   Q    Okay.  Have they made you read it or test on it since

20        that initial training?

21   A    Yes.

22   Q    Okay.  Let's talk a little bit about your training.

23             Other than the manual we're looking at here, what

24        training did you receive that you remember when you

25        started with NCO?
```

**Freedom Court Reporting, Inc**                               **877-373-3660**

1   A   I don't remember that much about training because it was

2       like a long time ago, but we read -- we read stuff

3       like -- we tested on stuff.  We talked -- we had group

4       discussions about stuff.  It's like -- I really don't

5       remember much, but I know that.  I remember that.

6   Q   Okay.  You do remember the manual?

7   A   Mm-hm, the manual, the training, the testing, the group

8       discussions.  I can't really remember everything in

9       detail though.

10  Q   I understand, and I don't -- this isn't a memory test, I

11      promise you, but I'd like to know is there anything as

12      you sit here that sticks out in your mind that you

13      remember specifically from training?

14  A   No.

15  Q   Okay.  You said the tests, that sort of thing.  Did they

16      make you sit with managers or other collectors and

17      listen in on phone calls, that sort of thing, before you

18      were allowed to collect on your own?

19  A   I did listen to -- we listened to some calls.

20  Q   Before you were allowed to collect on your own?

21  A   (Witness nods.)

22  Q   Yes?

23  A   Yes.

24  Q   Was that done on the floor, so to speak, or was this in

25      a classroom?

**Latisha Williams**                                                                    **11**

```
 1   A    In a classroom.

 2   Q    All right.  Did they make you listen to recordings?

 3   A    No, no recordings that I -- actually, what I listened to

 4        was actually a collector doing their job.

 5   Q    Okay.  So a live call?

 6   A    Mm-hm.

 7   Q    Yes?

 8   A    Yes.

 9   Q    Okay.  Do you know how long you spent training before

10        you started collecting?

11   A    No.

12   Q    Was it a matter of days, a matter of weeks?

13   A    I think it was maybe like one or two weeks.

14   Q    One or two weeks?

15   A    (Witness nods.)

16             THE REPORTER:  Yes?

17             THE WITNESS:  Yes.

18   Q    (By Mr. Seals)  Okay.  And can you tell me what ongoing

19        training you've had to do since the initial training?

20   A    Well, once I got on the floor, my supervisors were

21        there -- my supervisor was there to help me.  And then

22        we did side-by-sides.  And if I had any questions or

23        concerns, they were there to help me.

24   Q    Okay.  Have you asked for help while working at NCO?

25   A    Yeah.  I have no problem with asking for help.
```

**Latisha Williams**                                                                        **12**

```
 1   Q   No problem asking for help.  Do you have any ongoing

 2       classroom training?

 3   A   Only if it's something that -- something new that's

 4       brought to NCO, but if it's something that we already

 5       learned from training, we would just test on it or go

 6       over it again.

 7   Q   How often do you have to retest?

 8   A   Probably like every six months or something.

 9   Q   All right.  Do you know what skip tracing is?

10   A   Yes, I do.

11   Q   What is skip tracing?

12   A   Skip tracing is finding -- is finding location --

13       location information, finding better numbers and POEs.

14   Q   What's a POE?

15   A   Place of employment.

16   Q   Anything else?

17   A   That's how I describe it.

18   Q   Understood.  Did you receive any training dealing with

19       skip tracing?

20   A   Yeah, but -- yeah.

21   Q   Okay.  What kind of training did you receive?

22   A   Like -- I can't really -- I can't remember exactly what

23       the training was.

24   Q   The retests that they make you do, do you know if any of

25       those deal with skip tracing?
```

**Freedom Court Reporting, Inc**                                    **877-373-3660**

```
 1   A     No.

 2   Q     You don't know --

 3   A     (Witness shakes head.)

 4   Q     -- or they don't deal with it?

 5   A     I don't believe that they deal with it.

 6   Q     Okay.

 7   A     The question that you ask is kind of -- like because --

 8         like if we test, like it might be certain questions in

 9         the test that deals with skip tracing, so I'm kind of

10         confused with saying yes or no because I didn't take a

11         test that's all skip tracing or, you know --

12   Q     Okay.

13   A     -- but, yeah, it would be like a couple questions

14         about -- about it within the test.

15   Q     Well, if I ask a question that's confusing or doesn't

16         make much sense, please tell me to rephrase it and I'll

17         be happy to until we can both understand each other.  Is

18         that fair?

19   A     Yes.

20   Q     But on the other side of the coin, if you answer a

21         question, can I assume that you understood it?

22   A     Yes.

23   Q     Okay.  Good.  We talked a little bit about skip tracing.

24         Do you recall, did any of the tests have any question

25         dealing with talking to third parties?
```

**Latisha Williams**                                                      **14**

1    A    Yes.

2    Q    Okay.  Have you had any specific training regarding

3         talking to third parties that you can remember?

4    A    I can't -- yes.

5    Q    Okay.  What is it?

6    A    Well, I have the side-by-sides.  In reference to third

7         parties, yeah, I have the side-by-sides.  I have help

8         with that.

9    Q    How many side-by-sides have you had to do where you call

10        third parties?

11   A    I'm not sure how many I have done, but...

12   Q    Would it be more than ten?

13   A    I really don't know.

14   Q    Don't know, okay.

15   A    No.

16   Q    How many accounts are you working at a given time?

17   A    I'm not sure how many -- like -- like at one time?

18   Q    Sure.  If you go into work -- when do you work next?

19   A    I work at -- when I leave here.

20   Q    When you leave here?

21   A    Yeah.

22   Q    Okay.  When you go to the office, how many accounts do

23        you expect to have to work?

24   A    A lot.  I don't know exactly the numbers, but -- I'm not

25        exactly sure of the numbers, but I know I work a lot of

**Latisha Williams**                                                              **15**

```
 1       accounts.

 2   Q   Okay.  Would it be fair to say it's in the hundreds?

 3   A   Yes.

 4   Q   Okay.  Was that the same amount as back in June of 2011?

 5   A   Yes.

 6   Q   Okay.  Has it always been roughly the same amount of

 7       accounts?

 8   A   Yes.

 9   Q   How long are your working shifts?

10   A   Eight hours, but seven hours with a hour break.

11   Q   Seven hours with an hour break.  From when to when,

12       generally?

13   A   Nights, it's 12:00 to 9:00.  Mornings, 8:00 to 5:00.

14   Q   Okay.  Do you have a night shift today?

15   A   Mm-hm.

16               THE REPORTER:  Yes?

17               THE WITNESS:  Yes.  I'm sorry.

18   Q   (By Mr. Seals)  No.  It's okay.  We all do it, and we're

19       not trying to be rude -- or I'm not trying to be rude in

20       any way when I tell you that.  I promise you.

21           How many phone calls on average do you place per

22       shift?

23   A   It would still be in the hundreds.  I never actually

24       thought about how many calls I make a day.

25   Q   Sure.  Are some of the calls manually dialed?
```

1    A    Yes, they are.

2    Q    About how many?

3    A    It depends on -- it depends on that day.

4    Q    Okay.  Well, I'm trying to think of the best way to ask

5         you this.  Can you give me just a general average?  It's

6         normally, say, a range between this many and this many I

7         would do a day manually?

8    A    I would say between -- I don't know, because I don't

9         want my numbers to be way off.  I really don't know how

10        many we make a day, but if I would have to take a guess,

11        I would say between 120 and like 260.  And I don't even

12        know if -- that's just my guess.

13   Q    Okay.

14   A    I'm not really sure at all.

15                MR. SCHULTZ:  Latisha, just -- we don't want

16        you guessing.  It's his deposition, but if you don't

17        know a question --

18                THE WITNESS:  Okay.

19                MR. SCHULTZ:  -- just say you don't know.

20   Q    (By Mr. Seals)  Okay.

21   A    Okay.  I'm not sure how many calls we make a day.

22   Q    All right.  You said you have roughly the same accounts

23        as you did back in June of 2011.  Do you make as many

24        phone calls, roughly, as you did back in June 2011?

25   A    Yes.

**Latisha Williams**                                                          17

```
 1   Q    Okay.  How many of those phone calls result in a live

 2        contact with somebody else, usually?

 3   A    That could -- do you mean like contact with the debtor

 4        or contacts with just people?

 5   Q    A human being.  You call a number and someone picks up

 6        and says hello.

 7   A    Okay.  I would have to say at least like 75 percent of

 8        all the calls that I make I'm probably talking to

 9        somebody.

10   Q    Okay.  So 75 percent of the calls.  Do you have to leave

11        a lot of answering machine messages as well?

12   A    Yes.

13   Q    Okay.  Would you say that back in June of 2011 about

14        75 percent of the calls you were speaking with someone?

15   A    I'm not sure if -- around that time because sometimes in

16        collections you get a lot of voicemails.  I'm not really

17        sure.

18   Q    Okay.  That's fair.  Of the calls you make per shift,

19        roughly how many are you contacting a third party,

20        somebody that's not the debtor?

21   A    Is a percentage okay?

22   Q    A percentage is fine.

23   A    Well, I would have to say out of all my calls, I would

24        think that speaking to third parties it's at least

25        50 percent.
```

**Freedom Court Reporting, Inc**                              **877-373-3660**

1   Q    All right.  And that would be 50 percent of the live

2        contacts.  Is that fair?

3   A    Mm-hm.

4   Q    Yes?

5   A    Yes.

6   Q    Okay.  Can you tell us, because we may have to use this

7        in a trial, what is your understanding of the difference

8        between a consumer and a third party?

9   A    A consumer and third party?

10  Q    Yes, ma'am.

11  A    Well, a debtor is the person who owes the debt, and a

12       third party is a person who just may answer the debtor's

13       phone or maybe the debtor's mom, sister, somebody who

14       isn't the debtor.

15  Q    Okay.  If you look at Exhibit 1 that's in front of you,

16       on the bottom, they have -- the pages are numbered.  It

17       starts with NCO - 290.  Do you see that?

18              MR. SCHULTZ:  It's these numbers down here

19       he's talking about.

20              THE WITNESS:  Yes.

21  Q    (By Mr. Seals)  If you can turn to page 299, I would

22       appreciate it.

23  A    (Witness complies.)

24  Q    All right.  This has some "Answering Machine/Voice Mail

25       Messages (consumers residence)," and it looks like

1       certain scripts to use when calling in certain

2       circumstances.  Is that what it looks like to you?

3   A   Yes.

4   Q   At the bottom, for example, it says, "3rd Party Script -

5       Live Person at Consumer's Residence (example)," and it

6       kind of tells you what to say and that sort of thing.

7       Is that fair?

8   A   Yes.

9   Q   Okay.  Do you use a script now when you contact third

10      parties?

11  A   Yes.

12  Q   Okay.  Were you using a script when you would contact

13      third parties back in January -- or June, rather, 2011?

14  A   Yes, I was using the script, but -- yeah.

15  Q   Let me ask you this so I'm clear.  Not necessarily this

16      specific script, but was there a script that you would

17      use when you would call a third party to try to get

18      location information?

19  A   Is there a different script?  No.  There's not -- not

20      really a different script for that, but -- no.

21  Q   Okay.  All right.  I don't know if I'm being clear.  I

22      understand that these scripts are for certain

23      circumstances.  At the top, if you call a consumer's

24      residence and the answering machine picks up, it tells

25      you what to say, right?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Right here, it says that if you call someone and they're |
| 3 | | a live person at the consumer's residence, it tells you |
| 4 | | to use this script? |
| 5 | A | Mm-hm. |
| 6 | Q | Yes? |
| 7 | A | Yes. |
| 8 | Q | If you call a third party and they're not at the |
| 9 | | consumer's residence, is there a script? |
| 10 | A | You're saying if I call a third party and they're not at |
| 11 | | the debtor's residence? |
| 12 | Q | Right.  If you call the debtors mother's house or a |
| 13 | | neighbor, whoever. |
| 14 | A | Well, no, I'm not sure because -- like if we're |
| 15 | | calling -- so basically you're putting me in a situation |
| 16 | | where we're calling the mother's phone? |
| 17 | Q | Sure. |
| 18 | A | Okay.  Well -- |
| 19 | Q | You're trying to get information.  Is there a script |
| 20 | | that you use to get that information? |
| 21 | A | Yes, but it's basically just like a couple different |
| 22 | | words that's different from this, not that -- different |
| 23 | | from this. |
| 24 | Q | Is this basically the same script you would use in the |
| 25 | | situation I told you? |

```
 1   A     No.

 2   Q     No?  What's different?

 3   A     Well, the message would not have been left.  It all

 4         depends on how they answer the phone too.  It depends on

 5         a lot of stuff.

 6   Q     Okay.  That's fair.  Do you know if you were -- I don't

 7         know if I got an answer to this or not, and if I did,

 8         just let me know.

 9         Were you using a script when you would call Kay

10         Lindsey or Greg Lindsey, the two phone calls in this

11         case?

12   A     No.

13   Q     You were not using a script?

14   A     That is correct.

15   Q     Okay.  All right.  We're here, as I told you, because my

16         client, Mr. Lindsey, has filed a lawsuit accusing NCO of

17         violating the FDCPA based on, in part, two phone calls.

18         You said that you've listened to the recordings of

19         the calls.  When is the last time you listened to them?

20   A     I would have to say a week ago.

21   Q     All right.  Have you ever seen a transcript of the

22         calls?

23   A     Yeah.

24   Q     You have, okay.  I'm going to show you what I'm going to

25         mark as Exhibits 2 and Number 3, and these are
```

**Latisha Williams**                                            **22**

```
 1        transcripts that your lawyer provided to me.

 2             Exhibit 2 is a phone call to Kay Lindsey, who is my

 3        client's stepmother, on January -- I keep saying

 4        January.  June the 9th, 2011.  I'll show that to you,

 5        ma'am.

 6             And then Exhibit 3 is a phone call on June 16th,

 7        2011, to Gregory Lindsey, my client's brother.

 8             Do those look like the transcripts that you've

 9        reviewed?

10   A    Yes.

11   Q    Okay.  Is there anything in those transcripts that you

12        think is different than what is said on the phone call?

13   A    No.

14   Q    Okay.  If you would, just take a second and read those

15        and just tell me when you've read them.

16   A    (Perusing.)  All right.

17   Q    Okay.  You state in both calls that calls are monitored

18        and recorded, correct?

19   A    Mm-hm.

20   Q    Yes?

21   A    Yes.

22   Q    And you're required to do that by NCO?

23   A    Yes.

24   Q    Okay.  I saw that in the training manual.  Was that part

25        of your training?
```

**Freedom Court Reporting, Inc**                            **877-373-3660**

```
 1   A     Yes.

 2   Q     Okay.  In reading these two, you also state in both

 3         calls that -- I think Exhibit 3 they have you as

 4         Latasha, but I'm sure it's Latisha.

 5   A     Yes.

 6   Q     This is Latisha Williams from NCO Financial Systems, and

 7         then you tell them calls are monitored in both calls,

 8         correct?

 9   A     Yes.

10   Q     In both calls, you state that Kay and Greg's numbers are

11         reference numbers for Michael Lindsey, correct?

12   A     Yes.

13   Q     You state in both calls that you don't think you have a

14         correct number for Mr. Lindsey, and that's why you're

15         calling, correct?

16   A     Yes.

17   Q     In both calls, you ask Kay or Greg to give or relay a

18         message to Michael Lindsey to call you back, correct?

19   A     Yes.

20   Q     Okay.  Those are just so similar that I have to ask you,

21         was that part of any script you were using back in June

22         of 2011?

23              MR. SCHULTZ:  Objection.  It's been asked and

24         answered.  You can go ahead and answer it again,

25         Latisha.
```

```
 1                    THE WITNESS:  No.

 2    Q    (By Mr. Seals)  They are not?  Is that your testimony,

 3         these are not part of a script?

 4    A    Yes.

 5    Q    Okay.  In looking at these, is this what you were

 6         trained to say when contacting third parties?

