FILED

2012 Jul-13  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL LINDSEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:11-CV-03183-WMA** |
| | ) | |
| **NCO FINANCIAL SYSTEMS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**COMES NOW,** the Plaintiff, Michael Lindsey, (hereinafter "Plaintiff") and responds in opposition to the Motion for Summary Judgment filed by Defendant, NCO Financial Systems, Inc., (hereinafter "Defendant"). The Plaintiff submits that neither the facts nor the law entitle the Defendant to summary judgment in this case as there exist genuine issues of material fact to be decided by a jury.

## INTRODUCTION

As an initial matter, based upon applicable Alabama case law, Defendant is entitled to summary judgment on Plaintiff's claims for negligence and negligent training and supervision. These are counts 2 and 4 in Plaintiff's amended

Page 1 of  27

complaint. The remaining counts made the subject of Defendant's motion for summary judgment are Plaintiff's claims of wantonness and wanton/reckless training and supervision.  Defendant did not seek summary judgment on Plaintiff's Fair Debt Collection Practices Act claims.

This case is based upon illegal collection phone calls made by Defendant's employee, Latisha Williams to Plaintiff's brother, Greg Lindsey and Plaintiff's step-mother, Kay Lindsey.  In both calls, Latisha Williams committed the exact same violations of the Fair Debt Collection Practices Act either because she was inadequately trained and monitored by Defendant or because, despite her training, she intentionally violated the law in order to harass and coerce Plaintiff into paying a debt.

Viewing the facts in a light most favorable to Plaintiff, Plaintiff respectfully submits that Defendant is not entitled to summary judgment.

## STATEMENT OF FACTS

Defendant NCO Financial Systems is a company engaged in the business of collecting consumer debts. (Deposition of Greg Stevens, attached hereto as "Exhibit 1," p. 74).

On or about June 7, 2011, an account allegedly belonging to Plaintiff was placed with Defendant for collection. (Exhibit 1, p. 39). Defendant attempted to

collect the account until June 27, 2011. (Exhibit 1, p. 39). In the twenty days the account was being collected by Defendant, Plaintiff was called eighteen times. (Exhibit 1, p. 37). Of those eighteen times, a message was left for Plaintiff five times. (Exhibit 1, p. 37). Plaintiff's outgoing voicemail message at the time of these calls clearly stated that the caller had reached "attorney Michael Lindsey." (*See* Deposition of Michael Lindsey, attached to Defendant's motion as Exhibit E, p. 97).  Despite having a correct and accurate telephone number for Plaintiff, Defendant contacted Plaintiff's step-mother and brother and asked both to deliver a message to Plaintiff.  This activity is prohibited and regulated by the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq. ("FDCPA").  In fact, the House Report on the FDCPA states: "a debt collector may not contact third persons such as a consumer's friends, neighbors, relatives, or employer. Such contacts are not legitimate collection practices and result in serious invasions of privacy, as well as the loss of jobs." S.Rep. No. 95-382, reprinted at 1977 U.S. Code Cong. & Admin. News 1695, 1699.

## I.    Latisha Williams' training at NCO

Greg Stevens, the corporate representative for Defendant, testified his agreement that Defendant understands that a collector who is not trained is likely to violate the Fair Debt Collection Practices Act as opposed to a collector who is

trained. (Exhibit 1, p 78).

Latisha Williams is a person employed by Defendant to collect debts. (Deposition of Latisha Williams attached to Defendant's Motion as "Exhibit B," p. 7). Ms. Williams, by her testimony, believes she has worked for Defendant since February 2009. (Defendant's Exhibit B, p. 6). Prior to working for Defendant, Ms. Williams had never had any other job in the debt collection field. (Defendant's Exhibit B, p. 6). According to Ms. Williams, she trained for "maybe like one or two weeks," prior to collecting debt for Defendant. (Defendant's Exhibit B, p. 11).

The case at bar deals with skiptracing or contacting third parties in the attempt to collect a debt. Contacting third parties is an activity strictly regulated by the Fair Debt Collection Practices Act. According to Ms. Williams, skiptracing is finding location information, better phone numbers and places of employment for debtors. (Defendant's Exhibit B, p. 12).

