FILED
2012 Jul-13  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT "1"

**GREG STEVENS**                                              03/20/2012

---

### Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION
CASE NO: 2:11-CV-03183-WMA

MICHAEL LINDSEY,
    Plaintiff,
vs.
NCO FINANCIAL SYSTEMS, INC.,
    Defendant.

_____/

DEPOSITION OF:  GREG STEVENS
DATE TAKEN:    March 20, 2012
TIME:          12:45 p.m. - 2:30 p.m.
PLACE:         3350 Buschwood Park Drive
               Tampa, Florida 33618

TAKEN BY:      W. Whitney Seals, Esquire

REPORTED BY:   Linda Barros
               Court Reporter - Notary Public

---

### Page 2

APPEARANCES:
W. WHITNEY SEALS, ESQUIRE
OF: Pate & Cochrun, LLP
    400 Title Building
    300 North 21st Street
    Birmingham, Alabama 35203
    205-232-3900

    APPEARING ON BEHALF OF THE PLAINTIFF

JAMES K. SCHULTZ, ESQUIRE
OF: Sessions Fishman Nathan & Israel, LLP
    55 West Monroe Street
    Suite 1120
    Chicago, Illinois 60603
    312-578-0990

    APPEARING ON BEHALF OF THE DEFENDANT

    Appeared Telephonically Allison L.
    Cannizaro, Esquire

---

### Page 3

CONTENTS
TESTIMONY OF GREG STEVENS
   Direct Examination by Mr. Seals...........4

CERTIFICATE OF OATH.....................80
CERTIFICATE OF REPORTER.................81

EXHIBITS

Plaintiff's Exhibit A.........................10
   (Notice to take Deposition)
Plaintiff's Exhibit B.........................15
   (Training Manual)
Plaintiff's Exhibit C.........................17
   (Compliance Memo Acknowledgement)
Plaintiff's Exhibit D.........................33
   (Recorded statement Greg Lindsey)
Plaintiff's Exhibit E.........................33
   (Recorded statement Kay Lindsey)
Plaintiff's Exhibit F.........................33
   (Fact Sheet)
Plaintiff's Exhibit G.........................49
   (Telephone Monitoring Form)
Plaintiff's Exhibit H.........................73
   (Repayment Policy, NCO)
Plaintiff's Exhibit I.........................74
   (Answer & Affirmative Defenses)

- - - - -

STIPULATIONS

It is hereby agreed and so stipulated by
and between the parties hereto, through their
respective counsel, that the reading and signing
of the transcript are expressly waived by the
Deponent.

---

### Page 4

PROCEEDINGS
*********

    THE REPORTER:  Do you swear or affirm that
the testimony you are about to give will be the
truth, the whole truth, and nothing but the
truth?
    THE DEPONENT:  I do.
    GREG STEVENS,
having been first duly sworn, testified under oath
as follows:
    DIRECT EXAMINATION
BY MR. SEALS
    Q.  Mr. Stevens, my name is Whitney Seals.  I
represent a gentleman named Mike Lindsey who has
filed a lawsuit against NCO Financial in federal
court in Birmingham.  The purpose, of course,
today is just to ask some questions pursuant to
the 30(b)(6) notice that was sent out.  Have you
given a deposition before?
    A.  Yes.
    Q.  So you understand answer out loud.  If you
don't understand one of my questions we'll go back
and forth until we at least have some sort of
understanding.
    A.  Correct.

---

1 (Pages 1 to 4)

**GREG STEVENS**                                    **03/20/2012**

Page 5

1 Q. Okay. Good. If you would, we'll start
2 with an easy question. Would you tell us your
3 full name?
4 A. Greg Stevens.
5 Q. And who is your current employer and what
6 is your job title?
7 A. NCO Financial Systems.
8 Q. Okay. And your job title, sir?
9 A. Current title is vice president of
10 compliance and audit.
11 Q. And how long have you been with NCO?
12 A. It was part of an acquisition in 1998.
13 Q. What was the prior company?
14 A. Compass Receivables Management.
15 Q. And how long were you with Compass
16 Receivables?
17 A. About two years, which that was part of an
18 acquisition as well.
19 Q. Do you mind if I ask you the company that
20 was?
21 A. Financial Claims Control.
22 Q. How long were you with Financial Claims
23 Control?
24 A. Since 1985.
25 Q. Other than those jobs have you had other

Page 6

1 jobs in the debt collection field?
2 A. I worked for GC Services. I'm looking at
3 '82 to '83 maybe.
4 Q. Any other jobs?
5 A. I worked for a finance company between '83
6 and '85.
7 Q. Okay. All right. And because this may be
8 read to a jury, would you mind telling us just
9 basically what your job duties are as vice
10 president of compliance and control?
11 A. That's actually a new position, about a
12 month now. Part of compliance is state
13 regulations. Any new things that come out, FDCPA,
14 all that type of stuff. Anything to do with
15 compliance, making sure we adhere to client
16 standards, client requirements, and also audit
17 those functions as well.
18 Q. Does your job duties include any sort of
19 training functions?
20 A. No.
21 Q. When you say compliance -- and this is
22 probably going to sound idiotic, bear with me. I
23 assume you have to have at least a good working
24 knowledge of the FDCPA to advise your employer on
25 compliance. Is that fair?

Page 7

1 A. Yes.
2 Q. Do you understand that NCO has designated
3 you as the corporate representative today and that
4 your answers are binding on NCO to these
5 questions?
6 A. Yes.
7 Q. We talked about it earlier, if I use the
8 term FDCPA, you understand what I'm talking about?
9 A. Yes.
10 Q. Now I know that you've worked with debt
11 collection companies as far as back as 1982. Can
12 you tell me what specific training you have
13 relative to the FDCPA?
14 A. Throughout those different companies as
15 FDCPA has evolved or changed or they reinterpreted
16 we received updates. We've taken FDCPA tests
17 annually with NCO.
18 Q. Okay. So it's an ongoing training. Is
19 that a fair statement?
20 A. Yes.
21 Q. As the law evolves or changes --
22 A. Right.
23 Q. -- you have to stay up to date?
24 A. Correct.
25 Q. And just so I'm absolutely clear, what's

Page 8

1 your understanding of the purpose of the FDCPA?
2 A. Provides guidelines to us to protect --
3 and to protect collection agencies and protect the
4 consumer from unfair practices.
5 Q. Okay. So it's a fair statement it sets
6 outs consumers rights and a debt collector's
7 obligations. It that a fair statement?
8 A. Somewhat, yeah.
9 Q. Is there any way that's not a fair
10 statement? You say somewhat.
11 A. No.
12 Q. Is it fair to say that NCO understands if
13 its collectors don't comply with the FDCPA, then
14 consumers rights can be violated?
15 A. Yes.
16 Q. All right. Now I would assume that in all
17 of the years that you've been in debt
18 collection -- and just doing the math roughly in
19 my head, it seems like it's probably almost 30
20 years. Is that right?
21 A. Correct.
22 Q. In all those 30 years is it a fair
23 statement to say you had to have training each
24 year, at least to stay up to date with the FDCPA?
25 A. I wouldn't say it's every year, but as

**FREEDOM COURT REPORTING    877-373-3660**

**GREG STEVENS**                                                03/20/2012

Page 9

1   things change or evolve, like you said earlier,
2   different updates, yes.
3      Q.   And you mentioned the finance company job,
4   other than that job have you had any other jobs
5   outside of the debt collection industry in your
6   professional life?
7      A.   No.
8      Q.   Now have you ever given a deposition
9   before?  I think you said you had.
10     A.   I have.
11     Q.   What were the circumstances?
12     A.   Different cases for NCO.
13     Q.   Have you ever given a deposition in any
14  other context other than for NCO?
15     A.   No.
16     Q.   All right.  Can you tell me how many
17  depositions you have given for NCO?
18     A.   Approximately six or eight.
19     Q.   Six or eight?  Okay.  Do you mind telling
20  me when the most recent one is?
21     A.   I don't know the exact date.  Within the
22  last six months.
23     Q.   All right.  Okay.  Have you ever testified
24  in open court?
25     A.   No.

Page 10

1      Q.   And I ask everyone this, so please don't
2   be offended.  Have you ever been convicted of a
3   crime?
4      A.   No.
5      Q.   Now I want to show you what I have
6   marked -- what I will mark as Exhibit A to your
7   deposition.  And this is a deposition notice.
8   Have you seen this before, sir?
9         (Plaintiff's Exhibit A was marked for
10        identification.)
11     A.   Yes.
12     Q.   It's got certain topics on it, and I
13  wanted to ask you as quickly as I could, are there
14  any topics on here that you were not prepared to
15  testify about today?
16        MR. SCHULTZ:  Subject to the objections
17     that we've raised, and we can talk about those
18     if you want to.
19  BY MR. SEALS:
20     Q.   We can go through them.  We've got those
21  objections Friday.  So the defendant's
22  investigation into the claims made by the
23  plaintiff in this complaint.  Are you prepared to
24  talk about that?
25     A.   Yes.

Page 11

1      Q.   The methods, practices, techniques and
2   strategies used by defendant in training
3   collection employees.  Are you prepared to talk
4   about that?
5      A.   Yes.
6      Q.   The collection methods, practices,
7   techniques, strategies used by the defendant in
8   its efforts to collect debts from any person.  Are
9   you prepared to talk about that?
10     A.   Yes.
11     Q.   The management, supervision and discipline
12  of defendant's collection employees.  Can you talk
13  about that today?
14     A.   Yes.
15     Q.   The details and contents of the personnel
16  files of any person who is involved in any
17  collection activities related to the plaintiff's
18  alleged account.  And to qualify number five,
19  we're only referring to Latisha Williams.
20        I haven't seen any other personnel files
21  and don't know that I will.  Can you talk about
22  her personnel file today?
23     A.   Yes.
24     Q.   The use of alias names by any defendant.
25  It's my understanding NCO does not use alias

Page 12

1   names.  Is that correct?
2      A.   That's correct.
3      Q.   So six is a little bit irrelevant.
4   Documentation methods, if any, whether a
5   computerized manual or other of all activities
6   undertaken by the defendant or its employees or
7   agents related to the collection of accounts.  Can
8   you talk about that today?
9      A.   Yes.
10     Q.   The collection account records and notes
11  pertaining to the alleged debt which is being
12  collected by defendant from plaintiff and which is
13  the subject matter of this lawsuit.  Can you talk
14  about those records?
15     A.   Yes.
16     Q.   The telephone systems, local, long
17  distance services used by defendant and its
18  collection employees and agents in the course of
19  their business or in the course of collecting
20  accounts.  Is that something you can talk about?
21        MR. SCHULTZ:  That would be one of the
22     subjects that he hasn't been specifically
23     prepared on.
24        MR. SEALS:  I don't know that I'm going to
25     go into that, frankly.

                                    3  (Pages 9 to 12)

**GREG STEVENS**                                        03/20/2012

---

Page 13

1      MR. SCHULTZ: Because I think as we admit
2  in our objections, I'm not sure what the
3  relevance is. I think generally Greg can
4  testify about that stuff, but depending how
5  much you want to dive down into that --
6      MR. SEALS: I understand.
7      MR. SCHULTZ: Okay.
8  BY MR. SEALS:
9      Q.  Let me skip a few on those phones. If we
10  have to go back on it, I get it. How about the
11  factual basis for the defendant's answer? Is that
12  something you can talk about today?
13     MR. SCHULTZ: If you don't mind, if we
14  take out number nine, ten, eleven and twelve,
15  which I think all deal with the phone system,
16  he's prepared -- we'll stipulate he's prepared
17  to testify about everything else.
18     MR. SEALS: That makes it much easier.
19  Thank you.
20  BY MR. SEALS:
21     Q.  Now --
22     MR. SCHULTZ: I'm sorry. And number 19.
23  We're not going to go into 19. And, Whitney,
24  I'm not trying to be difficult, but number 19
25  is not a subject matter that we believe is

---

Page 14

1  relevant in any way in this case and to the
2  extent that you want to get into that, it's
3  going to have to be after we lose a motion.
4      MR. SEALS: Fair enough. If we have to,
5  we'll file it. Everything -- so I'm clear on
6  the record, everything except nine, ten,
7  eleven, twelve and nineteen. Is that correct
8  or incorrect?
9      MR. SCHULTZ: Correct. I'd say yes, but
10  I'm sure you'd like Greg to answer that one.
11     A.  Yes.
12  BY MR. SEALS:
13     Q.  Okay. All right. Now what documents
14  specifically do you recall reviewing prior to the
15  deposition today?
16     A.  I've looked at her personnel file.
17     Q.  Okay.
18     A.  The training memos, training package, the
19  account notes, and I've listened to recordings.
20     Q.  How recently have you reviewed those items
21  you've discussed?
22     A.  The account notes today, the recordings
23  today and her personnel file today.
24     Q.  The training memo, training package, would
25  it be a fair statement that you were familiar with

---

Page 15

1  those documents before you came here today?
2      A.  Yes.
3      Q.  Are those documents -- I've received a
4  couple versions, but I think I have the most
5  recent version, and we can go into that in a
6  moment, but those training memos and training
7  packages haven't changed significantly since June
8  2011, have they?
9      A.  Not that I'm aware of.
10     Q.  Okay. That's fair. I think we talked
11  about it, did you have a chance to review what I'm
12  going to mark as Exhibit B, which is the collector
13  training manual. Sir?
14     (Plaintiff's Exhibit B was marked for
15  identification.)
16     A.  I'm aware of it, yes.
17     Q.  Did you review it at all before today?
18     A.  I've seen it in the past, yes.
19     Q.  Okay. Now as far as you know, this
20  collector training manual was provided to Latisha
21  Williams. Is that correct?
22     A.  Correct.
23     Q.  Is this the manual that NCO would provide
24  to each one of its collectors?
25     A.  Yes.

---

Page 16

1      Q.  And so we're clear, Ms. Williams is still
2  employed with NCO, correct?
3      A.  Yes.
4      Q.  Now before you started working in the debt
5  collection field did you know anything about the
6  FDCPA?
7      A.  No.
8      Q.  Would you have any reason to know anything
9  about the FDCPA before working in the field?
10     A.  No.
11     Q.  NCO understandably trains its collectors
12  on what the FDCPA is. Is that correct?
13     A.  Correct.
14     Q.  In fact, I think that this manual has an
15  entire section that is introduction to FDCPA and
16  explanation of FDCPA. Is that right?
17     A.  Correct.
18     Q.  Now you would agree with me, I hope, that
19  it's important that NCO train its collectors with
20  regard to the FDCPA, correct?
21     A.  Yes.
22     Q.  I want to show you what I'm going to mark
23  as Exhibit C, and ask you if you recognize this
24  document. If you don't want to lug those back you
25  can pile them up over here. That's fine.

---

**FREEDOM COURT REPORTING    877-373-3660**

**GREG STEVENS**                                    **03/20/2012**

Page 17

1      (Plaintiff's Exhibit C was marked for
2  identification.)
3      A.  Yes.  It's a memo that collectors sign or
4  an acknowledgement.
5      Q.  Is it required or does NCO require all the
6  collectors to sign this?
7      A.  Yes.
8      Q.  And so I'm clear, I assume NCO University
9  is NCOs training program.  Is that correct?
10     A.  It's part of it, yes.
11     Q.  What is NCO University?
12     A.  It's just a tile they use to send out
13  communications for training, additional modules
14  for, you know, it could be maybe Excel or Word,
15  that kind of thing just related to a job.
16     Q.  Okay.  And when -- in the course of
17  training when would a collector sign this
18  document?  And not to be cryptic, the reason I
19  ask, it says by demonstrating my knowledge and by
20  affirming my signature, I agree to comply with all
21  debt collection laws.
22      That makes me think that maybe they take a
23  test or this is like the last thing they sign.  Is
24  that correct?
25     A.  Yeah.  During training, yes.

