FILED

2012 Sep-12  PM 02:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL LINDSEY,           }
                          }
      Plaintiff,      }
                          }     CIVIL ACTION NO.
v.                   }     2:11-cv-03183-WMA
                          }
NCO FINANCIAL SYSTEMS, INC.,  }
                          }
      Defendant.      }
                          }

## **MEMORANDUM OPINION**

Before the court is the motion of defendant, NCO Financial Systems, Inc. ("NCO"), for partial summary judgment as to four of the five claims brought by plaintiff, Michael Lindsey ("Lindsey") (Doc. 27). This action arises out of two telephone calls made by an NCO employee who allegedly disclosed information to Lindsey's step-mother and brother regarding a debt that Lindsey owed.  In his amended complaint, Lindsey claims that NCO violated the Fair Debt Collection Practices Act ("FDCPA") and committed the state law torts of negligence, negligent training and supervision, wantonness, and reckless and wanton training and supervision.  NCO does not seek summary judgment on the FDCPA claim.  For the reasons set forth below, NCO's motion for partial summary judgment will be granted except for Lindsey's claim of wanton conduct based on *respondeat superior*.

BACKGROUND[1]

In June 2011 an unpaid debt allegedly owed by Lindsey to Bank of America was placed with NCO, a debt collector, for collection. After many unsuccessful attempts to contact Lindsey directly, including leaving multiple voice mail messages, Latisha Williams ("Williams"), as an employee of NCO, placed a call to Lindsey's step-mother.  Williams says that the call was an attempt to get a better telephone number for Lindsey or to confirm that she had his correct number.  During this call to the step-mother, Williams did not reveal that NCO was a debt collector or that she was attempting to collect a debt.   Instead, she said (quoting from a transcript of the call):

> Hi Kay, this is Latisha Williams from NCO Financial Systems.   Your number was, I have your number as a reference number for Michael Lindsey.   Calls are monitored and recorded.  I was unable to get in contact with him.   I am not sure if the number that I have is correct, would you have a good contact number for him or would you be able to relay a message to him?

(Doc. 29, Ex. 2).  When asked what the call was in reference to, Williams responded only that it was a "personal business matter." *Id.*

Several days later, still unable to get in touch with Lindsey, Williams called Lindsey's brother.  Again, Williams did not state that she or NCO was a debt collector or that she was attempting to

---

[1] Because of the procedural posture, all facts and their reasonable inferences are viewed in the light most favorable to Lindsey.

collect a debt.  During this call, Williams said:

> This is Latasha [sic] Williams from NCO Financial
> Systems.  Calls are monitored and recorded.  Your number
> was left as a reference number for Michael Lindsey and I
> was trying to get a hold of him.  The number that I have
> is not—I don't think that it's a good number.  Would you
> be able to give him a message to call me?

(Doc. 29, Ex. 3).  When asked by the brother the purpose of the
call, Williams told him that she was calling in regards to a "very
important business matter."  *Id.*

Lindsey asserts that several of Williams' words uttered during
these calls violated the FDCPA.  Specifically, Lindsey points out
that during both calls Williams stated that she was calling from
NCO without first being asked by the recipient, stated that the
recipient's number was given as a reference, and asked the
recipient to deliver a message.  Although as of the date of her
deposition, Williams had not received any discipline as a result of
these calls that may have constituted violations of the FDCPA, the
undisputed evidence produced does show that Williams had received
six disciplinary warnings before her deposition was taken. Three of
these warnings were for failing to meet her collection goals.  As
Williams testified, if a collector repeatedly fails to meet her
collection goals, she can be terminated.  In addition to an hourly
wage, NCO provides Williams with an opportunity to earn a
commission when collections exceed her goals.