 7    A    No.

 8    Q    Okay.  What in here is different than your training?

 9    A    Well, I wasn't trying to say that your number was left

10         as a reference number.

11    Q    Okay.  Anything else?

12    A    And leaving a message and that's it.

13    Q    Okay.  So you were trained -- you were not trained,

14         rather, to say your number is a reference number?

15    A    Mm-hm.

16    Q    Did I hear you correctly?

17    A    Yes.

18    Q    And you were not trained to say, what, would you deliver

19         a message and that sort of thing?

20    A    Well, with this situation, I wasn't supposed to leave a

21         message.

22    Q    Okay.  Is there anything else in here that is different

23         than what you were trained to do?

24    A    No.

25    Q    All right.  Is there -- what did you mean by the
```

```
 1        reference number comment?  Your number was left as a
 2        reference number for Michael Lindsey?
 3   A    Well, I -- well, I had a misunderstanding and I
 4        wasn't -- I wasn't aware that I wasn't supposed to use a
 5        reference number -- excuse me.  I wasn't aware that the
 6        numbers that we have located in our F-screens, how we
 7        get them, so I thought that they were listed as a
 8        reference number like when a person opened an account,
 9        you know how we have to give like a lot of names and --
10        so that was my understanding -- or that was my
11        assumption.
12   Q    Okay.  And then what about the situation was such that
13        you weren't supposed to leave a message?
14   A    Well, yeah, 'cuz I asked for a better number, but I
15        don't think I was supposed to leave a message.
16   Q    Okay.  Can you tell me why?
17   A    Yeah.  No, because it depends on each and every account.
18        Like with this -- with this account, not -- I'm not
19        sure.
20   Q    Okay.  Okay.  Well, let me ask you this:  Are you
21        familiar with NCO's policies, what you're supposed to do
22        or not supposed to do when you call?
23   A    Yes.
24   Q    Okay.  Is there anything about the situation, if it was
25        different, that you would have been able to ask them to
```

```
1        deliver a message for you?

2   A    Yeah, if there was not a good -- if there was not

3        another number for him.

4   Q    Okay.  So if I'm understanding you correctly, if you did

5        not have -- if an account came in and you didn't have a

6        number for Mr. Lindsey, there just wasn't one there --

7   A    Yeah.

8   Q    -- but there was a number for Gregory Lindsey and there

9        was a number for Kay, are you telling me that it's NCO's

10       policy to ask them to deliver a message for you in that

11       situation?

12  A    Yes.

13  Q    Okay.  Is there any other time it's okay to ask them to

14       deliver a message when it's a third party?

15  A    If they answer the debtor's phone.

16  Q    If they answer the debtor's phone, it's okay to tell

17       them to deliver a message?

18  A    Yes.

19  Q    Okay.  Any other times that you can think of?

20  A    No.

21  Q    Okay.  When did you learn that you were not supposed to

22       say reference number?  When did that happen?

23  A    It happened -- I'm not really sure when it happened, but

24       it had to be some time ago.  Probably right after this.

25  Q    Okay.  Right after this.  Would someone at NCO have
```

**Latisha Williams**                                                                27

```
 1        said, don't say that or don't use a reference number

 2        when you talk to folks, that kind of thing?

 3   A    Yes.

 4   Q    Okay.  You had been working at NCO, by your testimony, a

 5        little over a couple of years when these calls took

 6        place; is that right?

 7   A    Probably -- yeah.  About a year and a couple months,

 8        yes.

 9   Q    A year and a couple of months, okay.  Before you were

10        being -- you were told not to use reference numbers or

11        say that, had anybody ever trained you or told you,

12        Ms. Williams, don't say reference number or don't use

13        that term or anything like that?

14   A    Well, I don't think anybody would have known that I

15        would have got on a call and said reference number, but

16        it's not in the training not to say it.

17   Q    Okay.

18   A    Like everybody don't think the same, so I thought that

19        it was okay to use reference number.

20   Q    Okay.  When did you find out you weren't supposed to

21        tell them to deliver a message or ask them to deliver a

22        message?

23   A    I'm not sure.

24   Q    Would it have been after these calls?

25   A    I believe so.
```

```
 1   Q    Okay.  Prior to the calls, when you would call folks,

 2        would you normally ask them to deliver a message for

 3        you?

 4   A    Can you repeat that again?

 5   Q    Sure.  In both of these calls --

 6   A    Yes.

 7   Q    -- they're both similar in that you asked a third party,

 8        could you just get a message to Mr. Lindsey, have him

 9        call me.  Okay?

10   A    Yeah.

11   Q    Is that your understanding?

12   A    Yes.

13   Q    Before these calls -- I know that now you know you're

14        not supposed to do that.

15   A    Mm-hm.

16   Q    Before these phone calls took place, is that something

17        that you would normally do?

18   A    The question that you're asking is kind of confusing

19        because I can leave a message on -- on the debtor's

20        number all the time, so you will have to rephrase the

21        question.

22   Q    Sure.  Sure.  I'll give you a hypothetical, okay, just

23        like in this case?

24   A    Okay.

25   Q    You call a third party.  It's not the debtor's number.
```

**Latisha Williams**                                                                 **29**

| 1  | A | All right. |
|----|---|------------|

2   Q   It's a third party.  And in these two cases or in these

3       two calls, you ask them to deliver a message.

4   A   Mm-hm.

5   Q   Correct?

6   A   Yes.

7   Q   Okay.  Before you found out you were not supposed to do

8       that, is that something that you would normally do?

9   A   I'm not sure if -- I'm not sure about that.

10  Q   You don't know?

11  A   No.

12  Q   Okay.  Do you remember anything specific in your

13      training about when you can or can't leave a message or

14      ask them to -- ask a third party to have someone call

15      you back?

16  A   No.

17  Q   Okay.  Just so I know and so it's clear when I look at

18      this later, what was the reason for calling Kay and Greg

19      Lindsey?

20  A   Because I was unable to get in contact with the debtor.

21  Q   Any other reason?

22  A   I just needed to -- I needed a better number for him or

23      either the number that I had to be confirmed as his

24      number.

25  Q   All right.  Okay.  In these calls, when you called both

```
 1        Kay and Greg, it was your intent to ask them to deliver

 2        a message for you, wasn't it?

 3   A    No.  I would ask if they had a better number, but

 4        listening to how people react when you talk to them, I

 5        didn't know that they were not going to confirm a number

 6        or anything.

 7   Q    How do you know that?

 8   A    It's -- I'm not sure.  It's just a feeling that I got.

 9   Q    Okay.  Anything other than the feeling you got?

10   A    Huh-uh.

11   Q    I'm just saying is there something in here that one of

12        them may have said that tells you or is a red flag to

13        you that says they're not going to confirm a number for

14        you?

15   A    Well, I gave them the option.

16   Q    Okay.  You gave them the option of -- I'm looking at

17        Exhibit 2.  It looks like the option you gave is I'm

18        unable to get in contact with him.  I'm not sure if the

19        number I have is correct.  Would you have a good contact

20        number for him or would you be able to relay a message

21        to him.  Is that right?  Did I read that right?

22   A    Yes.

23   Q    So the option you gave him was either give you a good

24        contact number or deliver a message to him?

25   A    Yes.
```

1   Q   Okay.  I'm going to show you, ma'am, what I'm marking as

2       Exhibit 4 and ask you if you've ever seen that before?

3   A   Yes.

4   Q   What is that?

5   A   This is notes from the account showing an F-screen

6       located at the bottom.

7   Q   Other than right now when I just showed those to you,

8       when's the last time you saw those?

9   A   I'm not sure.

10  Q   Has it been a long time?

11  A   No.

12  Q   Okay.  Within the last month?

13  A   Yes.

14  Q   Okay.  There's some codes and different things on here,

15      and there's a prefix that keeps coming up -- I'm looking

16      right now, ma'am, at page 3.  At the bottom there where

17      it says SRA, is that your code?

18  A   Yes.

19  Q   Okay.  So if I look at these notes, any time I see SRA,

20      that means you?

21  A   Yes.

22  Q   Okay.  Do you know who these other people are in these

23      codes?

24  A   No.  If I -- no.

25  Q   Okay.  All right.  But a fair statement is if I go back

1      at look at my office -- or at my office and I see SRA,

2      that is you?  You did whatever that was?

3   A   Yes.

4   Q   Okay.  There's a number of messages left on

5      Mr. Lindsey's phone number.  Is there any way to tell

6      looking at this whether or not a call was manually

7      dialed or auto dialed?

8   A   Yes.  If it was manually dialed, it would say TR.  If it

9      was on the dialer, it would say DR, or it would start

10      with a "D."  If it's dialed out, it would start with a

11      "T."

12   Q   Okay.  Fair enough.  And the TW, what does that mean?

13   A   Telephone work.

14   Q   Okay.  We took Greg Steven's, NCO's vice president for

15      compliance's deposition, and he told me, in looking at

16      this, that the work number appears to be the

17      (205)617-4773 number.  Is that right?

18            MR. SCHULTZ:  Which one?  The 4773 one?

19            MR. SEALS:  Yeah.

20            THE WITNESS:  No.  That doesn't say if it's

21      the right number.

22   Q   (By Mr. Seals)  Okay.  It does not say it was --

23   A   Well, it -- yeah.  It don't say on here.

24   Q   Okay.  All right.  There are number of calls to the work

25      number, and it says LMOM.  What does that mean?

1   A   LMOM, left message on machine.

2   Q   Left message on machine.  When you would call these

3       numbers, the work number, would you hear the greeting?

4   A   I'm not sure.  I really don't remember making the call.

5   Q   Okay.  As you sit here, typically, when you call and an

6       answering machine picks up and you're going to leave a

7       message, do you have to listen to the greeting first?

8   A   Yes.

9   Q   Okay.  So if you're sitting at your desk at NCO and you

10      call a number, an answering machine picks up, you have

11      to listen to it and then you leave your message?

12  A   Yes.

13  Q   Okay.  There's not like a button you can hit that skips

14      the message or anything like that?

15  A   No.

16  Q   Okay.  I'm showing you what was produced to me, and it

17      appears to be part of your personnel file and ask you if

18      you've ever seen that before?

19  A   Yes.

20  Q   Okay.  There are numbers at the bottom here.  If you

21      would, turn to page 259 with me.

22  A   You said it's on page what?

23  Q   259, ma'am.

24  A   Okay.

25  Q   At the bottom, there's a part that says, "Action Plan."

 1        Do you see that, ma'am?

 2    A   Mm-hm.

 3    Q   It says, "Will do side by sides to help make sure

 4        Latisha understands how to set up talk offs and skip

 5        trace her accounts."  And it says, "Critical Dates

 6        Start" June 8, 2011, and "Follow Up" June 15, 2011.  Do

 7        you see that?

 8    A   Yes.

 9    Q   As you sit here, do you remember whether or not anyone

10        did side-by-sides with you between June 8th and

11        June 15th, 2001?

12    A   I don't know if it was between that time, but I did do a

13        lot of side-by-sides.

14    Q   Okay.  And what would be involved in these

15        side-by-sides?

16    A   Sitting next to me and plugging this little thing into

17        my -- into my box so that they can hear my call.  And

18        they're able to basically sit next to me, and I can mute

19        my phone and they can tell me what to say or what I'm

20        doing wrong or they might even just monitor the call.

21    Q   Okay.  What do you -- what does it mean by "make sure

22        Latisha understands how to set up talk offs and skip

23        trace her accounts"?

24            MR. SCHULTZ:  I object to the extent you're

25        asking her to interpret someone else's words.

1   Q   (By Mr. Seals)  Do you understand what that means?

2   A   A little bit.

3   Q   Okay.  What does it mean to you?

4   A   It means basically how to set up talks -- how to set up

5       talk-offs.  If I needed help, how to set it up so that

6       the -- so my supervisor can jump right in and help me.

7   Q   Okay.  And then the skip trace right there, as you

8       understand, is that the same skip trace we talked about

9       earlier?

10  A   Yes.

11  Q   All right.  I want to go to 265, if we can.  Is your

12      signature at the bottom of that page?

13  A   Yes.

14  Q   Okay.  This looks like a verbal warning for performance

15      dated July 6, 2010.  Is that what it looks like to you?

16  A   Yeah.

17  Q   Okay.  It says that during June 2010, your goal was

18      $4,884, but you collected $2,662.  Did I read that

19      correctly?

20  A   Yes.

21  Q   Okay.  What did NCO do or tell you to do to collect

22      more?

23  A   We have a verbal warning and -- and there's another

24      chance to hit my goal.

25  Q   Okay.  It says -- under "Action To Be Taken," it says,

1        "Your performance must improve immediately.  If you have

2        any questions on proper procedures, please contact me

3        immediately.  Any future violations of your performance

4        requirements will result in a written warning, or

5        further progressive discipline, up to and including

6        termination."

7            Did I read that right?

8    A   Yes.

9    Q   Okay.  Other than giving you this verbal warning, did

10       they do any more training?  Did they do more

11       side-by-sides, anything like that to help you meet your

12       goals, if you remember?

13   A   No, I don't remember.

14   Q   All right.  On page 266, it's dated November 17th, 2010.

15       It's a verbal warning for collector misconduct.  It

16       says, on June 30th, 2010 and July 6th, 2010, "You

17       violated Company policy, and acted in an unprofessional

18       manner by failing to properly document NCO account

19       records."

20           Do you know what this was about?

21   A   No.

22   Q   Okay.  Sitting here, you have no memory of it?

23   A   (Witness shakes head.)

24   Q   No?

25   A   No.

1    Q    Okay.  The next one is 267.  It's another performance

2         warning dated January 3rd, 2011.

3              Is your signature at the bottom of that one as

4         well?

5    A    Yes.

6    Q    All right.  On 268 is a written warning the next month,

7         February the 1st, 2011.

8              Is it your understanding that a written warning is

9         more serious than a verbal warning?

10   A    Yes.

11   Q    Okay.  Was it your understanding, if you didn't collect

12        enough money or meet your collection goals, you could

13        eventually be fired?

14   A    Well, there are steps before that.

15   Q    Okay.  But if you consistently don't meet the goals, is

16        it your understanding that you can be fired?

17   A    Yes.

18   Q    Okay.  And that's your signature at the bottom, ma'am?

19   A    Yes.

20   Q    Okay.  The next one is 269, and it's dated April 14th,

21        2011.  It says, on April 6th, 2011, "You violated

22        Company Policy, and acted in an unprofessional manner by

23        failing to follow NCO procedure when speaking to a

24        consumer."

25              What was this one about?

```
 1   A    I'm not sure either.

 2   Q    Okay.  Sitting here, you don't remember?

 3   A    Huh-uh.

 4   Q    No?

 5   A    No.

 6   Q    Okay.  Do you know what you had to do or anything that

 7        took place to correct whatever happened?

 8   A    No.

 9   Q    Okay.  No other training or discipline or anything other

10        than this job discussion form?

11   A    No.  I'm not even sure what this is about, so I can't

12        remember it.

13   Q    Okay.  The next one is dated -- it's on page 270, and

14        it's dated September 8, 2011, a verbal warning for

15        collector misconduct.  It says, on June 15th, June 16th,

16        June 21, and June 25th, 2011, "You violated company

17        policy and acted in an unprofessional manner by failing

18        to properly document NCO records."

19             Do you know what this one is about?

20   A    No.

21   Q    Okay.  Did they -- did NCO force you to do any retests

22        or do any other training or anything like that as a

23        result of this particular warning?