When asked about the training she received dealing with skiptracing, Ms. Williams stated, "I can't remember exactly what the training was." (Defendant's Exhibit B, p. 12). Ms. Williams testified that she could not remember anything specifically from her training. (Defendant's Exhibit B, p. 10). Ms. Williams further testified as follows:

Q.    Okay. Any other training about what to do and not to do involving

> skip tracing or third parties beyond that initial what you testified as one-to-two-week training period?
>
> A.   Any other training other than that after that?
>
> Q.   Yeah, that you can remember.
>
> A.   Besides that – besides, no.
>
> Q.   Okay. So that was it.
>
> A.   Yes.

(Defendant's Exhibit B, p. 51).

Ms. Williams did testify that, in reference to contacting third parties, her managers would do "side by sides" with her. (Defendant's Exhibit B, p. 14). "Side by sides" involve managers sitting with collectors and making sure the collectors are working their files correctly. (Defendant's Exhibit A, p. 28). Ms. Williams testified that she does not know how many side by sides have been done with her involving calls to third parties. (Defendant's Exhibit B, p. 14).

Pat DeProspo is the general manager at the call center where Ms. Williams works. (Defendant's Exhibit A, pp. 5-6). Defendant offers Mr. DeProspo's testimony as evidence of the quality of training that Defendant provides to its employees. (*See* Defendant's brief, pp. 3-5). Mr. DeProspo, however, testified that none of his job duties involve training collectors and that training is handled by an

entirely different department at NCO and that he was only "generally familiar," with NCO's training. (Defendant's Exhibit A, pp. 5, 23).

## II.    <u>Monitoring of phone calls</u>

Mr. DeProspo testified regarding NCO's monitoring of collector's calls. Mr. DeProspo testified that monitoring calls was as important if not more important than the testing in the training department. (Defendant's Exhibit A, p. 29). Mr. DeProspo testified that, as general manager, he requires his managers to "virtually get on every contact that a collector makes" in order to monitor the calls. (Defendant's Exhibit A, p. 29). Greg Stevens, the Vice-President for Compliance and Audit testified that every time a manager monitors a call, a call monitoring form is filled out. (Exhibit 1, p. 64). While there is some dispute regarding exactly how many of Ms. Williams' telephone calls were monitored, Defendant only produced nine call monitoring forms for the period of time between April 2010 and May 2011. (Exhibit A, p. 65). To put this number into perspective, Latisha Williams testified that she makes "hundreds" of calls per working shift. (Defendant's Exhibit B, p. 15).

## III.    <u>Collection calls at issue in this case</u>

Greg Stevens, defendant's corporate representative, testified that when calling a third party, according to NCO policy, a collector cannot volunteer that

they are calling from NCO Financial Systems without being expressly asked. (Exhibit 1, p. 30). Mr. Stevens further testified that NCO trains its collectors not to state that they are calling from NCO Financial Systems without being expressly asked when calling third parties. (Exhibit 1, p. 31).

Mr. Stevens also testified that it is against NCO's policy to ask a third party to deliver a message to a consumer unless expressly asked to do so. (Exhibit 1, p. 25).

Pat DeProspo, Latisha Williams' general manager, testified that it violates NCO policy to call third parties if NCO has a number for the consumer. (Defendant's Exhibit A, p. 39). Mr. DeProspo also testified that it is against NCO policy to state NCO Financial in a call to a third party unless the third party asks who is calling. (Defendant's Exhibit A, pp. 40, 42). Mr. DeProspo further testified that Ms. Williams' asking Kay or Greg Lindsey to deliver a message to Plaintiff violated NCO policy. (Defendant's Exhibit A, p. 45).

It is not disputed that on June 9, 2011, Latisha Williams called Kay Lindsey, Plaintiff's step-mother. A transcript of that phone call is attached to this deposition as "Exhibit 2." In that phone call, Latisha Williams stated the following:

> Hi Kay, this is Latisha Williams from NCO Financial Systems. Your number was, I have your number as a reference number for Michael Lindsey. Calls are monitored and recorded. I was unable to get in contact

with him. I am not sure if the number that I have is correct, would you have a good contact number for him or would you be able to relay a message to him?