Page 18

1      Q.  And I understand there were several of
2  these or a couple of these produced.  Is this
3  something that they're required to sign every
4  year?
5      A.  I'm not sure if it's every year for this.
6  It would probably be likely if they're taking the
7  test, they understand at that point there may be a
8  different memo, but it would be something similar
9  to this, yes.
10     Q.  Okay.  And NCO, you're the director or the
11  vice president of compliance.  NCO trains its
12  collectors to comply with the FDCPA to prevent
13  FDCPA violations.  Is that a fair statement?
14     A.  Yes.
15     Q.  Because is it a fair statement also NCO
16  understands you train these collectors with regard
17  to the FDCPA because if you don't train them
18  they're more likely to violate the how if they
19  don't know what to do.  Is that a fair statement?
20     A.  Yes.
21     Q.  Now in fact does NCO let collectors
22  actually have consumer contact until they've been
23  trained?
24     A.  No.
25     Q.  And that includes Latisha Williams, I

Page 19

1  would assume.
2      A.  Correct.
3      Q.  Now as far as you know, and based on
4  everything you've got, is it a fair statement
5  Latisha Williams received training from NCO on the
6  FDCPA?
7      A.  Yes.
8      Q.  And we've looked at some of this.  I know
9  you reviewed the personnel records.  Can you tell
10  me specifically what training she had before say
11  June 2011 when what we're here about took place?
12     A.  I'd have to go back through some of the
13  documents that are filed, but --
14     Q.  Sure.  And I would assume there's a
15  standard training course that all the collectors
16  have to take.
17     A.  That's correct.
18     Q.  And I know that she started working in
19  February of 2010 and these incidents took place in
20  June of 2011, so that would be a little more than
21  a year.  What kind of training would you expect
22  generally for a collector to have between hire
23  date and about a year and a half later?
24     A.  They go to initial training at hire where
25  everything is gone over with them.  There is

Page 20

1  supplemental training that goes on based on how
2  the collector is performing.  There may be
3  retraining if there's an issue that comes up.
4      If new laws come out, new requirements,
5  new company policy, that information is sent to
6  the training department.
7      Q.  If a new law comes out or something that
8  affects what NCOs collectors are doing, how are
9  they notified that there's a change in what they
10  have to do?
11     A.  Depending on what it is, again, if it's
12  some sort of requirement, internal requirement or
13  external, some change in the law or state law, it
14  goes through the training department.  Either a
15  site trainer or a manager or a supervisor presents
16  that information to the collectors and they will
17  typically get a memo or something outlining what
18  the new requirement is and whether some require
19  sign off, some don't, just depending upon the
20  changes.
21     Q.  Okay.  And let me ask you this.  You may
22  or you may not know.  As you sit here today having
23  reviewed her personnel records, having reviewed at
24  least some of the training that she had to
25  undergo, do you have an opinion as to whether or

**FREEDOM COURT REPORTING    877-373-3660**

**GREG STEVENS**                                              **03/20/2012**

Page 21

1   not she was properly trained or improperly trained
2   with regard to the FDCPA?
3       A.  Based on all the information and
4   everything a collector is provided, she would have
5   been properly trained.
6       Q.  To short circuit a little, there's nothing
7   in here that would be a red flag to you as a
8   compliance vice president to think, wow, this
9   woman was not trained at all, would there?
10      A.  No.
11      Q   I'm going to switch gears a little bit.
12  If we can go to Exhibit B, sir, on Bate -- they're
13  Bates stamped at the bottom with page numbers.  If
14  you can go to 295, sir.
15      A.  295?
16      Q.  Yes, sir.  Do you see section 804 at the
17  bottom?
18      A.  Yes.
19      Q.  What is skip tracing?
20      A.  It's requiring information on a consumer.
21      Q.  Would that include location information,
22  contact phone numbers, that sort of thing?
23      A.  Contact phone numbers, yes.
24      Q.  How about addresses, is that part of it?
25      A.  If it's offered.  Typically it's for a

Page 22

1   phone number.
2       Q.  So primarily skip tracing would be to get
3   a good phone number for a consumer?
4       A.  Yes.
5       Q.  And skip tracing is an activity amongst
6   others that is regulated by the FDCPA, is it not?
7           MR. SCHULTZ:  Let me just object.  It
8       calls for a legal conclusion.
9   BY MR. SEALS:
10      Q.  As far as you know.
11      A.  There are pieces in the FDCPA that address
12  it.
13      Q.  Okay.  Got you.  And a third party, as far
14  as you know, is anyone other than a consumer.  Is
15  that correct?
16          MR. SCHULTZ:  Objection to the extent
17      you're asking him to opine about the
18      definitions in the FDCPA.
19          MR. SEALS:  The only question I'm asking
20      him is as compliance director I would assume he
21      knows the difference between third parties and
22      consumers.  If he doesn't, he can tell me.
23  BY MR. SEALS:
24      Q.  Do you know the difference between third
25  parties and consumers when I'm talking about the

Page 23

1   FDCPA?
2       A.  Yes.
3       Q.  What is the difference between a third
4   party and a consumer?
5       A.  A third party is someone other than the
6   consumer.
7       Q.  Okay.  Now in this section 804 we're
8   looking at says quote as a debt collector you're
9   only allowed to ask the third party for the
10  following information colon, consumers residence
11  home phone number, place of employment.  Correct,
12  sir?
13      A.  Yes, that's correct.
14      Q.  And per this training manual, there's
15  another sentence.  The first sentence in bold
16  print it says a collector may not leave any
17  message with any nearby when skip tracing.  Do you
18  see that, sir?
19      A.  Yes.
20      Q.  Is it NCOs policy that a collector may not
21  leave messages with a nearby with skip tracing?
22      A.  What's your definition of a nearby?
23      Q.  I didn't write it.  I don't know.  What's
24  NCOs definition?
25      A.  A neighbor.

Page 24

1       Q.  A neighbor?
2       A.  Yes.
3       Q.  So let's take nearby out.  Do you know is
4   it NCOs policy that it is permissible for a
5   collector to leave a message with anyone other
6   than a neighbor requesting a call back?
7       A.  That's going to require some explanation.
8       Q.  Okay.
9       A.  When they are contacting a consumer or a
10  third party, if they ask to take a message with a
11  collector and they're saying I can get him a
12  number or something, they at some point can leave
13  a message with that person --
14      Q.  Okay.
15      A.  -- if the person asks.
16      Q.  I want to ask you about that so I'm
17  absolutely clear when I'm reading this in a week
18  or two in my office.  Is it NCOs policy that if a
19  third party asks a collector if they can deliver a
20  message for the collector, that's permissible
21  under the FDCPA and under the NCO policy?
22      A.  FDCPA I'm not clear on that.  Under NCOs
23  policy it's permissible when asked.
24      Q.  Okay.  If not asked is it permissible?
25      A.  They're attempting to request information

**FREEDOM COURT REPORTING   877-373-3660**

**GREG STEVENS**                                    **03/20/2012**

Page 25

1  so they're trying to get a phone number. If they
2  are not asked, typically we would terminate the
3  call.
4      Q.  Okay. So I understand, and hope I'm not
5  too obtuse about this, if a collector calls a
6  relative, someone that does not live in the same
7  home as the consumer, is it NCOs policy that it's
8  permissible or impermissible without being asked
9  to ask that relative -- I'm sorry, can you deliver
10  a message to a consumer for me? Here's my phone
11  number. Is that permissible?
12      A.  We would typically ask for their phone
13  number and not leave a message.
14      Q.  And when you say typically, do you mean
15  unless specifically requested by the third party?
16      A.  Yes.
17      Q.  Okay. So in any other occasion, other
18  than being specifically requested, it's against
19  NCOs policy to ask to deliver a message. Is that
20  correct?
21      A.  Correct.
22      Q.  Okay. And NCO is aware that leaving
23  messages like we talked about violates the FDCPA,
24  aren't they?
25      MR. SCHULTZ: I'm going to object.

Page 26

1      Calls for a legal conclusion.
2      MR. SEALS: Okay. So I'm clear, this is
3  the compliance director for NCO with regard to
4  the FDCPA. He's been offered as the 30B6
5  representative. I want to know if according to
6  NCO it violates the FDCPA if you leave a
7  message with a relative without being
8  requested.
9      MR. SCHULTZ: And I'm going to object.
10  It's calling for a legal conclusion. I'm not
11  telling him he can't answer the question, I'm
12  just objecting.
13      MR. SEALS: Fair enough, Jim.
14      A.  Repeat it one more time, please.
15  BY MR. SEALS:
16      Q.  Okay. Absolutely.
17      MR. SCHULTZ: Just note my objection. Is
18  that okay?
19      MR. SEALS: Yeah, that's fair.
20      MR. SCHULTZ: So that way it will be
21  easier to follow.
22      MR. SEALS: Yes, yes, yes, yes.
23  BY MR. SEALS:
24      Q.  I'm trying to figure out what NCOs policy
25  is with regard to leaving a message during skip

Page 27

1  tracing, and if you answered this I apologize, but
2  is it NCOs policy that -- well, let me start over.
3  Is it NCOs policy -- I think you testified earlier.
4  that it's not permissible to leave messages unless
5  requested. Is that correct?
6      A.  Correct.
7      Q.  And that is because NCO understands that
8  it violates the FDCPA to do that. Is that also
9  correct?
10      A.  I didn't say that it also violates the
11  FDCPA.
12      Q.  Is there any other reason why NCO would
13  tell its collectors under the FDCPA section not to
14  do that?
15      A.  Part of our policy is, you know, to make
16  sure they're communicating with someone on a third
17  party level to make sure that they're not, one,
18  upsetting the person or continually calling, and
19  if someone offers to take a message, it's an
20  easier transition other than to tell them we're
21  not going to give you that information and hang
22  up.
23      Q.  Okay. But what I'm trying to get to is
24  under section 804, acquisition location
25  information, it says in bold print a collector may

Page 28

1  not leave any message with any nearby when skip
2  tracing. And I understand when you say nearby to
3  you means neighbor.
4      A.  Correct.
5      Q.  Can nearby extend to third parties?
6      A.  No.
7      Q.  So it does not. So if a collector calls a
8  debt -- a consumer's mother and says, "Hi, this is
9  Whitney Seals. I'm trying to get ahold of Dana
10  Seals. Could you please give a message to him for
11  me? My number is 1-800" whatever it is. Is that
12  permissible under NCO policy or not permissible?
13      A.  They would ask the third party -- I forget
14  the name you said, Whitney Seals if they have
15  location information for that person.
16      Q.  I mean, we can agree it's permissible for
17  NCO to call people to try to obtain location
18  information, correct?
19      A.  Right.
20      Q.  But we can also agree that the FDCPA
21  strictly regulates what they can ask for. Is that
22  fair?
23      A.  Yes.
24      Q.  And the FDCPA does not -- correct me if
25  I'm wrong, does not state that it's okay to leave

**FREEDOM COURT REPORTING   877-373-3660**

**GREG STEVENS**                                    **03/20/2012**

| Page 29 | Page 31 |
|---|---|
| 1  messages with third parties, does it? | 1  Is that legal or illegal? |
| 2      MR. SCHULTZ: I'm going to object to -- | 2      A.  According to our policy they would not |
| 3  BY MR. SEALS: | 3  leave that.  So they shouldn't leave that or ask |
| 4      Q.  If you know? | 4  open with that information. |
| 5      A.  I don't know if it's specifically saying a | 5      Q.  Okay.  So according to NCO policy, they |
| 6  third party.  I don't know that. | 6  cannot volunteer that they are calling for NCO, |
| 7      Q.  Okay.  On Bates stamp 296, which is the | 7  can they, without being asked? |
| 8  next page, the training manual goes on to state | 8      A.  Correct. |
| 9  that a collector must identify themselves and | 9      Q.  And that's how NCO trains them.  Is that |
| 10  state they are confirming or correcting location | 10  not right? |
| 11  information concerning the consumer.  Is that | 11      A.  That's correct. |
| 12  correct? | 12      Q.  All right.  We're moving right along.  If |
| 13      A.  Yes. | 13  we can turn to 301, sir.  This section under 807 |
| 14      Q.  And is that a requirement that the FDCPA | 14  gives 15 examples of false or misleading |
| 15  has or is that just NCOs requirement? | 15  representations.  Does it not, sir? |
| 16      A.  Probably both. | 16      A.  Yes. |
| 17      Q.  Okay.  Is that required under NCO policy | 17      Q.  And it says this section lists false and |
| 18  for every phone call during skip tracing? | 18  misleading practices that are prohibited.  The |
| 19      A.  Yes. | 19  FDCPA prohibition and NCOs policies are not |
| 20      Q.  Okay.  Do you have to use or do collectors | 20  limited to the following practices.  Does that |
| 21  have to use that certain language or can they use | 21  signal to a collector there can be other false or |
| 22  words to that effect? | 22  misleading representations that are also illegal? |
| 23      A.  They can use something similar. | 23      A.  Yes. |
| 24      Q.  As long as it conveys that you're trying | 24      Q.  And on paragraph ten, which is on 302, it |
| 25  to confirm or correct? | 25  prohibits -- FDCPA, according to this, prohibits |

| Page 30 | Page 32 |
|---|---|
| 1      A.  Correct. | 1  the use of any false representation or deceptive |
| 2      Q.  It also says -- where is it?  If expressly | 2  means to collect or attempt to collect a debt or |
| 3  asked you may also identify your employer.  Did I | 3  obtain consumer information. |
| 4  read that correctly, sir? | 4      Does that mean that NCO recognizes it is a |
| 5      A.  Yes, you did. | 5  violation of the FDCPA to use a false |
| 6      Q.  Okay.  If a collector is not expressly | 6  representation or deceptive means to try to get |
| 7  asked can they volunteer that they're calling from | 7  consumer information? |
| 8  NCO Financial Systems when talking to a third | 8      MR. SCHULTZ: Objection, legal conclusion. |
| 9  party? | 9  Go ahead, Greg. |
| 10      A.  If they're asked they can supply the | 10      A.  I mean, if you read ten, you're telling |
| 11  information. | 11  them if they won a TV or some sort of prize or you |
| 12      Q.  If they are not asked? | 12  have a lottery ticket for them yeah, sure. |
| 13      A.  If they're not asked, no. | 13  BY MR. SEALS: |
| 14      Q.  Okay.  And that's because it would violate | 14      Q.  But just to be clear, it's not just |
| 15  the FDCPA if they were not asked and they | 15  limited to don't tell them they won a prize.  I |
| 16  volunteered that information.  Is that correct? | 16  mean, there are other false or deceptive means |
| 17      MR. SCHULTZ: Objection, legal conclusion. | 17  they can use that aren't enumerated here that are |
| 18  You can answer, Greg. | 18  also illegal or that you would not train people to |
| 19      A.  If they identify themselves as calling | 19  do. |
| 20  from a collection agency then, yes. | 20      A.  Right.  Something like I'm a friend trying |
| 21  BY MR. SEALS: | 21  to get ahold of them, those type of things. |
| 22      Q.  Okay.  But let's -- forget that.  It says | 22      Q.  Okay.  And we can move on from this.  My |
| 23  employer in the manual.  So if in our hypothetical | 23  client has alleged that Latisha Williams, one of |
| 24  call if the collector calls up and said, "Hi, this | 24  NCOs employees, violated the law in the course of |
| 25  is Whitney Seals from NCO Financial.  Is Greg in?" | 25  phone calls to Greg Lindsey and Kay Lindsey.  Now |

**FREEDOM COURT REPORTING   877-373-3660**

Page 33

1  you said you had listened to the calls. Have you
2  ever seen the transcripts of the calls?
3      A.  I don't recall.
4      Q.  These transcripts were provided by NCOs
5  lawyers, and I'm going to mark Greg Lindsey's as D
6  and Kay Lindsey's as E. And I'll provide this to
7  you, and you said you had listened to this today?
8          (Plaintiff's Exhibits D and E were marked
9      for identification.)
10      Q.  These were provided by your counsel, but
11  take a look at it and make sure there's nothing
12  incorrect on there. Does that appear to be
13  accurate?
14      A.  It appears to be. I mean, I don't know
15  word to word, letter to letter, but, sure.
16      Q.  Okay. The other thing I want to mark is
17  Exhibit F, which are the collection notes. I'll
18  set those in front of you.
19          (Plaintiff's Exhibit F was marked for
20      identification.)
21      Q.  I'll give this to you. It's shorter.
22  It's only one page. Okay. I know you said it's
23  not word for word. Does that seem --
24      A.  Yes.
25      Q.  -- accurate? Okay. Now it's my

Page 34

1  understanding that Greg was called June 16, 2011
2  and Kay was called June 9, 2011. Is that also
3  your understanding? You can take a look there.
4      A.  What were the dates again?
5      Q.  June 9th for Kay and June 16th for
6  Mr. Gregory Lindsey. Short circuit on Bates 68 I
7  think it's the call to Kay unless you tell me
8  differently.
9      A.  Well, I can see where they left a message.
10  That's correct.
11      Q.  Okay. And I haven't seen these before.
12  I'm going to snatch them from you. I just want to
13  see what it says for June 9th.
14      A.  It's the same note. It's just a lot
15  better formatted.
16          MR. SEALS:  Do you mind terribly -- I was
17      going to say if I just mark this F would you
18      have any objection to that?
19          MR. SCHULTZ:  Not at all. Let me just go
20      make some copies real quick. I put my initials
21      on the top.
22          MR. SEALS:  I might actually just call it
23      G to keep it easier.
24          MR. SCHULTZ:  Whatever you want.
25          MR. SEALS:  I've decided I'm going to

Page 35

1  include these in there unless you have any kind
2  of objection.
3          MR. SCHULTZ:  However you want to do it.
4          MR. SEALS:  If you don't mind just keeping
5      them together.
6      A.  Okay.
7  BY MR. SEALS:
8      Q.  All right. Back to what I was saying. I
9  think you said that it is correct that Kay was
10  called on June 9th, looks like at about 6:14 in
11  the evening.
12      A.  Correct.
13      Q.  And can you translate TTPMRDLMFORCB dot
14  dot for me? What does that mean?
15      A.  Talked to person, give them monitoring
16  disclosure, monitoring recording, left message for
17  consumer.
18      Q.  For consumer?
19      A.  Or call back, I guess.
20      Q.  Okay. Talked to person?
21      A.  MRD, monitoring.
22      Q.  Okay. Monitoring disclosure, left message
23  to call back.
24      A.  Correct.
25      Q.  And my understanding is that Greg was

Page 36

1  contacted on the 16th.
2      A.  That's correct.
3      Q.  And those are the same letters. Does that
4  mean the same thing as far as you know?
5      A.  Yes.
6      Q.  There was one other on that page you're
7  looking at, the top of it says TTPMRDTTP relative
8  no longer stays there. No contact info in D is
9  unknown. What does that mean exactly? That's
10  under June 10th.
11      A.  Talked to person, monitoring disclosure,
12  talked to person again. Relative no longer stays
13  there. No contact info and D is unknown. Debtor
14  is unknown.
15      Q.  Debtor is unknown. Okay. I was curious
16  about that. Now other than those three can you
17  tell looking at this if the debt collector talked
18  to anyone else in the course of collecting this
19  account?
20      A.  Doesn't appear to.
21      Q.  Okay. On page four of what we just got at
22  the top, I was curious, it says 6/10/11, 16/29, CC
23  hyphen CC or back slash CC. What does that mean?
24      A.  Just a clerical note.
25      Q.  It says F screen one dash five status

Page 37

1 from one dash no answer to three dash left a
2 message. What does that mean?
3     A.  What it means is they contacted the number
4 out of the F screen and changed it from no answer
5 to left message.
6     Q.  Is it all possible to determine what
7 number that was?
8     A.  It's associated with the same call down
9 here on 6/16, it rolls over.
10     Q.  Okay.  Okay.  Thank you.  There's a phone
11 number on the front page, the second one down, the
12 205-617-4773 number and in Michael Lindsey's
13 deposition last week he testified that that would
14 have been the number he would have been using in
15 June of 2011 that he received calls on.
16         Is there any way looking at those notes to
17 determine how often a call was placed or even if a
18 call was placed to that number?
19     A.  From the notes maybe 18 times.
20     Q.  Does it appear that any messages were left
21 per the notes?
22     A.  You want to know how many times?
23     Q.  If you can tell.  I'm not familiar with
24 the notes.
25     A.  Five.