In addition to damages under the FDCPA, Lindsey seeks
compensatory and punitive damages based on state law claims of

negligence, wantonness, negligent training and supervision, and reckless and wanton training and supervision.  Both the claims for negligence and wantonness are based on Williams' actions and are advanced against NCO under a theory of *respondeat superior*.  The claims of negligent training and supervision and reckless or wanton training and supervision are direct claims against NCO based on its alleged inadequate training and supervision of Williams.  Lindsey seeks actual damages for alleged emotional distress and mental anguish, and punitive damages.  Lindsey testified that, as a result of these calls to his step-mother and brother he has suffered and will continue to suffer professional and personal embarrassment and humiliation.  Both Lindsey's step-mother and brother testified that they did not notice any changes in Lindsey's behavior after they reported the calls to him.  Furthermore, they both testified that their relationships with Lindsey have not been negatively affected. In fact, it was the filing of this lawsuit, not Williams' telephone calls, that notified Lindsey's step-mother and brother about his unpaid debt.

Deposition testimony offered in support of NCO's motion for partial summary judgment details NCO's training and monitoring programs.  Specifically, NCO offered the testimony of Pat Deprospo ("Deprospo"), the general manager of the call center where Williams works.  Deprospo is responsible for all aspects of this site, including employees, hiring, firing, disciplinary action, client

performance, and profit and loss statements.  Deprospo, testifying based on his twenty-three years experience in the collection industry and six years with NCO , explained the details of NCO 's training and monitoring program.  Collector training, he explained, begins with a classroom-style course, where individuals wanting to become collectors are trained on NCO  policies, the FDCPA, state laws, and client-specific policies.   To be a collector, the trainees are required to pass multiple tests before they "graduate," after which they are permitted to make collection calls.  If a trainee is unable to pass one of these tests, he or she will be let go.

Williams testified at her deposition that she was trained for one to two weeks before being allowed to make collection calls. She further testified that she took tests, read material, participated group discussions, and went over the information with a trainer.  According to Williams, this training included material on "skip-tracing," involving contacting third parties as a means to collect a debt.

Deprospo also offered testimony regarding NCO's continual training program.  He explained that training continues throughout the collector's employment, including required retesting approximately every six months.  Less formally, managers conduct daily "team huddles" and "side-by sides" (one-on-one meetings with collectors) to discuss issues that arise on collection calls.

Williams testified that during her employment, managers would conduct these "side-by-sides," where they provided specific training and, among other things, assisted with contacting third parties.  If a problem arises while a collector is working on an account, Deprospo explained, there are multiple levels of supervisors available to offer guidance.

Deprospo also offered testimony regarding NCO's monitoring programs.  He explained that collectors are anonymously monitored by three separate groups (two separate, internal monitoring groups and team supervisors) and are instructed to work under the assumption that every call is being monitored.  At the site where Williams works, Deprospo testified, the managers spend two to three hours a day monitoring calls.  Managers also review account notes for compliance issues.

There is a dispute over how many of Williams' calls were actually monitored.  Greg Stevens ("Stevens"), Vice President of Compliance and Audit, testified that every time a manager monitors a call, a call monitoring form should be filled out.  For the time period from April 2010 to May 2011, NCO  produced nine call monitoring forms for Williams' calls.  It is unclear exactly how many calls were monitored during this period because, as Stevens explained, some of these forms may cover multiple calls.  There is no evidence as to how many of Williams' calls were monitored before April 2010.

NCO administered approximately six verbal and written warnings to Williams since she started working in February 2009.  As discussed more thoroughly above, three of these disciplinary warnings were performance warnings for failure to meet her collection goal.  The remaining three were for collector misconduct, including failure to properly document NCO account records and failure to follow NCO procedure when speaking to a telephone call recipient.

Finally, to encourage compliance with the FDCPA, NCO policy requires that a collector who violates the FDCPA, resulting in NCO having to pay a settlement or judgment, is fined 25% of the defense costs, up to $500.  Williams has not had to pay such a fine during her employment.

## DISCUSSION

Under Alabama law, in order to sustain a claim for negligent training and supervision or reckless and wanton training and supervision against NCO, Lindsey must establish that Williams, the allegedly improperly trained and supervised employee, herself committed an actionable common law tort.  *Leahey v. Franklin Collection Serv., Inc.*, 756 F. Supp. 2d 1322, 1328-29 (N.D. Ala. 2010) (citing *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)).  For this reason, the court must first examine both Lindsey's claims that Williams was negligent and/or wanton in her collection efforts.  Lindsey

7

necessarily relies on *respondeat superior* to reach NCO.  If Lindsey can prove no tort by Williams, there would be no tort to be attributed to NCO.  He cannot make direct claims against NCO for negligent training and supervision or reckless and wanton training and supervision without first establishing an underlying tort.