24   A    No.  I don't even remember what the warning is about.

25   Q    Okay.  271 is a written warning for collector
```

```
 1        misconduct, correct?
 2    A   Yes.
 3    Q   Okay.  The date at the top is September 8, 2011, and it
 4        says that on June 9, June 10, June 15th, June 16th, June
 5        21st, June 24th and June 25th, 2011, "You violated
 6        Company policy and acted in an unprofessional manner by
 7        failing to fully follow NCO procedure regarding calls
 8        placed on an account, relating to third party contacts,
 9        and when documenting NCO's records."
10            Did I read that right?
11    A   Yes.
12    Q   What was this one about?
13    A   It looks like it was the same one that we just went
14        over, and I don't remember.
15    Q   Okay.  The date at the bottom is February 15th, 2012.
16        Is that correct?
17    A   Yes.
18    Q   Is that your signature next to it?
19    A   Yes.
20    Q   Okay.  Is it your testimony you do not know why you
21        received this?
22    A   No -- yes.  Excuse me.
23    Q   That's okay.  All right.  So this happened -- or you
24        signed off on this about four months ago, but you're not
25        sure what it was about?
```

**Latisha Williams**                                                    **40**

```
 1   A    No, I don't remember.

 2   Q    Okay.  Do you know of any additional training, any

 3        additional discipline, anything else that came out of

 4        this situation other than this warning?

 5   A    (Witness shakes head.)

 6   Q    No?

 7   A    No, I don't remember.

 8   Q    Okay.  All right.  When did you first learn that my

 9        client may have a claim against NCO?

10   A    Probably the beginning of this year.

11   Q    The beginning of this year?

12   A    Yes.

13   Q    All right.  And again, I don't want to know anything you

14        told any lawyer or anything like that, but how did you

15        find out?

16   A    I believe -- I believe that one of the -- our compliance

17        person at NCO, that he told me about it.

18   Q    Do you remember what he told you?

19   A    No, I don't, because like when I did find out, I -- we

20        probably talked a little bit about it and then I was

21        like okay, and then it was like a long time and then we

22        talked about it again, and then now here we are finally,

23        so...

24   Q    Okay.  And you found out about this the beginning of the

25        year?
```

```
1    A    Yeah.  I believe that's when I did.

2    Q    Okay.  Do you -- did you receive any sort of discipline

3         from NCO at all because of the claims my client made?

4    A    No.  Not yet, no.

5    Q    Okay.  Did they make you undergo any new training or sit

6         down and have any sort of long discussions with you

7         about your expectations because of what my client has

8         claimed?

9    A    Yes.  We have talked about -- we have talked about the

10        calls and what I did wrong.

11   Q    Okay.  When did you find out that you did something

12        wrong?

13   A    (No response.)

14   Q    Better yet, when did that conversation take place that

15        you just mentioned?

16   A    I'm not sure.

17   Q    Would it have been this year?

18   A    I believe so.

19   Q    Okay.  Would it have been around the time you learned

20        about this lawsuit?

21   A    Yes.

22   Q    Yes, okay.  Are you familiar with -- well, I'll show you

23        the document first.  Here, ma'am.

24             Is that your signature at the bottom of what I just

25        marked as Exhibit 6.
```

**Latisha Williams**                                                                **42**

```
1    A    Yes.

2    Q    Okay.  What is this document?

3    A    It's the repayment policy for --

4              THE REPORTER:  A little louder, please.

5              THE WITNESS:  A repayment policy if we're in a

6         situation like this.

7    Q    (By Mr. Seals)  Has NCO made you pay them back any

8         money?

9    A    No.

10   Q    Okay.  Has anyone at NCO told you that they're going to

11        make you pay back some money?

12   A    We have not had that discussion.

13   Q    Okay.  I need to ask you a question, and I don't want

14        you to be embarrassed by it, but I ask most of my

15        deponents this.  Have you ever been convicted a crime?

16   A    No.

17   Q    Okay.  Good.  Let's see here.  As you sit here, at the

18        time of the calls referenced in Exhibits 2 and 3 back in

19        June of 2011 that we've talked about, do you believe

20        that you were properly trained by NCO to handle those

21        calls and collect?

22   A    Which two -- two and three?

23   Q    Yes, ma'am.

24   A    Can you repeat the question?

25   Q    I'd be happy to.  At the time of the phone calls to Greg
```

**Latisha Williams**                                                                       **43**

```
 1        and Kay Lindsey which are referenced there, do you

 2        believe you were properly trained my NCO with regard to

 3        the FDCPA and third-party contacts?

 4   A    Yes.

 5   Q    Do you know, has NCO implemented any new policies for

 6        collectors when skip tracing or talking to third parties

 7        since June 2011?

 8   A    Yeah.  We had a lot of new policies since then.

 9   Q    Okay.  About skip tracing?

10   A    Not about -- not about skip tracing and not about third

11        parties.

12   Q    Okay.  There's been a bunch of new policies but not

13        about those two things?

14   A    Yeah.

15   Q    Okay.  Are you aware of any investigation into

16        Mr. Lindsey's claims, other than what we've talked about

17        already?

18   A    No.

19   Q    All right.  At the time of those phone calls shown in

20        Exhibits 2 and 3, when you asked both Kay and Greg

21        Lindsey to please relay a message to Mike Lindsey, okay,

22        did you know at the time you weren't supposed to do

23        that?

24   A    No.

25   Q    Okay.  Was that ever mentioned in your training, don't
```

1     do that?

2  A   Yes.

3  Q   So it was mentioned in your training before these phone

4     calls?

5  A   Yes.

6  Q   Okay.  Is there any reason why you did it in these phone

7     calls?

8  A   Yes, because I was just -- made a mistake, and I was

9     probably just getting comfortable with collecting and

10    probably let my guard down for a minute and just made a

11    mistake.

12  Q   These calls are over a week apart.  Was this basically

13    what you were telling most third parties when you would

14    call them at the time?

15  A   What third parties?

16  Q   Any other third parties.

17  A   Yeah, if it was not on -- on the F-screen numbers, yes.

18  Q   So if you had other accounts you were working, was this

19    basically the same thing you would tell other third

20    parties?

21  A   Yes.  If it wasn't on the F-screen, yes.

22  Q   Okay.  What do you mean by it wasn't on the F-screen?

23    I'm not sure I understand that.

24  A   If it wasn't a relative number.

25  Q   Okay.  So if it wasn't a relative's number, you would

**Latisha Williams**                                                    **45**

```
 1        tell them basically the same thing you told them here?

 2   A    No.

 3   Q    Okay.

 4   A    No.

 5   Q    I'm confused.

 6   A    I'm sorry.  I just -- I just think the -- like a big

 7        thing that -- I think the reference number thing, no, I

 8        wouldn't have did that on another call that was not

 9        placed to the -- I wouldn't say reference number at all.

10   Q    Okay.

11   A    I will only use reference -- I only used reference

12        numbers when I was dialing from the F-screen.

13   Q    Okay.

14   A    So, honestly, I don't -- I think, probably, this is

15        probably like my beginning of dialing on the F-screen,

16        and I actually don't like it at all.

17   Q    Okay.  Well, let's put the F-screen and the reference

18        number aside for a minute.

19   A    Okay.

20   Q    My question is more directly linked to the "would you be

21        able to relay a message to him."  You say that in both

22        phone calls?

23   A    Mm-hm.

24   Q    Right?

25   A    Mm-hm.
```

**Freedom Court Reporting, Inc**                          **877-373-3660**

1    Q    Yes?

2    A    Yes.

3    Q    So my question is not reference number, forget that.  At

4         the time, June 2011, around there, is that something

5         normally you would ask third parties to do, would you

6         please have him call me, would you give him my phone

7         number, anything like that?

8    A    Yes.

9    Q    Okay.  When did you stop doing that?

10   A    Well, it was -- I -- it all depends if it's a -- if it's

11        the numbers that we're dealing that like we're speaking

12        about Kay Lindsey and --

13   Q    Greg Lindsey?

14   A    -- Greg Lindsey, but if it was a debtor's number, yeah,

15        I would do it all the time, but with this it's

16        different.  It's different.

17   Q    How about a relative's number, would you do it then?

18   A    If I didn't have any numbers at all for the debtor, yes.

19   Q    Okay.  And if you did have a number for the debtor,

20        would you do it?

21   A    No.  I wouldn't, no.

22   Q    Okay.

23             MR. SEALS:  I want to take a quick break, if I

24        can.

25             (Recess taken.)

**Latisha Williams**                                                             **47**

```
1   Q    (By Mr. Seals)  Do you know, have you ever been

2        monitored while talking to a third party?

3   A    I'm not sure about third parties, but I know I have been

4        monitored.

5   Q    Okay.  Has anyone at NCO ever come to you and said you

6        did something wrong while talking to a third party?

7   A    Yes.

8   Q    Okay.  When was that?

9   A    I'm not sure when it was, but I have had that

10       conversation before.

11  Q    Was it before --

12  A    Well, I know I was told.  I'm not sure when it was.

13  Q    Told what?

14  A    Told that I did something wrong on a call.

15  Q    Okay.  To a third party?

16  A    Yes.

17  Q    All right.  Would that have been before this -- these

18       calls we're here about today or after?

19  A    I'm not sure.

20  Q    Okay.  Then I'll ask you this way.  Do you know as you

21       sit here, before June of 2011, were you ever told you

22       did anything wrong on third-party calls?

23  A    No.  I'm not sure.

24            MR. SEALS:  Okay.  I think that's all I have

25       for you.
```

```
 1                        EXAMINATION

 2   BY MR. SCHULTZ:

 3   Q   Latisha, I've got just a couple of questions.  We spent

 4       a lot of time talking about your training here today, so

 5       I hate to do this, but we're going to talk about it a

 6       little bit more.  I just want to make sure I'm crystal

 7       clear about everything.

 8           Before you ever went on the floor and started

 9       making calls any calls for NCO, you had gotten trained?

10   A   Yes.

11   Q   And that training included working off of the training

12       manual that's been identified as Exhibit 1, correct?

13   A   Yes.

14   Q   All right.  And there were certain tests that you were

15       required to take as well?

16   A   Yes.

17   Q   And that was before you started making any calls?

18   A   Yes.

19   Q   And those tests dealt with a lot of the topics that were

20       covered in this training manual?

21   A   Yes.

22   Q   Okay.  And that training would have occurred prior to

23       you making these calls to Kay Lindsey or Greg Lindsey?

24   A   Yes.

25   Q   And it would have occurred -- or I'm sorry, you would
```

```
 1        have taken tests before the calls to Greg and Kay

 2        Lindsey?

 3    A   Yes.

 4    Q   Okay.  And you passed all those tests?

 5    A   Yes.

 6    Q   Okay.  Now, we've looked at the recording -- or the

 7        transcripts of these calls.  In both the calls that you

 8        placed to Greg and Kay, you identify yourself as Latisha

 9        Williams from NCO Financial Systems, right?

10    A   Mm-hm.

11    Q   Yes?

12    A   Yes.

13    Q   So in both those calls, you had stated the company name

14        without being expressly asked, right?

15    A   Yes.

16    Q   Had you been trained by NCO before these calls that you

17        weren't supposed to do that when talking to a third

18        party?

19    A   Yes.

20    Q   And that was something that was also contained in your

21        training manual?

22    A   Yes.

23    Q   Okay.  And when you did that, was that just a mistake?

24    A   Yes, it was.

25    Q   Okay.  We talked a little bit too about your asking Greg
```

1        and Kay to pass on a message to Mike Lindsey, right?

2   A    Yes.

3   Q    And you had been trained by NCO as well that you

4        shouldn't have done that when talking to third parties

5        at a third-party number, correct?

6   A    Yes.

7   Q    And when you did that, it was just a mistake as well?

8   A    Yes.

9              MR. SCHULTZ:   Okay.   That's all I've got.

10                       FURTHER EXAMINATION

11  BY MR. SEALS:

12  Q    You testified earlier, and I want to make sure I'm

13       crystal clear as well, you don't remember your training?

14  A    I remember -- I know I took tests.  I know we took tests

15       before we got on the floor.  I don't remember as far as

16       how long I was in training, but I can -- I know we had

17       to take tests.  I know certain stuff that we did do.

18  Q    Tell me about it.

19  A    We took the -- well, I think I told you a little bit

20       about it, but we read stuff out of there, we had group

21       discussions, we read stuff individually, we went over

22       stuff with the trainer, and we took tests on it.

23            After that, we took a lot of tests, like every day

24       we probably -- every time we learned something, we

25       probably took a test.

**Latisha Williams**                                                                        **51**

```
1   Q   We read stuff out of there, we had group discussions

2       about stuff.  What stuff?

3   A   About the stuff that's in this manual about how to

4       collect a debt, what to do and what not to do.

5   Q   Okay.  Any of it have to do with third parties?

6   A   Yes.

7   Q   Any of it have to do with skip trace?

8   A   Yes.

9   Q   Okay.  Any other training about what to do and not to do

10      involving skip tracing or third parties beyond that

11      initial what you testified as one-to-two-week training

12      period?

13  A   Any other training other than that after that?

14  Q   Yeah, that you can remember.

15  A   Besides that -- besides, no.

16  Q   Okay.  So that was it?

17  A   Yes.

18  Q   The one to two weeks, that's the extent of your training

19      other than side-by-sides?

20  A   Yes.

21  Q   Okay.  You -- this is something I keep getting hung up

22      on, and I'm just not getting an answer to it that I

23      understand.

24          In both of these calls, you say almost the exact

25      same thing when the person picks up.  You say you're
```

```
 1          Latisha Williams calling from NCO Financial Services,

 2          your number is listed as a reference, you think you have

 3          a bad number, would they be able to deliver a message

 4          for you, the exact same thing in both of these.  Yes?

 5   A      Yes.

 6   Q      Okay.  Was that a habit at the time?

 7   A      No.  I wouldn't say that -- no.  I wouldn't say it was a

 8          habit, but it's -- like the F-screen numbers -- you dial

 9          a F-screen number.  There's a name right there.  And

10          usually, like if I say, Hi, Kay Lindsey, there wasn't no

11          Kay Lindsey here, so it's not her, so there is no -- but

12          this time it was her.  It was a right party -- not a

13          right, right party, but it was a right third party this

14          time.

15               So, you know, all -- every time you make a call,

16          the calls are not -- they're never the same.

17   Q      So if you called someone at this time and it was the

18          right party, you would tell them, yes or no, you work at

19          NCO Financial?

20   A      No.  I wouldn't tell them -- no.  I wouldn't tell them I

21          worked at NCO Financial.  I was just probably speaking

22          too fast and trying to hurry up and move along to

23          another account.