(*See* Exhibit 2).

It is not disputed that on June 16, 2011, Latisha Williams called Gregory Lindsey, Plaintiff's brother. A transcript of that phone call is attached to this Deposition as "Exhibit 3."  In that phone call, Latisha Williams stated the following:

This is Latasha (sic) Williams from NCO Financial Systems. Calls are monitored and recorded. Your number was left as a reference number for Michael Lindsey and I was trying to get ahold of him. The number that I have is not–I don't think that it's a good number. Would you be able to give him a message to call me?

(*See* Exhibit 3).

In both calls Ms. Williams states that she is calling from NCO Financial Systems without being expressly asked, states that the number she is calling was left as "a reference number," and asks the person she is calling to deliver a message to Plaintiff.

Latisha Williams testified that she does not remember anything specific in her training about when she can or cannot ask a third party to have someone call her back. (Defendant's Exhibit B, p. 29). In fact, Ms. Williams testified that in or around June 2011, she would normally ask third parties to deliver a message to

consumers to call her back if she did not have a number for a consumer.
(Defendant's Exhibit B, p. 46). Though the calls took place in June 2011, Ms.
Williams testified that she believes she was notified that she had violated policy
this year or maybe last year. (Defendant's Exhibit B, pp. 40-41, 53).

When asked why she placed the calls to Greg and Kay Lindsey at all,
Latisha Williams' testimony was "I was unable to get in contact with the debtor."
(Defendant's Exhibit B, p. 29). Patrick DeProspo, the general manager at Latisha
Williams' workplace, testified that it violates NCO policy to call a third party if
they have a number for the consumer. (Defendant's Exhibit A, pp. 39-40). Based
upon the testimony of her manager, because they had a number for Plaintiff,
Plaintiff's relatives should have never been called.

### IV.  NCO's discipline of Latisha Williams

Ms. Williams testified that she has not received any discipline as a result of
Plaintiff's claims. (Defendant's Exhibit B, p. 41). NCO has a policy requiring
collectors to repay defense costs as a result of FDCPA claims, but Ms. Williams
has not paid NCO any money as a result of Plaintiff's claim. (Defendant's Exhibit
B, p. 42). Of Latisha Williams' six disciplinary records produced by the
Defendant that were dated before the incidents made the basis of this suit, three of
the records, dated July 6, 2010, January 3, 2011, and February 1, 2011 were

warnings to Ms. Williams issued because she was not collecting enough money for

NCO.  (Defendant's Exhibit B, pp. 35, 37).  Ms. Williams testified that it was her

understanding if she did not meet her goals of money collected for Defendant she

could be fired.  (Defendant's Exhibit B, p. 37).

Latisha Williams is paid an hourly wage by Defendant and receives a

commission or bonus if she collects more than her goal.  (Defendant's Exhibit B,

p.7).

### V.   <u>Plaintiff's Damages</u>

Plaintiff testified that, as a result of Defendant's actions, he suffered

"embarrassment, humiliation both personally and professionally."  (Defendant's

Exhibit E, p. 108). In fact, Plaintiff testified to feelings of humiliation or

embarrassment in his deposition numerous times. (Defendant's Exhibit E, pp. 82,

83, 92, 93, 108, 109, 111, 112). Plaintiff testified that, as of the date of his

deposition, he continues to feel embarrassment. (Defendant's Exhibit E, p. 109).

Plaintiff testified that he believes Defendant intentionally humiliated him.

(Defendant's Exhibit E, p. 109). Plaintiff also testified that he has a perception in

his mind that any time he is at a family function everyone knows about the

situation made the basis of his suit. (Defendant's Exhibit E, p. 114).  Plaintiff

testified that he has taught financial responsibility classes in his church and all

over the world on mission trips and that Defendant's actions have caused

embarrassment. (Defendant's Exhibit E, pp. 111-112).

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary

judgment is proper only when there is no genuine issue as to any material fact and

the moving party is entitled to a judgment as a matter of law. *Celotex Corp v.*

*Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "A dispute is

genuine 'if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'" *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 91 L. Ed.