Page 38

1     Q.  Five messages.  Okay.  And I probably
2 should have done it in the beginning, can you --
3 I'm not familiar with these.  Can you tell me what
4 to look for if I'm looking at this sometime in the
5 future and want to find that information out how
6 many times that number was called, when it was
7 called, if a message was left?
8     A.  I can.
9     Q.  Please.
10     A.  Wherever you see a TW --
11     Q.  Yes, sir.
12     A.  -- that means that was telephone work.
13     Q.  So they had that number as his work number
14 per the notes, I mean?
15     A.  Yes.
16     Q.  Anytime I see TW it means telephone work.
17 And if they left a message, does it say left a
18 message or what does it say?
19     A.  LM.
20     Q.  LM.  So if I'm going through these notes
21 and it says TW, that is a call to the 617 number
22 and if it says LM at that date and time they left
23 a message.  Is that fair?
24     A.  Yes.
25     Q.  Thank you very much.  Okay.  One other

Page 39

1 question.  At the top of this page there's a date
2 Tuesday, June 28, 2011, and it's from NCO
3 automated report generated to Maxine Burman.  Do
4 you know who Maxine Burman is?
5     A.  She's the person that requested this fact
6 sheet.
7     Q.  Do you know who she is or what her role is
8 in NCO?
9     A.  I believe she works in our consumer
10 affairs department.
11     Q.  Okay.  Is there any indication on here
12 when NCO stopped collecting this account?  Because
13 it appears that the date received is June 7, 2011,
14 and I don't see any dates before that.  Can you
15 tell when it stopped?
16     A.  June 27th.
17     Q.  Okay.  So 20 days?
18     A.  Yes.
19     Q.  In reading this would you expect Latisha
20 Williams would be able to see or understand what
21 actions have been taken on the account?  What I'm
22 asking is do you train your collectors to
23 understand what the codes and what the accounts --
24     A.  Yes.
25     Q.  -- means?  Would you likewise expect a

Page 40

1 manager who pulled this and reviewed it, Latisha's
2 manager, to understand what all this means?
3     A.  Yes.
4     Q.  And it said left messages for call back
5 and I don't want to belabor the point because we
6 talked about it before, but we talked about the
7 very narrow circumstance NCO believes leaving a
8 message for call back is appropriate.  Did we not?
9     A.  Yes.
10     Q.  And that, according to you, so I'm
11 clear --
12         MR. SCHULTZ:  I just want to make sure we
13 make a distinction.  You're talking about calls
14 to a third party at opposed to what we call the
15 work number messages.
16 BY MR. SEALS:
17     Q.  I didn't see any left message.  The only
18 time I saw left message for call back, and please
19 correct me if I'm wrong, was in the June 9th call
20 and in the June 16th call to Kay Lindsey and
21 Gregory Lindsey.
22         MR. SCHULTZ:  I just want to make sure
23 we're talking about the same type of message.
24 Messages of third parties as opposed to
25 messages where we think we're calling the

GREG STEVENS                                              03/20/2012

Page 41

1    debtor.
2        MR. SEALS: Okay.
3        MR. SCHULTZ: That's my only concern here.
4    BY MR. SEALS:
5        Q. All right. Let me see if I can work
6    around this. The only time I see in those notes
7    that a message left for call back was on June 9th,
8    the phone call to Kay, and June 16th, which was
9    the phone call to Greg.
10       Is there any indication here that
11   Mr. Lindsey lived at either one of those
12   addresses?
13       A. Well, the whole address isn't there. It's
14   more the phone number.
15       Q. Okay. I mean, I can see under the phone
16   number it says relative.
17       A. Correct.
18       Q. Okay. So if an account manager was
19   reviewing this and they flipped to say that June
20   16th call they can see the date that someone had
21   called a relative and had talked to person, gave
22   the disclosure and left a message for a call back.
23       A. Yes.
24       Q. All right. If we can go to Exhibit D,
25   sir, if you have it in front of you, which is the

Page 42

1    transcript for Greg. According to the transcript
2    of the call Latisha Williams, NCO collector,
3    identified that she's with NCO Financial Systems
4    without being expressly asked. Is that correct?
5        A. Based on this, yes.
6        Q. And this was produced by your counsel.
7    You understand that?
8        A. Yes.
9        Q. Okay. In remembering or based on your own
10   memory of the phone calls you remember anyone
11   asking Latisha in this phone call who her employer
12   was before she volunteered it?
13       A. I don't recall, but I do want to back up
14   just a little. I thought when she identified she
15   didn't say NCO Financial Systems. I think she
16   just said NCO on the recording or not.
17       Q. If you want to listen to it again, I don't
18   have it on me, but you're welcome to if it helps
19   you. I have listened to it and while I'm not the
20   one testifying, I remember this being fairly
21   accurate word for word. That's why we had it
22   transcribed.
23       A. Okay.
24       Q. If you disagree with it and you want to
25   talk to your counsel and listen to it again,

Page 43

1    you're absolutely welcome to. That's your call.
2        MR. SCHULTZ: You want to go listen to it?
3    We can go listen to it.
4        MR. SEALS: If you don't mind,
5    we'll take a quick break, and if there's
6    something wrong in there, let me know.
7        (Break from 1:15 p.m. to 1:18 p.m.)
8        Q. Back on. We just took a break a moment
9    ago, Mr. Stevens, so you can listen to the tapes
10   again. Did you listen to both of them or only
11   Gregory Lindsey's?
12       A. Both.
13       Q. Having the transcripts in hand, are the
14   transcripts accurate?
15       A. Yes.
16       Q. Are there any mistakes in the transcripts
17   that you want to bring to my attention that you
18   just heard?
19       A. No.
20       Q. So as far as we're concerned talking
21   they're 100 percent accurate. Is that a fair
22   statement?
23       A. Yes.
24       Q. Okay. And if we can look at Mr. Lindsey's
25   transcript which is Exhibit D. According to the

Page 44

1    transcript of the call of Greg Lindsey, Latisha
2    Williams identified that she's with NCO Financial
3    Systems without being expressly asked. Is that
4    correct?
5        A. Yes.
6        Q. And as we discussed, that's a violation of
7    NCO policy and FDCPA, correct?
8        MR. SCHULTZ: Objection, calls for a legal
9    conclusion.
10       A. It's a violation of our policy that we set
11   out, yes.
12   BY MR. SEALS:
13       Q. Is it also a violation of the FDCPA?
14       MR. SCHULTZ: Objection, legal conclusion.
15       A. I don't know if it's specifically a
16   violation of FDCPA.
17   BY MR. SEALS:
18       Q. Okay. Do you train your -- does NCO train
19   its collectors to identify that they are calling
20   from NCO Financial Systems before being requested
21   when they call third parties?
22       A. No.
23       Q. They train them not to do that. Is that
24   correct?
25       A. Correct.

11  (Pages 41 to 44)

**FREEDOM COURT REPORTING**   877-373-3660

Page 45

1   Q.  So we're clear, Gregory Lindsey is a third
2  party in this case.  Is that right?
3   A.  Yes.
4   Q.  And in the same conversation Latisha
5  Williams asked Greg Lindsey to give my client a
6  message to call her back.  Is that correct?
7   A.  Yes.
8   Q.  And according to this transcript did she
9  do that without any sort of prompting from
10  Mr. Lindsey?
11   A.  Yes.
12   Q.  All right.  And as we discussed, that's a
13  violation of NCO policy and the FDCPA, correct?
14       MR. SCHULTZ:  Objection, legal conclusion.
15   A.  Again, I'll go back to a violation of our
16  policy that I'm aware of.
17  BY MR. SEALS:
18   Q.  Are you aware whether or not that is a
19  violation of the FDCPA?
20   A.  If it's specifically a violation, I'm not
21  aware.
22   Q.  Do you have any reason to believe it's not
23  a violation of the FDCPA?
24   A.  My recollection is if you identify
25  yourself as a debt collector.

Page 46

1   Q.  Okay.  But beyond that, you don't know one
2  way or another.  Is that a fair statement?
3   A.  Yes.
4   Q.  Latisha Williams also tells Gregory
5  Lindsey's phone number was left as a reference
6  number for Michal Lindsey, correct?
7   A.  Yes.
8   Q.  Now I know that you were not at
9  Mr. Lindsey's deposition, so you'll have to take
10  my word for this next part, but if Mike Lindsey
11  testified he never listed Greg as a reference with
12  regard to this or any of these other financial
13  accounts, does NCO have any evidence that Mike
14  Lindsey provided Greg Lindsey's number as a
15  reference number?
16   A.  No.
17   Q.  Do you know how NCO would have gotten
18  Gregory Lindsey's number?
19   A.  Yes.
20   Q.  How would that have been?
21   A.  We received it through a vendor that we
22  use for skip trace information.
23   Q.  Who would that vendor be?
24   A.  Lexis Nexus.
25   Q.  Okay.  Do you have any knowledge as to

Page 47

1  how Lexis Nexus would have acquired that number?
2   A.  They have a database of information on
3  consumers.
4   Q.  Okay.  Do you know -- do you have any idea
5  about the specifics of how they would have gotten
6  the number?
7   A.  No.
8   Q.  All right.  I want to look at Exhibit E
9  which is the Kay Lindsey transcript.  It's
10  shorter.  According to the transcript of Kay
11  Lindsey, Latisha Williams, NCOs collector,
12  identified she's with NCO Financial Systems
13  without being expressly asked, correct?
14   A.  Yes.
15   Q.  And as we discussed, that's a violation of
16  NCO policy, according to you, but you are not sure
17  whether or not that violates the FDCPA.  Is that
18  correct?
19   A.  Correct.
20   Q.  And Kay Lindsey is a third party just like
21  Gregory Lindsey.  Is that right?
22   A.  Yes.
23   Q.  And in the same conversation she asked Kay
24  Lindsey to give my client a message to call her
25  back, correct?

Page 48

1   A.  Yes.
2   Q.  And she does that without Kay Lindsey
3  requesting whether or not she wants to requesting
4  to give Mike a message.  Is that correct?
5   A.  Yes.
6   Q.  And as we discussed again, it's a
7  violation of NCO policy, but you're not certain
8  whether it violates the FDCPA.  Is that right?
9   A.  Yes.
10   Q.  And just like in Greg Lindsey's case,
11  Latisha tells Kay Lindsey that her phone number is
12  a reference number for Mike Lindsey, correct?
13   A.  Yes.
14   Q.  And again, if Mike testified he had never
15  listed Kay Lindsey as a reference on any of his
16  financial information, do you have any evidence
17  that Mike Lindsey provided Kay Lindsey's phone
18  number at any time with regard to this account
19  they were trying to collect?
20   A.  No.
21   Q.  Is this the number that Lexis Nexus would
22  have also provided like Greg's?
23   A.  Yes.
24   Q.  I asked you before, but if you don't know
25  specifics how they got Greg's, do you know the

Page 49

1   specifics how they got Kay's number?
2       A.   No.
3       Q.   All right.  I received some other
4   documents from counsel I'm going to mark as G and
5   ask if you had seen these.  I believe these are
6   personnel records for Latisha Williams.  Feel free
7   to go through them, sir.  They're Bates stamped at
8   the bottom.
9            (Plaintiff's Exhibit G was marked for
10           identification.)
11      Q.   The records, for the record, that I
12  introduced as Exhibit G are Bates stamped number
13  248 through 273.
14      A.   Okay.
15      Q.   Have you seen those before today?
16      A.   Yes.
17      Q.   Are those documents you reviewed earlier
18  today that you discussed?
19      A.   They appear to be.
20      Q.   Okay.  Please look at Bates stamp page
21  259, sir.  Can you tell me what is this document?
22      A.   It appears to be a monitoring form or
23  review form for Latisha.
24      Q.   And what's the purpose of that document?
25      A.   To provide the collector with feedback

Page 50

1   based on their performance.
2       Q.   It looks like the document is dated May 1,
3   2011.  Am I reading that correctly?  I know it's
4   small at the top or does that look like June 1?
5   If you don't know I understand.
6       A.   Either.
7       Q.   Could be May, could be June.  Make sure my
8   eyesight isn't so bad.  It says in the needs
9   improvement section lacking proper activation on
10  new business accounts, needs to be skipping
11  accounts to find better numbers.  What exactly
12  does that mean in layman's terms?
13      A.   The consumer is on the phone and they're
14  hesitant to pay, they get someone else on the
15  telephone, a manager or supervisor to give the
16  consumer more options to pay.
17      Q.   All right.  And then when it say needs to
18  be skipping accounts to find better numbers, is
19  that the skip tracing we talked about earlier?
20  I'm sorry.  The needs improvement section.
21      A.   What it probably means is accounts without
22  a phone number or an address that's bad.
23      Q.   Okay.  And what does lacking proper
24  activation under new business accounts mean?
25      A.   She may not have called -- if there was

Page 51

1   two numbers on the account, may have only called
2   one of them.
3       Q.   Okay.  On the bottom -- I'm going down
4   here, it says action plan.  Do you see that
5   section, sir?
6       A.   Yes.
7       Q.   All right.  It says quote will do side by
8   side to help make sure Latisha understands how set
9   up talk offs and skip trace her accounts.  What
10  does that mean, side by side?
11      A.   A supervisor or the manager, whoever is
12  working with her on her development plan, would
13  stick with that person and help them.
14      Q.   So that means literally sit next to them
15  as they perform these calls?
16      A.   Yes.
17      Q.   Based on this can you tell whether or
18  not -- let me start over.  The significance of
19  this document, does this indicate to you that
20  Latisha Williams needed some improvement in some
21  areas of her job duties?
22      A.   Based on the review, yes.
23      Q.   And have you ever personally evaluated
24  Latisha Williams?
25      A.   No.

Page 52

1       Q.   It says critical dates on the bottom as
2   well, listing June 8, 2011 through and then a
3   follow up June 15, 2011.  What does critical dates
4   mean?
5       A.   It's just when they did the performance or
6   when they're going to start the evaluation.
7       Q.   So would you expect --
8       A.   The next follow up is the next review.
9       Q.   Okay.  I'm sorry, I interrupted you.
10  Would you expect her manager to be actively
11  monitoring or training her on those skip trace
12  calls between June 9, 2011 and June 15, 2011?
13      A.   Yes.
14      Q.   And when you say side by side, you said
15  literally side by side.  Does that involve any
16  sort of monitoring of calls where you may not be
17  sitting right next to the collector?
18      A.   It's hard to answer.
19      Q.   That's fair.  That's fair.  Bates 260,
20  261, and 262 all appear to be the same as 259
21  except they have different dates, critical
22  dates on them, and they're dated different days.
23  Is that right?
24      A.   Yes.
25      Q.   So according to these documents, Latisha

**GREG STEVENS**                                          03/20/2012

---

Page 53

1   Williams' manager was doing these side by sides
2   with skip tracing at least between April 8, 2011
3   and June 15, 2011. Is that correct?
4       A.  I'm looking at it. I don't know if
5   that's -- I'm trying to speculate what they did on
6   what days. I mean --
7       Q.  Sure. I don't want you to speculate. But
8   based on these records it appears that was the
9   plan. Is that fair?
10      A.  It's hard to draw a conclusion, but based
11  on the dates when they started and when they
12  finished or what would have been done, again, I'm
13  just guessing, yes.
14      Q.  Okay. That's fire. Bates 265 to 273
15  would have been called job discussion summary
16  forms. What's the job --
17      A.  What's the numbers again?
18      Q.  I'm sorry, sir, 265 through 273. 265
19  through the end there are nine documents that are
20  entitled job discussion summary form. What's a
21  job discussion form in NCO?
22      A.  It's a review of the rep, if there's an
23  issue with performance.
24      Q.  Who's the rep? Is that like a manager?
25      A.  The representative, Latisha in this case.

---

Page 54

1       Q.  Oh, I'm sorry. So it would be -- would it
2   be management reviewing some issue with the debt
3   collector? Is that fair?
4       A.  Yes.
5       Q.  And are you familiar with these forms at
6   all?
7       A.  Yes.
8       Q.  Now Bates 265, 267 and 268 and 272 appear
9   to be discussions regarding Latisha Williams not
10  collecting enough money to meet NCOs expectations.
11  Is that a correct statement or am I reading that
12  wrong?
13          MR. SCHULTZ: Can you maybe slow down?
14  BY MR. SEALS:
15      Q.  Sure, 265, 267, 268 and 272.
16      A.  Yes.
17      Q.  All right. Do you know if Latisha
18  Williams is paid by commission, hourly or if she
19  receives a salary?
20      A.  I can tell you collectors are paid hourly,
21  so I would assume she's paid hourly.
22      Q.  Do you know if collectors also receive
23  commissions?
24      A.  Some do, some don't.
25      Q.  As we sit here today do you know if

---

Page 55

1   Latisha Williams is one of these commissioned
2   collectors or not?
3       A.  I do not.
4       Q.  Okay. That's fair. Now Bates 266 looks
5   like a verbal warning for collector misconduct and
6   failing to document NCO account records on June
7   30, 2010 and July 6, 2010. Can you tell looking
8   at this form what that's about or what that
9   references?
10      A.  I can't tell the specific allegation.
11      Q.  Okay, 269 is another one. It says on
12  April 6, 2011 you, being Latisha, violated company
13  policy and acted in an unprofessional manner by
14  failing to follow NCO procedures in speaking with
15  a consumer. Just like before, can you tell what
16  this is about or what account this is about?
17      A.  No.
18      Q.  All right. Bates 270 is dated September
19  8, 2011, which is after the calls we're here about
20  today, and it state it's a verbal warning that on
21  June 15, 16, 21 and 25 Latish Williams violated
22  company policy and acted in an unprofessional
23  manner by failing to document NCO records.
24          Do you know if that has anything to do
25  with Michael Lindsey's account or not?