**Negligence and Negligent Training and Supervision**

In his brief in opposition to summary judgment, Lindsey concedes that NCO is entitled to summary judgment on his claims for negligence by Williams and negligent training and supervision by NCO.  Lindsey's negligence claim fails because he has not alleged facts to demonstrate actionable damages.  Alabama law is clear that "[d]amages for mental anguish are not recoverable for negligence except when the plaintiff has suffered physical injury as a result of the negligent conduct or was placed in an immediate risk of physical injury by the conduct." *Brown v. First Fed. Bank*, — So. 3d — , 2012 WL 415468, *12 (Ala. Civ. App. 2012) (citing *B'ham Coal & Coke Co. v. Johnson*, 10 So. 3d 993, 999 (Ala. 1998).  It is undisputed that Lindsey did not suffer physical injury and was not placed in immediate risk of physical injury as a result of Williams' actions.  Lindsey's damages, if any, are his alleged emotional distress and mental anguish. Summary judgment will be granted as to the claims appropriately conceded by Lindsey.

**Wantonness**

NCO advances two challenges to Lindsey's claim that Williams

was wanton in her collection efforts.  NCO contends that there is no evidence of actionable damages or of wanton conduct.

### 1. Actionable Damages Sustained by Lindsey

NCO argues that the wantonness claim must fail because there is no evidence of actionable damages.  In support, NCO cites *Hardesty v. CPRM Corp.*, which holds that Alabama law "does not permit every plaintiff to maintain a suit for negligence or wantonness when the only damages or mental or emotional harm." 391 F. Supp. 2d 1067, 1071 (M.D. Ala. 2005).  This case and the other cases that NCO cites fail to distinguish between claims for negligence and wantonness.

When recognizing the distinction between negligence and wantonness, Alabama courts have acknowledged that damages for emotional distress or mental anguish alone may be recoverable for wantonness.  While, as explained above, such damages are not recoverable for mere negligence absent physical injury or plaintiff being in the "zone of danger," "it is well settled that a plaintiff may recover compensatory damages for mental anguish, even when mental anguish is the only injury visited upon the plaintiff." *Brown v. First Federal Bank*, — F.3d — , 2012 WL 415468, *12 (Ala. Civ. App. 2012) (quoting *George H. Lanier Mem'l Hosp. v. Andrews*, 901 So. 2d 714, 725 (Ala. 2004)); *See also B'ham Coal & Coke Co.*, 10 So. 3d at 999.

Next, as part of its contention that there is no evidence of

actionable damages, NCO argues that, even if emotional distress or mental anguish damages alone are sufficient to support a claim of wantonness, Lindsey has not suffered emotional distress or mental anguish as a matter of law.  NCO contends that there is no legally cognizable injury.

It is well settled in Alabama that a plaintiff must have a manifest, present injury before he or she may recover in tort.  *S. Bakeries, Inc. v. Knipp*, 852 So. 2d 712, 716 (Ala. 2002). Emotional distress or mental anguish, however, may satisfy this requirement for a wantonness claim.   To establish emotional distress or mental anguish damages, there is no requirement that the plaintiff's alleged emotional distress or mental anguish be predicated on the presence of physical symptoms or a psychiatrist's diagnosis.  *Ala. Power Co. v. Harmon*, 483 So. 2d 386, 389 (Ala. 1986) (citing *B&M Homes, Inc. v. Hogan*, 376 So. 2d 667, 671 (Ala. 1979)).  Instead, to survive summary judgment, a plaintiff must present "some evidence" of the emotional distress or mental anguish.  *Id.* (citing *B&M Homes, Inc.*, 376 So. 2d at 671).  Once the plaintiff has offered "some evidence," the question of damages for emotional distress or mental anguish is for the jury.  *Id.* (citing *B&M Homes, Inc.*, 376 So. 2d at 671).