24   Q      You were -- these calls were over a week apart.  Okay?

25   A      Yes.
```

```
1   Q    You make the exact -- you told -- when your lawyer was
2        asking you questions, you told him it was just a
3        mistake, right?
4   A    Yes.
5   Q    You make the same exact mistake two calls a week apart?
6   A    Yeah, because I wasn't notified that I was doing wrong
7        until after the two calls was -- after they seen the two
8        calls, if they would have stopped me the first call,
9        there would have never been a second call.
10  Q    How long was it after these calls that you were notified
11       that you had done wrong?
12  A    I'm not exactly sure how long it was, but I'm pretty
13       sure that -- I'm not exactly sure how long it was.
14  Q    Was it last year?  Was it this year?
15  A    I believe it was this year.
16  Q    This year you were told you did wrong on those two
17       calls?
18  A    Yes -- no.  We spoke before that.  I think -- yeah.  I
19       think we spoke before that in reference to the mistakes
20       that was made on there.
21  Q    Okay.
22  A    And probably -- I just found out probably the beginning
23       of this year that it was a bigger issue.
24  Q    Okay.  When do you remember talking about those mistakes
25       for the first time?  For frame of reference, the calls
```

**Latisha Williams**                                                                        **54**

1        happened in June of 2011.

2    A    Yes.

3    Q    So a year's gone by.  How long was it until you figured

4        out -- someone told you you'd made mistakes or done

5        wrong?

6    A    Well, just looking at some of this stuff that was

7        right -- June the 6th -- yeah.  I think I -- when you

8        asked me on here, it popped into my head, but I wasn't

9        really sure, but I believe that some of this stuff that

10       I signed was in reference to this account.

11   Q    Let's go back to it then.

12            MR. SCHULTZ:  Just for the record, we're

13       referring to the Job Description Summary Form,

14       Exhibit 5.

15   Q    (By Mr. Seals)  Let's go back to that.

16   A    If you look at the dates, like -- I believe that's when

17       we probably spoke about it, but I'm not really -- I'm

18       not really sure, but I'm pretty sure that I probably had

19       to sign something in regards to it.  It just don't say

20       it in detail.

21            I just know this because of the dates, and I

22       noticed this just as we were speaking about it a

23       little -- not too long ago.

24   Q    Okay.  Let's look at page 270.  The date is September 8,

25       2011, right?

1  A    Yep.

2  Q    And the signature on the bottom is yours, right?

3  A    Yes.

4  Q    And the date next to it is September 8, 2011, right?

5  A    Yes.

6  Q    Okay.  It says, on June 15th, June 16th, June 21, and

7       June 25th, "You violated company policy and acted in an

8       unprofessional manner by failing to properly document

9       NCO records."  One of those calls is on June 9th, and

10      the other is on June 16th.

11          Is there anything in there about you saying

12      something wrong?  Is there anything in there about you

13      doing something wrong, other than what it says, properly

14      documenting NCO records?

15  A    No, but I'm pretty sure that when they told me that I

16      can't -- when we had the conversation about me using a

17      reference number, that I probably signed something and

18      we had discussion --

19  Q    Okay.

20  A    -- about that, and I told them I didn't know.

21  Q    You using a reference number, is that a documenting NCO

22      records issue?

23  A    No, it's not.

24  Q    Okay.  Would you agree with me that the only discipline

25      that's on here is you failed to properly document NCO

**Latisha Williams**                                                              **56**

1      records?

2   A   Yes.

3   Q   Okay.  Let's turn the page.  The next one is dated

4       September 8th at the top, but is dated this year at the

5       bottom.  It says June 9, June 10, June 15, June 16,

6       June 21, June 24, and June 25th, "You violated Company

7       policy and acted in an unprofessional manner by failing

8       to fully follow NCO procedure regarding calls placed on

9       an account, relating to third party contacts, and when

10      documenting NCO's records."

11          Does that jog your memory at all?

12  A   Not -- not really, but this -- not really.

13  Q   Okay.  Because I want to make sure I'm clear on this,

14      the testimony you gave me earlier was that you have not

15      been punished yet for anything that happened regarding

16      my client's complaint?

17  A   Yeah, but like -- I signed something and we talked about

18      it, and it was probably like a written warning or

19      something and that falls under there.  There it is.

20  Q   Is there a separate written warning maybe that's out

21      there that I don't have?

22  A   No.  I didn't even know there was that many warnings

23      under my file, so I doubt if there's any more.

24  Q   Okay.  There's two more beyond this one, but they were

25      after the fact.

**Latisha Williams**                                                                                   **57**

```
 1              You said, again, it was a mistake that you

 2         identified yourself, it was a mistake that you told

 3         Mr. Lindsey -- or Mr. Lindsey and Ms. Lindsey to deliver

 4         a message to Mike.  The exact same mistake two calls

 5         over a week apart.

 6              Were you making the same mistake in other calls at

 7         the time?

 8    A    I don't believe so.

 9    Q    Okay.  Is it going to be your testimony in front of a

10         jury that the only time you made those mistakes was

11         these two phone calls?

12    A    I don't believe I made any more mistakes.

13    Q    Okay.  So is that a yes, that's going to be your

14         testimony?

15    A    Yes.

16              MR. SEALS:  Okay.  I think that's all I have

17         for you.

18              THE WITNESS:  Okay.  Thank you.

19                   FURTHER EXAMINATION

20    BY MR. SCHULTZ:

21    Q    Sorry, Latisha, but I have to -- when you're notified

22         about these mistakes, does NCO do anything besides

23         notify you, as far as any additional retraining or

24         reconfirm what you're supposed to do?

25    A    Okay.  Repeat that, please.
```

**Freedom Court Reporting, Inc**                          **877-373-3660**

```
 1   Q    Sure.  You talked about how during --

 2   A    Yeah.

 3   Q    -- when you get these JDSs, that you're told or you're

 4        given notice that you made the mistake, right?

 5   A    Mm-hm.

 6   Q    Yes?

 7   A    Yes.

 8   Q    Okay.  Is there any other things that are done during

 9        that process where NCO will try to tell you what the

10        right thing to do is?

11   A    Yes.

12   Q    Okay.  So there's kind of a retraining to tell you what

13        the right policy is?

14   A    Yes.

15   Q    Okay.  And did you -- to the best of your recollection,

16        did you have a discussion with somebody at NCO regarding

17        the mistakes that have been identified in these two

18        calls with Kay and Greg Lindsey?

19   A    Well, as far as in a reference number, I know that we

20        can't say that.  And it's something now that we can --

21        it's -- they basically tell us to let them know where we

22        got it from.  We have a couple different searches, and

23        that's how we obtain those numbers.  We don't have those

24        numbers as reference numbers.  We do searches of our own

25        and we -- I guess our system provides this, but I just
```

```
 1        try not to -- I just don't like the F-screen.

 2   Q    Okay.  Well --

 3   A    I wouldn't --

 4   Q    Now you know that when you call third parties, you're

 5        not supposed to ask them to deliver a message, right?

 6   A    Yes.

 7   Q    And now you know that when you call third parties,

 8        you're not supposed to say the company name, unless

 9        expressly asked?

10   A    Yes.

11               MR. SCHULTZ:  Okay.  That's all I've got.

12               MR. SEALS:  All right.

13               MR. SCHULTZ:  It doesn't end.

14               MR. SEALS:  No, it doesn't.  There's so many

15        inconsistencies.

16                         FURTHER EXAMINATION

17   BY MR. SEALS:

18   Q    Okay.  You've been told by NCO don't say a reference

19        number.  We can all agree on that?

20   A    Yes.

21   Q    Okay.  You've been told you can't leave messages for

22        third parties if you have a good number and if you're

23        calling a relative.  Is that a fair statement?

24   A    Yes.

25   Q    Okay.  And that happened sometime after these calls, but
```

**Latisha Williams**                                                              **60**

1          you don't know when?

2    A    Yes.

3    Q    Okay.  We talked about it could have been the first of

4          the year, it could have been sometime last year.  We

5          just don't know.  Is that fair?

6    A    Well, I don't believe that it was this year.  I think

7          that it was probably sometime last year.

8    Q    Sometime last year?

9    A    When is the last year -- 2000 -- okay.  Yeah.

10   Q    But your testimony has also been that in certain

11         circumstances, you can ask third parties to deliver

12         messages for you?

13   A    Yes.

14   Q    Okay.  You told me, for example, if a third party

15         answers the debtor's phone --

16   A    Yes.

17   Q    -- you can tell them, hey, have the debtor call me back,

18         here's my number, I'm Latisha Williams, there you go?

19   A    Yeah.

20   Q    Okay.  Is there any other situation that you can ask a

21         third party to deliver a message for you that is

22         permissible under NCO's rules?

23              MR. SCHULTZ:  Objection, asked and answered.

24         You can still answer it.

25              THE WITNESS:  Yes.

```
1   Q    (By Mr. Seals)  Okay.

2   A    Unless -- if I -- if we don't have a number for the

3        debtor and we're skip tracing, we can -- no.  No, I

4        can't.  Excuse me.  No.  We -- no.  We can't leave a

5        message under any other circumstances.

6   Q    At all?

7   A    No.

8                 MR. SEALS:  Okay.  All right.

9                 MR. SCHULTZ:  I'm done this time.  So if

10       you're done, we're all done.

11                MR. SEALS:  Me too.

12                MR. SCHULTZ:  All right.  Latisha, you've got

13       the right to review the deposition transcript, if you'd

14       like, to make sure our court reporter here took down

15       everything accurately.

16            Alternatively, you can just assume that she's done

17       her job and she's got it all accurate and you can waive

18       that right.  It's your choice.

19            Generally speaking, most people just waive it so

20       they don't have to read the transcript, but it's your

21       choice what you want to do.  So do you want to waive it,

22       or would you like to review the transcript?

23                THE WITNESS:  I want to go.

24                MR. SCHULTZ:  All right.  You want to waive

25       it?
```

**Latisha Williams**                                                                  **62**

1                    THE WITNESS:  I want to go, yeah.

2                    MR. SCHULTZ:  Okay.  We'll waive.  You're all

3         done then.

4                    THE WITNESS:  Thank you, guys.

5                    MR. SEALS:  Yes, ma'am.

6                    MR. SCHULTZ:  All right.  Thank you.

7                        (WITNESS EXCUSED)

8                    (Deposition concluded at 1:40 p.m.)

9                    (The ORIGINAL EXHIBITS are attached to the

10                   original transcript and copies supplied to all

11                   counsel.)

12                   (The ORIGINAL TRANSCRIPT was provided to

13                   MR. SEALS and copies to MR. SEALS and

14                   MR. SCHULTZ.)

15                       * * (END OF RECORD) * *

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF MINNESOTA
                                               CERTIFICATE
 2   COUNTY OF COTTONWOOD

 3       I, PAMELA J. FRANZ, hereby certify that I reported the
     deposition of LATISHA WILLIAMS on the 13th day of June, 2012,
 4   and that the witness was by me first duly sworn to tell the
     truth and nothing but the truth concerning the matter in
 5   controversy aforesaid;

 6       That I was then and there a Notary Public in and for the
     County of Cottonwood, State of Minnesota; that by virtue
 7   thereof I was duly authorized to administer an oath;

 8       That the foregoing transcript is a true and correct
     transcript of my stenographic notes in said matter,
 9   transcribed under my direction and control;

10       That the cost of the original has been charged to the
     party who noticed the deposition and that all parties who
11   ordered copies have been charged at the same rate for such
     copies;
12
         That the reading and signing of the deposition was
13   waived;

14       That I am not related to nor an employee of any of the
     attorneys or parties hereto, nor a relative or employee of
15   any attorney employed by the parties hereto, nor financially
     interested in the outcome of the action and have no contract
16   with parties, attorneys or persons with an interest in the
     action that affects or has a substantial tendency to affect
17   my impartiality;

18       WITNESS MY HAND AND SEAL this 19th day of June, 2012.

19

20

21

22

23                       _____

24                               NOTARY PUBLIC

25
```

**WORD INDEX**

**< - >**
**-** 1:*4, 9, 16, 19*
*19:4*

**< $ >**
**$2,662** 35:*18*
**$4,884** 35:*18*

**< , >**
**,** 18:*25* 19:*5*

**< 0 >**
**00248** 3:*15*
**00273** 3:*15*
**00290** 3:*10*
**00354** 3:*10*
**06** 1:*25*

**< 1 >**
**1** 3:*10* 9:*1*
*18:15* 48:*12*
**1:40** 62:*8*
**10** 39:*4* 56:*5*
**1120** 2:*12*
**12:00** 15:*13*
**12:20** 4:*3*
**120** 16:*11*
**13** 1:*25*
**13th** 4:*1* 63:*3*
**14th,** 37:*20*
**15** 34:*6* 56:*5*
**15th** 34:*11*
*38:15* 39:*4, 15*
*55:6*
**16,** 56:*5*
**16th** 39:*4* 55:*6*
**16th,** 22:*6* 38:*15*
**16th.** 55:*10*
**17th** 36:*14*
**19th** 63:*18*
**1st** 37:*7*

**< 2 >**
**2** 3:*10* 21:*25*
*22:2* 30:*17*
*42:18* 43:*20*
**2:11-CV-03183-WM**

**A** 1:*4*
**200** 4:*3*
**2000** 60:*9*
**2001** 34:*11*
**2009** 6:*16* 8:*25*
**2009.** 6:*15*
**2010** 6:*14, 17*
*35:15, 17* 36:*16,*
*16*
**2010.** 36:*14*
**2011** 15:*4* 16:*23,*
*24* 17:*13* 19:*13*
*22:4, 7* 23:*22*
*34:6, 6* 37:*21, 21*
*38:14, 16* 39:*3, 5*
*42:19* 43:*7* 46:*4*
*47:21* 54:*25* 55:*4*
**2011.** 37:*2, 7*
*54:1*
**2012** 1:*25* 4:*2*
**2012,** 63:*3*
**2012.** 39:*15*
*63:18*
**205** 32:*17*
**205.323.3900** 2:*6*
**205.3233906** 2:*6*
**21** 38:*16* 55:*6*
*56:6*
**21st** 2:*5* 39:*5*
**22** 3:*10, 10*
**23,35,61** 3:*7*
**24** 56:*6*
**24th** 39:*5*
**259** 33:*21, 23*
**25th** 38:*16* 39:*5*
*55:7* 56:*6*
**260** 16:*11*
**265** 35:*11*
**266** 36:*14*
**267** 37:*1*
**268** 37:*6*
**269** 37:*20*
**270** 38:*13* 54:*24*
**271** 38:*25*
**290** 18:*17*
**299** 18:*21*

**< 3 >**

**3** 3:*10* 21:*25*
*22:6* 23:*3* 31:*16*
*42:18* 43:*20*
**300** 2:*5*
**30th** 36:*16*
**31** 3:*10*
**312.578.0990** 2:*13*
**312.578.0991** 2:*13*
**33** 3:*15*
**34th** 4:*2*
**35203** 2:*5*
**3rd** 19:*4* 37:*2*

**< 4 >**
**4** 3:*2, 10* 31:*2*
**400** 2:*4*
**41** 3:*17*
**4773** 32:*18*
**48** 3:*3*

**< 5 >**
**5** 3:*10*
**5.** 54:*14*
**5:00.** 15:*13*
**50** 3:*4* 17:*25*
*18:1*
**55** 2:*11*
**57** 3:*5*
**59** 3:*6*

**< 6 >**
**6** 3:*16* 35:*15*
**6.** 41:*25*
**60603-5130** 2:*12*
**617-4773** 32:*17*
**6th** 36:*16* 37:*21*
*54:7*

**< 7 >**
**75** 17:*7, 10, 14*

**< 8 >**
**8** 34:*6* 38:*14*
*39:3* 55:*4*
**8,** 54:*24*
**8:00** 15:*13*
**8009** 4:*2*
**8th** 34:*10* 56:*4*

**< 9 >**
**9** 3:*10* 39:*4* 56:*5*
**9:00** 15:*13*
**9th** 22:*4* 55:*9*

**< A >**
**a** 4:*14, 20, 22*
*5:3, 5, 9, 13, 16,*
*20, 23* 6:*1, 5, 7,*
*10, 12, 15, 19, 21,*
*25* 7:*2, 5, 8, 10,*
*13, 17, 20, 25* 8:*4,*
*6, 11, 14, 17, 20,*
*23* 9:*3, 5, 9, 11,*
*14, 21* 10:*1, 7, 14,*
*19, 21, 23* 11:*1, 3,*
*6, 8, 11, 13, 15, 20,*
*25* 12:*3, 8, 10, 12,*
*15, 17, 20, 22*
*13:1, 3, 5, 7, 10,*
*13, 19, 20, 22*
*14:1, 4, 6, 11, 13,*
*15, 17, 19, 21, 24*
*15:3, 5, 8, 10, 13,*
*15, 23* 16:*1, 3, 8,*
*14, 21, 25* 17:*3, 7,*
*12, 15, 21, 23*
*18:3, 5, 9, 11, 11,*
*23* 19:*3, 8, 11, 14,*
*19* 20:*1, 5, 7, 10,*
*12, 14, 18, 21*
*21:1, 3, 12, 14, 20,*
*23* 22:*10, 13, 16,*
*19, 21, 23* 23:*1, 5,*
*9, 12, 13, 16, 17,*
*19* 24:*4, 7, 9, 12,*
*15, 17, 20, 20, 24*
*25:1, 3, 4, 7, 14,*
*17, 23* 26:*2, 5, 7,*
*12, 15, 18, 20, 23*
*27:3, 4, 7, 14, 18,*
*21, 23, 25* 28:*4, 6,*
*10, 12, 15, 18, 24*
*29:1, 4, 6, 9, 11,*
*16, 20, 22* 30:*3, 8,*
*10, 15, 22, 25*
*31:3, 5, 9, 11, 13,*
*18, 21, 24* 32:*3, 8,*
*10, 13, 23* 33:*1, 4,*
*6, 8, 12, 15, 19, 22,*