2d 202, 106 S. Ct. 2505 (1986).

## ARGUMENT

**I.      ALABAMA LAW IS CLEAR THAT A PLAINTIFF DOES NOT HAVE TO SUFFER PHYSICAL INJURY OR BE WITHIN THE ZONE OF DANGER TO RECOVER DAMAGES STRICTLY FOR MENTAL ANGUISH OR EMOTIONAL DISTRESS AS A RESULT OF WANTONNESS.**

Defendant argues before this Court in its brief that, because Plaintiff did not

testify that he suffered physical injury and because he was not in the zone of

danger, he may not recover damages based solely on mental anguish or emotional

distress. For this erroneous proposition, Defendant relies on *Hardesty v. CPRM*

*Corp.*, 397 F.Supp.2d 1067, 1073 (M.D.Ala. 2005) and *Ex parte Gran Manor,*

*Inc.*, 778 So.2d 173 (Ala.2000) amongst other cases.  This simply is not the law.

Under Alabama law, when a plaintiff who claims only mental anguish and emotional distress damages and alleges only negligence, the zone of danger test and requirement of a physical injury would apply.  However, the zone of danger test and the physical injury requirement do not apply when a plaintiff claims mental anguish and emotional distress damages as a result of a defendant's wantonness.

The Alabama Supreme Court made this distinction as follows: "[D]amages for mental anguish and emotional distress are proper only in tort cases in which the plaintiff is in the 'zone of danger' or has suffered a physical injury **or the defendant's action constitutes wantonness**..."  *Birmingham Coal & Coke Co. v. Johnson,* 10 So.3d 993, 1000 (Ala.2008) (emphasis added).

In *Brown v. First Federal Bank,* 2012 Ala.Civ.App. LEXIS 37*,* the plaintiff did not allege any physical injury as a result of the tortious conduct of the Defendants nor was she in the zone of danger. For that reason her negligence claims were dismissed. However, with regard to her wantonness claims, the Alabama Court of Civil Appeals held that, "[a]s to [plaintiff's] wantonness claim against [defendant], however, damages for mental anguish are recoverable. Indeed '[i]t is well settled that a plaintiff may recover compensatory damages for mental

anguish, even when mental anguish is the only injury visited upon the plaintiff.'"
*Brown v. First Federal Bank*, 2012 Ala.Civ.App. LEXIS 37, *34. (quoting *George H. Lanier Mem'l Hosp. v. Andrews*, 901 So.2d 714, 725 (Ala. 2004).

In supporting a claim for mental-anguish damages, "[a] plaintiff is **required only to present some evidence of mental anguish**, and once the plaintiff has done so the question whether the plaintiff has suffered mental anguish and, if so, the question of how much compensation the plaintiff is entitled to for the mental anguish **are questions for the jury**." *Id.* at *35 (quoting *Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166, 178 (Ala.2000) (emphasis added).

"A physical injury or physical symptom is not a prerequisite for a finding of mental anguish." *Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166, 178 (Ala.2000) (citing *Kmart Corp. v. Kyles*, 723 So.2d 578 (Ala.1998).

The Alabama Supreme Court has found that "mental anguish includes anxiety, **embarassment**, anger, fear, frustration, disappointment, worry, annoyance and inconvenience." *Slack v. Stream*, 988 So.2d 516 (Ala.2008) (quoting *Horton Homes, Inc. v. Brooks*, 832 So.2d 44, 53 (Ala.2001).

There is no requirement under current Alabama law that a plaintiff suffer some physical injury or be in the zone of danger to recover damages for mental anguish or emotional distress, especially when damages are claimed as a result of

claims of wantonness. As such, Defendant's motion for summary judgment on this ground is due to be denied.

## II.   GENUINE ISSUES OF MATERIAL FACT EXIST WITH REGARD TO WHETHER OR NOT PLAINTIFF SUFFERED MENTAL ANGUISH OR EMOTIONAL DISTRESS.

Defendant claims that "plaintiff's has failed to offer sufficient evidence of mental damages to support those claims as a matter of law." (*See* Defendant's Brief at 11). To support this contention, Defendant relies on only one case, *Southern Bakeries, Inc. v. Knipp*, 852 So.2d 712 (Ala.2002).