---

Page 56

1       A.  Based on the timing, it appears it may
2   have something to do with it.
3       Q.  But you're not sure looking at it, are
4   you?
5       A.  If I just had to look at the document?
6       Q.  Yeah, that's what I'm saying.
7       A.  Well, because I have the notes I would
8   have to say in the call times seem to line up, so
9   and knowing what happened --
10      Q.  So it's quite possible it would be
11  related?
12      A.  Yes.
13      Q.  Is that fair?
14      A.  Yes. I would say it is, yes.
15      Q.  The last one I'll ask you about is Bates
16  271, and this one was a little confusing. It says
17  it's a written warning for collector misconduct.
18  At the top it's dated September 8, 2011, but the
19  prior form at the bottom it appears all of the
20  dates next to the signatures are last month on
21  February 15, 2012. Does it look that way to you
22  as well?
23      A.  Yes.
24      Q.  On this one it states that on several
25  dates in June Latisha violated company policy by

---

14  (Pages 53 to 56)

**GREG STEVENS**                                              03/20/2012

Page 57

1  failing to fully follow NCO procedures regarding
2  calls placed on account relating to third party
3  contacts and documenting NCOs records.
4         Again, like the other one, is there any
5  way to tell whether this is related to Mike
6  Lindsey's account or do you know?
7     A.  Well, I'll use the same thing.  It appears
8  it's based on what I know and what I'm looking at
9  the notes --
10    Q.  Okay.
11    A.  -- took place.
12    Q.  It says it's a written warning.  Is that
13  more serious than a verbal warning?
14    A.  Yes.
15    Q.  And it looks like there's a hierarchy,
16  verbal, written, final and termination.  Do they
17  get progressively worse, I would assume?
18    A.  Yes.
19    Q.  Now is there any NCO policy that indicates
20  how many written or verbal warnings a collector
21  can get before they are terminated?
22    A.  Not that I'm aware of.
23    Q.  All right.  Is it NCOs policy to have
24  these disciplinary job discussions like in Bates
25  stamp 271 eight months after the collector's

Page 58

1  misconduct?
2     A.  I don't -- the date, what could happen
3  depending upon when the infraction was discovered
4  or when it took place --
5     Q.  Sure.
6     A.  -- it could go back, yes.
7     Q.  Okay.  You testified earlier you're
8  familiar with these forms.  Did I hear you
9  correctly?
10    A.  Yes.
11    Q.  Is it unusual to you in any way to see a
12  disciplinary form for conduct that took place
13  eight months before the form was signed?
14    A.  You mean if the infraction took place?
15    Q.  Yeah.  If the infraction takes place in
16  June and it's not written up or signed or at least
17  presented until February of the next year is that
18  at all unusual to you?
19    A.  No.
20    Q.  Not at all?
21    A.  If an infraction -- when we -- I'm getting
22  confused here.  When we learn of an infraction
23  whether it took place six months ago or two days
24  ago, they would be written up when we learned of
25  that infraction.

Page 59

1     Q.  Okay.  Part of the 30B6 notice is
2  something we'll get into shortly, is the
3  investigation of this, my client's complaint and
4  allegations he's made.  Do you know what was
5  discovered apparently on February 15, 2012 or
6  sometime shortly before that would have caused her
7  to be written up?
8     A.  The calls in June.
9     Q.  The calls in June that we think may be
10  related to my client's account?
11    A.  Correct.
12    Q.  Okay.  When did NCO first become aware of
13  Mike's allegations against them?
14    A.  Appears we received an attorney letter on
15  June 28th.
16    Q.  Do you know what investigation was done
17  after that attorney letter was found or received?
18    A.  Well, I'm sure the information was pulled
19  based on whatever the allegations were, the fact
20  sheet would have been printed and then given to
21  the compliance department or our attorneys to
22  research based on whatever the demand letter was.
23    Q.  I don't want to get into anything that NCO
24  discussed with its lawyers.  Is there any way to
25  know if it went to someone in the compliance

Page 60

1  department or to an attorney?
2     A.  Initially it goes through the compliance
3  department to prepare all the documents or to pull
4  the notes and so forth.
5     Q.  Okay.  A suit was filed in this case on
6  September 1, 2011, and it looks like September 1,
7  2011 is what five months before February.  Did
8  some investigation take place between September
9  2011 and February 15, 2012 that you know of that
10  would have yielded this document I'm looking at,
11  Bates 271?
12       MR. SCHULTZ:  And just so we're excluding
13  anything that may have been involving counsel.
14       MR. SEALS:  Oh, of course.
15    A.  I want to make sure.  Repeat that again.
16  BY MR. SEALS:
17    Q.  Sure.  It's unusual to me, it may not be
18  to you, but it's unusual to me that we have a
19  document that is a disciplinary document that
20  appears to be related to my client's allegations
21  that is dated just last month when the suit was
22  filed in September.
23       So my question is are you aware of any
24  investigation NCO undertook that would have
25  yielded any information that would have led to

Page 61

1  this being filled out in February 2012?
2      A.  Well, if I look at this, the first one
3  had four calls on it.
4      Q.  Okay.
5      A.  The second one there were additional calls
6  added to it.
7      Q.  Yes, sir.
8      A.  And that may have been noticed, you know,
9  further down the road.
10     Q.  Sure.
11     A.  And she would have received an amended one
12 at that point.
13     Q.  Is 271 an amended write up of the --
14     A.  It may have been an additional because of
15 the additional allegations.
16     Q.  Okay.  Do collectors receive these if NCO
17 determines they have violated the FDCPA?
18     A.  They receive them if they violated
19 company policy.  Would they get one specifically
20 for FDCPA?  I suppose they can, but again, it's
21 company policy their performance, there's
22 different reasons.
23     Q.  All right.  Is one of those reasons if
24 management determined a collector violated the
25 FDCPA, would they receive a job discussion summary

Page 62

1  form like the one we're looking at?
2      A.  It's possible.
3      Q.  Okay.  Is there any circumstance that
4  you're aware of where a collector has been found
5  to have violated the FDCPA and they were not
6  disciplined or given one of these forms?
7      A.  Not that I'm aware of.
8      Q.  In fact, every time -- you're the
9  director.  I know it's a new job, but you're the
10 vice president of compliance department, I would
11 assume that part of your job is dealing with these
12 forms.  Is that fair?
13     A.  I don't deal with these forms.
14     Q.  Does your department deal with these forms
15 or review them?
16     A.  Not currently, no.
17     Q.  Okay.  Maybe I'm chasing my tail.  I think
18 we're clear on you're not aware of anytime someone
19 has violated FDCPA and not received one of these.
20 Did I hear you correctly?
21     A.  Yes.
22     Q.  Okay.  So the correlate to that is every
23 time you're aware of someone has violated the
24 FDCPA and you know they receive one of these?
25     A.  If we are aware of it?

Page 63

1      Q.  Yes.
2      A.  And something they've done?
3      Q.  Yes.
4      A.  It is likely that they received one.
5      Q.  Okay.  Do you know whether or not Latisha
6  Williams received the form in 271 because NCO
7  determined she violated the FDCPA?
8          MR. SCHULTZ:  Object to the extent it
9  calls for attorney/client privilege and work
10 product.
11         MR. SEALS:  Work product?
12         MR. SCHULTZ:  Sure.  We can talk about
13 this off the record if you want.
14         MR. SEALS:  We can.
15         (Break at 2:05 p.m. to 2:07 p.m.)
16 BY MR. SEALS:
17     Q.  We can go on.  I want to go to -- let's
18 see.  There's some telephone monitoring forms and
19 I think you might have gotten these a little out
20 of order.  That's okay.  248 through 257 on
21 Exhibit G, have you seen those before?
22     A.  Yes.
23     Q.  Are those forms that NCO utilizes when
24 it's monitoring calls?
25     A.  Yes.

Page 64

1      Q.  Now according to Bates 256, unless you see
2  something I missed, it looks like the most recent
3  monitoring form was filled out September 7, 2010.
4  Does that look correct or incorrect?
5      A.  You said what?
6      Q.  September 7, 2010, that's the most recent
7  one I could find that was produced.
8      A.  One for 11/29/2010.
9      Q.  Yes.  Okay.  254?
10     A.  255.
11     Q.  According to these records that have been
12 produced, it looks like the most recent is
13 November 29, 2010.  Is that right?
14     A.  There's one here for 5/1/2011.
15     Q.  This is why I asked it.  Okay.  So as
16 recently as May 2011 there has been a monitoring
17 form filled out for Latisha Williams.  Is that
18 right?
19         MR. SCHULTZ:  May or June whatever the
20 ongoing date is.
21 BY MR. SEALS:
22     Q.  Okay.  Got you.  Is it NCO policy that
23 every time a manager monitors a phone call one of
24 these forms is filled out?
25     A.  Yes.

16  (Pages 61 to 64)

**GREG STEVENS**                                                03/20/2012

Page 65

1    Q.  Okay.  So based on what you've told me are
2  you aware of whether or not the phone calls to
3  Greg or Kay Lindsey were monitored?
4    A.  I don't know.
5    Q.  Okay.  If they had been would you expect a
6  form like this to be in existence somewhere?
7    A.  Yes.
8    Q.  Have you ever seen a form showing that
9  either of those phone calls were monitored?
10    A.  No.
11    Q.  Okay.  There are about nine of these forms
12  here.  Would that indicate to you that nine of
13  Latisha's phone calls have been monitored between
14  looks like April 2010 until about May 2011?
15    A.  You're saying nine times, not nine calls.
16    Q.  Nine calls.  Excuse me, nine calls,
17  roughly.  A couple looks like they were the same
18  date, just sort of carry over.  Let me ask you
19  this.  Let me --
20    A.  Okay.
21    Q.  Does NCO have a policy how many calls
22  involving collectors are to be monitored per year,
23  per month, week, anything like that?
24    A.  There is a new policy where they're
25  monitoring every collector.  Every month when at

Page 66

1  the sites they may, you know, they could monitor
2  if they felt a collector needed more.
3    Q.  Okay.
4    A.  I don't think that these forms were just
5  one call each.  What you're talking about is just
6  looking at some of the notes it seems they
7  monitored more than one call.
8    Q.  Okay.  Was the every collector gets
9  monitored every month policy in effect in June of
10  2011?
11    A.  I don't recall.
12    Q.  Okay.  Do you know how many calls NCO
13  would expect Latisha to make on a given workday?
14    A.  No.  It depends on her workload, how many
15  accounts in her file, that type of stuff.
16    Q.  Okay.  That's fair.  Typically there's
17  quite a few.  We found at least 18 calls within a
18  20-day period to one phone number in the records
19  we looked at earlier.  Is it fair to say NCO
20  expects its collectors to make many calls during
21  the workday?
22      MR. SCHULTZ:  I'm just going to object to
23  many.  I don't know if you know what that
24  means.
25    A.  I don't know what many means, but you

Page 67

1  know, again, we have a certain file, a certain
2  size number of accounts depending upon the type of
3  business they're working.  It depends on how many
4  people they contact, how many their talks offs
5  are, so they could just vary.
6  BY MR. SEALS:
7    Q.  Who would be the best person to testify
8  about how many calls Latisha Williams is expected
9  to make every day that she works?
10    A.  A site manager maybe could know
11  specifically what her workload was.
12    Q.  Okay.  Does NCO have a policy as to what
13  managers are expected to do if during the course
14  of monitoring one of these calls the manager
15  determines a violation of NCO policy or the FDCPA
16  has taken place?
17    A.  Repeat that.
18    Q.  Sure.  Let's say there's a situation.  I
19  would assume that Latisha is not told, hey, the
20  very next call we're going to monitor.  This is
21  something she would not know about.  Is that
22  right?
23    A.  Yes.
24    Q.  Let's say in the course of one of those
25  phone calls a blatant clear violation of NCO

Page 68

1  policy or FDCPA takes place.  She calls and she
2  says I'm going beat you up if you don't pay me.  I
3  mean, just something outlandish.
4      What would you expect or what would NCO
5  expect a manager to do in that circumstance?
6    A.  Well, to intervene in the call, if it's
7  still going on or immediately counsel the
8  representative.
9    Q.  Okay.  And would one of those discussion
10  forms we looked at, would that likely be generated
11  in that instance?
12    A.  I would assume so if it was beating
13  someone up as you referred to.
14    Q.  All right.  Do managers monitor every
15  single call made by these collectors?
16    A.  No.
17    Q.  Do you know how many calls per day
18  managers are expected to monitor?
19    A.  No.  It depends on the size of the office,
20  number of reps.
21    Q.  Do you think that there would be fewer
22  violations of the FDCPA if NCO monitored every
23  single call?
24      MR. SCHULTZ:  Let me object to the extent
25  you're asking him to speculate.

17  (Pages 65 to 68)

Page 69

1    A.  It's hard to say.  I mean, when the rep is
2  on the phone, you know, whether you're monitored
3  or not, you know, they could still make a mistake.
4  BY MR. SEALS:
5    Q.  So you don't think those would be reduced
6  if NCO -- if say a collector knew every single
7  call was monitored?
8    A.  Collectors don't know now when we're
9  monitoring, so they should assume they're always
10  monitored.
11    Q.  Is there any reason why NCO does not
12  monitor every single call?
13    A.  Monitor every single call?
14    Q.  By every single collector.
15    A.  Staffing, it would be impossible.
16    Q.  Okay.  Staffing, you couldn't hire enough
17  people to do it?
18    A.  I don't know that you would -- I don't
19  know if you could.  I mean, it's -- I don't know
20  if it's a job that you would apply for, I guess.
21  I don't know.
22    Q.  Okay.  I mean, is it too expensive?
23    A.  Operationally I don't know that it makes
24  sense.
25    Q.  Okay.  And why is that?

Page 70

1    A.  Well, we monitor now, so it's -- to
2  monitor every single call it just operationally
3  does not make sense.
4    Q.  Okay.  So Latisha I think is -- I think
5  you'd agree with me she's made more phone calls
6  than have been monitored.  Is that a fair
7  statement?
8    A.  Yes.
9    Q.  Of those phone calls -- and we can go
10  through them and count them up if you want, but I
11  would probably assume there were less than 20 that
12  have been monitored.  Would you disagree with that
13  based on the forms that have been provided to me?
14    A.  Less than 20, no.
15    Q.  You wouldn't agree with that?
16    A.  That there have been less than 20 calls
17  monitored?
18    Q.  Made by Latisha Williams.
19    A.  I wouldn't.
20    Q.  Maybe I misunderstood you.  My
21  understanding was every single time a manager
22  monitors a call one of these forms is generated.
23  Is that correct or incorrect?
24    A.  This could be multiple calls is what I
25  told you earlier.

Page 71

1    Q.  It could be.  And if you want, we can sit
2  here and count them all up, but my estimate is
3  based on the fact it's nine pages and the most per
4  page is two, there are probably less than 20 that
5  have been monitored according to these forms.  Do
6  you agree with that or disagree?
7    A.  The forms in the back, they're different
8  style forms, and some of the monitoring was
9  changed over that point.  So I can't tell you
10  looking from this form if only one or two calls
11  were monitored.
12    Q.  Okay.
13    A.  It seems to be that on the first one you
14  said lacking proper activation on new business,
15  you wouldn't be able to determine that looking at
16  one account.
17    Q.  Okay.  So there could be multiple calls on
18  that account maybe they were trying to help her
19  with.  Is that fair?
20    A.  Yes.
21    Q.  Okay.  Who at NCO is allowed to monitor
22  these calls?
23    A.  Managers.  We have a department now that
24  monitors.
25    Q.  There's a separate monitoring department?

Page 72

1    A.  Yes.  Currently, yes.
2    Q.  How many employees are in the monitoring
3  department?
4    A.  I mean, different areas have their own.  I
5  don't know exactly how many.
6    Q.  Who would know?  Who would be the best
7  person to ask that?
8    A.  I mean, I can get that information.  I
9  just don't have it with me today.
10    Q.  Okay.  That's fair.  I can send discovery
11  for that.  Do you know if that monitoring
12  department was in existence in June of 2011?
13    A.  I would have to check.  Based on the
14  client that she was working, it's possible.
15    Q.  I think her client was Bank of America.
16    A.  Correct.
17    Q.  Does that help any?
18    A.  At this moment it doesn't, but it's
19  something I could find out.
20    Q.  Okay.  It looks like managers are allowed
21  to monitor.  You said that.
22    A.  Yes.
23    Q.  How many managers would she have?
24    A.  She would -- again, the site may have a
25  supervisor.