Lindsey has offered minimal evidence of emotional damages.  In fact, the only evidence of damages is in Lindsey's own deposition testimony in which he states that he suffered both professional and

personal embarrassment and humiliation.  Lindsey further elaborated that, when he is at a family function, he has the perception that everyone knows about his unpaid debt.  Lindsey did not visit a therapist or doctor as a result of these feelings and does not plan to do so in the future.  Furthermore, Lindsey's step-mother and brother, who received the telephone calls from Williams, both testified that they did not notice any changes in Lindsey's behavior after the calls to suggest that he felt embarrassed or humiliated.  Both Lindsey's step-mother and brother testified that their frequency of contact with Lindsey has not changed and that their relationships with Lindsey have not been negatively affected. In fact, it was this lawsuit, not Williams' telephone calls, that first made Lindsey's step-mother and brother aware of Lindsey's indebtedness.

In support of its contention that Lindsey has not presented evidence of actionable damages, NCO cites *Southern Bakeries, Inc. v. Knipp*, 852 So. 2d 712 (Ala. 2002).  In *Knipp*, the plaintiffs were allegedly exposed to asbestos while removing an oven in the course of their employment.  *Id.* at 713-14.  Although they had not developed an asbestos-related disease at the time of the case, the plaintiffs sought emotional distress and mental anguish damages based on their fear that the exposure to asbestos put them at a greater risk of developing an asbestos-related disease in the future.  *Id.* at 714.  Similarly to Lindsey, the plaintiffs had not

sought medical or psychiatric care and did not have plans to do so in the future. *Id.* at 717-18. Furthermore, the plaintiffs had not complained of any ailments to a medical provider and had not sought medication or other assistance. *Id.* at 718. Based on this evidence, the Alabama Supreme Court concluded that the plaintiffs' fear of developing an asbestos-related disease in the future was not a legally cognizable present injury. *Id.* The court explained that "[o]pening the courts generally for compensation for fear of future disease would be a dramatic change in the law and could engender significant unforeseen and unforeseeable consequences; awarding such compensation is better left to the Legislature." *Id.*

On at least one occasion the Alabama Supreme Court has found that a jury could infer that a plaintiff suffered some measure of emotional distress or mental anguish based on limited evidence. *See Foster v. Life Ins. Co. of Ga.*, 656 So. 2d 333, 337 (Ala. 1994). In *Foster,* the only evidence presented the plaintiff's emotional distress or mental anguish was her "bare assertion that the discovery of fraud affected her 'a lot' and that she sued two months after the mental anguish and emotional distress began." *Id*. Although reducing the amount of the jury award, the court explained that this evidence provided a sufficient basis for the jury to infer that plaintiff suffered damages and upheld the jury verdict after remittitur. *Id.*

Whether a reasonable jury could infer that Lindsey has in fact

12

suffered emotional distress or mental anguish as a result of
Williams' telephone calls is a close question.  On the one hand,
Lindsey's alleged damages could be viewed as nothing more than fear
that his relatives might find out that he is a debtor.  Viewed in
this light, *Knipp* may be instructive.  On the other hand, Lindsey
has testified to past and present feelings of embarrassment and
humiliation, which are markedly different emotions from fear of an
uncertain future event.  These alleged injuries do not carry the
same policy considerations that were present in *Kipp*.  As such,
*Kipp* does not carry as much weight as NCO suggests.  It is not the
province of the court to decide close issues of fact at the summary
judgment stage.  Because Lindsey has offered "some evidence" of
emotional distress or mental anguish, his claim for wantonness by
Williams does not fail for want of actionable damages.

### 2. Wanton Conduct by Williams

NCO next argues that Lindsey's wantonness claim must fail
because Williams was not wanton in her collection efforts as a
matter of law.  Under Alabama law, wantonness is defined as "the
conscious doing of some act or the omission of some duty which
under knowledge of existing conditions and while conscious that,
from the doing of such act or the omission of such duty, injury
will likely be the probable result . . . ."  *Roberts v. Brown*, 384
So. 2d 1047, 1048 (Ala. 1980) (citations omitted).  "[B]efore a
party can be said to be guilty of wanton conduct it must be shown

13

that **with reckless indifference to the consequences** he **consciously and intentionally did some wrongful act** or omitted some known duty which produced the result." *Id.* (citations omitted) (emphasis added).