*24*  34:2, 8, 12, 12,
16  35:2, 4, 10, 13,
16, 20, 23  36:8,
13, 21, 23, 25
37:5, 10, 14, 17,
19, 23  38:1, 3, 5,
8, 11, 20, 22, 24
39:2, 11, 13, 17,
19, 22  40:1, 5, 7,
10, 12, 16, 19
41:1, 4, 9, 13, 16,
18, 21  42:1, 3, 5,
9, 12, 16, 22, 24
43:4, 8, 10, 14, 18,
24  44:2, 5, 8, 10,
15, 17, 21, 24
45:2, 4, 6, 11, 14,
19, 23, 25  46:2, 8,
10, 14, 18, 21
47:3, 7, 9, 12, 14,
16, 19, 23  48:5,
10, 13, 16, 18, 21,
24  49:3, 5, 10, 12,
15, 19, 22, 24
50:2, 6, 8, 14, 19
51:3, 6, 8, 13, 15,
17, 20  52:5, 7, 7,
12, 20, 25  53:2, 4,
6, 12, 15, 18, 22
54:2, 6, 16, 22
55:1, 3, 5, 15, 16,
20, 23  56:2, 12,
17, 22  57:8, 9, 12,
15, 25  58:2, 5, 7,
11, 14, 19  59:3, 6,
10, 20, 24  60:2, 6,
9, 13, 16, 19, 20
61:2, 4, 7
**ability**  5:11
**able**  25:25  30:20
34:18  45:21  52:3
**about**  6:2  17:13
35:8  43:16  56:17
**about.**  18:19
38:24
**account**  7:14
25:18  26:5  31:5
36:18  39:8  56:9
**account,**  25:8

**account.**  4:17
25:17  52:23
54:10
**accounts**  7:3, 24
14:16, 22  15:7
16:22  34:5, 23
44:18
**accounts.**  7:15
15:1
**accurate**  61:17
**accurately.**  61:15
**accusing**  21:16
**Act**  8:10
**acted**  36:17
37:22  38:17
39:6  55:7  56:7
**Action**  33:25
35:25  63:15, 16
**actually**  15:23
**additional**  40:2, 3
57:23
**administer**  63:7
**advance.**  6:8
**affect**  5:11  63:16
**aforesaid**  63:5
**again,**  23:24
**again.**  12:6
**ago**  9:15  10:2
26:24  39:24
**ago.**  21:20  54:23
**agree**  55:24
59:19
**ahead**  5:1  23:24
**AL**  2:5
**ALABAMA**  1:2
4:13
**all**  21:3  62:2, 10
**all.**  16:14  45:9,
16
**allowed**  10:18, 20
**already**  12:4
**Also**  2:15
**Alternatively**
61:16
**am.**  9:11
**America**  7:15, 18,
21, 24
**amount**  15:4, 6
**an**  8:21  33:5
55:7

**and**  5:18  7:20
10:16  23:6, 23
34:10, 17  38:13
44:9  52:9  55:6,
9, 17  58:22
62:13  63:4
**another**  35:23
**answer**  4:24, 25
5:8  13:20  18:12
21:4, 7  23:24
26:15, 16  51:22
60:24
**answered**  23:24
**answered.**  60:23
**answering**  17:11
18:24  19:24
33:6, 10
**answers**  60:15
**any**  5:10  6:22
40:2  42:7  63:15
**anybody**  27:11,
14
**anyone**  34:9
**anything.**  30:6
**apart**  44:12
52:24  53:5
**apart.**  57:5
**APPEARANCES:**
2:1
**appears**  32:16
33:17
**appreciate**  18:22
**April**  37:20, 21
**are**  21:25  23:10
**are.**  16:1
**as**  10:11  23:3
31:1  37:3  50:15
**aside**  45:18
**ask**  4:25  16:4
**asked**  11:24
23:23  25:14
28:7  43:20
49:14  54:8  59:9
60:23
**asking**  11:25
12:1  28:18
34:25  49:25  53:2
**assume**  13:21
61:16

**assumption.**
25:11
**at**  20:10  29:17
30:16  32:15
46:3  52:18  57:6
**attached**  62:9
**attorney**  5:21
63:15
**attorneys**  63:14,
16
**August.**  8:4
**authorized**  63:7
**auto**  32:7
**Avenue**  4:2
**average**  15:21
16:5
**aware**  25:4, 5
43:15

**< B >**
**back**  15:4  16:23,
24  17:13  19:13
23:18, 21  29:15
31:25  42:7, 11,
18  54:11, 15
**back,**  60:17
**bad**  52:3
**Bank**  7:15, 18, 20,
21, 24
**based**  4:15  7:11
21:17
**basically**  20:15,
21, 24  34:18
35:4  44:12, 19
45:1  58:21
**Bates**  3:10, 10
**be**  45:20
**been**  47:1, 3
**before**  11:9
**before.**  47:10
**beginning**  40:10,
11, 24  45:15
53:22
**believe**  8:24
13:5  27:25
40:16, 16  41:1,
18  42:19  43:2
53:15  54:9, 16
57:8, 12  60:6
**besides**  57:22

best 4:25 16:4
58:15
better 12:13
25:14 29:22
30:3 41:14
beyond 51:10
56:24
big 45:6
bigger 53:23
Birmingham 2:5
4:13
bit 9:22 13:23
40:20 48:6
49:25 50:19
bit. 35:2
bonus 7:23 8:2,
7
bonus. 7:25
bonuses 7:11, 19,
22
both 23:2 29:25
45:21
bottom 18:16
19:4 31:16
33:20, 25 35:12
37:3, 18 39:15
41:24 55:2 56:5
bottom. 31:6
box 34:17
break 15:11
46:23
break. 15:10
brother. 22:7
brought 4:14
12:4
Building 2:4
bunch 43:12
but 14:11 26:23
27:15 30:3
52:11 59:25
button 33:13
By 2:6, 15 4:11,
13 37:22 39:6
48:2 50:11
57:20 59:17

< C >
call 3:10, 10 7:4
8:13 11:5 14:9
17:5 19:17, 23

20:2, 8, 10, 12
21:9 22:2, 6, 12
23:18 25:22
27:15 28:1, 9, 25
29:14 32:6 33:2,
5, 10 34:17
44:14 45:8 46:6
59:4, 7 60:17
call, 52:15 53:8
call. 33:4 34:20
47:14 53:9
called 4:7 29:25
52:17
calling 8:12
19:1 20:15, 16
23:15 29:18
52:1 59:23
calls 10:17
15:21, 24, 25
16:21, 24 17:1, 8,
10, 14, 18, 23
21:10, 19, 22
22:17, 17 23:3, 7,
10, 13, 17 27:5,
24 28:1, 5, 13, 16
29:3, 25 32:24
39:7 41:10
42:18, 21, 25
43:19 44:4, 7, 12
45:22 47:18, 22
48:9, 9, 17, 23
49:1, 7, 7, 13, 16
51:24 52:16, 24
53:5, 7, 8, 10, 17,
25 55:9 56:8
57:4, 6, 11 58:18
59:25
calls, 23:7
calls. 10:19
21:17
can. 46:24
can't 38:11
case 21:11 28:23
cases 29:2
certain 9:17
13:8 19:1, 1, 22
48:14 50:17
60:10
CERTIFICATE

63:1
certify 63:3
chance 35:24
charged 63:10, 11
check 8:7
Chicago 2:12
choice 61:21
choice. 61:18
circumstances
19:2, 23 60:11
circumstances.
61:5
claim 40:9
claimed 41:8
claims 41:3
43:16
classroom 10:25
12:2
classroom. 11:1
clear 19:15, 21
29:17 48:7
50:13 56:13
client 7:20
21:16 40:9 41:3,
7
client's 22:3, 7
56:16
COCHRUN 2:4
code 31:17
codes 31:14, 23
coin 31:17
collect 7:2, 12
10:18, 20 35:21
37:11 42:21 51:4
collected 35:18
collecting 8:19
11:10 44:9
Collection 3:16
4:16 6:23, 23
8:10 37:12
collections 17:16
Collector 3:10
7:4, 6 11:4
36:15 38:15, 25
collector. 7:5
collectors 10:16
43:6
come 5:25 47:5
comfortable 44:9

coming 31:15
commencing 4:3
comment 25:1
commission 8:8
commission. 7:13
commissioned
8:6
commissions
7:11, 18
Company 36:17
37:22 38:16
39:6 49:13 55:7
56:6 59:8
complaint 56:16
compliance 40:16
compliance's
32:15
complies. 18:23
concerning 63:4
concerns 11:23
concluded 62:8
Confidential 3:10,
10, 16
confirm 30:5, 13
confirmed 29:23
confused 13:10
confused. 45:5
confusing 13:15
28:18
consistently
37:15
Consumer 3:17
18:8, 9 37:24
consumers 18:25
Consumer's 19:5,
23 20:3, 9
contact 17:2, 3
19:9, 12 29:20
30:18, 19, 24 36:2
contacting 17:19
24:6
contacts 17:4
18:2 43:3 56:9
contacts, 39:8
contained 49:20
contract 63:15
control 63:9
controversy 63:5

Latisha Williams                                                              67

conversation
41:14  47:10
55:16
convicted  42:15
copies  62:10, 13
63:11, 11
correct  22:18
23:8, 11, 14, 15,
18  29:5  30:19
38:7  39:1, 16
48:12  50:5  63:8
correct.  21:14
correctly  24:16
26:4  35:19
cost  63:10
COTTONWOOD
63:2, 6
could  37:12
counsel.  62:11
COUNTY  63:2, 6
couple  13:13
20:21  27:5, 7, 9
48:3  58:22
COURT  1:1, 4
61:14
covered  48:20
crime  42:15
Critical  34:5
crystal  48:6
50:13
currently  6:9
cuz  25:14

< D >
date  39:3, 15
54:24  55:4
date.  6:3
dated  35:15
36:14  37:2, 20
38:13, 14  56:3, 4
Dates  34:5
54:16, 21
day  16:7, 10
50:23  63:3, 18
day.  15:24  16:3,
21
days  11:12
deal  12:25  13:4,
5

dealing  12:18
13:25  46:11
deals  13:9
dealt  48:19
debt  6:23, 23
8:9, 19  18:11
51:4
debtor  17:3, 20
18:11  46:18
60:17  61:3
debtor,  46:19
debtor.  18:14
29:20
debtors  20:12
debtor's  18:12,
13  20:11  26:15,
16  28:19, 25
46:14  60:15
debts  7:2
Defendant  2:15
Defendant.  1:9
Defense  3:17
delinquent  7:3
deliver  24:18
26:1, 10, 14, 17
27:21, 21  28:2
29:3  30:1, 24
52:3  57:3  59:5
60:11, 21
Department  3:16
depends  16:3, 3
21:4, 4  25:17
46:10
deponents  42:15
DEPOSITION
1:17  4:1, 21
5:14, 25  9:1
16:16  32:15
61:13  62:8  63:3,
10, 11
DeProspo  2:15
describe  7:7
12:17
described  7:8
DESCRIPTION
3:9  54:13
desk  33:9
detail  10:9
detail.  54:20
dial  52:8

dialed  15:25
32:7, 7, 8, 10
dialer  32:9
dialing  45:12, 15
did  26:4  36:9
did,  21:7
did.  41:1
difference  18:7
different  7:20
19:19, 20  20:21,
22, 22  21:2
22:12  24:8, 22
25:25  31:14
46:16  58:22
different.  46:16
direction  63:9
directly  45:20
disagree  6:17
discipline  36:5
38:9  40:3  41:2
55:24
discussion  38:10
55:18  58:16
discussion.  42:12
discussions  10:4,
8  41:6  50:21
51:1
DISTRICT  1:1, 2
DIVISION  1:3
do  14:22  25:21
29:7  34:6  43:22
51:9
do.  8:18  12:10
50:17  51:4
document  36:18
38:18  41:23
42:2  55:8, 25
documenting
39:9  55:14, 21
56:10
doesn't  13:15
doing  4:23  11:4
34:20  46:9  53:6
55:13
done  54:4  61:16
done.  61:10
don't  5:21  10:4
16:8, 16  21:6
43:25

doubt  56:23
down  61:14
DR  32:9
duly  4:7  63:4, 7
during  58:8
duties  7:6, 7

< E >
earlier  35:9
50:12  56:14
Eight  15:10
either  29:23
30:23
either.  38:1
else's  34:25
Email  2:14
embarrassed
42:14
employed  6:11
63:15
employee  8:4, 22
63:14, 14
employment.
12:15
end.  59:13
Erstad  4:2
even  16:11
eventually  37:13
everybody  27:18
everything.  48:7
exact  51:24  52:4
53:1, 5  57:4
exactly  7:21
12:22  14:24, 25
53:12, 13
Examination  3:2,
3, 4, 5, 6  4:10
48:1  50:10
57:19  59:16
examined  4:8
example  19:4, 5
60:14
excuse  25:5
39:22  61:4
EXCUSED  62:7
Exhibit  9:1
18:15  22:2, 6
23:3  30:17  31:2
41:25  48:12
54:14

**EXHIBITS** 3:*8*
21:*25* 42:*18*
43:*20* 62:*9*
**expect** 14:*23*
**expectations** 41:*7*
**expected** 8:*21*
**expressly** 49:*14*
59:*9*
**extent** 34:*24*
51:*18*

**< F >**
**Fact** 3:*10*
**fact.** 56:*25*
**failed** 55:*25*
**failing** 36:*18*
37:*23* 38:*17*
39:*7* 55:*8* 56:*7*
**Fair** 6:*16* 8:*9*
13:*18* 15:*2*
17:*18* 18:*2* 19:*7*
21:*6* 31:*25*
32:*12* 59:*23* 60:*5*
**falls** 56:*19*
**familiar** 8:*9, 21*
9:*10* 25:*21* 41:*22*
**far** 50:*15* 57:*23*
58:*19*
**fast** 52:*22*
**Fax** 2:*6, 13*
**FDCPA** 8:*12, 13,*
16, 21 21:*17* 43:*3*
**February** 6:*14,*
15, 16, 17 37:*7*
39:*15*
**feeling** 30:*8, 9*
**field** 6:*24*
**figured** 54:*3*
**FILE** 1:*4* 3:*10*
33:*17* 56:*23*
**filed** 21:*16*
**finally,** 40:*22*
**FINANCIAL** 1:*8*
4:*15* 6:*9* 23:*6*
49:*9* 52:*1, 19, 21*
**financially** 63:*15*
**find** 5:*24* 6:*6*
27:*20* 40:*15, 19*
41:*11*

**finding** 12:*12, 12,*
13
**fine** 4:*23* 6:*22*
8:*25*
**fine.** 17:*22*
**finish** 4:*23, 25*
**fired** 37:*13, 16*
**first** 4:*7* 33:*7*
40:*8* 41:*23* 53:*8,*
25 60:*3* 63:*4*
**FISHMAN** 2:*11*
**flag** 30:*12*
**floor** 10:*24*
11:*20* 48:*8* 50:*15*
**folks** 27:*2*
**folks,** 28:*1*
**Follow** 34:*6*
37:*23* 39:*7* 56:*8*
**follows:** 4:*8*
**for** 28:*2* 30:*13*
32:*14* 38:*14*
43:*5* 59:*21*
**force** 38:*21*
**foregoing** 63:*8*
**forget** 46:*3*
**form** 38:*10*
**Form,** 54:*13*
**found** 6:*1* 29:*7*
40:*24* 53:*22*
**four** 39:*24*
**frame** 53:*25*
**FRANZ** 1:*25* 63:*3*
**front** 18:*15* 57:*9*
**F-screen** 31:*5*
44:*17, 21, 22*
45:*17* 52:*8, 9*
**F-screen,** 45:*15*
**F-screen.** 45:*12*
59:*1*
**F-screens** 25:*6*
**fully** 39:*7* 56:*8*
**Further** 3:*4, 5, 6*
36:*5* 50:*10*
57:*19* 59:*16*
**future** 36:*3*