The case at bar is easily distinguishable from the *Knipp* case. The plaintiffs in *Knipp* were allegedly exposed to asbestos while removing an oven and claimed mental anguish due to "a greater risk of developing lung cancer and other diseases of the lungs in the future." *Id* at 714. The plaintiffs in *Knipp* had not developed any lung injury at the time of the complaint. *Id.* at 715. The Alabama Supreme Court declined to find any legally cognizable injury based upon the evidence and held that, "Opening the courts generally for compensation for fear of future disease would be a dramatic change in the law and could engender significant unforeseen and unforeseeable consequences." *Id*. at 718. The fear of future disease is not present in this case.  Defendant also claims that, based upon the holding in *Knipp*, because Plaintiff did not seek medical attention, he cannot have

any claim for mental anguish.    This is contrary to Alabama law.

"The presence of a physical injury or physical symptoms is not a prerequisite for a claim of damages for mental anguish, and that once the plaintiff has presented **some evidence** of mental anguish, 'the question of damages for mental anguish is for the jury.'" *National Insurance Association v. Sockwell* 829 So.2d 111, 133 (Ala.2002) (quoting *Alabama Power v. Harmon*, 483 So.2d 386, 389 (Ala.1986) (emphasis added).

In *Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166 (Ala.2000), a plaintiff claimed mental anguish damages and **sought no medical treatment**. The Alabama Supreme Court in *Goodman* quoted the language above that physical symptoms and injury are not a prerequisite for a finding of mental anguish and echoed that a plaintiff is required only to present some evidence of mental anguish to get the question of how much compensation is due for the mental anguish to a jury. *Goodman* at 178.

In addition to the *Goodman* case, Alabama appellate courts have allowed mental anguish damage verdicts to stand in other cases even when there is no testimony from medical providers or no medical treatment.

In *Kmart v. Kyles*, the only evidence of mental anguish was the plaintiff's husband's testimony that his wife "cried" when she called him to tell him she had

been arrested. *Kmart v. Kyles*, 723 So.2d 572, 577-578 (Ala.1998).  The Alabama Supreme Court remitted the jury's verdict, but allowed it to stand despite no evidence of medical treatment for emotional distress.

Other compensatory awards have been affirmed in other types of cases since the beginning of the noticeable political shift in the Alabama Supreme Court, as well. *George H. Lanier Mem. Hosp. v. Andrews*, 901 So.2d 714 (Ala.2004) (**$100,000** compensatory award for mental anguish to each parent in negligence case affirmed – no psychiatrist testified); *Orkin Exterm. Co. v. Jeter*, 832 So.2d 25 (Ala. 2001)(remitting to **$200,000** compensatory award for mental anguish, despite fact that plaintiff died after only 9 months of endurance; no psychiatrist testified); *Horton Homes, Inc. v. Brooks*, 832 So.2d 44 (Ala.2001) (**$138,000** compensatory award for mental anguish affirmed in breach of warranty case; no psychiatrist testified); *National Ins. Ass'n v. Sockwell*, 829 So.2d 111 (Ala.2002) (**$201,000** compensatory award for mental anguish affirmed in "bad faith" case; no psychiatrist testified); *Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166 (Ala.2000) (**$200,000** compensatory award for mental anguish affirmed in malicious prosecution case; no psychiatrist testified); *Southern Energy Homes, Inc. v. Washington*, 774 So.2d 505 (Ala.2000) (**$375,000** compensatory award for primarily mental anguish affirmed, breach of warranty case; no psychiatric

Page 16 of  27

testimony).