18  (Pages 69 to 72)

GREG STEVENS                                                      03/20/2012

| Page 73 |
| --- |

1  Q.  Okay.
2  A.  A manager, division manager and a general
3  manager.
4  Q.  Okay.  So two or three.  Is that fair?
5  A.  Yes.  She wouldn't directly report to all
6  three.  She reports directly to her supervisor.
7  Q.  All right.  I want to show you what I'm
8  going to mark as H and ask if you know what this
9  is.  Let me mark this one, sir, and I'll give it
10  to you.
11      (Plaintiff's Exhibit H was marked for
12  identification.)
13  Q.  Do you know what that document is?
14  A.  Yes.
15  Q.  What is that document?
16  A.  It provides for when an employee makes an
17  error and we are required to pay based on that
18  error that they contribute a portion of our
19  expense.
20  Q.  Looks like 25 percent or the maximum
21  amount of 500.  Is that correct?
22  A.  Correct.
23  Q.  Do you know if Latisha Williams has been
24  required to pay NCO for any costs as outlined in
25  Exhibit H?

| Page 74 |
| --- |

1  A.  Not that I'm aware of.
2  Q.  Just so we're clear, it appears to be her
3  signature.  I know you're probably not familiar
4  with it, but it appears to be her signature on the
5  date of 2/4/11.  Is that fair?
6  A.  Yes.
7  Q.  Now the last thing I really want to get
8  to, have you seen the answer that's been filed in
9  this case?
10  A.  Yes.
11  Q.  Okay.  Here you go, sir.  Do you want me
12  to mark that?
13      MR. SCHULTZ:  No.  Whatever you want.
14  BY MR. SEALS:
15  Q.  For safety sake, here you go.  Here's I,
16  sir.  Does that appear to be a copy of the answer
17  filed on October 11, 2011?
18      (Plaintiff's Exhibit I was marked for
19  identification.)
20  A.  Yes.
21  Q.  So that I'm clear, are you aware, is NCO
22  engaged in the business of collecting consumer
23  debts?
24  A.  Yes.
25  Q.  Does it regularly attempt to collect as

| Page 75 |
| --- |

1  well as collect consumer debts allegedly owed to
2  another?
3  A.  Yes.
4  Q.  Are you familiar at all with what's known
5  as the bona fide error defense?
6  A.  I'm not a legal expert, but I have heard
7  the term, yes.
8  Q.  Are you aware of any procedures that NCO
9  has adapted to avoid collectors from asking third
10  parties to deliver call back messages to consumers
11  at all?
12  A.  Yes.
13  Q.  What procedure would that be?
14  A.  The ones we've spoken of earlier.
15  Q.  When you say the ones we've spoken of
16  earlier, do you mean the training that we talked
17  about?
18  A.  Training materials.
19  Q.  Any other procedures that you're aware of?
20  A.  Training materials, provide them the
21  monitoring feedback.
22  Q.  Okay.  Other than the training materials
23  and monitoring feedback I think we both discussed,
24  anything else that you're aware of?
25  A.  Relating to just third party information

| Page 76 |
| --- |

1  or just anything?
2  Q.  Any procedures that NCO has adapted to
3  avoid collectors from asking third parties to
4  deliver call back messages.
5  A.  The training documents we discussed.
6  Q.  Is that it as far as you know?
7  A.  Yes.
8  Q.  Have they adopted any procedures to avoid
9  collectors from identifying the third parties
10  they're calling from NCO without being expressly
11  asked that you're aware of?
12  A.  Yes.
13  Q.  What are those?
14  A.  Again, the policies and procedures of the
15  training manual.
16  Q.  Anything else?
17  A.  The training class.
18  Q.  The training class, training manual.  Do
19  you know of anything else as you sit here today?
20  A.  No.
21  Q.  All right.  Are you aware of any evidence
22  that Ms. Williams -- any of Ms. Williams'
23  statements in the phone call to Greg Lindsey were
24  in any way unintentional or accidental?
25      MR. SCHULTZ: I'm just going to object to

**FREEDOM COURT REPORTING   877-373-3660**

**GREG STEVENS**                                           **03/20/2012**

Page 77

```
 1    the extent that you're asking the witness to
 2    assume the statement is accurate.  You can
 3    still answer the question.
 4  BY MR. SEALS:
 5    Q.  Well, let me back it up.  Ms. Williams
 6  made some statements in the phone call to Greg
 7  Lindsey, didn't she?
 8    A.  Yes.
 9    Q.  Do you know of any evidence at all or does
10  NCO know of any evidence that the statements made
11  in that phone call were accidental or
12  unintentional in any way?
13    A.  I think where she referred to the consumer
14  as a reference where our notes indicate that they
15  were a relative, that she misinterpreted that.
16    Q.  Any other statements accidental or
17  unintentional?
18    A.  Well, I mean, obviously she made a mistake
19  when she identified NCO Financial in the opening
20  of the call.
21    Q.  Okay.  But what I'm asking -- and maybe
22  I'm not asking this very well, do you have any
23  evidence that it was unintentionally done or did
24  she intentionally say I'm whatever it says.  I'm
25  Latisha Williams calling from NCO Financial
```

Page 78

```
 1  Systems, if you know.
 2    A.  I don't know.  I can't speak for her.
 3    Q.  Fair enough.  Same with Ms. Kay Lindsey,
 4  the phone call there, do you know of any
 5  statements that were unintentional or accidental
 6  that Latisha Williams may have made?
 7    A.  I can't speak for Latisha.
 8    Q.  Fair enough.
 9    MR. SEALS:  I think that I'm finished.
10  Can I have just literally a minute?
11    (Break from 2:26 p.m. to 2:28 p.m.)
12  BY MR. SEALS:
13    Q.  Is it a fair statement that NCO spends
14  time and resources to train its collectors as best
15  it can to comply with the FDCPA?
16    A.  Yes.
17    Q.  And the reason for that is that NCO
18  understands a collector that is not trained is
19  likely to violate the FDCPA as opposed to a
20  collector that is trained.  Is that a fair
21  statement?
22    A.  Sure.
23    Q.  And NCO understands that.  That's why you
24  spend the money to train folks, right?
25    A.  Yes.
```

Page 79

```
 1    Q.  And you understood that back in June of
 2  2011 just like you do today.  Is that fair?
 3    A.  Yes.
 4    Q.  All right.
 5    MR. SEALS:  I think that's all I have.
 6    MR. SCHULTZ:  We have no further
 7  questions.  We'll waive signature, unless you
 8  want to look at it.  We'll waive.
 9    COURT REPORTER:  Are you ordering?
10    MR. SEALS:  Yeah.  I'll order.
11    COURT REPORTER:  Do you want a copy?
12    MR. SCHULTZ:  Yeah, e-mail.
13    (Deposition concluded at 2:30 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 80