In what appears to be an effort to establish the requisite underlying tort of wantonness, Lindsey has commingled arguments regarding his wantonness claim and his reckless and wanton training and supervision claim. Throughout his brief, Lindsey continuously discusses NCO's training and monitoring, but fails to identify how Williams' actual actions themselves were wanton. A parsing of these intertwined arguments reveals Lindsey's "either/or" contention; specifically, that either (1) NCO recklessly and wantonly failed properly to train and supervise Williams and is directly liable for her conduct, or (2) that NCO properly trained Williams, but while she was acting in the scope of her employment, she was wanton in her debt collection practices such and NCO is liable under the theory of *respondeat superior*. Only the second of the alternative approaches is viable.

As previously stated, Lindsey has presented some evidence from which a jury could reasonably infer wanton conduct by Williams. Lindsey presents two key pieces of evidence. First from Williams' disciplinary history, including three separate warnings for failing to meet her collection goal, a jury could reasonably infer that Williams cut corners and consciously disregarded NCO's collection

14

policies.  As Williams herself testified, if she repeatedly failed to meet her goal, she could be terminated.  The second piece of evidence is NCO's commission program itself, under which Williams had the opportunity to earn money in addition to her hourly wage when her collections exceeded her goal.  Lindsey argues that Williams had a financial incentive to violate NCO's collection policies and the FDCPA.

In response to these arguments, NCO contends that it would be illogical for Williams' consciously to violate NCO's collection policy (and allegedly the FDCPA) in her collection efforts.  In addition to a collection goal, NCO has policies in place that require its collectors to comply with the FDCPA and NCO rules.  Violation of these policies can also result in termination.  Thus, NCO contends that it would be counterintuitive for Williams to violate a policy that could result in termination to avoid termination for failure to meet her collection goal.  While this argument could be compelling to a jury, it is for a jury to determine its weight, not the court at summary judgment.  The fact that NCO has not filed a motion for summary judgment as to the FDCPA claim is arguably an admission that what Williams said during these two telephone calls constitutes a violation or violations of the FDCPA.

Although Lindsey's evidence of wantonness is scant, scant evidence is all he needs.  Under Alabama law, "if there is any

15

evidence from which a jury can reasonably infer wantonness, the issue should be presented to the jury." *Sellers v. Sexton*, 576 So. 2d 172, 174 (Ala. 1991) (citing *McDougle v. Shaddrix*, 534 So. 2d 228 (Ala. 1988)).   Under this standard, Lindsey has presented sufficient evidence to overcome summary judgment.   As such, NCO's motion for summary judgment will be denied as to the wantonness claim.

**Reckless or Wanton Training and Supervision**

Because Lindsey's wantonness claim against Williams does not fail as a matter of law, even if weak, the court must examine NCO's challenge to Lindsey's claim for reckless and wanton training and supervision, which now has the door open to it.   *See Leahey*, 756 F. Supp. 2d at 1329.   Even if Williams acted wantonly, NCO has offered detailed and uncontradicted evidence on its training and monitoring programs as well as its training and monitoring of Williams. Although Lindsey does not dispute the veracity of the evidence that NCO has presented in this regard, he contends that certain pieces of testimony and certain insufficiencies create a question of fact with regard to whether or not NCO was itself wanton in its training or monitoring of Williams.   The court will address each of Lindsey's arguments in turn.

To establish a claim for wanton training and supervision, Lindsey must "establish by affirmative proof that [NCO] actually knew of [Williams' alleged] incompetence or reasonably should have

16

known of it." *See Speigner v. Shoal Creek Drummond Mine*, No. 09-15483, 2010 WL 4342242, *4 (11th Cir. Nov. 3, 2010) (citing *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 683 (Ala. 2001)).   Lindsey offers several arguments as to why, despite the undisputed evidence, an issue of fact remains as whether NCO actually knew or reasonably should have known of Williams' alleged incompetence.