**< G >**
**general** 16:*5*
**generally** 15:*12*

61:*19*
**gentlemen** 4:*13*
**get** 19:*17*
**getting** 44:*9*
51:*21, 22*
**give** 4:*24* 16:*5*
23:*17* 25:*9*
28:*22* 30:*23* 46:*6*
**given** 4:*21*
14:*16* 58:*4*
**giving** 36:*9*
**go** 7:*13* 12:*5*
14:*18, 22* 23:*24*
31:*25* 35:*11*
54:*11, 15* 60:*18*
62:*1*
**go.** 61:*23*
**goal** 7:*13* 35:*17*
**goal.** 35:*24*
**goals** 36:*12*
37:*12, 15*
**going** 9:*1* 21:*24,*
24 30:*5, 13* 31:*1*
33:*6* 42:*10* 48:*5*
57:*9, 13*
**Good** 13:*23*
26:*2* 30:*19, 23*
42:*17* 59:*22*
**got** 61:*12*
**got.** 30:*8* 50:*9*
59:*11*
**gotten** 48:*9*
**greeting** 33:*3, 7*
**Greg** 21:*10*
23:*17* 29:*18*
30:*1* 32:*14*
42:*25* 43:*20*
46:*13, 14* 48:*23*
49:*1, 8, 25* 58:*18*
**Gregory** 22:*7*
26:*8*
**Greg's** 23:*10*
**group** 10:*3, 7*
50:*20* 51:*1*
**guard** 44:*10*
**guess** 58:*25*
**guess,** 16:*10*
**guess.** 16:*12*
**guessing** 16:*16*

**guys.** 62:*4*

**< H >**
**habit** 52:*6, 8*
**had** 50:*16* 54:*18*
**half** 6:*7, 12*
**HAND** 63:*18*
**handle** 42:*20*
**hang** 5:*21*
**happen** 26:*22*
**happened** 4:*16*
26:*23, 23* 38:*7*
39:*23* 54:*1*
56:*15* 59:*25*
**happy** 13:*17*
42:*25*
**has** 41:*7*
**hate** 48:*5*
**have** 7:*2* 26:*25*
33:*10* 36:*1*
47:*24* 52:*2* 57:*16*
**head** 54:*8*
**head.** 13:*3*
36:*23* 40:*5*
**hear** 24:*16* 33:*3*
34:*17*
**hello.** 17:*6*
**help** 11:*21, 23,*
24 12:*1* 14:*7*
34:*3* 35:*5, 6*
36:*11*
**help.** 11:*25*
**here** 18:*18*
**here,** 31:*14*
**here.** 14:*19*
32:*23*
**hereto** 63:*14, 15*
**hey** 60:*17*
**Hi** 52:*10*
**him** 28:*8*
**him.** 26:*3*
**his** 4:*16* 29:*23*
**hit** 33:*13* 35:*24*
**honestly** 45:*14*
**hour** 4:*3* 15:*10,*
11
**hourly** 7:*9*
**hourly.** 7:*10*
**hours** 15:*10, 10,*

*11*
**house** 20:*12*
**how** 16:*9*
**Huh-uh.** 30:*10*
38:*3*
**human** 17:*5*
**hundreds** 15:*2*,
*23*
**hung** 51:*21*
**hurry** 52:*22*
**hypothetical**
28:*22*

**< I >**
**I** 6:*1* 9:*16* 10:*10*
16:*6* 19:*21* 25:*3*,
*14* 27:*14* 30:*4*
45:*7* 46:*23*
51:*22* 52:*20*
53:*18* 54:*21*
55:*15* 61:*3*
**I'd** 9:*1*
**identified** 48:*12*
57:*2* 58:*17*
**identify** 49:*8*
**If** 6:*16* 8:*12*
33:*17* 61:*9*
**IL** 2:*12*
**I'll** 13:*16*
**I'm** 30:*17* 34:*19*
50:*12* 54:*17*
**immediately** 36:*1*,
*3*
**impartiality** 63:*17*
**implemented** 43:*5*
**improve** 36:*1*
**in** 6:*7* 10:*8*, *24*
13:*8* 15:*19*
17:*15* 42:*18*
43:*19* 63:*4*
**INC.,** 1:*8*
**included** 48:*11*
**including** 36:*5*
**inconsistencies.**
59:*15*
**INDEX** 3:*1*, *8*
**individually** 50:*21*
**information**
12:*13* 19:*18*
20:*19*, *20*

**initial** 9:*20*
11:*19* 51:*11*
**intent** 30:*1*
**interest** 63:*16*
**interested** 63:*15*
**Interoffice** 3:*16*
**interpret** 34:*25*
**into** 34:*16* 43:*15*
**investigation**
43:*15*
**involved** 34:*14*
**involving** 51:*10*
**Is** 13:*17* 37:*8*, *15*
45:*14* 60:*21*
**is.** 56:*19*
**ISRAEL** 2:*11*
**issue** 55:*22*
**issue.** 53:*23*
**It** 18:*16* 19:*5*
32:*8* 33:*16*
36:*15* 39:*3*
**it,** 61:*21*
**it.** 12:*17* 13:*5*
18:*22* 24:*12*
27:*16* 38:*12*
40:*17* 50:*18*, *22*
60:*24*
**It's** 16:*5* 32:*20*
46:*10*, *15*
**I've** 8:*6*

**< J >**
**James** 2:*15*
**January** 19:*13*
22:*3*, *4* 37:*2*
**JDSs** 58:*3*
**job** 6:*23* 7:*1*, *2*
38:*10* 54:*13*
61:*17*
**job.** 11:*4*
**jog** 56:*11*
**jschultz@sessions**
**-law.biz** 2:*14*
**July** 35:*15* 36:*16*
**jump** 35:*6*
**June** 4:*2* 15:*4*
16:*23*, *24* 17:*13*
19:*13* 22:*4*, *6*
23:*21* 34:*6*, *6*, *10*,
*11* 35:*17* 36:*16*

38:*15*, *15*, *16*, *16*
39:*4*, *4*, *4*, *4*, *4*, *5*,
*5* 42:*19* 43:*7*
46:*4* 47:*21* 54:*1*,
*7* 55:*6*, *6*, *6*, *7*, *9*,
*10* 56:*5*, *5*, *5*, *5*, *6*,
*6*, *6* 63:*3*, *18*
**jury** 57:*10*
**just** 8:*2* 28:*22*
41:*24* 58:*25*

**< K >**
**Kay** 21:*9* 22:*2*
23:*10*, *17* 26:*9*
29:*18* 30:*1* 43:*1*,
*20* 46:*12* 48:*23*
49:*1*, *8* 50:*1*
52:*10*, *11* 58:*18*
**keep** 22:*3* 51:*21*
**keeps** 31:*15*
**kind** 12:*21* 13:*7*,
*9* 19:*6* 27:*2*
28:*18* 58:*12*
**knew** 6:*2*, *7*
**know** 5:*22* 8:*13*
9:*15*, *17*, *17* 10:*5*,
*11* 11:*9* 12:*9*, *24*
13:*2*, *11* 14:*14*,
*24*, *25* 16:*8*, *9*, *12*,
*17* 19:*21* 21:*6*, *7*
25:*9* 28:*13*, *13*
29:*10*, *17* 30:*5*, *7*
31:*22* 34:*12*
36:*20* 38:*6*, *19*
39:*20* 40:*2*, *13*
43:*5*, *22* 47:*1*, *3*,
*12*, *20* 50:*14*, *14*,
*16*, *17* 52:*15*
54:*21* 56:*22*
58:*19*, *21* 59:*4*, *7*
60:*1*, *5*
**know.** 14:*13*
16:*19* 21:*8* 55:*20*
**known** 27:*14*

**< L >**
**L.L.P.** 2:*4*
**Latasha** 23:*4*
**LATISHA** 1:*18*
3:*10* 4:*1*, *6*

16:*15* 23:*6* 34:*4*,
*22* 48:*3* 49:*8*
52:*1* 57:*21*
60:*18* 61:*12* 63:*3*
**Latisha.** 23:*4*, *25*
**lawsuit** 4:*15*
21:*16* 41:*20*
**lawyer** 4:*12* 22:*1*
40:*14* 53:*1*
**lawyers** 9:*6*
**learn** 26:*21* 40:*8*
**learned** 12:*5*
41:*19* 50:*24*
**least** 17:*24*
**leave** 14:*19*, *20*
17:*10* 24:*20*
25:*13*, *15* 28:*19*
29:*13* 33:*6*, *11*
59:*21* 61:*4*
**leaving** 24:*12*
**left** 21:*3* 24:*9*
25:*1* 32:*4* 33:*1*, *2*
**like** 18:*25*
**Lindsey** 4:*14*, *14*
21:*10*, *10*, *16*
22:*2*, *7* 23:*11*, *14*,
*18* 25:*2* 26:*6*, *8*
28:*8* 29:*19* 43:*1*,
*21*, *21* 46:*12*, *13*,
*14* 48:*23*, *23*
49:*2* 50:*1* 52:*10*,
*11* 57:*3*, *3*, *3*
58:*18*
**LINDSEY,** 1:*5*
**Lindsey's** 32:*5*
43:*16*
**linked** 45:*20*
**listed** 25:*7* 52:*2*
**listen** 10:*17*, *19*
11:*2* 33:*7*, *11*
**listened** 5:*16*
10:*19* 11:*3*
21:*18*, *19*
**listening** 5:*18*
30:*4*
**little** 5:*1*, *16*
9:*22* 13:*23* 27:*5*
34:*16* 35:*2*
40:*20* 42:*4* 48:*6*

49:25  50:19
54:23
**live**  11:5  17:1
18:1  19:5  20:3
**LLP**  2:11
**LMOM**  32:25
33:1
**located**  25:6
31:6
**location**  12:12,
13  19:18
**long**  6:2, 11
9:15  10:2  11:9
15:9  31:10
40:21  41:6
50:16  53:10, 12,
13  54:3, 23
**look**  6:13  18:15
22:8  29:17
31:19  32:1
54:16, 24
**looked**  49:6
**looking**  9:23
24:5  30:16
31:15  32:6, 15
54:6
**looks**  7:14
18:25  19:2
30:17  35:14, 15
39:13
**lot**  14:24, 25
17:11, 16  21:5
25:9  34:13  43:8
48:4, 19  50:23
**louder**  42:4

**< M >**
**ma'am**  31:1, 16
34:1  37:18
**ma'am.**  6:4
18:10  22:5
33:23  41:23
42:23  62:5
**machine**  17:11
18:24  19:24
33:2, 6, 10
**machine.**  33:1
**Mail**  18:24
**making**  33:4

48:9, 17, 23  57:6
**managers**  10:16
**manner**  36:18
37:22  38:17
39:6  55:8  56:7
**Manual**  3:10  9:7,
8, 10, 23  10:6, 7
22:24  48:12, 20
49:21  51:3
**manual.**  9:5
**manually**  15:25
16:7  32:6, 8
**many**  16:23
59:14
**mark**  9:1  21:25
**marked**  41:25
**marking**  31:1
**matter**  11:12, 12
63:4
**matter,**  63:8
**me**  36:2
**me.**  11:23  22:1
33:21  35:6  39:22
**mean**  17:3
24:25  32:12, 25
34:21  35:3  44:22
**means**  31:20
35:1, 4
**medication**  5:11
**meet**  36:11
37:12, 15
**Memorandum**
3:16
**memory**  10:10
36:22  56:11
**mentioned**  41:15
43:25  44:3
**message**  21:3
23:18  24:12, 19
25:13  26:1, 10,
14, 17  27:21, 22
28:2, 8, 19  29:13
30:2, 20, 24  33:1,
2, 7, 11, 14  43:21
45:21  50:1  52:3
57:4  59:5  60:21
61:5
**message.**  24:21
25:15  29:3

**messages**  17:11
18:25  32:4
59:21  60:12
**MICHAEL**  1:5
4:14  23:11, 18
25:2
**Mike**  43:21  50:1
57:4
**mind**  10:12
**Minneapolis**  4:3
**Minnesota**  4:3
63:1, 6
**minute**  44:10
**minute.**  45:18
**misconduct**
36:15  38:15  39:1
**mistake**  44:8
49:23  50:7  53:3,
5  57:1, 2, 4, 6
58:4
**mistake.**  44:11
**mistakes**  53:19,
24  54:4  57:10,
22  58:17
**mistakes.**  57:12
**misunderstanding**
25:3
**Mm-hm**  10:7
**Mm-hm.**  11:6
15:15  18:3  20:5
22:19  24:15
28:15  29:4  34:2
45:23, 25  49:10
58:5
**mom**  18:13
**money**  37:12
42:8, 11
**monitor**  34:20
**monitored**  22:17
23:7  47:2
**monitored.**  47:4
**Monroe**  2:11
**month**  6:7  31:12
**month,**  37:6
**months**  12:8
27:9  39:24
**months,**  27:7
**more**  36:10
**more.**  56:23
**Mornings**  15:13

**mother's**  20:12,
16
**move**  52:22
**mute**  34:18
**my**  4:24  21:15
22:2  25:10  40:8
42:14  63:17

**< N >**
**name**  4:12, 14
49:13  52:9  59:8
**names**  25:9
**NATHAN**  2:11
**NCO**  1:8  3:10,
10, 10, 15, 15, 16
4:15  6:9  7:1
8:2, 7, 22, 25
9:25  11:24  12:4
18:17  21:16
22:22  23:6
26:25  27:4  33:9
35:21  36:18
37:23  38:18, 21
39:7  40:9, 17
41:3  42:7, 10, 20
43:2, 5  47:5
48:9  49:9, 16
50:3  52:1, 19, 21
55:9, 14, 21, 25
56:8  57:22  58:9,
16  59:18
**NCO's**  25:21
26:9  32:14  39:9
56:10  60:22
**necessarily**  19:15
**need**  42:13
**needed**  29:22, 22
35:5
**neighbor**  20:13
**never**  6:3  15:23
52:16  53:9
**new**  12:3  41:5
43:5, 8, 12
**night**  15:14
**Nights**  15:13
**no**  52:10
**No.**  4:22  5:13,
23  6:25  10:14
11:11  13:1
14:15  19:20

21:1, 12  22:13
24:1, 7, 24  26:20
29:11, 16  31:11,
24  33:15  36:21,
25  38:5, 8, 20
41:4  42:9, 16
43:18, 24  45:2, 4
46:21  51:15  61:7
**nods.**  5:3  10:21
11:15
**noes**  5:7
**normally**  16:6
28:2, 17  29:8
46:5
**North**  2:5
**NORTHERN**  1:2
**not**  14:24  19:19
25:18  26:2
39:24  43:12
45:8  56:14
**not.**  7:22  55:23
**Notary**  63:6, 24
**notes**  5:19  31:5,
19  63:8
**notes.**  5:17
**notice**  58:4
**noticed**  54:22
63:10
**notified**  53:6, 10
57:21
**notify**  57:23
**November**  36:14
**NUMBER**  3:9
17:5  21:25
23:14  24:9, 14,
14  25:1, 1, 2, 5, 8,
14  26:3, 6, 8, 9,
22  27:1, 12, 15
28:20  29:22, 23
30:3, 5, 13, 19, 20,
24  32:4, 5, 16, 17,
24, 25  33:3, 10
44:25  45:7, 9, 18
46:3, 7, 14, 17, 19
50:5  52:2, 3, 9
55:17, 21  58:19
59:19, 22  60:18
61:2
**number.**  24:10
27:19  28:25

29:24  32:21
44:24
**numbered**  18:16
**Numbers**  3:10,
15  12:13  14:24,
25  16:9  18:18
23:10, 11  25:6
27:10  33:3, 20
44:17  45:12
46:11, 18  52:8
58:23, 24, 24

**< O >**
**oath**  63:7
**object**  34:24
**Objection**  23:23
60:23
**Objections**  3:7
**obtain**  58:23
**occurred**  48:22,
25
**OF**  1:17  4:1  5:1
12:24  13:9
14:25  15:6  17:7
21:16, 18  30:11
40:3  60:3  63:14
**office**  14:22
32:1, 1
**offs**  34:4, 22
**Okay**  4:21, 23
5:2, 8, 14, 18, 23,
24  6:9, 11, 16, 22
7:1, 4, 9, 11, 18,
23  8:1, 5, 12, 15,
19  9:10, 12, 19,
22  10:6, 15  11:5,
9, 18, 24  12:21
13:23  14:2, 5, 22
15:2, 4, 6, 14, 18
16:4, 21  17:1, 7,
10, 13, 18, 21
18:6, 15  19:9, 12,
21  20:18  21:6,
15, 24  22:11, 14,
17, 24  23:2, 20
24:5, 8, 11, 13, 22
25:12, 16, 20, 20,
24  26:4, 13, 13,
16, 19, 21, 25
27:4, 9, 19, 20

28:1, 9, 22  29:7,
12, 17, 25  30:9,
16  31:1, 12, 14,
19, 22, 25  32:4,
12, 14, 22, 24
33:5, 9, 13, 16, 20
34:14, 21  35:3, 7,
14, 17, 21, 25
36:9, 22  37:1, 11,
15, 18, 20  38:2, 6,
9, 13, 21, 25  39:3,
15, 20, 23  40:2, 8,
21, 24  41:2, 5, 11,
19, 22  42:2, 10,
13, 17  43:9, 12,
15, 25  44:6, 22,
25  45:17  46:9,
19  47:5, 8, 15, 20,
24  48:22  49:4, 6,
23, 25  50:9  51:5,
9, 16, 21  52:6, 24
53:24  54:24
55:6, 24  56:3, 13,
24  57:9, 13, 16,
18, 25  58:8, 12,
15  59:2, 11, 18,
21, 25  60:3, 9, 14,
20  61:8  62:2
**okay,**  43:21
**Okay.**  5:9  13:6,
12  14:14  16:13,
18, 20  27:17
28:24  33:24
45:3, 10, 13, 19
46:22  53:21
55:19  61:1
**on**  7:11  21:4
32:4  56:8
**once**  11:20
**one-to-two-week**
51:11
**ongoing**  11:18
12:1
**opened**  25:8
**option**  30:16, 17,
23
**option.**  30:15
**or**  7:6  11:22
27:10  29:13, 22

36:4  56:18  57:23
**ordered**  63:11
**ORIGINAL**  62:9,
10, 12  63:10
**other**  8:1  38:9
**others.**  9:18
**out**  56:20
**outcome**  63:15
**over**  50:21
**owes**  18:11
**own**  58:24

**< P >**
**p.m.**  4:4  62:8
**page**  3:2, 3, 4, 5,
6, 10, 10, 10, 10,
15, 17  18:21
31:16  33:21, 22
35:12  36:14
38:13  54:24  56:3
**pages**  3:7  18:16
**paid**  7:9, 10, 11
**PAMELA**  1:25
63:3
**part**  4:15  7:15
21:17  22:24
23:21  24:3
33:17, 25
**particular**  38:23
**parties**  13:25
14:3, 7, 10  17:24
19:10, 13  24:6
43:6  44:13, 15,
20  46:5  47:3
50:4  51:5, 10
59:4, 22  60:11
63:10, 14, 15, 16
**parties,**  59:7
**parties.**  43:11
44:16
**party**  18:8, 9, 12
19:4, 17  20:8, 10
26:14  28:25
29:2, 14  39:8
47:2, 6, 15  49:18
52:12, 13, 13, 18
56:9  60:14, 21
63:10
**party,**  17:19  28:7

**Latisha Williams**

pass 50:1
passed 49:4
PATE 2:4
Patrick 2:15
pay 42:7, 11
people 7:2 17:4
30:4 31:22 61:19
per 15:21
percent 17:7, 10,
14 18:1
percent. 17:25
percentage 17:21,
22
performance
35:14 36:1, 3
37:1
period 51:12
permissible 60:22
person 18:11, 12
19:5 20:3 25:8
40:17 51:25
Personnel 3:10,
16 33:17
persons 63:16
Perusing. 22:16
Phone 2:6, 13
10:17 15:21
16:24 17:1
18:13 20:16
21:4, 10, 17 22:2,
6, 12 26:16
28:16 32:5
34:19 42:25
43:19 44:3, 6
45:22 46:6
57:11 60:15
phone. 26:15
picks 17:5 19:24
33:6, 10 51:25
Place 12:15
15:21 27:6
28:16 38:7 41:14
placed 39:8
45:9 49:8 56:8
Plaintiff 2:8
Plaintiff, 1:6
Plan 33:25
please 13:16
36:2 43:21 46:6

please. 42:4
57:25
plugging 34:16
POE 12:14
POEs. 12:13
policies 25:21
43:5, 8, 12
policy 26:10
36:17 37:22
38:17 39:6 42:3,
5 55:7 56:7
58:13
Policy, 3:17
popped 54:8
Practices 8:10
prefix 31:15
prepare 5:14
Present 2:15
president 32:14
pretty 53:12
54:18 55:15
Prior 28:1 48:22
Probably 12:8
17:8 26:24 27:7
40:10, 20 44:9,
10 45:14, 15
50:24, 25 52:21
53:22, 22 54:17,
18 55:17 56:18
60:7
problem 11:25
12:1
procedure 37:23
39:7 56:8
procedures 36:2
process 58:9
produced 33:16
progressive 36:5
promise 5:6
10:11 15:20
prompt 5:6
proper 36:2
properly 36:18
38:18 42:20
43:2 55:8, 13, 25
provided 22:1
62:12
provides 58:25
Public 63:6, 24

punished 56:15
purpose 8:15
put 45:17
putting 20:15

< Q >
Q 4:12, 21, 23
5:4, 6, 10, 14, 18,
21, 24 6:4, 6, 9,
11, 13, 16, 20, 22
7:1, 4, 6, 9, 11, 14,
18, 23 8:1, 5, 9,
12, 15, 19, 21, 24
9:4, 6, 10, 12, 19,
22 10:6, 10, 15,
20, 22, 24 11:2, 5,
7, 9, 12, 14, 18, 24
12:1, 7, 9, 11, 14,
16, 18, 21, 24
13:2, 4, 6, 12, 15,
20, 23 14:2, 5, 9,
12, 14, 16, 18, 20,
22 15:2, 4, 6, 9,
11, 14, 18, 25
16:2, 4, 13, 20, 22
17:1, 5, 10, 13, 18,
22 18:1, 4, 6, 10,
15, 21, 24 19:4, 9,
12, 15, 21 20:2, 6,
8, 12, 17, 19, 24
21:2, 6, 13, 15, 21,
24 22:11, 14, 17,
20, 22, 24 23:2, 6,
10, 13, 17, 20
24:2, 5, 8, 11, 13,
16, 18, 22, 25
25:12, 16, 20, 24
26:4, 8, 13, 16, 19,
21, 25 27:4, 9, 17,
20, 24 28:1, 5, 7,
11, 13, 16, 22, 25
29:2, 5, 7, 10, 12,
17, 21, 25 30:7, 9,
11, 16, 23 31:1, 4,
7, 10, 12, 14, 19,
22, 25 32:4, 12,
14, 22, 24 33:2, 5,
9, 13, 16, 20, 23,
25 34:3, 9, 14, 21
35:1, 3, 7, 11, 14,

17, 21, 25 36:9,
14, 22, 24 37:1, 6,
11, 15, 18, 20
38:2, 4, 6, 9, 13,
21, 25 39:3, 12,
15, 18, 20, 23
40:2, 6, 8, 11, 13,
18, 24 41:2, 5, 11,
14, 17, 19, 22
42:2, 7, 10, 13, 17,
23, 25 43:5, 9, 12,
15, 19, 25 44:3, 6,
12, 16, 18, 22, 25
45:3, 5, 10, 13, 17,
20, 24 46:1, 3, 9,
13, 17, 19, 22
47:1, 5, 8, 11, 13,
15, 17, 20 48:3,
11, 14, 17, 19, 22,
25 49:4, 6, 11, 13,
16, 20, 23, 25
50:3, 7, 12, 18
51:1, 5, 7, 9, 14,
16, 18, 21 52:6,
17, 24 53:1, 5, 10,
14, 16, 21, 24
54:3, 11, 15, 24
55:2, 4, 6, 19, 21,
24 56:3, 13, 20,
24 57:9, 13, 21
58:1, 3, 6, 8, 12,
15 59:2, 4, 7, 18,
21, 25 60:3, 8, 10,
14, 17, 20 61:1, 6
question 4:24
5:1 13:7, 15, 21,
24 16:17 28:18
42:13, 24 45:20
46:3
question. 28:21
questions 11:22
13:8, 13 36:2
48:3 53:2
quick 46:23

< R >
range 16:6
rate 63:11
react 30:4

**read** 9:13, 15, 16, 19  10:2, 2  22:14, 15  30:21  35:18  36:7  39:10  50:20, 21  51:1  61:20
**reading** 23:2  63:11
**really** 6:2, 5  9:14  10:4, 8  12:22  14:13  16:9, 14  17:16  19:20  26:23  33:4  54:9, 17, 18  56:12
**really.** 56:12
**reason** 29:18, 21  44:6
**recall** 13:24
**receive** 7:23  9:24  12:18, 21  41:2
**received** 7:25  8:1, 4  39:21
**Recess** 46:25
**recognize** 9:2
**recollection,** 58:15
**reconfirm** 57:24
**record** 5:8  6:17  54:12  62:15
**recorded** 22:18
**recording** 49:6
**recordings** 5:16, 18  11:2, 3  21:18
**records** 6:13  36:19  38:18  39:9  55:9, 14, 22  56:1, 10
**red** 30:12
**reference** 14:6  23:11  24:10, 14  25:1, 2, 5, 8  26:22  27:1, 10, 12, 15, 19  45:7, 9, 11, 11, 17  46:3  52:2  53:19, 25  54:10  55:17, 21  58:19, 24  59:18

**referenced** 42:18  43:1
**referral** 8:4, 7
**referring** 54:13
**regard** 43:2
**regarding** 14:2  39:7  56:8, 15  58:16
**regards** 54:19
**regulations** 8:17
**related** 63:14
**relating** 39:8  56:9
**relative** 44:24  59:23  63:14
**relative's** 44:25  46:17
**relay** 23:17  30:20  43:21  45:21
**remember** 7:21  9:24  10:1, 5, 5, 6, 8, 13  12:22  14:3  29:12  33:4  34:9  36:12  38:2, 12, 24  40:18  50:13, 14, 15  53:24
**remember.** 36:13  39:14  40:1, 7  51:14
**Repayment** 3:17  42:3, 5
**repeat** 28:4  42:24  57:25
**rephrase** 13:16  28:20
**reported** 63:3
**REPORTER** 11:16  15:16  42:4  61:14
**represent** 4:13
**represented** 9:6
**required** 22:22  48:15
**requirements** 36:4
**residence** 18:25  19:5, 24  20:3, 9, 11
**response.** 41:13

**result** 17:1  36:4  38:23
**retest** 12:7
**retests** 12:24  38:21
**retraining** 57:23  58:12
**review** 5:16  61:13, 22
**reviewed** 22:9
**reviewing** 5:19
**Riemer** 4:2
**right** 5:10  6:13, 14, 16, 22  7:6, 14  8:1, 9  9:12  11:2  12:9  16:22  18:1, 24  19:21, 25  20:2, 12  21:15, 21  24:25  26:24, 25  27:6  29:25  30:21, 21  31:7, 16, 25  32:17, 21, 24  35:6, 7, 11  36:7, 14  37:6  39:10, 23  40:8, 13  43:19  45:24  47:17  48:14  49:9, 14  50:1  52:9, 12, 13, 13, 13, 18  53:3  54:7, 25  55:2, 4  58:4, 10, 13  59:5  61:12, 13, 18, 24  62:6
**right.** 22:16  29:1  59:12  61:8
**roughly** 15:6  16:22, 24  17:19
**rude** 5:6  15:19, 19
**rules** 8:17  60:22

**< S >**
**safe** 5:10
**salary** 7:9
**same.** 52:16
**saw** 22:24  31:8
**say** 54:19
**say.** 6:5

**saying** 13:10  20:10  22:3  30:11  55:11
**says** 17:6  19:4  20:2  30:13  31:17  32:25  33:25  34:3, 5  35:17, 25  36:16  37:21  38:15  39:4  55:6, 13  56:5
**says,** 35:25
**Schultz** 2:15  3:3, 5, 7  16:15, 19  18:18  23:23  32:18  34:24  50:9  54:12  59:11, 13  60:23  61:9, 12, 24  62:2, 6
**SCHULTZ.** 62:14
**SCHULTZ:** 48:2  57:20
**Script** 19:4, 9, 12, 14, 16, 16, 19, 20  20:4, 9, 19, 24  21:9, 13  23:21  24:3
**scripts** 19:1, 22
**SEAL** 63:18
**Seals** 2:6  3:2, 4, 6  4:12  11:18  15:18  16:20  18:21  24:2  32:19, 22  35:1  42:7  46:23  47:1, 24  54:15  57:16  59:12, 14  61:1, 8, 11  62:5, 13, 13
**SEALS:** 4:11  50:11  59:17
**searches** 58:22, 24
**second** 22:14  53:9
**see** 18:17  31:19  32:1  34:1, 7  42:17
**seen** 21:21  31:2

**Latisha Williams**

**74**

33:18  53:7
**sense**  13:16
**separate**  7:18
56:20
**September**  38:14
39:3  54:24  55:4
56:4
**serious**  37:9
**Services,**  52:1
**SESSIONS**  2:11
**set**  6:3  7:15, 19
34:4, 22  35:4, 4, 5
**seven**  15:10, 11
**shakes**  13:3
36:23  40:5
**Sheet**  3:10
**shift**  15:14, 22
**shift,**  17:18
**shifts**  15:9
**show**  8:25  21:24
22:4  31:1  41:22
**showed**  31:7
**showing**  31:5
33:16
**shown**  43:19
**side**  13:20  34:3
**side-by-sides**
11:22  14:6, 7, 9
34:10, 15  36:11
51:19
**side-by-sides.**
34:13
**sides**  34:3
**sign**  54:19
**signature**  35:12
37:3, 18  39:18
41:24  55:2
**signed**  39:24
54:10  55:17
56:17
**signing**  63:11
**similar**  23:20
28:7
**since**  9:19
**sister**  18:13
**sit**  10:12, 16
33:5  34:9, 18
41:5  42:17  47:21
**sitting**  33:9
34:16  36:22  38:2

**situation**  20:15,
25  24:20  25:12,
24  26:11  40:4
42:6  60:20
**six**  12:8
**Six-page**  3:10
**skip**  12:9, 11, 12,
19, 25  13:9, 11,
23  34:4, 22  35:7,
8  43:6, 9, 10
51:7, 10  61:3
**skips**  33:13
**so**  8:7  40:23
48:4  61:19
**so.**  27:25  41:18
57:8
**some**  4:15
**somebody**  17:2,
20  18:13  58:16
**somebody.**  17:9
**something**  28:16
41:11  46:4
**something.**  12:8
**sorry**  45:6  48:25
57:21
**sorry.**  15:17
**sort**  10:15, 17
19:6  24:19  41:2,
6
**sound**  6:14
**South**  4:2
**SOUTHERN**  1:3
**speak**  10:24
**speaking**  17:14,
24  37:23  46:11
52:21  54:22
61:19
**specific**  14:2
19:16  29:12
**specifically**  10:13
**spent**  11:9  48:3
**spoke**  5:20, 21
53:18, 19  54:17
**SRA**  31:17
**SRA,**  31:19  32:1
**start**  32:9, 10
34:6
**started**  6:13
8:24  9:12, 25

11:10  48:8, 17
**starts**  18:17
**state**  22:17  23:2,
10, 13  63:1, 6
**stated**  49:13
**statement**  31:25
59:23
**STATES**  1:1
**stenographic**
63:8
**stepmother**  22:3
**steps**  37:14
**Steven's**  32:14
**sticks**  10:12
**stood**  9:18
**stop**  46:9
**stopped**  53:8
**Street**  2:5, 11
**stuff**  9:18  10:2,
3, 4  50:17, 20, 21,
22  51:1, 2, 2, 3
54:6, 9
**stuff.**  21:5
**Subject:**  3:16
**substantial**  63:16
**such**  63:11
**Suite**  2:12  4:2
**Summary**  54:13
**supervisor**  11:21
35:6
**supervisors**
11:20
**supplied**  62:10
**supposed**  24:20
25:4, 13, 15, 21,
22  26:21  27:20
28:14  29:7
43:22  49:17
57:24  59:5, 8
**sure**  5:7  14:11,
17, 18, 25  15:25
16:14, 21  17:15
20:14  23:4
26:23  28:5, 22,
22  29:9, 9  30:8,
18  33:4  34:3, 21
38:1, 11  39:25
44:23  47:3, 9, 12
48:6  50:12
53:12, 13, 13

54:9, 18, 18
55:15  56:13
58:1  61:14
**sure.**  17:17
20:17  25:19
27:23  31:9
41:16  47:19, 23
**sworn**  63:4
**sworn,**  4:7
**system**  58:25
**SYSTEMS**  1:8
23:6  49:9

**< T >**
**take**  13:10  16:10
22:14  41:14
46:23  48:15
50:17
**TAKEN**  1:25  4:1
49:1
**Taken,**  35:25
**taken.**  46:25
**talk**  9:22  27:2
30:4  34:4, 22
48:5
**talked**  9:17  10:3
13:23  35:8
40:20, 22  41:9, 9
42:19  43:16
49:25  56:17
58:1  60:3
**talking**  8:13
13:25  14:3  17:8
18:19  43:6  47:2,
6  48:4  49:17
50:4  53:24
**talk-offs**  35:5
**talks**  35:4
**tax**  7:25
**telephone**  3:10,
10  32:13
**tell**  5:12  11:18
13:16  15:20
18:6  22:15  23:7
25:16  26:16
27:21  32:5
34:19  35:21
44:19  45:1
50:18  52:18, 20,

**Freedom Court Reporting, Inc**

**877-373-3660**

*20* 58:*9, 12, 21*
60:*17* 63:*4*
**telling** 26:*9*
44:*13*
**tells** 19:*6, 24*
20:*3* 30:*12*
**ten** 14:*12*
**tendency** 63:*16*
**term** 27:*13*
**termination** 36:*6*
**test** 9:*19* 10:*10*
12:*5* 13:*8, 9, 11*
**test.** 13:*14* 50:*25*
**tested** 10:*3*
**testified** 4:*8*
50:*12* 51:*11*
**testify** 5:*12*
**testimony** 27:*4*
39:*20* 56:*14*
57:*9, 14* 60:*10*
**testimony,** 24:*2*
**testing** 10:*7*
**tests** 9:*16* 10:*15*
13:*24* 48:*14, 19*
49:*1, 4* 50:*14, 14,*
*17, 22, 23*
**Thank** 57:*18*
62:*4, 6*
**that** 9:*6* 25:*12*
26:*10* 27:*18*
35:*5, 18* 38:*6*
41:*14* 47:*9*
51:*10* 54:*9*
**that.** 5:*22* 10:*5*
14:*8* 28:*14* 29:*9*
37:*14* 44:*23*
54:*15*
**that's** 12:*3*
**THE** 4:*1* 7:*23*
8:*15* 20:*8, 24*
21:*21* 24:*25*
25:*5* 28:*20*
30:*18* 32:*16*
40:*24* 41:*9*
42:*17* 49:*6*
52:*17* 56:*4* 58:*9*
61:*2* 62:*9* 63:*3,*
*4, 6, 10, 14, 16*
**them.** 7:*8* 22:*15*
**then** 11:*21*

**then.** 43:*8* 54:*11*
62:*3*
**there** 26:*8*
**there.** 53:*20*
**thereof** 63:*7*
**these** 29:*2*
31:*22* 33:*2*
34:*14* 47:*17*
**they** 10:*15*
**they're** 20:*2*
**thing** 9:*13* 10:*15,*
*17* 24:*19* 27:*2*
34:*16* 44:*19*
45:*1, 7, 7* 51:*25*
52:*4* 58:*10*
**thing.** 19:*6*
**things** 4:*16*
31:*14* 43:*13* 58:*8*
**think** 6:*2, 15*
8:*12* 11:*13* 16:*4*
17:*24* 22:*12*
23:*3, 13* 25:*15*
26:*19* 27:*14, 18*
45:*6, 7, 14* 47:*24*
50:*19* 52:*2*
53:*18, 19* 54:*7*
57:*16* 60:*6*
**third** 13:*25* 14:*3,*
*6, 10* 17:*19, 24*
18:*8, 9, 12* 19:*9,*
*13, 17* 20:*8, 10*
24:*6* 26:*14* 28:*7,*
*25* 29:*2, 14* 39:*8*
43:*6, 10* 44:*13,*
*15, 16, 19* 46:*5*
47:*2, 3, 6, 15*
49:*17* 50:*4* 51:*5,*
*10* 52:*13* 56:*9*
59:*4, 7, 22* 60:*11,*
*14, 21*
**third-party** 43:*3*
47:*22* 50:*5*
**this** 18:*6* 19:*15*
21:*10* 44:*18*
52:*13*
**this,** 56:*13*
**this.** 20:*23*
26:*24* 42:*6*
**those** 22:*14*

42:*20* 58:*23*
**though.** 10:*9*
**thought** 15:*24*
25:*7* 27:*18*
**three** 42:*22*
**time** 7:*25* 9:*15*
10:*2* 14:*16, 17*
17:*15* 21:*19*
26:*13, 24* 28:*20*
31:*8, 10, 19*
34:*12* 40:*21*
41:*19* 42:*18, 25*
43:*19, 22* 44:*14*
46:*4, 15* 48:*4*
50:*24* 52:*6, 12,*
*15, 17* 53:*25*
57:*7, 10* 61:*9*
**time.** 52:*14*
**times** 26:*19*
**Title** 2:*4* 7:*1, 2, 4*
**to** 5:*11, 24* 11:*3*
17:*8* 21:*24*
25:*25* 26:*13, 21*
27:*20* 30:*12*
42:*10* 43:*2*
48:*22* 51:*3*
52:*22* 62:*12*
**today** 4:*19* 5:*12,*
*15* 6:*6* 15:*14*
47:*18* 48:*4*
**told** 8:*3, 24*
20:*25* 21:*15*
27:*10, 11* 32:*15*
40:*14, 17, 18*
42:*10* 45:*1*
47:*12, 13, 14, 21*
50:*19* 53:*1, 2, 16*
54:*4* 55:*15, 20*
57:*2* 58:*3* 59:*18,*
*21* 60:*14*
**too.** 8:*8* 61:*11*
**took** 27:*5*
**top** 19:*23* 39:*3*
56:*4*
**topics** 48:*19*
**TR** 32:*8*
**trace** 34:*5, 23*
35:*7, 8* 51:*7*
**tracing** 12:*9, 11,*
*12, 19, 25* 13:*9,*

*11* 43:*6, 9, 10*
51:*10* 61:*3*
**tracing.** 13:*23*
**train** 9:*7*
**trained** 24:*6, 13,*
*18, 23* 27:*11*
42:*20* 43:*2* 48:*9*
49:*16* 50:*3*
**trained,** 24:*13*
**trainer** 50:*22*
**Training** 3:*10, 16*
9:*5, 14, 20, 24*
10:*1, 7, 13* 11:*9,*
*19, 19* 12:*2, 5, 18,*
*21, 23* 14:*2*
22:*24, 25* 24:*8*
27:*16* 29:*13*
36:*10* 38:*9, 22*
40:*2* 41:*5* 43:*25*
44:*3* 48:*4, 11, 11,*
*20, 22* 49:*21*
50:*13, 16* 51:*9,*
*11, 13, 18*
**training.** 9:*22*
**transcribed** 63:*9*
**Transcript** 3:*10,*
*10* 21:*21* 61:*13,*
*20, 22* 62:*10, 12*
63:*8, 8*
**transcripts** 22:*1,*
*8, 11* 49:*7*
**trial** 18:*7*
**true** 63:*8*
**truth** 5:*12* 63:*4, 4*
**try** 19:*17* 58:*9*
59:*1*
**trying** 15:*19, 19*
16:*4* 20:*19* 24:*9*
52:*22*
**turn** 18:*21* 33:*21*
56:*3*
**TW** 32:*12*
**twice** 8:*6*
**Two** 6:*12* 11:*13,*
*14* 21:*10, 17*
23:*2* 29:*2, 3*
42:*22, 22* 43:*13*
51:*18* 53:*5, 7, 7,*
*16* 56:*24* 57:*4,*

11  58:17
**typically**  33:5

**< U >**
**unable**  29:20
30:18
**undergo**  41:5
**understand**
10:10  13:17
19:22  35:1, 8
44:23
**understand.**
51:23
**understanding**
4:18  7:16  8:15
18:7  25:10  26:4
28:11  37:8, 11, 16
**understands**
34:4, 22
**Understood**
12:18  13:21
**UNITED**  1:1
**unless**  59:8
**unprofessional**
36:17  37:22
38:17  39:6  55:8
56:7
**up**  17:5  35:4
51:21
**us.**  7:3
**use**  18:6  19:1, 9,
17  20:4, 20, 24
25:4  27:1, 10, 12,
19  45:11
**usually**  17:2
52:10

**< V >**
**verbal**  35:14, 23
36:9, 15  37:9
38:14
**vice**  32:14
**violated**  36:17
37:21  38:16
39:5  55:7  56:6
**violating**  21:17
**violations**  36:3
**virtue**  63:6
**Voice**  18:24

**voicemails**  17:16
**vs.**  1:7

**< W >**
**waive**  61:17, 19,
21, 24  62:2
**waived**  63:13
**want**  5:2, 6, 22
8:25  16:9, 15
35:11  40:13
42:13  46:23
48:6  50:12
56:13  61:21, 21,
23, 24  62:1
**warning**  35:14,
23  36:4, 9, 15
37:2, 6, 8, 9
38:14, 23, 24, 25
40:4  56:18, 20
**warnings**  56:22
**was**  10:1  25:24
35:17  40:20
44:8  53:1  54:6
57:10  63:11
**was.**  12:23
47:12  49:24
53:13
**wasn't**  54:8
**way**  15:20  16:4,
9  32:5  47:20
**we**  8:17  25:6
40:19, 21  50:24
58:19, 21  60:4
**week**  21:20
44:12  52:24
53:5  57:5
**weeks**  11:12, 14
51:18
**weeks.**  11:13
**Well**  5:21  11:20
13:15  14:6  16:4
17:11, 23  18:11
20:14, 18  21:3
24:9, 20  25:3, 3,
14, 20  27:14
30:15  32:23
37:4, 14  41:22
45:17  46:10
47:12  48:15
50:3, 7, 13, 19

54:6  58:19  59:2
60:6
**went**  39:13  48:8
50:21
**were**  7:14  11:20
24:5  27:9  48:14,
19  56:24
**we're**  9:23  15:18
20:14, 16  21:15
42:5  46:11, 11
47:18  48:5
54:12  61:3, 10
**West**  2:11
**we've**  8:12
42:19  43:16  49:6
**what**  8:25  9:23
12:22  58:12
**whatever**  5:7
**when**  54:16  56:9
**when,**  15:11
**when's**  31:8
**where**  31:16
**Whitney**  2:6  4:12
**who**  18:13  63:10
**whoever.**  20:13
**WILLIAMS**  1:18
3:10  4:1, 12
23:6  27:12  49:9
52:1  60:18  63:3
**WILLIAMS,**  4:6
**with**  12:18  63:16
**witness**  4:7  5:3
10:21  11:15, 17
13:3  15:17
16:18  18:20, 23
24:1  32:20
36:23  40:5  42:5
57:18  60:25
61:23  62:1, 4, 7
63:4, 18
**words**  20:22
**words.**  34:25
**work**  6:9  14:18,
18, 19, 23, 25
32:16, 24  33:3
52:18
**work.**  32:13
**worked**  52:21
**working**  6:13
7:15, 23  8:2, 24

11:24  14:16
15:9  27:4  44:18
48:11
**would**  17:23
18:21  19:16
44:13, 25  48:25
**written**  36:4
37:6, 8  38:25
56:18, 20
**wrong**  34:20
41:12  47:6, 14,
22  53:6, 11, 16
54:5  55:12, 13
**wrong.**  41:10

**< Y >**
**Yeah**  6:19  7:25
9:11  11:25
12:20  13:13
14:7  25:14, 17
26:2  27:7  32:23
41:1  43:8  44:17
51:14  53:6, 18
54:7  56:17
**yeah,**  46:14
**yeah.**  6:19  12:20
14:21  19:14
21:23  26:7
28:10  32:19
35:16  43:14
58:2  60:9, 19
62:1
**year**  27:7, 9
40:11, 25  41:17
53:14, 14, 16, 23
56:4  60:4, 4, 6, 8,
9
**year.**  40:10
53:15  60:7
**years**  27:5
**year's**  54:3
**years.**  6:12
**Yep.**  55:1
**Yes.**  4:20  5:5
6:10, 21  7:17
8:11, 14, 20, 23
9:3, 9, 21  10:23
11:8, 17  13:19,
22  14:1, 4  15:3,
5, 8  16:25  17:12

18:*5, 20*  19:*3, 8,
11*  20:*1, 7*  22:*10,
21, 23*  23:*1, 5, 9,
12, 16, 19*  24:*4,
17*  25:*23*  26:*12,
18*  27:*3, 8*  28:*6,
12*  29:*6*  30:*22,
25*  31:*3, 13, 18,
21*  32:*3*  33:*8, 12,
19*  34:*8*  35:*10,
13, 20*  36:*8*  37:*5,
10, 17, 19*  39:*2,
11, 17, 19*  40:*12*
41:*21*  42:*1*  43:*4*
44:*2, 5, 17, 21*
46:*2, 8, 18*  47:*7,
16*  48:*10, 13, 16,
18, 21, 24*  49:*3, 5,
12, 15, 19, 22*
50:*2, 6, 8*  51:*6, 8,
17, 20*  52:*5, 25*
53:*4*  54:*2*  55:*3,
5*  56:*2*  57:*15*
58:*7, 11, 14*  59:*6,
10, 20, 24*  60:*2,
13, 16, 25*
**yeses**  5:*7*
**you**  9:*12, 24*
10:*12, 17*  20:*3*
22:*11*  25:*20*
33:*9, 20*  35:*7*
36:*16*  39:*20, 23*
40:*13, 14*  41:*6,
22*  43:*1*  46:*5*
47:*5, 20, 21*  49:*7,
16*  50:*3*  54:*7*
55:*12*  57:*1*
**you,**  18:*15*  22:*4*
23:*20*  27:*11*  31:*7*
**you.**  15:*20*
47:*25*  57:*17, 18*
62:*6*
**you'd**  61:*13*
**your**  29:*12*
35:*11*  36:*11*
49:*20*  57:*13*
61:*20*
**you're**  4:*18*
23:*14*  28:*13*

34:*24*  51:*25*
58:*3*  59:*4, 22*
**you've**  22:*8*