Some would question the value of pre-2000 citations, but for those bored or interested, see also *Gray Brown-Service Mortuary, Inc. v. Lloyd*, 729 So.2d 280 (Ala. 1999) (**$2 million** compensatory award for mental anguish in "outrage" case for botched funeral affirmed; no psychiatric testimony); *First Commercial Bank v. Spivey*, 694 So.2d 1316 (Ala.1997) (**$500,000** compensatory award, most of which was for mental anguish; no psychiatrist testified); *Duck Head Apparel Co., Inc. v. Hoots*, 694 So.2d 1316 (Ala.1997) (this Court ordered remittiturs of compensatory awards for mental anguish to **$2,000,000**, **$1,000,000**, and **$500,000** for salesmen in fraud case; no psychiatrist testified); and *Sperau v. Ford Motor Co.*, 674 So.2d 24 (Ala.1995) (**$200,000** and **$500,000** compensatory awards, as remitted by trial court, for mental anguish in fraud case affirmed; no psychiatrist testified).

Defendant's reliance on *Knipp* is misplaced as that case is distinguishable from the present case. Alabama law does not require a plaintiff to seek and receive medical treatment or present medical evidence as a pre-requisite to receiving compensatory damages as a result of mental anguish or emotional distress. While Plaintiff's lack of medical treatment for mental anguish may factor in to a jury's determination of the amount of damages, it is not an absolute bar to his potential recovery of those damages. Per Alabama law, a jury should decide Plaintiff's

damages because he has presented "some evidence" of mental anguish. As such he cannot be found to not have suffered emotional distress or mental anguish as a matter of law.

**III.  THERE IS SUBSTANTIAL EVIDENCE THAT DEFENDANT'S CONDUCT WAS WANTON SUCH THAT A JURY COULD REASONABLY INFER WANTONNESS**.

Defendant asks this Court to find as a matter of law that it is not liable to Plaintiff for wantonness because "NCO did not consciously or intentionally commit a wrongful act which produced injury to the plaintiff."  (Defendant's Brief at 14).   As an initial matter, the Alabama Supreme Court has held that "recklessness and wantonness are fundamentally different concepts than intent, and that claims alleging reckless or wanton conduct are distinctively different types of claims than those alleging intentional harm to a plaintiff.  *Ex parte Capstone Bldg. Corp*., 2012 Ala. LEXIS 32.  A defendant can be found to be guilty of wanton conduct without any evidence of intent to harm a plaintiff.

Wantonness has been defined by the Alabama Supreme Court as "the conscious doing or some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."  *Bozeman v. Central Bank of the South*, 646

So.2d 601.

Greg Stevens, the corporate representative for the Defendant testified that Defendant knows that if its collectors do not comply with the FDCPA, then consumers' rights can be violated. (Exhibit 1, p. 8). He further agreed under oath that Defendant knows that a collector that is not trained is **likely** to violate the law as opposed to a collector that is trained. (Exhibit 1, p. 78).

Whether or not Defendant adequately trained or monitored Latisha Williams or omitted that duty is a genuine issue of material fact in this case. Based upon Mr. Stevens' sworn testimony, this Defendant is conscious that if it omits to properly train its collectors or if the collectors do not comply with the requirements of the FDCPA then violations of the law and subsequent harm from the violations **are likely to occur**.

In this case, Defendant has offered testimony that Latisha Williams was adequately trained and monitored and that her violations of the FDCPA were simply "mistakes."  Plaintiff has offered Latisha Williams' testimony that she only had one to two weeks of training that involved skip tracing and contacting third parties. (Defendant's Exhibit B, p. 51). When asked about the training she received dealing with skiptracing, Ms. Williams stated, "I can't remember exactly

what the training was." (Defendant's Exhibit B, p. 12). Ms. Williams testified that she could not remember anything at all specifically from her training. (Defendant's Exhibit B, p. 10). Based upon this evidence, viewed in a light most favorable to Plaintiff, a jury could reasonably infer that Latisha Williams was not trained adequately despite Defendant's knowledge that failure to train its collectors makes them likely to break the law and cause harm.

Defendant has offered evidence that monitoring its collectors for compliance is as important as the initial collector training. With regard to monitoring and her "mistakes," Latisha Williams testified that "I wasn't notified that I was doing wrong until after the two calls was–after they seen the two calls, if they would have stopped me the first call, there would have never been a second call." (Defendant's Exhibit B, p. 53).

Mr. DeProspo testified that he requires his managers to "virtually get on every contact that a collector makes" in order to monitor the calls. (Defendant's Exhibit A, p. 29). There is testimony from the Defendant's corporate representative that every time a manager monitors a call, a call monitoring form is filled out. (Exhibit 1, p. 64). While there is some dispute regarding exactly how many of Ms. Williams' telephone calls were monitored, Defendant only produced nine call monitoring forms for the period of time between April 2010 and May

2011. (Exhibit A, p. 65). Latisha Williams testified that she makes "hundreds" of calls per working shift. (Defendant's Exhibit B, p. 15). If Latisha Williams was being monitored as Defendant claims, there likely would be hundreds of monitoring forms for over a year's time, not nine. Given this contradictory evidence, a jury could reasonably infer that little or no monitoring of calls took place and that, as Latisha Williams testifed, had adequate monitoring taken place, the second illegal phone call (and likely the first illegal phone call ) would not have happened.

As more evidence that Defendant engaged in very limited monitoring of calls, Latisha Williams testified that at the time of the calls at issue she normally would ask third parties to deliver messages for her, in violation of the law. (Defendant's Exhibit B, p. 46). Later, she contradicted herself and stated that she can only leave a message with a third party when she calls a consumers' number and in no other circumstance. (Defendant's Exhibit B, pp. 56-57). Again, given this contradictory evidence, a jury could reasonably infer that little or no monitoring of calls took place and that, as Latisha Williams testifed, had adequate monitoring taken place her illegal conduct would have ceased.

Upon being questioned by Defendant's counsel at her deposition, Ms. Williams testified that she was trained not to state the company name without

being expressly asked and that she was trained not to ask third parties to deliver messages.  (Defendant's Exhibit B, pp. 49-50).  She further testified that the fact that she did these two exact same things in two calls a week apart on the same account was simply "a mistake."  (Defendant's Exhibit B, pp. 49-50).   In an unexplained contradiction, Ms. Williams also testified in her deposition that in or around June 2011, she would normally ask third parties to deliver a message to consumers to call her back if she did not have a number for a consumer.  (Defendant's Exhibit B, p. 46).  Most incredible, however, is that Ms. Williams testified that the only time she made these "mistakes" was in these two particular calls on the same account that took place a week apart.  (Defendant's Exhibit B, p. 57).

        If a jury believed that Ms. Williams was in fact appropriately trained by Defendant, that jury could reasonably infer that Ms. Williams knew she was not supposed to call third parties if she had a contact number for Plaintiff, that she was not supposed to identify her company without being expressly asked and that she was not supposed to ask third parties to deliver messages to consumers, but did so anyway, causing harm.  The jury could further infer that Defendant never appropriately monitored her to discover her wrongdoing.

        The choice presented by the evidence is as follows, either Defendant failed

to properly train Latisha Williams and, as such there is evidence of wantonness based upon Defendant's employee's sworn testimony that Defendant is conscious that if it fails to train its employees, they are likely to cause harm **or** Defendant did train Latisha Williams, but failed to monitor her and, based upon the incentive of commissions if she collected more money, she recklessly or wantonly used illegal debt collection tactics.

Given Ms. Williams' disciplinary history, including three warnings for failing to collect enough money for Defendant with the knowledge that failing to collect enough could get her fired, a reasonable jury could infer that Ms. Williams let Kay and Greg Lindsey know that she was calling from NCO Financial, told them falsely that they were "references" and asked them both independently to deliver messages to Plaintiff as a means to embarrass, humiliate and coerce Plaintiff into paying a debt and increase her amount collected and potential bonus from Defendant.  A reasonable jury could infer that since Ms. Williams was compensated in part based upon commissions, she had a financial interest at stake when she engaged in her illegal debt collection tactics.

"If there is **<u>any evidence</u>** from which a jury can reasonably infer wantonness, the issue should be presented to the jury." *Sellers v. Sexton*, 576 So.

2d 172, 175 (Ala. 1991) (citations omitted) (emphasis added). It is for a jury to decide whether or not Defendant's acts or omissions were wanton. Plaintiff has presented substantial evidence that Defendant knew it must train its employees otherwise the employees would likely cause harm. Despite this knowledge, Plaintiff has presented evidence that Defendant failed to adequately train or monitor Latisha Williams. As a result, Plaintiff suffered damage. Defendant is  not entitled to summary judgment on Plaintiff's wantonness claim as genuine issues of material fact exist.

### IV.    PLAINTIFF'S CLAIM OF WANTONNESS SHOULD BE DECIDED BY A JURY AS SHOULD HIS CLAIM OF WANTON TRAINING AND SUPERVISION.

As Defendant points out in its brief, a claim for wanton supervision requires the plaintiff to establish by affirmative proof that the employer actually knew of the employee's incompetence or reasonably should have know of it. *Speigner v. Shoal Creek Drummond Mine*, 402 F.App'x 428, 433 (11th Cir. 2010). As stated above, there is a question of fact with regard to whether or not Defendant adequately trained or monitored Latisha Williams.

Defendant relies on Pat DeProspo's testimony regarding the adequacy training even though Mr. DeProspo candidly admitted in his deposition that none

of his job duties involve training collectors and that training is handled by an entirely different department at NCO and that he was only "generally familiar," with NCO's training. (Defendant's Exhibit A, pp. 5, 23). Further, again, Latisha Williams testified basically that she had no memory of her training and that other than a one to two week period, she had not received other training on third party contacts, the basis of this lawsuit.

Defendant also claims that Plaintiff's wanton training and supervision claim should fail because "in response to the mistakes, NCO disciplined [Latisha Williams] pursuant to its disciplinary policy and provided her with additional training."  (Defendant's Brief at 19). Defendant further writes in its brief that it "acted appropriately and by no means 'disregarded its agent's incompetence.'" (Defendant's Brief at 19-20).

Though the calls took place in June 2011, Ms. Williams testified that she believes she was only notified that she had violated policy this year or maybe last year. (Defendant's Exhibit B, pp. 41, 53). Ms. Williams testified that she has not received any discipline because of Plaintiff's claims. (Defendant's Exhibit B, p. 41). She only testified that she signed something that "probably was like a written warning or something."  (Defendant's Exhibit B, p. 56). Further when shown all the disciplinary forms produced by Defendant, she could not remember what **any**

of the write ups were for or why she received them. (Defendant's Exhibit B, pp.

36-40). She further did not testify that she received any additional training as a

result of the disciplinary forms. (Defendant's Exhibit B, pp. 38, 40).

<u>**CONCLUSION**</u>

Defendant is not entitled to summary judgment on all of Plaintiff's claims.

Plaintiff has produced substantial evidence that genuine issues of material fact

exist with regard to Plaintiff's claims of wantonness and wanton training and

supervision such that they are due to go before a jury. Viewing the facts in a light

most favorable to Plaintiff, Defendant has not shown that it is due judgment as a

matter of law on any of Plaintiff's claims except the claims of negligence and

negligent hiring, training and supervision. As such, Plaintiff respectfully requests

that this Court enter an Order denying summary judgment to Defendant.

*/s/W. Whitney Seals*
W. WHITNEY SEALS,
Attorney for Plaintiff

**OF COUNSEL:**
**PATE & COCHRUN, LLP**
P. O. Box 10448
Birmingham, AL 35202-0448
Telephone: (205) 323-3900
Fax: (205) 323-3906
filings@plc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the <u>13th</u> DAY OF <u>July</u>, 2012,that the foregoing is electronically filed with the Clerk of the Court using the CM/ECF system, the CM/ECF system will send notification of such filing to the following;

Allison L. Cannizaro, Esq.

James Schultz, Esq.

Sessions, Fishman & Nathan, LLP

3850 N. Causeway Blvd., Ste 1240

Metairie, LA 70002-1752

Phone:  (504) 828-3700


Laura C. Nettles, Esq.

Lloyd, Gray, Whitehead & Monroe, P.C.

2501 20th Place South, Ste. 300

Birmingham, AL 35223

Phone:  (205) 967-8822

Fax:      (205) 967-2830


and I hereby certified that I have mailed the foregoing document by U.S. Mail, postage prepaid, to the following:

SAME AS ABOVE.

<u>/s/W. Whitney Seals</u>

OF COUNSEL