```
 1             CERTIFICATE OF OATH
 2
 3  STATE OF FLORIDA
 4  COUNTY OF HILLSBOROUGH
 5    I, LINDA BARROS, Notary Public, State of
 6  Florida, certify that GREG STEVENS, personally
 7  appeared before me on March 30th, 2012, and was
 8  duly sworn.
 9    Signed this 30th day of March, 2012.
10
11
12
13
14
15
        _____
16    LINDA BARROS
      Notary Public - State of Florida
      My Commission No. DD903934
17    Expires:  August 5, 2013
18
19
20
21
22
23
24
25
```

**FREEDOM COURT REPORTING   877-373-3660**

**GREG STEVENS**                                              **03/20/2012**

Page 81

1          CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA
4    COUNTY OF HILLSBOROUGH
5          I, LINDA BARROS, Court Reporter and
6    Notary Public, certify that I was authorized to
7    and did stenographically report the deposition
8    of GREG STEVENS; that a review of the transcript
9    was not requested; and that the foregoing
10   transcript, pages 1 through 79, is a true and
11   accurate record of my stenographic notes.
12         I FURTHER CERTIFY that I am not a
13   relative, or employee, or attorney, or counsel of
14   any of the parties, nor am I a relative or
15   employee of any of the parties' attorney or
16   counsel connected with the action, nor am I
17   financially interested in the action.
18         DATED this 27th day of March, 2012.
19
20
21
22

23   _____
     LINDA BARROS, Court Reporter
24
25

**FREEDOM COURT REPORTING    877-373-3660**

GREG STEVENS

03/20/2012

Page 82

**A**

able 39:20 71:15
absolutely 7:25
  24:17 26:16
  43:1
accidental 76:24
  77:11,16 78:5
account 11:18
  12:10 14:19,22
  36:19 39:12,21
  41:18 48:18
  51:1 55:6,16
  55:25 57:2,6
  59:10 71:16,18
  67:2
accounts 12:7
  12:20 39:23
  46:13 50:10,11
  50:18,21,24
  51:9 66:15
  67:2
accurate 33:13
  33:25 42:21
  43:14,21 77:2
  81:11
acknowledge...
  3:11 17:4
acquired 47:1
acquisition 5:12
  5:18 27:24
acted 55:13,22
action 51:4
  81:16,17
actions 39:21
activation 50:9
  50:24 71:14
actively 52:10
activities 11:17
  12:5
activity 22:5
adapted 75:9
  76:2
added 61:6
additional 17:13
  61:5,14,15
address 22:11

41:13 50:22
addresses 21:24
  41:12
adhere 6:15
admit 13:1
adopted 76:8
advise 6:24
affairs 39:10
affirm 4:3
affirmative 3:17
affirming 17:20
agencies 8:3
agency 30:20
agents 12:7,18
ago 43:9 58:23
  58:24
agree 16:18
  17:20 28:16,20
  70:5,15 71:6
agreed 3:21
ahead 32:9
ahold 28:9 32:21
alabama 1:1 2:4
alias 11:24,25
allegation 55:10
allegations 59:4
  59:13,19 60:20
  61:15
alleged 11:18
  12:11 32:23
allegedly 75:1
allison 2:11
allowed 23:9
  71:21 72:20
amended 61:11
  61:13
america 72:15
amount 73:21
annually 7:17
answer 3:17
  4:21 13:11
  14:10 26:11
  30:18 37:1,4
  52:18 74:8,16
  77:3

answered 27:1
answers 7:4
anytime 38:16
  62:18
apologize 27:1
apparently 59:5
appear 33:12
  36:20 37:20
  49:19 52:20
  54:8 74:16
appeared 2:11
  80:7
appearing 2:5
  2:10
appears 33:14
  39:13 49:22
  53:8 56:1,19
  57:7 59:14
  60:20 74:2,4
apply 69:20
appropriate
  40:8
approximately
  9:18
april 53:2 55:12
  65:14
areas 51:21 72:4
arent 25:24
  32:17
asked 24:23,24
  25:2,8 30:3,7
  30:10,12,13,15
  31:7 42:4 44:3
  45:5 47:13,23
  48:24 64:15
  76:11
asking 22:17,19
  39:22 42:11
  68:25 75:9
  76:3 77:1,21
  77:22
asks 24:15,19
associated 37:8
assume 6:23
  8:16 17:8 19:1

19:14 22:20
  54:21 57:17
  62:11 67:19
  68:12 69:9
  70:11 77:2
attempt 32:2
  74:25
attempting
  24:25
attention 43:17
attorney 59:14
  59:17 60:1
  63:9 81:13,15
attorneys 59:21
audit 5:10 6:16
august 80:17
authorized 81:6
automated 39:3
avoid 75:9 76:3
  76:8
aware 15:9,16
  25:22 45:16,18
  45:21 57:22
  59:12 60:23
  62:4,7,18,23
  62:25 65:2
  74:1,21 75:8
  75:19,24 76:11
  76:21

**B**

b 3:8,10 4:18
  15:12,14 21:12
back 4:22 7:11
  13:10 16:24
  19:12 24:6
  35:8,19,23
  36:23 40:4,8
  40:18 41:7,22
  42:13 43:8
  45:6,15 47:25
  58:6 71:7
  75:10 76:4
  77:5 79:1
bad 50:8,22

bank 72:15
barros 1:18 80:5
  80:15 81:5,23
based 19:3 20:1
  21:3 42:5,9
  50:1 51:17,22
  53:8,10 56:1
  57:8 59:19,22
  65:1 70:13
  71:3 72:13
  73:17
basically 6:9
basis 13:11
bate 21:12
bates 21:13 29:7
  34:6 49:7,12
  49:20 52:19
  53:14 54:8
  55:4,18 56:15
  57:24 60:11
  64:1
bear 6:22
beat 68:2
beating 68:12
beginning 38:2
behalf 2:5,10
belabor 40:5
believe 13:25
  39:9 45:22
  49:5
believes 40:7
best 67:7 72:6
  78:14
better 34:15
  50:11,18
beyond 46:1
binding 7:4
birmingham 2:4
  4:16
bit 12:3 21:11
blatant 67:25
bold 23:15 27:25
bona 75:5
bottom 21:13,17
  49:8 51:3 52:1

GREG STEVENS

03/20/2012

Page 83

56:19
**break** 43:5,7,8
  63:15 78:11
**bring** 43:17
**building** 2:3
**burman** 39:3,4
**buschwood** 1:16
**business** 12:19
  50:10,24 67:3
  71:14 74:22

---
**C**
**c** 2:1 3:1,11 4:1
  16:23 17:1
**call** 24:6 25:3
  28:17 29:18
  30:24 34:7,22
  35:19,23 37:8
  37:17,18 38:21
  40:4,8,14,18
  40:19,20 41:7
  41:8,9,20,22
  42:2,11 43:1
  44:1,21 45:6
  47:24 56:8
  64:23 66:5,7
  67:20 68:6,15
  68:23 69:7,12
  69:13 70:2,22
  75:10 76:4,23
  77:6,11,20
  78:4
**called** 34:1,2
  35:10 38:6,7
  41:21 50:25
  51:1 53:15
**calling** 26:10
  27:18 30:7,19
  31:6 40:25
  44:19 76:10
  77:25
**calls** 22:8 25:5
  26:1 28:7
  30:24 32:25
  33:1,2 37:15

40:13 42:10
44:8 51:15
52:12,16 55:19
57:2 59:8,9
61:3,5 63:9,24
65:2,9,13,15
65:16,16,21
66:12,17,20
67:8,14,25
68:1,17 70:5,9
70:16,24 71:10
71:17,22
**cannizaro** 2:12
**cant** 26:11 55:10
  71:9 78:2,7
**carry** 65:18
**case** 1:3 14:1
  45:2 48:10
  53:25 60:5
  74:9
**cases** 9:12
**caused** 59:6
**cc** 36:22,23,23
**certain** 10:12
  29:21 48:7
  67:1,1
**certificate** 3:4,5
  80:1 81:1
**certify** 80:6 81:6
  81:12
**chance** 15:11
**change** 9:1 20:9
  20:13
**changed** 7:15
  15:7 37:4 71:9
**changes** 7:21
  20:20
**chasing** 62:17
**check** 72:13
**chicago** 2:9
**circuit** 21:6 34:6
**circumstance**
  40:7 62:3 68:5
**circumstances**
  9:11

**claims** 5:21,22
  10:22
**class** 76:17,18
**clear** 7:25 14:5
  16:1 17:8
  24:17,22 26:2
  32:14 40:11
  45:1 62:18
  67:25 74:2,21
**clerical** 36:24
**client** 6:15,16
  32:23 45:5
  47:24 63:9
  72:14,15
**clients** 59:3,10
  60:20
**cochrun** 2:2
**codes** 39:23
**collect** 11:8 32:2
  32:2 48:19
  74:25 75:1
**collected** 12:12
**collecting** 12:19
  36:18 39:12
  54:10 74:22
**collection** 6:1
  7:11 8:3,18 9:5
  11:3,6,12,17
  12:7,10,18
  16:5 17:21
  30:20 33:17
**collector** 15:12
  15:20 17:17
  19:22 20:2
  21:4 23:8,16
  23:20 24:5,11
  24:19,20 25:5
  27:25 28:7
  29:9 30:6,24
  31:21 36:17
  42:2 45:25
  47:11 49:25
  52:17 54:3
  55:5 56:17
  57:20 61:24

62:4 65:25
66:2,8 69:6,14
78:18,20
**collectors** 8:6,13
  15:24 16:11,19
  17:3,6 18:12
  18:16,21 19:15
  20:8,16 27:13
  29:20 39:22
  44:19 54:20,22
  55:2 57:25
  61:16 65:22
  66:20 68:15
  69:8 75:9 76:3
  76:9 78:14
**colon** 23:10
**come** 6:13 20:4
**comes** 20:3,7
**commission**
  54:18 80:16
**commissioned**
  55:1
**commissions**
  54:23
**communicating**
  27:16
**communicatio...**
  17:13
**companies** 7:11
  7:14
**company** 5:13
  5:19 6:5 9:3
  20:5 55:12,22
  56:25 61:19,21
**compass** 5:14,15
**complaint** 10:23
  59:3
**compliance** 3:11
  5:10 6:10,12
  6:15,21,25
  18:11 21:8
  22:20 26:3
  59:21,25 60:2
  62:10
**comply** 8:13

17:20 18:12
78:15
**computerized**
  12:5
**concern** 41:3
**concerned** 43:20
**concerning**
  29:11
**concluded** 79:13
**conclusion** 22:8
  26:1,10 30:17
  32:8 44:9,14
  45:14 53:10
**conduct** 58:12
**confirm** 29:25
**confirming**
  29:10
**confused** 58:22
**confusing** 56:16
**connected** 81:16
**consumer** 8:4
  18:22 21:20
  22:3,14 23:4,6
  24:9 25:7,10
  29:11 32:3,7
  35:17,18 39:9
  50:13,16 55:15
  74:22 75:1
  77:13
**consumers** 8:6
  8:14 22:22,25
  23:10 28:8
  47:3 75:10
**contact** 18:22
  21:22,23 36:8
  36:13 67:4
**contacted** 36:1
  37:3
**contacting** 24:9
**contacts** 57:3
**contents** 11:15
**context** 9:14
**continually**
  27:18
**contribute** 73:18

GREG STEVENS

03/20/2012

Page 84

| | | | | |
|---|---|---|---|---|
| control 5:21,23 6:10 | county 80:4 81:4 | dd903934 80:16 | deponent 3:23 4:7 | 59:5 |
| conversation 45:4 47:23 | couple 15:4 18:2 65:17 | deal 13:15 62:13 62:14 | deposition 1:13 3:9 4:19 9:8,13 | discovery 72:10 discussed 14:21 44:6 45:12 |
| conveys 29:24 | course 4:16 12:18,19 17:16 | dealing 62:11 | 10:7,7 14:15 37:13 46:9 | 47:15 48:6 49:18 59:24 |
| convicted 10:2 | 19:15 32:24 | debt 6:1 7:10 8:6 8:17 9:5 12:11 | 79:13 81:7 | 75:23 76:5 |
| copies 34:20 | 36:18 60:14 | 16:4 17:21 | depositions 9:17 | discussion 53:15 |
| copy 74:16 79:11 | 67:13,24 | 23:8 28:8 32:2 | designated 7:2 | 53:20,21 61:25 |
| corporate 7:3 | court 1:1,19 4:16 9:24 79:9 | 36:17 45:25 54:2 | details 11:15 | 68:9 |
| correct 4:25 | 79:11 81:5,23 | debtor 36:13,15 | determine 37:6 37:17 71:15 | discussions 54:9 57:24 |
| 7:24 8:21 12:1 | crime 10:3 | 41:1 | determined | distance 12:17 |
| 12:2 14:7,9 | critical 52:1,3 | debts 11:8 74:23 | 61:24 63:7 | distinction |
| 15:21,22 16:2 | 52:21 | 75:1 | determines | 40:13 |
| 16:12,13,17,20 | cryptic 17:18 | deceptive 32:1,6 | 61:17 67:15 | district 1:1,1 |
| 17:9,24 19:2 | curious 36:15,22 | 32:16 | development | dive 13:5 |
| 19:17 22:15 | current 5:5,9 | decided 34:25 | 51:12 | division 1:2 73:2 |
| 23:11,13 25:20 | currently 62:16 | defendant 1:10 | didnt 23:23 | document 16:24 |
| 25:21 27:5,6,9 | 72:1 | 2:10 11:2,7,24 | 27:10 40:17 | 17:18 49:21,24 |
| 28:4,18,24 | | 12:6,12,17 | 42:15 77:7 | 50:2 51:19 |
| 29:12,25 30:1 | ____D____ | defendants | difference 22:21 | 55:6,23 56:5 |
| 30:16 31:8,11 | d 3:12 4:1 33:5,8 | 10:21 11:12 | 22:24 23:3 | 60:10,19,19 |
| 34:10 35:9,12 | 36:8,13 41:24 | 13:11 | different 7:14 | 73:13,15 |
| 35:24 36:2 | 43:25 | defense 75:5 | 9:2,12 18:8 | documentation |
| 40:19 41:17 | dana 28:9 | defenses 3:17 | 52:21,22 61:22 | 12:4 |
| 42:4 44:4,7,24 | dash 36:25 37:1 | definition 23:22 | 71:7 72:4 | documenting |
| 44:25 45:6,13 | 37:1 | 23:24 | differently 34:8 | 57:3 |
| 46:6 47:13,18 | database 47:2 | definitions | difficult 13:24 | documents |
| 47:19,25 48:4 | date 1:14 7:23 | 22:18 | direct 3:2 4:11 | 14:13 15:1,3 |
| 48:12 53:3 | 8:24 9:21 | deliver 24:19 | directly 73:5,6 | 19:13 49:4,17 |
| 54:11 59:11 | 19:23 38:22 | 25:9,19 75:10 | director 18:10 | 52:25 53:19 |
| 64:4 70:23 | 39:1,13 41:20 | 76:4 | 22:20 26:3 | 60:3 76:5 |
| 72:16 73:21,22 | 58:2 64:20 | demand 59:22 | 62:9 | doesnt 22:22 |
| correcting 29:10 | 65:18 74:5 | demonstrating | disagree 42:24 | 36:20 72:18 |
| correctly 30:4 | dated 50:2 52:22 | 17:19 | 70:12 71:6 | doing 8:18 20:8 |
| 50:3 58:9 | 55:18 56:18 | department | disciplinary | 53:1 |
| 62:20 | 60:21 81:18 | 20:6,14 39:10 | 57:24 58:12 | dont 4:22 8:13 |
| correlate 62:22 | dates 34:4 39:14 | 59:21 60:1,3 | 60:19 | 9:21 10:1 |
| costs 73:24 | 52:1,3,21,22 | 62:10,14 71:23 | discipline 11:11 | 11:21 12:24 |
| couldnt 69:16 | 53:11 56:20,25 | 71:25 72:3,12 | disciplined 62:6 | 13:13 16:24 |
| counsel 3:22 | day 67:9 68:17 | depending 13:4 | disclosure 35:16 | 18:17,19 20:19 |
| 33:10 42:6,25 | 80:9 81:18 | 20:11,19 58:3 | 35:22 36:11 | 23:23 29:5,6 |
| 49:4 60:13 | days 39:17 | 67:2 | 41:22 | 32:15 33:3,14 |
| 68:7 81:13,16 | 52:22 53:6 | depends 66:14 | discovered 58:3 | 35:4 39:14 |
| count 70:10 71:2 | 58:23 | 67:3 68:19 | | |

GREG STEVENS

03/20/2012

Page 85

40:5 42:13,17
43:4 44:15
46:1 48:24
50:5 53:4,7
54:24 58:2
59:23 62:13
65:4 66:4,11
66:23,25 68:2
69:5,8,18,18
69:19,21,23
72:5,9 78:2
dot 35:13,14
draw 53:10
drive 1:16
duly 4:9 80:8
duties 6:9,18
51:21

_____

**E**

e 2:1,1 3:1,8,13
4:1,1 33:6,8
47:8
earlier 7:7 9:1
27:3 49:17
50:19 58:7
66:19 70:25
75:14,16
easier 13:18
26:21 27:20
34:23
easy 5:2
effect 29:22 66:9
efforts 11:8
eight 9:18,19
57:25 58:13
either 20:14
41:11 50:6
65:9
eleven 13:14
14:7
email 79:12
employed 16:2
employee 73:16
81:13,15
employees 11:3

11:12 12:6,18
32:24 72:2
employer 5:5
6:24 30:3,23
42:11
employment
23:11
engaged 74:22
entire 16:15
entitled 53:20
enumerated
32:17
error 73:17,18
75:5
esquire 1:17 2:2
2:7,12
estimate 71:2
evaluated 51:23
evaluation 52:6
evening 35:11
evidence 46:13
48:16 76:21
77:9,10,23
evolve 9:1
evolved 7:15
evolves 7:21
exact 9:21
exactly 36:9
50:11 72:5
examination 3:2
4:11
examples 31:14
excel 17:14
excluding 60:12
excuse 65:16
exhibit 3:9,10,11
3:12,13,14,15
3:16,17 10:6,9
15:12,14 16:23
17:1 21:12
33:17,19 41:24
43:25 47:8
49:9,12 63:21
73:11,25 74:18
exhibits 33:8

existence 65:6
72:12
expect 19:21
39:19,25 52:7
52:10 65:5
66:13 68:4,5
expectations
54:10
expected 67:8
67:13 68:18
expects 66:20
expense 73:19
expensive 69:22
expert 75:6
expires 80:17
explanation
16:16 24:7
expressly 3:23
30:2,6 42:4
44:3 47:13
76:10
extend 28:5
extent 14:2
22:16 63:8
68:24 77:1
external 20:13
eyesight 50:8

_____

**F**

f 3:14 33:17,19
34:17 36:25
37:4
fact 3:14 16:14
18:21 39:5
59:19 62:8
71:3
factual 13:11
failing 55:6,14
55:23 57:1
fair 6:25 7:19
8:5,7,9,12,22
14:4,25 15:10
18:13,15,19
19:4 26:13,19
28:22 38:23

43:21 46:2
52:19,19 53:9
54:3 55:4
56:13 62:12
66:16,19 70:6
71:19 72:10
73:4 74:5 78:3
78:8,13,20
79:2
fairly 42:20
false 31:14,17,21
32:1,5,16
familiar 14:25
37:23 38:3
54:5 58:8 74:3
75:4
far 7:11 15:19
19:3 22:10,13
36:4 43:20
76:6
fdcpa 6:13,24
7:8,13,15,16
8:1,13,24 16:6
16:9,12,15,16
16:20 18:12,13
18:17 19:6
21:2 22:6,11
22:18 23:1
24:21,22 25:23
26:4,6 27:8,11
27:13 28:20,24
29:14 30:15
31:19,25 32:5
44:7,13,16
45:13,19,23
47:17 48:8
61:17,20,25
62:5,19,24
63:7 67:15
68:1,22 78:15
78:19
february 19:19
56:21 58:17
59:5 60:7,9
61:1

federal 4:15
feedback 49:25
75:21,23
feel 49:6
felt 66:2
fewer 68:21
fide 75:5
field 6:1 16:5,9
figure 26:24
file 11:22 14:5
14:16,23 66:15
67:1
filed 4:15 19:13
60:5,22 74:8
74:17
files 11:16,20
filled 61:1 64:3
64:17,24
final 57:16
finance 6:5 9:3
financial 1:9
4:15 5:7,21,22
30:8,25 42:3
42:15 44:2,20
46:12 47:12
48:16 77:19,25
financially
81:17
find 38:5 50:11
50:18 64:7
72:19
fine 16:25
finished 53:12
78:9
fire 53:14
first 4:9 23:15
59:12 61:2
71:13
fishman 2:7
five 11:18 36:25
37:25 38:1
60:7
flag 21:7
flipped 41:19
florida 1:16 80:3

80:6,16 81:3
folks 78:24
follow 26:21
  52:3,8 55:14
  57:1
following 23:10
  31:20
follows 4:10
foregoing 81:9
forget 28:13
  30:22
form 3:15 49:22
  49:23 53:20,21
  55:8 56:19
  58:12,13 62:1
  63:6 64:3,17
  65:6,8 71:10
formatted 34:15
forms 53:16
  54:5 58:8 62:6
  62:12,13,14
  63:18,23 64:24
  65:11 66:4
  68:10 70:13,22
  71:5,7,8
forth 4:23 60:4
found 59:17
  62:4 66:17
four 36:21 61:3
frankly 12:25
free 49:6
friday 10:21
friend 32:20
front 33:18
  37:11 41:25
full 5:3
fully 57:1
functions 6:17
  6:19
further 61:9
  79:6 81:12
future 38:5

**G**

g 3:15 4:1 34:23

49:4,9,12
  63:21
gc 6:2
gears 21:11
general 73:2
generally 13:3
  19:22
generated 39:3
  68:10 70:22
gentleman 4:14
getting 58:21
give 4:4 27:21
  28:10 33:21
  35:15 45:5
  47:24 48:4
  50:15 73:9
given 4:19 9:8
  9:13,17 59:20
  62:6 66:13
gives 31:14
go 4:22 10:20
  12:25 13:10,23
  15:5 19:12,24
  21:12,14 32:9
  34:19 41:24
  43:2,3 45:15
  49:7 58:6
  63:17,17 70:9
  74:11,15
goes 20:1,14
  29:8 60:2
going 6:22 12:24
  13:23 14:3
  15:12 16:22
  21:11 24:7
  25:25 26:9
  27:21 29:2
  33:5 34:12,17
  34:25 38:20
  49:4 51:3 52:6
  66:22 67:20
  68:2,7 73:8
  76:25
good 5:1 6:23
  22:3

gotten 46:17
  47:5 63:19
greg 1:13 3:2,12
  4:8 5:4 13:3
  14:10 30:18,25
  32:9,25 33:5
  34:1 35:25
  41:9 42:1 44:1
  45:5 46:11,14
  48:10 65:3
  76:23 77:6
  80:6 81:8
gregory 34:6
  40:21 43:11
  45:1 46:4,18
  47:21
gregs 48:22,25
guess 35:19
  69:20
guessing 53:13
guidelines 8:2

**H**

h 3:8,16 73:8,11
  73:25
half 19:23
hand 43:13
hang 27:21
happen 58:2
happened 56:9
hard 52:18
  53:10 69:1
hasnt 12:22
havent 11:20
  15:7 34:11
head 8:19
hear 58:8 62:20
heard 43:18
  75:6
help 51:8,13
  71:18 72:17
helps 42:18
heres 25:10
  74:15
hereto 3:22

hes 13:16,16
  26:4 59:4
hesitant 50:14
hey 67:19
hi 28:8 30:24
hierarchy 57:15
hillsborough
  80:4 81:4
hire 19:22,24
  69:16
home 23:11 25:7
hope 16:18 25:4
hourly 54:18,20
  54:21
hyphen 36:23
hypothetical
  30:23

**I**

id 14:9 19:12
idea 47:4
identification
  10:10 15:15
  17:2 33:9,20
  49:10 73:12
  74:19
identified 42:3
  42:14 44:2
  47:12 77:19
identify 29:9
  30:3,19 44:19
  45:24
identifying 76:9
idiotic 6:22
ill 33:6,17,21
  45:15 56:15
  57:7 73:9
  79:10
illegal 31:1,22
  32:18
illinois 2:9
im 6:2 7:8,25
  12:24 13:2,22
  13:24 14:5,10
  15:9,11,16

16:22 17:8
18:5 21:11
22:19,25 24:16
24:17,22 25:4
25:9,25 26:2,9
26:10,11,24
27:23 28:9,25
29:2 32:20
33:5 34:12,25
37:23 38:3,4
38:20 39:21
40:10,19 42:19
45:16,20 49:4
50:20 51:3
52:9 53:4,5,12
53:18 54:1
56:6 57:8,22
58:21 59:18
60:10 62:7,17
66:22 68:2
73:7 74:1,21
75:6 76:25
77:21,22,24,24
78:9
immediately
  68:7
impermissible
  25:8
important 16:19
impossible
  69:15
improperly 21:1
improvement
  50:9,20 51:20
incidents 19:19
include 6:18
  21:21 35:1
includes 18:25
incorrect 14:8
  33:12 64:4
  70:23
indicate 51:19
  65:12 77:14
indicates 57:19
indication 39:11

41:10
**industry** 9:5
**info** 36:8,13
**information**
  20:5,16 21:3
  21:20,21 23:10
  24:25 27:21,25
  28:15,18 29:11
  30:11,16 31:4
  32:3,7 38:5
  46:22 47:2
  48:16 59:18
  60:25 72:8
  75:25
**infraction** 58:3
  58:14,15,21,22
  58:25
**initial** 19:24
**initially** 60:2
**initials** 34:20
**instance** 68:11
**intentionally**
  77:24
**interested** 81:17
**internal** 20:12
**interrupted** 52:9
**intervene** 68:6
**introduced**
  49:12
**introduction**
  16:15
**investigation**
  10:22 59:3,16
  60:8,24
**involve** 52:15
**involved** 11:16
**involving** 60:13
  65:22
**irrelevant** 12:3
**isnt** 41:13 50:8
**israel** 2:7
**issue** 20:3 53:23
  54:2
**items** 14:20
**ive** 14:16,19

---

15:3,18 34:25

---
**J**
---
**james** 2:7
**jim** 26:13
**job** 5:6,8 6:9,18
  9:3,4 17:15
  51:21 53:15,16
  53:20,21 57:24
  61:25 62:9,11
  69:20
**jobs** 5:25 6:1,4
  9:4
**july** 55:7
**june** 15:7 19:11
  19:20 34:1,2,5
  34:5,13 35:10
  36:10 37:15
  39:2,13,16
  40:19,20 41:7
  41:8,19 50:4,7
  52:2,3,12,12
  53:3 55:6,21
  56:25 58:16
  59:8,9,15
  64:19 66:9
  72:12 79:1
**jury** 6:8

---
**K**
---
**k** 2:7
**kay** 3:13 32:25
  33:6 34:2,5,7
  35:9 40:20
  41:8 47:9,10
  47:20,23 48:2
  48:11,15,17
  65:3 78:3
**kays** 49:1
**keep** 34:23
**keeping** 35:4
**kind** 17:15
  19:21 35:1
**knew** 69:6
**know** 7:10 9:21

---

11:21 12:24
  15:19 16:5,8
  17:14 18:19
  19:3,8,18
  20:22 22:10,14
  22:24 23:23
  24:3 26:5
  27:15 29:4,5,6
  33:14,22 36:4
  37:22 39:4,7
  43:6 44:15
  46:1,8,17 47:4
  48:24,25 50:3
  50:5 53:4
  54:17,22,25
  55:24 57:6,8
  59:4,16,25
  60:9 61:8 62:9
  62:24 63:5
  65:4 66:1,12
  66:23,23,25
  67:1,10,21
  68:17 69:2,3,8
  69:18,19,19,21
  69:23 72:5,6
  72:11 73:8,13
  73:23 74:3
  76:6,19 77:9
  77:10 78:1,2,4
**knowing** 56:9
**knowledge** 6:24
  17:19 46:25
**known** 75:4
**knows** 22:21

---
**L**
---
12:11 3:20
**lacking** 50:9,23
  71:14
**language** 29:21
**latish** 55:21
**latisha** 11:19
  15:20 18:25
  19:5 32:23
  39:19 42:2,11

---

44:1 45:4 46:4
  47:11 48:11
  49:6,23 51:8
  51:20,24 52:25
  53:25 54:9,17
  55:1,12 56:25
  63:5 64:17
  66:13 67:8,19
  70:4,18 73:23
  77:25 78:6,7
**latishas** 40:1
  65:13
**law** 7:21 20:7,13
  20:13 32:24
**laws** 17:21 20:4
**lawsuit** 4:15
  12:13
**lawyers** 33:5
  59:24
**laymans** 50:12
**learn** 58:22
**learned** 58:24
**leave** 23:16,21
  24:5,12 25:13
  26:6 27:4 28:1
  28:25 31:3,3
**leaving** 25:22
  26:25 40:7
**led** 60:25
**left** 34:9 35:16
  35:22 37:1,5
  37:20 38:7,17
  38:17,22 40:4
  40:17,18 41:7
  41:22 46:5
**legal** 22:8 26:1
  26:10 30:17
  31:1 32:8 44:8
  44:14 45:14
  75:6
**letter** 33:15,15
  59:14,17,22
**letters** 36:3
**level** 27:17
**lexis** 46:24 47:1

---

48:21
**life** 9:6
**likewise** 39:25
**limited** 31:20
  32:15
**linda** 1:18 80:5
  80:15 81:5,23
**lindsey** 1:6 3:12
  3:13 4:14
  32:25,25 34:6
  40:20,21 41:11
  44:1 45:1,5,10
  46:6,10,14
  47:9,11,20,21
  47:24 48:2,11
  48:12,15,17
  65:3 76:23
  77:7 78:3
**lindseys** 33:5,6
  37:12 43:11,24
  46:5,9,14,18
  48:10,17 55:25
  57:6
**line** 56:8
**listed** 46:11
  48:15
**listen** 42:17,25
  43:2,3,9,10
**listened** 14:19
  33:1,7 42:19
**listing** 52:2
**lists** 31:17
**literally** 51:14
  52:15 78:10
**little** 12:3 19:20
  21:6,11 42:14
  56:16 63:19
**live** 25:6
**lived** 41:11
**llp** 2:2,7
**lm** 38:19,20,22
**local** 12:16
**location** 21:21
  27:24 28:15,17
  29:10

long 5:11,15,22
  12:16 29:24
longer 36:8,12
look 33:11 34:3
  38:4 43:24
  47:8 49:20
  50:4 56:5,21
  61:2 64:4 79:8
looked 14:16
  19:8 66:19
  68:10
looking 6:2 23:8
  36:7,17 37:16
  38:4 53:4 55:7
  56:3 57:8
  60:10 62:1
  66:6 71:10,15
looks 35:10 50:2
  55:4 57:15
  60:6 64:2,12
  65:14,17 72:20
  73:20
lose 14:3
lot 34:14
lottery 32:12
loud 4:21
lug 16:24

_____ M _____
m 1:15,15 43:7,7
  63:15,15 78:11
  78:11 79:13
making 6:15
management
  5:14 11:11
  54:2 61:24
manager 20:15
  40:1,2 41:18
  50:15 51:11
  52:10 53:1,24
  64:23 67:10,14
  68:5 70:21
  73:2,2,3
managers 67:13
  68:14,18 71:23

72:20,23
manner 55:13
  55:23
manual 3:10
  12:5 15:13,20
  15:23 16:14
  23:14 29:8
  30:23 76:15,18
march 1:14 80:7
  80:9 81:18
mark 10:6 15:12
  16:22 33:5,16
  34:17 49:4
  73:8,9 74:12
marked 10:6,9
  15:14 17:1
  33:8,19 49:9
  73:11 74:18
materials 75:18
  75:20,22
math 8:18
matter 12:13
  13:25
maximum 73:20
maxine 39:3,4
mean 25:14
  28:16 32:4,10
  32:16 33:14
  35:14 36:4,9
  36:23 37:2
  38:14 41:15
  50:12,24 51:10
  52:4 53:6
  58:14 68:3
  69:1,19,22
  72:4,8 75:16
  77:18
means 28:3 32:2
  32:6,16 37:3
  38:12,16 39:25
  40:2 50:21
  51:14 66:24,25
meet 54:10
memo 3:11
  14:24 17:3

18:8 20:17
memory 42:10
memos 14:18
  15:6
mentioned 9:3
message 23:17
  24:5,10,13,20
  25:10,13,19
  26:7,25 27:19
  28:1,10 34:9
  35:16,22 37:2
  37:5 38:7,17
  38:18,23 40:8
  40:17,18,23
  41:7,22 45:6
  47:24 48:4
messages 23:21
  25:23 27:4
  29:1 37:20
  38:1 40:4,15
  40:24,25 75:10
  76:4
methods 11:1,6
  12:4
michael 1:6
  37:12 55:25
michal 46:6
mike 4:14 46:10
  46:13 48:4,12
  48:14,17 57:5
mikes 59:13
mind 5:19 6:8
  9:19 13:13
  34:16 35:4
  43:4
minute 78:10
misconduct 55:5
  56:17 58:1
misinterpreted
  77:15
misleading
  31:14,18,22
missed 64:2
mistake 69:3
  77:18

mistakes 43:16
misunderstood
  70:20
modules 17:13
moment 15:6
  43:8 72:18
money 54:10
  78:24
monitor 66:1
  67:20 68:14,18
  69:12,13 70:1
  70:2 71:21
  72:21
monitored 65:3
  65:9,13,22
  66:7,9 68:22
  69:2,7,10 70:6
  70:12,17 71:5
  71:11
monitoring 3:15
  35:15,16,21,22
  36:11 49:22
  52:11,16 63:18
  63:24 64:3,16
  65:25 67:14
  69:9 71:8,25
  72:2,11 75:21
  75:23
monitors 64:23
  70:22 71:24
monroe 2:8
month 6:12
  56:20 60:21
  65:23,25 66:9
months 9:22
  57:25 58:13,23
  60:7
mother 28:8
motion 14:3
move 32:22
moving 31:12
mrd 35:21
multiple 70:24
  71:17

_____ N _____
n 2:1 3:1,1,20
  4:1
name 4:13 5:3
  28:14
named 4:14
names 11:24
  12:1
narrow 40:7
nathan 2:7
nco 1:9 3:16
  4:15 5:7,11 7:2
  7:4,17 8:12
  9:12,14,17
  11:25 15:23
  16:2,11,19
  17:5,8,11
  18:10,11,15,21
  19:5 24:21
  25:22 26:3,6
  27:7,12 28:12
  28:17 29:17
  30:8,25 31:5,6
  31:9 32:4 39:2
  39:8,12 40:7
  42:2,3,15,16
  44:2,7,18,20
  45:13 46:13,17
  47:12,16 48:7
  53:21 55:6,14
  55:23 57:1,19
  59:12,23 60:24
  61:16 63:6,23
  64:22 65:21
  66:12,19 67:12
  67:15,25 68:4
  68:22 69:6,11
  71:21 73:24
  74:21 75:8
  76:2,10 77:10
  77:19,25 78:13
  78:17,23
ncos 17:9 20:8
  23:20,24 24:4
  24:18,22 25:7

25:19 26:24
27:2,3 29:15
31:19 32:24
33:4 47:11
54:10 57:3,23
**nearby** 23:17,21
23:22 24:3
28:1,2,5
**needed** 51:20
66:2
**needs** 50:8,10,17
50:20
**neighbor** 23:25
24:1,6 28:3
**never** 46:11
48:14
**new** 6:11,13
20:4,4,5,7,18
50:10,24 62:9
65:24 71:14
**nexus** 46:24
47:1 48:21
**nine** 13:14 14:6
53:19 65:11,12
65:15,15,16,16
71:3
**nineteen** 14:7
**north** 2:3
**northern** 1:1
**notary** 1:19 80:5
80:16 81:6
**note** 26:17 34:14
36:24
**notes** 12:10
14:19,22 33:17
37:16,19,21,24
38:14,20 41:6
56:7 57:9 60:4
66:6 77:14
81:11
**notice** 3:9 4:18
10:7 59:1
**noticed** 61:8
**notified** 20:9
**november** 64:13

**number** 11:18
13:14,22,24
22:1,3 23:11
24:12 25:1,11
25:13 28:11
37:3,7,11,12
37:14,18 38:6
38:13,13,21
40:15 41:14,16
46:5,6,14,15
46:18 47:1,6
48:11,12,18,21
49:1,12 50:22
66:18 67:2
68:20
**numbers** 21:13
21:22,23 50:11
50:18 51:1
53:17

**O**

**o** 3:1,20 4:1
**oath** 3:4 4:9 80:1
**object** 22:7
25:25 26:9
29:2 63:8
66:22 68:24
76:25
**objecting** 26:12
**objection** 22:16
26:17 30:17
32:8 34:18
35:2 44:8,14
45:14
**objections** 10:16
10:21 13:2
**obligations** 8:7
**obtain** 28:17
32:3
**obtuse** 25:5
**obviously** 77:18
**occasion** 25:17
**october** 74:17
**offended** 10:2
**offered** 21:25

26:4
**offers** 27:19
**office** 24:18
68:19
**offs** 51:9 67:4
**oh** 54:1 60:14
**okay** 5:1,8 6:7
7:18 8:5 9:19
9:23 13:7
14:13,17 15:10
15:19 17:16
18:10 20:21
22:13 23:7
24:8,14,24
25:4,17,22
26:2,16,18
27:23 28:25
29:7,17,20
30:6,14,22
31:5 32:22
33:16,22,25
34:11 35:6,20
35:22 36:15,21
37:10,10 38:1
38:25 39:11,17
41:2,15,18
42:9,23 43:24
44:18 46:1,25
47:4 49:14,20
50:23 51:3
52:9 53:14
55:4,11 57:10
58:7 59:1,12
60:5 61:4,16
62:3,17,22
63:5,20 64:9
64:15,22 65:1
65:5,11,20
66:3,8,12,16
67:12 68:9
69:16,22,25
70:4 71:12,17
71:21 72:10,20
73:1,4 74:11
75:22 77:21

**ones** 75:14,15
**ongoing** 7:18
64:20
**open** 9:24 31:4
**opening** 77:19
**operationally**
69:23 70:2
**opine** 22:17
**opinion** 20:25
**opposed** 40:14
40:24 78:19
**options** 50:16
**order** 63:20
79:10
**ordering** 79:9
**outlandish** 68:3
**outlined** 73:24
**outlining** 20:17
**outs** 8:6
**outside** 9:5
**owed** 75:1

**P**

**p** 1:15,15 2:1,1
3:20 4:1 43:7,7
63:15,15 78:11
78:11 79:13
**package** 14:18
14:24
**packages** 15:7
**page** 21:13 29:8
33:22 36:6,21
37:11 39:1
49:20 71:4
**pages** 71:3 81:10
**paid** 54:18,20,21
**paragraph**
31:24
**park** 1:16
**part** 5:12,17
6:12 17:10
21:24 27:15
46:10 59:1
62:11
**parties** 3:22

22:21,25 28:5
29:1 40:24
44:21 75:10
76:3,9 81:14
81:15
**party** 22:13 23:4
23:5,9 24:10
24:19 25:15
27:17 28:13
29:6 30:9
40:14 45:2
47:20 57:2
75:25
**pate** 2:2
**pay** 50:14,16
68:2 73:17,24
**people** 28:17
32:18 67:4
69:17
**percent** 43:21
73:20
**perform** 51:15
**performance**
50:1 52:5
53:23 61:21
**performing** 20:2
**period** 66:18
**permissible** 24:4
24:20,23,24
25:8,11 27:4
28:12,12,16
**person** 11:8,16
24:13,15 27:18
28:15 35:15,20
36:11,12 39:5
41:21 51:13
67:7 72:7
**personally** 51:23
80:6
**personnel** 11:15
11:20,22 14:16
14:23 19:9
20:23 49:6
**pertaining** 12:11
**phone** 13:15

21:22,23 22:1
22:3 23:11
25:1,10,12
29:18 32:25
37:10 41:8,9
41:14,15 42:10
42:11 46:5
48:11,17 50:13
50:22 64:23
65:2,9,13
66:18 67:25
69:2 70:5,9
76:23 77:6,11
78:4
**phones** 13:9
**pieces** 22:11
**pile** 16:25
**place** 1:16 19:11
19:19 23:11
57:11 58:4,12
58:14,15,23
60:8 67:16
68:1
**placed** 37:17,18
57:2
**plaintiff** 1:7 2:5
10:23 12:12
**plaintiffs** 3:9,10
3:11,12,13,14
3:15,16,17
10:9 11:17
15:14 17:1
33:8,19 49:9
73:11 74:18
**plan** 51:4,12
53:9
**please** 10:1
26:14 28:10
38:9 40:18
49:20
**point** 18:7 24:12
40:5 61:12
71:9
**policies** 31:19
76:14

**policy** 3:16 20:5
23:20 24:4,18
24:21,23 25:7
25:19 26:24
27:2,3,15
28:12 29:17
31:2,5 44:7,10
45:13,16 47:16
48:7 55:13,22
56:25 57:19,23
61:19,21 64:22
65:21,24 66:9
67:12,15 68:1
**portion** 73:18
**position** 6:11
**possible** 37:6
56:10 62:2
72:14
**practices** 8:4
11:1,6 31:18
31:20
**prepare** 60:3
**prepared** 10:14
10:23 11:3,9
12:23 13:16,16
**presented** 58:17
**presents** 20:15
**president** 5:9
6:10 18:11
21:8 62:10
**prevent** 18:12
**primarily** 22:2
**print** 23:16
27:25
**printed** 59:20
**prior** 5:13 14:14
56:19
**privilege** 63:9
**prize** 32:11,15
**probably** 6:22
8:19 18:6
29:16 38:1
50:21 70:11
71:4 74:3
**procedure** 75:13

**procedures**
55:14 57:1
75:8,19 76:2,8
76:14
**produced** 18:2
42:6 64:7,12
**product** 63:10
63:11
**professional** 9:6
**program** 17:9
**progressively**
57:17
**prohibited**
31:18
**prohibition**
31:19
**prohibits** 31:25
31:25
**prompting** 45:9
**proper** 50:9,23
71:14
**properly** 21:1,5
**protect** 8:2,3,3
**provide** 15:23
33:6 49:25
75:20
**provided** 15:20
21:4 33:4,10
46:14 48:17,22
70:13
**provides** 8:2
73:16
**public** 1:19 80:5
80:16 81:6
**pull** 60:3
**pulled** 40:1
59:18
**purpose** 4:16
8:1 49:24
**pursuant** 4:17
**put** 34:20

**Q**

**qualify** 11:18
**question** 5:2

22:19 26:11
39:1 60:23
77:3
**questions** 4:17
4:22 7:5 79:7
**quick** 34:20 43:5
**quickly** 10:13
**quite** 56:10
66:17
**quote** 23:8 51:7

**R**

**r** 2:1 4:1
**raised** 10:17
**read** 6:8 30:4
32:10
**reading** 3:22
24:17 39:19
50:3 54:11
**real** 34:20
**really** 74:7
**reason** 16:8
17:18 27:12
45:22 69:11
78:17
**reasons** 61:22
61:23
**recall** 14:14 33:3
42:13 66:11
**receivables** 5:14
5:16
**receive** 54:22
61:16,18,25
62:24
**received** 7:16
15:3 19:5
37:15 39:13
46:21 49:3
59:14,17 61:11
62:19 63:4,6
**receives** 54:19
**recognize** 16:23
**recognizes** 32:4
**recollection**
45:24

**record** 14:6
49:11 63:13
81:11
**recorded** 3:12
3:13
**recording** 35:16
42:16
**recordings**
14:19,22
**records** 12:10
12:14 19:9
20:23 49:6,11
53:8 55:6,23
57:3 64:11
66:18
**red** 21:7
**reduced** 69:5
**reference** 46:5
46:11,15 48:12
48:15 77:14
**references** 55:9
**referred** 68:13
77:13
**referring** 11:19
**regard** 16:20
18:16 21:2
26:3,25 46:12
48:18
**regarding** 54:9
57:1
**regularly** 74:25
**regulated** 22:6
**regulates** 28:21
**regulations** 6:13
**reinterpreted**
7:15
**related** 11:17
12:7 17:15
56:11 57:5
59:10 60:20
**relating** 57:2
75:25
**relative** 7:13
25:6,9 26:7
36:7,12 41:16

41:21 77:15
81:13,14
relevance 13:3
relevant 14:1
remember 42:10
42:20
remembering
42:9
rep 53:22,24
69:1
repayment 3:16
repeat 26:14
60:15 67:17
report 39:3 73:5
81:7
reported 1:18
reporter 1:19
3:5 4:3 79:9,11
81:1,5,23
reports 73:6
represent 4:14
representation
32:1,6
representations
31:15,22
representative
7:3 26:5 53:25
68:8
reps 68:20
request 24:25
requested 25:15
25:18 26:8
27:5 39:5
44:20 81:9
requesting 24:6
48:3,3
require 17:5
20:18 24:7
required 17:5
18:3 29:17
73:17,24
requirement
20:12,12,18
29:14,15
requirements

6:16 20:4
requiring 21:20
research 59:22
residence 23:10
resources 78:14
respective 3:22
retraining 20:3
review 15:11,17
49:23 51:22
52:8 53:22
62:15 81:8
reviewed 14:20
19:9 20:23,23
40:1 49:17
reviewing 14:14
41:19 54:2
right 6:7 7:22
8:16,20 9:16
9:23 14:13
16:16 28:19
31:10,12,12
32:20 35:8
41:5,24 45:2
45:12 47:8,21
48:8 49:3
50:17 51:7
52:17,23 54:17
55:18 57:23
61:23 64:13,18
67:22 68:14
73:7 76:21
78:24 79:4
rights 8:6,14
road 61:9
role 39:7
rolls 37:9
roughly 8:18
65:17

_____
S
_____

s 2:1 3:1,8,20,20
4:1
safety 74:15
sake 74:15
salary 54:19

saw 40:18
saying 24:11
29:5 35:8 56:6
65:15
says 17:19 23:8
23:16 27:25
28:8 30:2,22
31:17 34:13
36:7,22,25
38:21,22 41:16
50:8 51:4,7
52:1 55:11
56:16 57:12
68:2 77:24
schultz 2:7
10:16 12:21
13:1,7,13,22
14:9 22:7,16
25:25 26:9,17
26:20 29:2
30:17 32:8
34:19,24 35:3
40:12,22 41:3
43:2 44:8,14
45:14 54:13
60:12 63:8,12
64:19 66:22
68:24 74:13
76:25 79:6,12
screen 36:25
37:4
seals 1:17 2:2
3:2 4:12,13
10:19 12:24
13:6,8,18,20
14:4,12 22:9
22:19,23 26:2
26:13,15,19,22
26:23 28:9,10
28:14 29:3
30:21,25 32:13
34:16,22,25
35:4,7 40:16
41:2,4 43:4
44:12,17 45:17

54:14 60:14,16
63:11,14,16
64:21 67:6
69:4 74:14
77:4 78:9,12
79:5,10
second 37:11
61:5
section 16:15
21:16 23:7
27:13,24 31:13
31:17 50:9,20
51:5
see 21:16 23:18
34:9,13 38:10
38:16 39:14,20
40:17 41:5,6
41:15,20 51:4
58:11 63:18
64:1
seen 10:8 11:20
15:18 33:2
34:11 49:5,15
63:21 65:8
74:8
send 17:12
72:10
sense 69:24 70:3
sent 4:18 20:5
sentence 23:15
23:15
separate 71:25
september 55:18
56:18 60:6,6,8
60:22 64:3,6
serious 57:13
services 6:2
12:17
sessions 2:7
set 33:18 44:10
51:8
sets 8:5
sheet 3:14 39:6
59:20
shes 39:5 42:3

44:2 47:12
54:21 70:5
short 21:6 34:6
shorter 33:21
47:10
shortly 59:2,6
shouldnt 31:3
show 10:5 16:22
73:7
showing 65:8
side 51:7,8,10,10
52:14,14,15,15
53:1
sides 53:1
sign 17:3,6,17
17:23 18:3
20:19
signal 31:21
signature 17:20
74:3,4 79:7
signatures 56:20
signed 58:13,16
80:9
significance
51:18
significantly
15:7
signing 3:22
similar 18:8
29:23
single 68:15,23
69:6,12,13,14
70:2,21
sir 5:8 10:8
15:13 21:12,14
21:16 23:12,18
30:4 31:13,15
38:11 41:25
49:7,21 51:5
53:18 61:7
73:9 74:11,16
sit 20:22 51:14
54:25 71:1
76:19
site 20:15 67:10

GREG STEVENS

03/20/2012

Page 92

| | | | T | |
|---|---|---|---|---|
| 72:24 | spend 78:24 | 39:15 | t 3:1,1,8,20,20 | telling 6:8 9:19 |
| sites 66:1 | spends 78:13 | strategies 11:2,7 | tail 62:17 | 26:11 32:10 |
| sitting 52:17 | spoken 75:14,15 | street 2:3,8 | take 3:9 13:14 | tells 46:4 48:11 |
| situation 67:18 | staffing 69:15 | strictly 28:21 | 17:22 19:16 | ten 13:14 14:6 |
| six 9:18,19,22 | 69:16 | stuff 6:14 13:4 | 24:3,10 27:19 | 31:24 32:10 |
| 12:3 58:23 | stamp 29:7 | 66:15 | 33:11 34:3 | term 7:8 75:7 |
| size 67:2 68:19 | 49:20 57:25 | style 71:8 | 43:5 46:9 60:8 | terminate 25:2 |
| skip 13:9 21:19 | stamped 21:13 | subject 10:16 | taken 1:14,17 | terminated |
| 22:2,5 23:17 | 49:7,12 | 12:13 13:25 | 7:16 39:21 | 57:21 |
| 23:21 26:25 | standard 19:15 | subjects 12:22 | 67:16 | termination |
| 28:1 29:18 | standards 6:16 | suit 60:5,21 | takes 58:15 68:1 | 57:16 |
| 46:22 50:19 | start 5:1 27:2 | suite 2:8 | talk 10:17,24 | terms 50:12 |
| 51:9 52:11 | 51:18 52:6 | summary 53:15 | 11:3,9,12,21 | terribly 34:16 |
| 53:2 | started 16:4 | 53:20 61:25 | 12:8,13,20 | test 17:23 18:7 |
| skipping 50:10 | 19:18 53:11 | supervision | 13:12 42:25 | testified 4:9 9:23 |
| 50:18 | state 6:12 20:13 | 11:11 | 51:9 63:12 | 27:3 37:13 |
| slash 36:23 | 28:25 29:8,10 | supervisor | talked 7:7 15:10 | 46:11 48:14 |
| slow 54:13 | 55:20 80:3,5 | 20:15 50:15 | 25:23 35:15,20 | 58:7 |
| small 50:4 | 80:16 81:3 | 51:11 72:25 | 36:11,12,17 | testify 10:15 |
| snatch 34:12 | statement 3:12 | 73:6 | 40:6,6 41:21 | 13:4,17 67:7 |
| somewhat 8:8 | 3:13 7:19 8:5,7 | supplemental | 50:19 75:16 | testifying 42:20 |
| 8:10 | 8:10,23 14:25 | 20:1 | talking 7:8 | testimony 3:2 |
| sorry 13:22 25:9 | 18:13,15,19 | supply 30:10 | 22:25 30:8 | 4:4 |
| 50:20 52:9 | 19:4 43:22 | suppose 61:20 | 40:13,23 43:20 | tests 7:16 |
| 53:18 54:1 | 46:2 54:11 | sure 6:15 13:2 | 66:5 | thank 13:19 |
| sort 4:23 6:18 | 70:7 77:2 | 14:10 18:5 | talks 67:4 | 37:10 38:25 |
| 20:12 21:22 | 78:13,21 | 19:14 27:16,17 | tampa 1:16 | thats 6:11 8:9 |
| 32:11 45:9 | statements | 32:12 33:11,15 | tapes 43:9 | 12:2 15:10 |
| 52:16 65:18 | 76:23 77:6,10 | 40:12,22 47:16 | techniques 11:1 | 16:25 19:17 |
| sound 6:22 | 77:16 78:5 | 50:7 51:8 53:7 | 11:7 | 23:13 24:7,20 |
| southern 1:2 | states 1:1 56:24 | 54:15 56:3 | telephone 3:15 | 26:19 30:14 |
| speak 78:2,7 | status 36:25 | 58:5 59:18 | 12:16 38:12,16 | 31:9,11 34:10 |
| speaking 55:14 | stay 7:23 8:24 | 60:15,17 61:10 | 50:15 63:18 | 36:2,9 41:3 |
| specific 7:12 | stays 36:8,12 | 63:12 67:18 | telephonically | 42:21 43:1 |
| 55:10 | stenographic | 78:22 | 2:11 | 44:6 45:12 |
| specifically | 81:11 | swear 4:3 | tell 5:2 7:12 9:16 | 47:15 50:22 |
| 12:22 14:14 | stenographica... | switch 21:11 | 19:9 22:22 | 52:19,19 53:5 |
| 19:10 25:15,18 | 81:7 | sworn 4:9 80:8 | 27:13,20 32:15 | 53:14 55:4,8 |
| 29:5 44:15 | stevens 1:13 3:2 | system 13:15 | 34:7 36:17 | 56:6 63:20 |
| 45:20 61:19 | 4:8,13 5:4 43:9 | systems 1:9 5:7 | 37:23 38:3 | 64:6 66:16 |
| 67:11 | 80:6 81:8 | 12:16 30:8 | 39:15 49:21 | 72:10 74:8 |
| specifics 47:5 | stick 51:13 | 42:3,15 44:3 | 51:17 54:20 | 78:23 79:5 |
| 48:25 49:1 | stipulate 13:16 | 44:20 47:12 | 55:7,10,15 | theres 19:14 |
| speculate 53:5,7 | stipulated 3:21 | 78:1 | 57:5 71:9 | 20:3,9 21:6 |
| 68:25 | stopped 39:12 | | | 23:14 33:11 |

37:10 39:1
43:5 53:22
57:15 61:21
63:18 64:14
66:16 67:18
71:25
**theyre** 18:3,6,18
21:12 24:11,25
25:1 27:16,17
30:7,10,13
43:21 49:7
50:13 52:6,22
65:24 67:3
69:9 71:7
76:10
**theyve** 18:22
63:2
**thing** 17:15,23
21:22 33:16
36:4 57:7 74:7
**things** 6:13 9:1
32:21
**think** 9:9 13:1,3
13:15 15:4,10
16:14 17:22
21:8 27:3 34:7
35:9 40:25
42:15 59:9
62:17 63:19
66:4 68:21
69:5 70:4,4
72:15 75:23
77:13 78:9
79:5
**third** 22:13,21
22:24 23:3,5,9
24:10,19 25:15
27:16 28:5,13
29:1,6 30:8
40:14,24 44:21
45:1 47:20
57:2 75:9,25
76:3,9
**thought** 42:14
**three** 36:16 37:1

73:4,6
**ticket** 32:12
**tile** 17:12
**time** 1:15 26:14
38:22 40:18
41:6 48:18
62:8,23 64:23
70:21 78:14
**times** 37:19,22
38:6 56:8
65:15
**timing** 56:1
**title** 2:3 5:6,8,9
**today** 4:17 7:3
10:15 11:13,22
12:8 13:12
14:15,22,23,23
15:1,17 20:22
33:7 49:15,18
54:25 55:20
72:9 76:19
79:2
**told** 65:1 67:19
70:25
**top** 34:21 36:7
36:22 39:1
50:4 56:18
**topics** 10:12,14
**trace** 46:22 51:9
52:11
**tracing** 21:19
22:2,5 23:17
23:21 27:1
28:2 29:18
50:19 53:2
**train** 16:19
18:16,17 32:18
39:22 44:18,18
44:23 78:14,24
**trained** 18:23
21:1,1,5,9
78:18,20
**trainer** 20:15
**training** 3:10
6:19 7:12,18

8:23 11:2
14:18,18,24,24
15:6,6,13,20
17:9,13,17,25
19:5,10,15,21
19:24 20:1,6
20:14,24 23:14
29:8 52:11
75:16,18,20,22
76:5,15,17,18
76:18
**trains** 16:11
18:11 31:9
**transcribed**
42:22
**transcript** 3:23
42:1,1 43:25
44:1 45:8 47:9
47:10 81:8,10
**transcripts** 33:2
33:4 43:13,14
43:16
**transition** 27:20
**translate** 35:13
**true** 81:10
**truth** 4:5,5,6
**try** 28:17 32:6
**trying** 13:24
25:1 26:24
27:23 28:9
29:24 32:20
48:19 53:5
71:18
**ttpmrdlmforcb**
35:13
**ttpmrdttp** 36:7
**tuesday** 39:2
**turn** 31:13
**tv** 32:11
**tw** 38:10,16,21
**twelve** 13:14
14:7
**two** 5:17 24:18
51:1 58:23
71:4,10 73:4

**type** 6:14 32:21
40:23 66:15
67:2
**typically** 20:17
21:25 25:2,12
25:14 66:16

---
**U**
**u** 3:20
**undergo** 20:25
**understand** 4:21
4:22 7:2,8 13:6
18:1,7 25:4
28:2 39:20,23
40:2 42:7 50:5
**understandably**
16:11
**understanding**
4:24 8:1 11:25
34:1,3 35:25
70:21
**understands**
8:12 18:16
27:7 51:8
78:18,23
**understood** 79:1
**undertaken** 12:6
**undertook** 60:24
**unfair** 8:4
**unintentional**
76:24 77:12,17
78:5
**unintentionally**
77:23
**united** 1:1
**university** 17:8
17:11
**unknown** 36:9
36:13,14,15
**unprofessional**
55:13,22
**unusual** 58:11
58:18 60:17,18
**updates** 7:16 9:2
**upsetting** 27:18

**use** 7:7 11:24,25
17:12 29:20,21
29:21,23 32:1
32:5,17 46:22
57:7
**utilizes** 63:23

---
**V**
**vary** 67:5
**vendor** 46:21,23
**verbal** 55:5,20
57:13,16,20
**version** 15:5
**versions** 15:4
**vice** 5:9 6:9
18:11 21:8
62:10
**violate** 18:18
30:14 78:19
**violated** 8:14
32:24 55:12,21
56:25 61:17,18
61:24 62:5,19
62:23 63:7
**violates** 25:23
26:6 27:8,10
47:17 48:8
**violation** 32:5
44:6,10,13,16
45:13,15,19,20
45:23 47:15
48:7 67:15,25
**violations** 18:13
68:22
**volunteer** 30:7
31:6
**volunteered**
30:16 42:12
**vs** 1:8

---
**W**
**w** 1:17 2:2
**waive** 79:7,8
**waived** 3:23
**want** 10:5,18

GREG STEVENS

03/20/2012

Page 94

13:5 14:2
16:22,24 24:16
26:5 33:16
34:12,24 35:3
37:22 38:5
40:5,12,22
42:13,17,24
43:2,17 47:8
53:7 59:23
60:15 63:13,17
70:10 71:1
73:7 74:7,11
74:13 79:8,11
**wanted** 10:13
**wants** 48:3
**warning** 55:5,20
56:17 57:12,13
**warnings** 57:20
**way** 8:9 14:1
26:20 37:16
46:2 56:21
57:5 58:11
59:24 76:24
77:12
**week** 24:17
37:13 65:23
**welcome** 42:18
43:1
**went** 59:25
**west** 2:8
**weve** 7:16 10:17
10:20 19:8
75:14,15
**whats** 7:25
23:22,23 49:24
53:16,17,20
75:4
**whitney** 1:17 2:2
4:13 13:23
28:9,14 30:25
**whos** 53:24
**williams** 11:19
15:21 16:1
18:25 19:5
32:23 39:20

42:2 44:2 45:5
46:4 47:11
49:6 51:20,24
53:1 54:9,18
55:1,21 63:6
64:17 67:8
70:18 73:23
76:22,22 77:5
77:25 78:6
**witness** 77:1
**woman** 21:9
**won** 32:11,15
**word** 17:14
33:15,15,23,23
42:21,21 46:10
**words** 29:22
**work** 38:12,13
38:16 40:15
41:5 63:9,11
**workday** 66:13
66:21
**worked** 6:2,5
7:10
**working** 6:23
16:4,9 19:18
51:12 67:3
72:14
**workload** 66:14
67:11
**works** 39:9 67:9
**worse** 57:17
**wouldnt** 8:25
70:15,19 71:15
73:5
**wow** 21:8
**write** 23:23
61:13
**written** 56:17
57:12,16,20
58:16,24 59:7
**wrong** 28:25
40:19 43:6
54:12

**X**

x 3:8

**Y**

**yeah** 8:8 17:25
26:19 32:12
56:6 58:15
79:10,12
**year** 8:24,25
18:4,5 19:21
19:23 58:17
65:22
**years** 5:17 8:17
8:20,22
**yielded** 60:10,25
**youd** 14:10 70:5
**youll** 46:9
**youre** 18:10
22:17 23:8
29:24 32:10
36:6 40:13
42:18 43:1
48:7 56:3 58:7
62:4,8,9,18,23
65:15 66:5
68:25 69:2
74:3 75:19,24
76:11 77:1
**youve** 7:10 8:17
14:21 19:4
65:1

**Z**

**0**

**05** 63:15
**07** 63:15

**1**

**1** 43:7,7 50:2,4
60:6,6 64:14
81:10
**10** 3:9 36:22
**100** 43:21
**10th** 36:10
**11** 36:22 64:8
74:5,17

**1120** 2:8
**11cv03183wma**
1:3
**12** 1:15
**14** 35:10
**15** 3:10 31:14
43:7 52:3,12
53:3 55:21
56:21 59:5
60:9
**16** 34:1 36:22
37:9 55:21
**16th** 34:5 36:1
40:20 41:8,20
**17** 3:11
**18** 37:19 43:7
66:17
**1800** 28:11
**19** 13:22,23,24
**1982** 7:11
**1985** 5:24
**1998** 5:12

**2**

**2** 1:3,15 63:15
63:15 74:5
78:11,11 79:13
**20** 1:14 39:17
70:11,14,16
71:4
**2010** 19:19 55:7
55:7 64:3,6,8
64:13 65:14
**2011** 15:8 19:11
19:20 34:1,2
37:15 39:2,13
50:3 52:2,3,12
52:12 53:2,3
55:12,19 56:18
60:6,7,9 64:14
64:16 65:14
66:10 72:12
74:17 79:2
**2012** 1:14 56:21
59:5 60:9 61:1

80:7,9 81:18
**2013** 80:17
**2052323900** 2:4
**2056174773**
37:12
**20day** 66:18
**21** 55:21
**21st** 2:3
**248** 49:13 63:20
**25** 55:21 73:20
**254** 64:9
**255** 64:10
**256** 64:1
**257** 63:20
**259** 49:21 52:20
**26** 78:11
**260** 52:19
**261** 52:20
**262** 52:20
**265** 53:14,18,18
54:8,15
**266** 55:4
**267** 54:8,15
**268** 54:8,15
**269** 55:11
**270** 55:18
**271** 56:16 57:25
60:11 61:13
63:6
**272** 54:8,15
**273** 49:13 53:14
53:18
**27th** 39:16 81:18
**28** 39:2 78:11
**28th** 59:15
**29** 36:22 64:8,13
**295** 21:14,15
**296** 29:7

**3**

**30** 1:15 4:18
8:19,22 55:7
79:13
**300** 2:3
**301** 31:13

GREG STEVENS                                    03/20/2012

Page 95

**302** 31:24
**30b6** 26:4 59:1
**30th** 80:7,9
**3125780990** 2:9
**33** 3:12,13,14
**3350** 1:16
**33618** 1:16
**35203** 2:4

---
**4**

**4** 3:2 74:5
**400** 2:3
**45** 1:15
**49** 3:15

---
**5**

**5** 64:14 80:17
**500** 73:21
**55** 2:8

---
**6**

**6** 4:18 35:10
    36:22 37:9
    55:7,12
**60603** 2:9
**617** 38:21
**68** 34:6

---
**7**

**7** 39:13 64:3,6
**73** 3:16
**74** 3:17
**79** 81:10

---
**8**

**8** 52:2 53:2
    55:19 56:18
**80** 3:4
**804** 21:16 23:7
    27:24
**807** 31:13
**81** 3:5
**82** 6:3
**83** 6:3,5
**85** 6:6

---
**9**

**9** 34:2 52:12
**9th** 34:5,13
    35:10 40:19
    41:7