Lindsey would imply, although his argument is not clearly articulated, that NCO should not be able to rely on Deprospo's deposition testimony regarding NCO's training and monitoring programs because he does not personally train employees himself or work in the training department, but instead is only "generally familiar" with training and monitoring at NCO.   This contention is without merit.   Deprospo is the General Manager of the office location where Williams works and is responsible for essentially anything and everything that occurs at that site.   While Deprospo does not personally conduct the training sessions or monitor individual calls, he is responsible for the site, employees, hiring, firing, disciplinary action, client performance, and profit and loss statements.   Furthermore, he oversees managers who conduct much of the continual training and monitoring.   Based on his high level position and experience in the collection industry, there is no doubt that Deprospo has personal knowledge and is competent to offer testimony regarding NCO 's training and monitoring policy and

17

programs.

Next, Lindsey argues that there is a material fact issue because Williams testified at her deposition that she did not remember what she learned during her initial one to two week training and that, other than that initial training, she did not receive training on contacting third parties.  This argument does not accurately reflect Williams' deposition testimony.  While Williams testified that she did not "remember much about training because it was a long time ago," she followed this statement by thoroughly explaining several aspects of her initial training. (Doc. 27, Ex. B at 9-10).  Williams also testified that during her employment, managers would conduct "side-by-sides" where they would provide specific training and assist her with contacting third parties.  Lindsey does not provide the court with a citation to any evidence in support of his assertion that Williams did not receive training (other than the initial one to two weeks) on contacting third parties, and Williams deposition testimony establishes the fact to the contrary.  Furthermore, Lindsey does not deny that Williams participated in thorough training before she was allowed to make collection calls.  Lindsey's conclusory argument regarding Williams' training does nothing to create a genuine issue of material fact as to whether NCO knew or should have known about Williams' alleged incompetence.  A few shortcomings by an employee does not render that employee so incompetent as to be terminated.

18

It might be different if Williams had suffered twenty disciplinary actions before these telephone calls.

Lindsey strongly argues that summary judgment is improper because Williams was not timely notified by NCO of her alleged violations of policy.  She cannot remember the specifics regarding disciplinary warnings she received in the past, and she did not receive any additional training as a result of the disciplinary warning she received as a result of the Lindsey calls.  This evidence does not create a genuine issue of material fact as to whether NCO was wanton in its training or supervision of Williams. The two calls in question took place in June 2011, and as Lindsey himself points out, Williams was notified that she violated policy much later.  The court fails to see how NCO's delay in discussing a matter can prove that the matter was caused by lack of supervision that preceded the matter complained of.  Although Williams had not received any "discipline" as a result of these particular calls, the undisputed evidence establishes that she did receive additional training based on these calls, which NCO admits were in violation of its practices and procedures.  Williams testified at her deposition that she was required to meet with someone and review what she did wrong on the calls.

In what appears to be an effort to demonstrate that NCO  does not follow its own policies, Lindsey argues that Williams has not had to pay any of the costs related to this case pursuant to NCO's

repayment policy.   Under the policy, however, an employee is not required to contribute to defense costs until there is a determination that NCO violated the law and incurs settlement, judgment, or litigation costs.   Because no such event has yet occurred, this argument is premature to say the least.

Based on the evidence presented, no reasonable jury could find that NCO recklessly or wantonly training or supervised Williams. The undisputed evidence establishes that NCO maintained and implemented a thorough, if not perfect, training program.   As to NCO's monitoring practices, it is both unreasonable and unrealistic to require an employer to look over each of its employees' shoulders every minute of every work day.   This is an unreasonable expectation that is simply not required under Alabama tort law. There is no evidence from which to find that NCO knew or reasonably should have known of Williams' alleged incompetence or that it wantonly disregarded Williams' alleged incompetence.   Summary judgment will be granted as to the claim that NCO recklessly or wantonly failed to train and supervise Williams.

### Conclusion

For the foregoing reasons, NCO's motion for partial summary judgment will be granted in part and denied in part.   NCO does not seek summary judgment on the FDCPA claim.   A separate order effectuating this opinion will be entered.

DONE this 12th day of September, 2012.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE